# EXHIBIT 3

# State of Louisiana
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE
70804-9005

Jeff Landry
Attorney General

October 21, 2019

Administrator Andrew Wheeler
Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

*Via regulations.gov*: EPA-HQ-OW-2019-0405-0025

Dear Administrator Wheeler:

     This comment provides support and further recommendations to the proposed changes[1] of the Environmental Protection Agency's regulations related to state water quality certifications required under Section 401 of the Federal Water Pollution Control Act, commonly known as the Clean Water Act (CWA).[2] Water quality certifications allow states to evaluate and limit potential impacts to water quality that may result from discharges associated with federally permitted or licensed activities.[3] As part of the State water quality certification scheme, Congress granted State regulators with the authority to veto a proposed project if the applicant fails to demonstrate the project's compliance with applicable water quality standards and effluent limitations.[4] States that fail to provide a certification within a reasonable period, not to exceed one year, waive their certification authority.[5] Projects that fail to obtain State certification or waiver are not eligible to receive a permit.[6]

     The sections covered by the certification and the entirety of the CWA seek to preserve the water quality of the nation's navigable waters by curtailing the discharge of pollutants into those

---

[1] EPA-HQ-OW-2019-0405-0025.
[2] 33 U.S.C. § 1341(a)(1).
[3] 33 U.S.C. § 1341(a)(1).
[4] S. Rep. No. 95-370, at 72-73 (1977).
[5] 33 U.S.C. § 1341(a)(1).
[6] *Id.*

waters.[7] "Pollutants" include chemical and radiological pollutants,[8] physical particulate pollutants like dredge materials,[9] and thermal properties like heat discharge.[10] When unqualified, as in the state certification provisions, the term "discharge" is defined to specifically mean the discharge of pollutants.[11] While the parameters of these certifications seem well bounded, ambiguity exists and has been improperly abused by states wishing to expand their authority under the CWA.

1. The proposed changes would remedy problems arising from statutory ambiguity.

While many states effectively and appropriately discharge their duties as co-regulators under the CWA, ambiguities within the statutory language lead some states to push the limits of their federally recognized authority and even the limits of Congress' commerce authority. This hijacking of the CWA unreasonably increases regulatory burdens, frustrates economic and national security, and, in some cases, thwarts the express will of Congress. Courts have also relied on erroneous, under-supported interpretations of these ambiguities to condone overreach by some state actors.[12] Many of the proposed regulatory changes will restore the proper structure and paradigm to the 401 certification process while encouraging meaningful cooperation amongst all interested parties.

   *a. Certain states improperly elongate the period of review.*

Some states have improperly manipulated the one-year period for review, which is an upper-bound limit expressly provided by Congress.[13] Two tactics of particular favor to these state regulators are: (1) classifying an application as "incomplete" and (2) encouraging improper withdrawal and resubmission agreements to re-start the one-year time period.[14] These tactics have recently been rebuked by courts and federal agencies alike. For instance, when considering whether the New York Department of Environmental Conservation waived its certification authority, the United States Court Appeals for the Second Circuit stated:

> The plain language of Section 401 outlines a bright-line rule regarding the beginning of review: the timeline for a state's action regarding a request for certification "shall not exceed one year" after "receipt of such request." It does not specify that this time limit applies only for "complete" applications. If the statute required "complete" applications, states could blur this bright-line rule into a subjective standard, dictating that applications are "complete" only when state agencies decide that they have all the information they need. The state agencies could thus theoretically request supplemental information indefinitely.[15]

Before this ruling, states relied on improper guidance issued nearly a decade prior for the proposition that they could determine "what constitutes a 'complete application' that starts the

---

[7] 33 U.S.C. § 1251(a).
[8] 33 U.S.C. § 1362(6); s*ee also* 33 U.S.C. § 1342.
[9] *See* 33 U.S.C. § 1344.
[10] 33 U.S.C. § 1362(6).
[11] *Id.* at § 1362(16).
[12] *PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 712-13, 715-19, 114 S. Ct. 1900, 1909, 1911-13, 128 L. Ed. 2d 716, 728, 730-33 (1994) (instances where court cites EPA interpretation in support of their reasonable reading); *see also Id.* at 724, 728-29, 731 (Thomas, J. dissenting) (Justice Thomas' observation of same).
[13] 33 U.S.C. § 1341(a)(1).
[14] *Hoopa Valley Tribe, infra* note 20.
[15] *New York State Dep't of Envtl. Cons. v. FERC*, 884 F.3d 450, 455-56 (2nd Cir. 2018).

timeframe clock…."[16] While rescinding this erroneous guidance was an important step in the right direction, further clarification through regulatory changes is appropriate.

States have also improperly circumvented Congressional intent by encouraging withdrawal-and-resubmission schemes with project proponents in an attempt to reset the certification timeframe. The FERC and the U.S. Second Circuit have viewed this scheme as legally valid.[17] However, the United States Court of Appeals for the D.C. Circuit took at different view in *Hoopa Valley Tribe*.[18] Therein, the D.C. Circuit rejected both FERC's and the Second Circuit's blessing of such withdrawal-and-resubmission schemes, stating:

> Section 401 requires state action within a reasonable period of time, not to exceed one year. California and Oregon's deliberate and contractual idleness defies this requirement. By shelving water quality certifications, the states usurp FERC's control over whether and when a federal license will issue. Thus, if allowed, the withdrawal-and-resubmission scheme could be used to indefinitely delay federal licensing proceedings and undermine FERC's jurisdiction to regulate such matters. . . . There is no legal basis for recognition of an exception for an individual request made pursuant to a coordinated withdrawal-and-resubmission scheme, and we decline to recognize one that would so readily consume Congress's generally applicable statutory limit.[19]

In our view, the Court of Appeals for the D.C. Circuit has the right perspective on the matter. Allowing states to extend their time for review by requesting withdrawal-and-resubmission of the same application stands directly in the way of Congressional intent and poses an unacceptable form of regulatory obstructionism.[20] It is clear from these examples that ambiguity as to the tolling provision of this review period exists and has been acted upon to the detriment of otherwise beneficial infrastructure projects.

Avoiding the certification limbo created by the withdrawal-and-resubmission scheme, under the proposed rule, certifying authorities will be required to make a final agency action within a reasonable time not to exceed one year. In lieu of the withdrawal-and-resubmission scheme,

---

[16] OFFICE OF WETLANDS, OCEANS, AND WATERSHEDS, U.S. ENVTL. PROT. AGENCY, CLEAN WATER ACT SECTION 401 WATER QUALITY CERTIFICATION: A WATER QUALITY PROTECTION TOOL FOR STATES AND TRIBES 11 (2010) (citing *City of Fredericksburg v. Fed. Energy Regulatory Comm'n*, 876 F.2d 1109, 1112 (4th Cir. 1989); 33 USC 1341(a)(1); CWA §401(a)(1); *Del Ackels v. U.S. Envtl. Prot. Agency*, 7 F.3d 862, 867 (9th Cir. 1993)) (replaced by U.S. ENVTL. PROT. AGENCY, CLEAN WATER ACT SECTION 401 GUIDANCE FOR FEDERAL AGENCIES, STATES AND AUTHORIZED TRIBES (2019)).

[17] *Constitution Pipeline Co.*, 162 F.E.R.C. ¶ 61,014 (2018) ("We reiterate that once an application is withdrawn, no matter how formulaic or perfunctory the process of withdrawal and resubmission is, the refiling of an application restarts the one-year waiver period under section 401(a)(1). *We continue to be concerned, however, that states and project sponsors that engage in repeated withdrawal and refiling of applications for water quality certifications are acting, in many cases, contrary to the public interest and to the spirit of the Clean Water Act by failing to provide reasonably expeditious state decisions*") (emphasis added); *New York State Dep't of Envtl. Cons. v. FERC*, supra note 17, at 456 ("If a state deems an application incomplete, it can simply deny the application without prejudice—which would constitute "acting" on the request under the language of Section 401. It could also request that the applicant withdraw and resubmit the application.").

[18] *Hoopa Valley Tribe v. FERC,* 913 F.3d 1099 (D.C. Cir. 2019).

[19] *Id.* at 1104, 1105.

[20] *Id.* at 1104 ("According to FERC, it is now commonplace for states to use Section 401 to hold federal licensing hostage. At the time of briefing, twenty-seven of the forty-three licensing applications before FERC were awaiting a state's water quality certification, and four of those had been pending for *more than a decade*.") (emphasis in original).

Page 4

certification denials will likely increase. With the likely increase in denials, we ask that EPA amend the proposed rule to acknowledge that a certifying authority' denial of Section 401 certification may be made with or without prejudice. In other words, due to time constraints and information limitations, a certifying authority may feel the need to deny the certification at that time but may be willing to grant the certification after reviewing additional information. Allowing certifying authorities to signal their willingness to consider additional information through subsequent requests will likely avoid unnecessary litigation. Allowing denials without prejudice will maximize the opportunity for cooperation between the certifying authority, the applicant, and the federal agency, but it will also allow the applicant to immediately challenge an arbitrary or capricious denial. This framework will constitute a vast improvement over the withdrawal-and-resubmission scheme while salvaging opportunities for regulatory cooperation.

> b. *In conjunction with effective information sharing among regulating agencies, the proposed definitions of "certification request" and "receipt" will effectively curtail timing manipulation.*

Rules for how additional information can be requested will help to cure abuse of the certification process.[21] By defining the terms "certification request" and "receipt", EPA will hold certifying authorities accountable to the terms prescribed by Congress. The proposed definition of "certification request" standardizes the request process, and the specific statement requesting certification action removes any ambiguity as to the intent of the request. However, EPA should consider input from state regulatory agencies as well as the specific needs of federal licensing and permitting agencies when formulating the final criteria for "certifying requests". It may come to light that establishing these requirements as a baseline to be built upon is the preferable option. In any event, this information should be considered in light of a more robust information sharing format between federal and state or tribal regulators. Encouraging and facilitating the exchange of relevant, necessary information between regulating parties furthers the goal of establishing an effective standard for certifying requests.

 Specifying that a "receipt" occurs on "the date that a certification request is documented as received by a certifying authority in accordance with applicable submission procedures" establishes an intuitive standard for tolling. EPA should also consider requiring project proponents to provide notice and attestation to the lead federal agency that they have submitted their certification requests to the certifying agency in accordance with applicable submission procedures. This requirement will ensure the lead federal agency is notified of the submission and of the proponents' attestation that applicable procedures were followed. Overall, the proposed regulatory changes will significantly curtail the ability of states to misuse or circumvent Congress' explicit directive that certification actions are to be taken within the one-year reasonable period.

> c. *Without properly defining the scope of certification authority, Congress left ambiguous what conditions or applicable laws are appropriately enforced under state certifications.*

As noted above, State certifications under Section 401 are an important piece of Congress' plan to address pollution of the nation's waters through cooperative federalism. However, when read in isolation, state certifications could be seen as including a much broader scope of review than just water quality. Indeed, some certifications greatly overstep the reasonable bounds of the

---

[21] 33 U.S.C. § 1341(a)(1).

Page 5

CWA.[22] EPA's historic interpretation of language found in Section 401(d) found that lead certifying agencies were without authority to question or consider specific limitations or conditions contained in a state certification.[23] However, while questioning the expertise and judgment of state regulators is inappropriate when considering the best methods of protecting state water quality standards,[24] it is within EPA's purview, as the agency empowered to enforce the CWA through rulemaking, to properly clarify ambiguities left by Congress.[25] Further, as the Supreme Court's holdings in both *PUD No. 1*[26] and *S.D. Warren*[27] drew upon EPA's interpretation for support of their "most reasonable reading" of Section 401, it follows that the plain language of the statute is not sufficiently exact to foreclose a different, reasonable interpretation to supplant the Court's previous interpretation.[28] This is supported by the Supreme Court's ruling in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*.[29] Therein, Justice Thomas wrote for the Court, stating in pertinent part:

> In *Chevron,* this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts. If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of

---

[22] *Town of Summersville*, 60 F.E.R.C. ¶ 61291, at 61990. Speaking to the requirement that the applicant build recreation facilities, the Commission commented: "We believe that these conditions are beyond the scope of Section 401, and that states should not use their water quality certification authority to impose conditions that are unrelated to water quality. However, since pursuant to Section 401(d) of the Clean Water Act all of the conditions in the water quality certification must become conditions in the license, review of the appropriateness of the conditions is within the purview of state courts and not the Commission. The only alternatives available to the Commission are either to issue a license with the conditions included or to deny Summersville's application, and we do not believe it is in the public interest to deny the application."

[23] *Roosevelt Campobello Int'l Park Comm'n v. Envtl. Prot. Agency, et al*, 684 F.2d 1041 (1st Cir. 1982), "'EPA has no authority to ignore State certification or to determine whether limitations certified by the State are more stringent than required to meet the requirements of State law.'" (quoting Envtl. Prot. Agency, Decision of the General Counsel No. 58 (March 29, 1977).

[24] *See Sierra Club v. US Army Corps of Engineers*, 909 F.3d 635 (4th Cir. 2018), citing *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1201 (9th Cir. 2008) (for the proposition that any additional license conditions imposed by a federal agency must allow for compliance with a coordinate state condition).

[25] *U.S. v. Mead Corp.*, 533 U.S. 218, 121 S. Ct. 2146, 150 L. Ed. 2d 292 (2001) (determining which agencies are due deference under *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L. Ed. 2d 694 (1984)).

[26] *PUD No. 1*, *supra* note 14.

[27] *S.D. Warren Co. v. Me. Bd. of Envt'l Prot., et al.*, 547 U.S. 370, 126 S. Ct. 1843, 164 L. Ed. 2d 625 (2006).

[28] *P.U.D No. 1*, *supra* note 14, at 728 ("Our view of the statute is consistent with EPA's regulations implementing §401."; "EPA's conclusion that *activities* – not merely discharges – must comply with state water quality standards is a reasonable interpretation of §401, and is entitled to deference."; "This interpretation is consistent with EPA's view of the statute.") (emphasis in original); *S.D. Warren*, *supra* note 29, at 377 ("In resort to common usage under § 401, this Court has not been alone, for the Environmental Protection Agency (EPA) and FERC have each regularly read "discharge" as having its plain meaning and thus covering releases from hydroelectric dams. Warren is, of course, entire correct in cautioning us that because neither EPA nor FERC has formally settled the definition, or even set out agency reasoning, these expressions of agency understanding do not command deference from this Court. But even so, the administrative usage of 'discharge' in this way confirms our understanding of the everyday sense of the term.") (Internal citations and quotations omitted).

[29] *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005).

the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.

****

Some of the respondents dispute this conclusion, on the ground that the Commission's interpretation is inconsistent with its past practice. We reject this argument. Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework. Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act. For if the agency adequately explains the reasons for a reversal of policy, "change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency ... must consider varying interpretations and the wisdom of its policy on a continuing basis," for example, in response to changed factual circumstances, or a change in administrations.[30]

Thus, EPA is well within its Congressional mandate to redefine ambiguous terms, even when that redefinition presents and effects a different interpretation.

EPA's intent to "increase the predictability and timeliness of section 401 certification"[31] is evident in the proposed changes, including the timing provisions discussed previously.

> d. While Section 401 alone does not properly define the scope of certification review, its purpose and placement within the CWA clearly limit its scope to discharges affecting water quality.

As noted above, the CWA's aims to protect our nation's waters by prohibiting the unlawful discharge of pollutants is a cooperative endeavor between states and the federal government. A clear statement of the appropriate scope and criteria states consider under their role as certifying authorities is an important piece of maintaining program integrity. As stated in Section 401(a), a state's role is to certify that a "discharge" will comply with section 301, 302, 303, 306, and 307 of the CWA. However, the term "discharge" is not defined in the Act. The agency's proposed definition of "discharge" as those originating from point sources reflects the holistic approach EPA took with this rulemaking effort. As noted by the Senate report on the 1972 amendments were made "to assure consistency with the bill's changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants."[32] The United States Court of Appeals for the Ninth Circuit considered this when evaluating which discharges trigger the need for 401 certification. In *Oregon Natural Desert Association v. Dombeck*,[33] the court considered whether Section 401 review is triggered by pollutants discharged into the John Day River from federally permitted cattle grazing. In deciding that the discharge did not trigger a

---

[30] *Id.* at 980-82 (internal citations omitted).
[31] 84 Fed. Reg. at 44,080.
[32] S. Rep. N0. 414, at 69 (1971).
[33] 172 F.3d 1092, (9th Cir. 07/22/1998).

Section 401 review, the court considered Section 401 within the entirety of the CWA and the 1972 amendments. Specifically, the court found "[t]he term 'discharge' in §1341 is limited to discharges from point sources. All of the sections cross-referenced in §1341 relate to the regulation of point sources." EPA's proposal to define discharges as those originating from point sources is consistent with this reasonable reading of the Section 401. Further, specifying that any potential discharge by a federally licensed or permitted project triggers Section 401 review reinforces the states' roles as cooperative regulators. Taken together, these definitions provide a determinable, expanded trigger for Section 401 review.

While the proposed changes concerning discharges will result in a net expansion of state certification opportunities, the changes concerning the scope of a state review will provide appropriate bounds that are consistent with a logical reading of the section and the Administration's goal of streamlining federal permitting processes. EPA's acknowledgement that Congress intended Section 401 to focus on protection of water quality is the proper starting point for defining the scope of state certifications.[34] From that understanding springs many of the changes that will be most effective in curtailing the more egregious instances of obstructionism.

For instance, Section 401(d) provides that the conditions and requirements contained in a state's certification will become conditions in any Federal license or permit, including "any other appropriate requirement of State law." The term "appropriate requirement of state law" is ambiguous and unique to not only this section, but this paragraph. As noted above,[35] states have used this ambiguity to impose conditions unrelated to water quality through water quality certificates, sometimes with judicial approval.[36] This places the lead federal permitting or licensing agency in the precarious position of either forcing improper terms on applicants or denying a project otherwise in the best interests of the United States, a clear imbalance of federalism. And while these ambiguities are ideally addressed by Congress,[37] the EPA's proposed rule would effectively guard against the most unreasonable conditions on certification. Defining "appropriate requirement" as provisions of EPA-approved CWA regulatory provisions that control discharges comports with the structure and purpose of the Act. It also follows Justice Thomas' opinion in *P.U.D. No. 1*, which we believe is the more logical and internally consistent reading of this provision within both Section 401 and the CWA as a whole.[38]

EPA's proposal to enact a definition of the proper scope of Section 401 is also an important development to prevent states' abuse of Section 401, which some have wielded to push improper political stances. Some states have denied certifications based on the downstream effects on

---

[34] 84 Fed. Reg. 44,103.

[35] *See, supra* note 24.

[36] *P.U.D. No. 1*, *supra* 511 U.S. 711.

[37] The need to address abuses of the 401 process is noted by Senator John Barrasso of Wyoming, who introduced the "Water Quality Certificate Improvement Act of 2019", S. 1087, 116th Cong. (2019). Representative David McKinley of West Virginia has also introduced a similar instrument in the House of Representatives. H.R. 2205, 116th Cong. (2019).

[38] *P.U.D. No. 1*, *supra* 511 U.S. 711 (Thomas, J. dissent) ("The final term on the list -- "appropriate requirement[s] of State law" – appears to be more general in scope. Because this reference follows a list of more limited provisions that specifically address discharges, however, the principle *ejusdem generis* would suggest that the general reference to "appropriate" requirements of state law is most reasonably construed to extend only to provisions that, like the other provisions in the list, impose discharge-related restrictions.").

climate by increased fossil fuel usage[39] or opposition to expanded use of fossil fuels generally.[40] As noted in the proposed rulemaking, none of these stances are within the ambit of the CWA.[41] By defining the scope of certifications as "limited to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements[,]" EPA establishes an appropriate framing based on Section 401 and the CWA in its entirety. And while "water quality requirements" were considered in the context of state regulations during legislative deliberations on the program,[42] it is a term that does not appear in Section 401 and is ripe for definition. Its definition as "applicable provisions of 301, 302, 303. 306, and 307 of the Clean Water Act and EPA-approved state or tribal Clean Water Act regulatory program provisions" accomplishes two goals. First, it supports EPA's goal of enacting CWA regulations that are based on a reasonable, holistic interpretation of the Act. Second, it embraces the more logical reading of "appropriate requirement of state law[,]" which decreases the opportunity for abuse. This is also consistent with EPA's proposed definition of "condition", which would require any condition imposed through a state certificate be within the proper scope of Section 401. In all, the definitions embrace the proper scope for certifications and conditions allowable thereunder, which create a bulwark against the most egregious and harmful abuses of Section 401 certifications.

> e. *Lead federal agency review of state certification conditions should respect the sovereignty and expertise of states while upholding the needed boundaries this proposed rulemaking would set.*

The proposed rulemaking solicits comment on what information or justification is necessary or appropriate to evaluate whether conditions in state certifications are consistent with the proposed scope of 401 certification. While comment on this area is best left to state water quality regulators, we submit comment on the proper boundaries lead federal agencies should respect when evaluating these conditions. First, lead federal agencies should not be required to review certification conditions, especially in view of the timing strains the above-mentioned clarifications to proper state review periods will alleviate. This review should be discretionary and invoked as the lead agency sees fit. Further, lead agencies should not substantively review the specific requirements of a condition once that condition is determined to be within the scope of Section 401. As noted by multiple courts, the efficacy of conditions to protect water quality are beyond the purview of federal agencies[43] and determining whether a certification meets state water quality standards is a question within the purview of state courts.[44] Any review of a state certification condition should be limited to its validity under the proposed changes to the CWA. Any further substantive analysis would improperly curtail a state's proper authority as a co-regulator under the CWA. Additionally, the inclusion of a condition beyond the scope of Section 401 certification should not be fatal to the entire certification or other properly imposed conditions.

---

[39] Letter from Thomas S. Berkman, Deputy Comm'r and Gen. Counsel, N.Y. State Dep't of Envtl. Conservation, Re: 3-3399-0071/00001 – Valley Lateral Project Notice of Decision, to Georgia Carter, Vice President and Gen. Counsel, Millennium Pipeline Co. (Aug. 30, 2017).

[40] See Tom Johnson, Move in Congress to Weaken Clean Water Act Could Have Impact in New Jersey, NJ SPOTLIGHT, Aug. 16, 2018 ("'If this bill happens, it will make it extremely difficult to fight these dangerous projects,' said Jeff Tittel, director of the New Jersey Sierra Club. 'It (the Section 401 review) is probably the most effective tool we have to fight these projects.'").

[41] 84 Fed. Reg. 44094.

[42] *See, supra* note 42.

[43] *See*, *supra* note 25.

[44] *Ackels v. EPA*, 7 F.3d 862 (10/14/1993).

Page 9

This would unnecessarily thwart valid state enforcement authority while inevitably leading to additional delays in project licensing or permitting. While EPA should empower federal agencies to review conditions in the scope of CWA certification, it should also do so in a manner that respects proper limits of state sovereignty.

2. Conclusion

Section 401 certifications are an important component of the cooperative federalism envisioned by the CWA. Unfortunately, ambiguity in the statutory language has left this program ripe for abuse by some states. The proposed updates reflect a holistic reinterpretation and modernize a program that has not seen a meaningful revision in decades. By properly defining the period for review, the proper scope of the act, and the conditions appropriately included, EPA has proposed effective means of curtailing abuses of Section 401. This proposal to restore a proper balance among sovereigns brings Section 401 in line with Congressional intent and the Administration's goal of streamlining federal permitting and licensing programs. We support the EPA in its rulemaking effort, and look forward to providing further comment on the final rule.

Sincerely,

Jeff Landry
Louisiana Attorney General

Patrick Morrisey
West Virginia Attorney General

Leslie Rutledge
Arkansas Attorney General

Tim Fox
Montana Attorney General

Phil Bryant
Mississippi Governor