# EXHIBIT 10



**Joel Beauvais**
Vice President &
Deputy General
Counsel – Environment,
Health & Safety

101 Constitution Avenue, N.W.
Suite 400 East
Washington, DC  20001
(202) 347-7500
(202) 347-7501 Fax
joel.beauvais@exeloncorp.com

October 21, 2019

**VIA REGULATIONS.GOV**

The Honorable Andrew Wheeler
Administrator
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

RE:  **Updating Regulations on Water Quality Certification**
Comments of Exelon Generation Co., LLC
Docket ID No. EPA-HQ-OW-2019-0405

## EXECUTIVE SUMMARY

On August 22, 2019, the Environmental Protection Agency ("EPA") published in the *Federal Register* a notice of proposed rulemaking to revise EPA's water quality certification regulations in 40 C.F.R. Part 121.  *Updating Regulations on Water Quality Certification*, Proposed Rule, 84 Fed. Reg. 44080 (Aug. 22, 2019) (the "Proposed Rule").  Exelon Generation Company, LLC—one of the nation's leading energy companies—strongly supports the Proposed Rule and applauds EPA's efforts to update its implementing regulations for Section 401 of the Clean Water Act ("CWA"), 33 U.S.C. § 1341.

While the Proposed Rule takes important steps to make EPA's regulations consistent with the underlying statute and to clarify implementation of Section 401 for States and regulated parties, Exelon recommends several changes to make the Part 121 regulations more effective.  Specifically, as explained in detail below, Exelon recommends that the Proposed Rule (including the regulatory text) be revised to:

1. clarify that a certification condition is permissible only when it directly addresses a water quality effect caused by the licensee's "activity," and that the burden of establishing the necessity of such a condition rests at all times with the State;

2. encourage States to adopt procedural requirements similar to those that will apply when the Administrator receives a certification request;

3. confirm that States may not use their water quality certification request "submission procedures" to evade Section 401's one-year clock;

4. confirm that Federal licensing or permitting agencies have sole responsibility for enforcement of certification conditions; and

5. expressly state that any modification to a certification—including a modification made pursuant to a so-called "reopener" condition—has no legal effect unless and until it is approved by the relevant Federal licensing or permitting agency pursuant to that agency's own regulations.

## **BACKGROUND**

Exelon Generation Company, LLC is a subsidiary of Exelon Corporation, a Fortune 100 energy company with the largest number of electricity and natural gas customers in the United States. Exelon Corporation does business in 48 States, the District of Columbia, and Canada. Exelon Corporation serves approximately 10 million customers in Delaware, the District of Columbia, Illinois, Maryland, New Jersey, and Pennsylvania through its Atlantic City Electric, BGE, ComEd, Delmarva Power, PECO, and Pepco subsidiaries. Exelon is one of the largest competitive U.S. power generators, with more than 32,000 megawatts of nuclear, gas, wind, solar, and hydroelectric generating capacity comprising one of the nation's cleanest and lowest-cost power generation fleets. Exelon routinely seeks licenses and permits from Federal agencies and water quality certifications from State agencies in connection with the construction and operation of its nuclear, hydroelectric, and natural-gas-fired electric generating assets.

Exelon's views on EPA's Section 401 regulations are informed by its recent efforts to relicense the Conowingo Hydroelectric Project ("Conowingo" or the "Project"), a hydroelectric generating facility on the lower Susquehanna River, about ten miles upstream from the River's confluence with the Chesapeake Bay. With a generating capacity of 500 megawatts, the Project is by far the largest source of renewable energy in Maryland. In 2014, Exelon requested a water quality certification from the Maryland Department of the Environment ("MDE") in connection with its efforts to renew the Project's Federal license. In 2018, MDE issued a purported certification for the Project (the "Certification"). MDE attached conditions to the Certification that vastly exceeded the scope of State authority under CWA Section 401. For example, MDE's Certification requires Exelon to remove pollutants from the Susquehanna River that were released into the water through upstream agricultural runoff, wastewater treatment facilities, and other sources of pollution in New York, Pennsylvania, and a small portion of Maryland. Although it is undisputed that Exelon itself does not introduce these pollutants into the River, the Certification purported to require Exelon to remove 6,000,000 pounds of nitrogen and 260,000 pounds of phosphorus from the River every year for the entire term of the Project's Federal license. The Certification includes a "payment in lieu" provision that would allow the Project to satisfy its obligations by instead paying MDE a fee exceeding $172 million annually, or more than ***$7 billion*** over the term of the Federal license. This amount is orders of magnitude greater than the Project's economic value as an operating asset, and thus Exelon would be forced to abandon the Federal license and discontinue the Project's operation absent a substantial change in the Certification's terms. Exelon and MDE are presently engaged in an ongoing dispute over the legality of the Certification, and that dispute implicates multiple issues discussed in the Proposed Rule.

Following President Trump's issuance of Executive Order 13868 in April 2019,[1] EPA requested pre-proposal recommendations concerning the scope and content of its new regulations and guidance.[2] Exelon submitted comments[3] encouraging EPA to promulgate a rule codifying the D.C. Circuit's recent opinion in *Hoopa Valley Tribe v. FERC*,[4] which confirmed that States waive their opportunity to issue a Section 401 certification when they engage in a "coordinated withdrawal-and-resubmission scheme."[5] Exelon also urged EPA to clarify that certification conditions are permissible under Section 401 only if they relate directly to the licensee's "activity."[6]

On August 22, 2019, EPA published the Proposed Rule in the *Federal Register*. Exelon supports the Proposed Rule and appreciates this opportunity to provide comments, including recommended changes that would further improve EPA's proposed revisions.

### **DISCUSSION**

The remainder of these comments focuses on Exelon's recommendations with respect to the issues discussed in the Proposed Rule, including (1) the permissible scope of water quality certification conditions; (2) the procedures governing the process for requesting a certification; (3) the timeline by which States must act on requests for certifications; (4) the proper roles for State and Federal agencies in enforcing certifications; and (5) the rules governing modification or "reopening" of such certifications.

**1.      Scope of Water Quality Certification Conditions**

Exelon strongly supports the portions of the Proposed Rule that clarify the permissible scope of conditions on Section 401 certifications, making the regulations more consistent with statutory text and Congressional intent. As explained below, Exelon requests that EPA adopt several additional requirements related to the scope of certifications.

The Proposed Rule includes a new provision defining the term "condition" to mean "a specific requirement included in a certification that is within the scope of certification." Proposed Rule § 121.1(f), 84 Fed. Reg. 44120. The Rule goes on to state that "[t]he scope of a Clean Water Act section 401 certification is limited to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements." Proposed Rule § 121.3, 84 Fed. Reg. 44120. The proposed regulations also require at Section 121.5(d) that any conditions imposed in the certification must be accompanied by an explanation of "why the condition is necessary to assure that the discharge from the proposed project will comply with water quality requirements," *id.* § 121.5(d)(1); a citation to the relevant "federal, state, or tribal

---

[1] *See* Executive Order 13868, 84 Fed. Reg. 15495 (Apr. 10, 2019).
[2] *See* Memorandum from Lauren Kasparek, Office of Wetlands, Oceans and Watersheds, Envt'l Protection Agency (Docket ID No. EPA-HQ-OW-2018-0855) (Apr. 15, 2019).
[3] *See* Comments of Exelon Generation Co., LLC, Docket No. EPA-HQ-OW-2018-0855 (May 24, 2019) ("*Exelon May 2019 Comments*").
[4] 913 F.3d 1099 (D.C. Cir. 2019).
[5] *Id.* at 1103; *see Exelon May 2019 Comments* at 4–6.
[6] *Exelon May 2019 Comments* at 9–10.

3

law that authorizes the condition," *id.* § 121.5(d)(2); and a "statement of whether and to what extent a less stringent condition could satisfy applicable water quality requirements," *id.* § 121.5(d)(3). *See* 84 Fed. Reg. 44120. Finally, the Proposed Rule clearly states that a Federal agency "shall not" incorporate any condition from a Section 401 certification unless it determines that that the condition "satisf[ies] the definition [of 'condition'] in § 121.1(f) and meets the requirements of § 121.5(d)." Proposed Rule § 121.8(a)(1), 84 Fed. Reg. 44121.

Exelon strongly supports this revised framework, which effectively implements the statutory text and makes clear that States cannot use purported "conditions" as vehicles to impose requirements that exceed States' authority under the CWA. As Exelon explained in its prior comments,[7] States have for years attempted to use certification conditions as a means to achieve general policy goals that, in many instances, bear little or no relation to the actual water quality effects caused by the project at issue. The discussion of this problem in the Proposed Rule's preamble resonates especially strongly with Exelon's experience relating to Conowingo: "EPA is also aware of certification conditions that purport to require project proponents to address pollutants that are not discharged from the construction or operation of a federally licensed or permitted project. Using the certification process to yield facility improvements or payments from project proponents that are unrelated to water quality impacts from the proposed federally licensed or permitted project is inconsistent with the authority provided by Congress." 84 Fed. Reg. 44105. EPA's Proposed Rule, when finalized, will help to eliminate such actions and ensure that the text of Section 401—and not unrelated policy objectives of State administrators—serves as the standard against which new certification conditions are judged.

In addition to the changes in the Proposed Rule, which Exelon supports, we recommend four modifications to strengthen protections against use of the certification process to impose conditions beyond States' proper authority under Section 401.

First and most important, EPA should modify the Proposed Rule to clarify that Section 401 conditions are permissible ***only if they <u>directly address</u> water quality effects <u>caused by</u> the licensee's or permittee's "<u>activity</u>."*** In numerous contexts—including both pipelines and hydroelectric facilities—States recently have sought to use Section 401 conditions to address water quality concerns caused by entities or activities other than those that are the subject of the certification. EPA should take this opportunity to confirm that these efforts are not permitted by the CWA and violate EPA regulations.

The guiding principle for courts tasked with determining the propriety of Section 401 certification conditions in diverse contexts—including ballast-water discharges,[8] construction projects affecting adjacent waterways,[9] and wetland development[10]—has been whether the

---

[7] *See Exelon May 2019 Comments* at 3–4, 9–10.
[8] *See, e.g.*, *Port of Oswego Auth. v. Grannis*, 897 N.Y.S.2d 736, 738 (N.Y. 3d Dep't 2010) (approving Section 401 conditions addressing discharge of ballast water because conditions were necessary to prevent introduction of invasive species and pathogens into waterways); *In re 401 Water Quality Certification*, 822 N.W.2d 676, 678, 689 (Minn. Ct. App. 2012) (approving conditions directly addressing an activity of shipping vessels that involved discharge of ballast water).
[9] *See, e.g.*, *Friends of the Earth v. U.S. Navy*, 841 F.2d 927, 929 (9th Cir. 1988) (affirming decision that conditioned Navy's Section 401 permit to construct a port on acquiring a State shoreline management

4

condition was designed to directly address water quality effects caused by the licensee's or permittee's activity.  Courts have emphasized that State agencies evaluating requests for Section 401 certifications may not consider the effects of activities other than those being licensed.  In *Delaware Riverkeeper Network v. Secretary of the Pennsylvania Department of Environmental Protection*, for example, the Third Circuit held that a State agency correctly declined to assess the impacts of "tree clearing activities" before issuing a certification for construction related to a pipeline expansion because there was not a sufficient nexus between the "construction activity" being licensed and the "pre-construction activity" of tree-clearing.[11] A fortiori, water quality effects that are caused by entities and activities entirely distinct from the licensee/permittee are not properly within the scope of Section 401 conditions.

When a certification condition falls on the wrong side of the line—that is, when it does not directly address a water quality effect caused by a licensee's or permittee's activity—courts have not hesitated to invalidate the condition.[12]  In *Port of Seattle v. Pollution Control Hearings Board*, for example, the Washington Supreme Court considered a number of conditions that a State agency imposed in a Section 401 certification for construction of an airport runway on wetlands.[13]  Although the court approved many of those conditions, it overturned a streamflow condition that would have "required that the Port do more than offset the impact of the third runway."[14]  The court explained that the "actual impact" of the runway would be a reduction in stream flow of 0.08 cubic feet per second ("cfs") in the Des Moines Creek, and thus agreed with the Port that the State agency "erred when it required the Port to mitigate low flows … anytime flows fall below 1.0 cfs because this condition requires [the Port] to augment low flows beyond the 0.08 cfs impact of the … runway project."[15]  The Federal Energy Regulatory Commission ("FERC") has also confirmed that conditions not directly addressing a water quality effect caused by the licensee's "activity" are improper under Section 401.  Indeed, FERC has often noted its opinion that conditions "unrelated" to a project's activities are not proper Section 401 limitations.[16]  This principle is not limited to the hydropower context, and States have also sought to use Section 401 to impose unwarranted conditions on pipelines.[17]

---

permit that addressed the port's effects on water quality and aquatic life); *Interstate Props. v. Schregardus*, No. 99AP-249, 1999 WL 1267309, at *2 (Ohio Ct. App. Dec. 30, 1999) (approving Section 401 conditions for modification of a waterway that were designed to mitigate effects of construction on erosion and nearby trees).

[10] *Family Dev., Ltd. v. Steuben Cty. Waste Watchers, Inc.*, 749 N.E.2d 1243, 1246, 1260 (Ind. Ct. App. 2001) (approving Section 401 conditions for the construction of landfill that directly addressed mitigation of damages to nearby wetlands); *O'Hagan v. State*, No. 28897–4–II, 2003 WL 22962168 (Wash Ct. App. Dec. 16, 2003) (discussing Section 401 conditions for development of cranberry bog that were designed "to mitigate wetland loss").

[11] 833 F.3d 360, 386 (3d Cir. 2016).

[12] *See Exelon May 2019 Comments* at 8–10.

[13] 90 P.3d 659 (Wash. 2004).

[14] *Id.* at 681.

[15] *Id.*; *see* 17 A.L.R. FED. 2D 309 § 23 (2007) (discussing *Port of Seattle* and noting that conditions are impermissible when they more than "offset[] the expected impact of the project"); *id.* §§ 19, 21, 26 (cataloging other inappropriate conditions).

[16] *See, e.g.*, Order Issuing New License, *Portland Gen. Elec. Co.*, Project No. 2195-011, 133 FERC 62281, at 64620 ¶ 57, 2010 WL 11404139 (FERC Dec. 21, 2010); Order Issuing New License, *Pub. Utility Dist. No. 1 of Snohomish Cty., Wash.*, Project No. 2157-188, 136 FERC 62188, at 64488 ¶ 92,

In the particular context of hydropower, Section 401 does not authorize conditions to regulate pollutants that were not added to navigable waters by the applicant. Put differently, an effect caused by the presence of pollutants in water discharged through a hydroelectric facility, where the presence of those pollutants is not attributable to the federally licensed or permitted activity, falls outside the scope of certification.

The Proposed Rule takes a step in the right direction by stating that conditions are only appropriate if they are "within the scope of certification," Proposed Rule § 121.1(f), 84 Fed. Reg. 44120, and that conditions must be "necessary to assure that the discharge from the proposed project will comply with water quality requirements," *id.* § 121.5(d)(1). Exelon commends the additions in Section 121.8(a)(1), which clarify that a Federal agency may not incorporate conditions into a Federal license or permit if those conditions do not satisfy the new Sections 121.1(f) and 121.5(d). Moreover, Exelon strongly supports EPA's clarification that Congress did not intend for States to be able to impose "one-time and recurring payments to state agencies for improvements or enhancements that are unrelated to the proposed [project]." 84 Fed. Reg. at 44094.[18]

To better implement the clear text of Section 401, however, Exelon respectfully recommends that EPA revise the text of Proposed Rule Section 121.5(d) to read as follows, with suggested modifications underlined: "Any grant of certification with conditions shall be in writing. <u>Any condition must directly address a water quality effect caused by the particular activity for which the applicant is seeking a license or permit. Any grant of certification with conditions</u> shall for each condition include, at a minimum . . . ."

<u>Second</u>, EPA should modify the Proposed Rule to clarify that the certifying authority—not the applicant—bears the burden of establishing that any conditions are necessary to assure compliance with water quality requirements. As Exelon explained in its prior comments,[19] the States' power under Section 401 is a narrow exception in a federally occupied field, and thus the burden of showing that a Section 401 condition is "necessary to assure" compliance with water quality standards necessarily rests at all times with the State.[20] This principle follows from the

---

2011 WL 13045891 (FERC Sept. 2, 2011); Order Issuing New License, *Pub. Utility Dist. No. 1 of Douglas Cty., Wash.*, Project No. 2149-152, 141 FERC 62104, at 64270 ¶ 53, 2012 WL 12372998 (FERC Nov. 9, 2012); *see also Mitchell Cty. Conservation Bd., Project No. 11530-000—Iowa*, 77 FERC 6202, 64458 n.4 (FERC Dec. 27, 1996) (refusing to require a hydropower licensee to spend project revenues on improvements at county parks that were "unrelated to the project" being licensed).

[17] *See, e.g.*, *Delaware Riverkeeper Network*, 833 F.3d at 386.

[18] Exelon also believes that Section 121.13(b) of the Proposed Rule—which applies only to certifications made by the Administrator—correctly recognizes that it would be inappropriate for the Administrator to request additional information from an applicant unless that information is "directly related to the discharge from the proposed project and its potential effect on the receiving waters." 84 Fed. Reg. at 44122.

[19] *See also Exelon May 2019 Comments* at 7.

[20] *See, e.g.*, *California v. FERC*, 495 U.S. 490, 506 (1990); *First Iowa Hydro-Elec. Coop.*, 328 U.S. 152, 180 (1946) (Federal Power Act establishes "a complete scheme of national regulation" to "promote the comprehensive development of the water resources of the Nation"); *see also PUD No. 1 of Jefferson Cty.*

fact that, when Congress has preempted a field (as Congress did with hydropower regulation in the Federal Power Act), the burden to show that some State action should be permissible under a purported exception to Federal preemption rests with the party seeking to establish the exception.[21]  To implement this recommendation, Exelon respectfully suggests that EPA modify the existing text of Section 121.5(d)(1) of the Proposed Rule to state that the writing articulating the certification conditions must include "[a] statement explaining why <u>the certifying authority has carried its burden to demonstrate that</u> the condition is necessary to assure that the discharge from the proposed project will comply with water quality requirements" (suggested modification underlined).

<u>Third</u>, EPA should further clarify that, if a less stringent condition could satisfy the applicable water quality requirements, a more stringent condition is—by definition—not "necessary to assure" compliance.  33 U.S.C. § 1341(d).  Therefore, the more stringent condition should not be included in the Federal license or permit.  This conclusion is already implied by Section 121.5(d)(3), which requires a "statement of whether and to what extent a less stringent condition could satisfy applicable water quality requirements."  84 Fed. Reg. 44120.  But the Proposed Rule should take the next step, by concluding that if a less stringent condition in fact would satisfy applicable water quality requirements, the more stringent condition cannot be imposed on the project proponent.

<u>Fourth</u>, EPA should clarify that a Federal licensing or permitting agency need not incorporate or enforce conditions in a State certification that the Federal agency, after due consideration, concludes are unlawful because they violate ***any*** provision of the CWA, of EPA's CWA regulations, or of a statute the agency is charged with implementing (or its implementing regulations).  As noted above, Exelon applauds the addition of Proposed Rule Section 121.8(a)(1), which clarifies that a Federal agency shall not incorporate license or permit conditions if those conditions do not satisfy the new Sections 121.1(f) and 121.5(d).  That said, the existing language in Section 121.8(a) may be read to suggest that Federal agencies would be required to incorporate certification conditions that they believe are unlawful under any provision of the CWA or its implementing regulations ***other than*** Sections 121.1(f) or 121.5(d) of the Proposed Rule.

To implement this suggestion, Exelon respectfully requests that EPA modify the text of Proposed Rule Section 121.8(a)(1) to read:  "If the Federal agency determines that a condition does not satisfy the definition of § 121.1(f), <u>does not</u> meet the requirements of § 121.5(d)<u>, or otherwise fails to comply with any provision of the Clean Water Act, of regulations promulgated pursuant to the Clean Water Act, or of any Federal law that the Federal agency is charged with</u>

---

*v. Wash. Dep't of Ecology*, 511 U.S. 700, 722 (1994) (noting State's inability to impose conditions on a Federal hydroelectric license "pursuant to state law").

[21] *See, e.g.*, *Tran Enters., LLC v. DHL Exp. (USA), Inc.*, 627 F.3d 1004, 1009–10 (5th Cir. 2010) (holding that "the party asserting … an exception" to a Federal statute's preemptive scope would "bear the burden of proof at trial"); *see also New England Health Care Employees Union, Dist. 1199, SEIU/AFL-CIO v. Rowland*, 204 F. Supp. 2d 336, 343 n.7 (D. Conn. 2002) (noting that, when there exists a "rebuttable presumption that Congress intended to preempt state law," "the defendants have the burden of production for any exception to preemption or evidence of congressional intent not to preempt").

administering, such condition shall not be incorporated into the license or permit" (suggested modifications underlined).

**2.     Certification Request and Receipt**

Exelon supports the Proposed Rule's clarification of the process for requesting a water quality certification from a certifying authority. However, as explained below, Exelon suggests that EPA consider stronger incentives for States to adopt clear *ex ante* rules governing what information is required to support approval of a certification request and what procedures apply to any subsequent information requests by the State, to help ensure that certification requests can be approved within one year or less after receipt.

Section 121.4 of the Proposed Rule provides that, when a State agency is the certifying authority, the proponent of the project will begin the application process by submitting a certification request to the State and then contacting the Federal licensing or permitting agency to provide notice of the request, which triggers the Federal agency's duty to provide the certifying State the "applicable reasonable period of time to act on the certification request." Proposed Rule § 121.4(b)–(c), 84 Fed. Reg. at 44120. The Proposed Rule states that the Federal agency may not establish a "reasonable period of time" that "exceed[s] one year from receipt" of the request, and in turn defines "receipt" to mean "the date that a certification request is documented as received by a certifying authority." Proposed Rule §§ 121.4(e), 121.1(o), 84 Fed. Reg. at 44120.

A separate provision of the Proposed Rule at Subpart D governs certifications made by the Administrator rather than by a State. The Proposed Rule requires that the project proponent request a pre-filing meeting with the Administrator at least 30 days prior to submitting the certification request, *see id.* § 121.12(a); that the Administrator must hold such a meeting and "discuss the nature of the proposed project and potential water quality effects" with the applicant, *id.* § 121.12(b)–(c); that the Administrator may request additional information from the applicant within 30 days of receiving the request, *see id.* § 121.13(a); that the Administrator "shall only request additional information that is within the scope of certification" and "that can be collected or generated within the established reasonable period of time," *id.* § 121.13(b)–(c); and that the Administrator must provide public notice of the certification request within 20 days and may schedule a public hearing in his or her discretion, *see id.* § 121.14(a)–(b).

Exelon commends EPA's efforts to bring clarity to the process through which applicants request certifications and certifying authorities receive them. Exelon is particularly supportive of the provisions of the Proposed Rule that govern certification by the Administrator. *See* Proposed Rule Subpart D, 84 Fed. Reg. 44122. Those provisions contemplate a timely and efficient process and recognize that it would be unfair to an applicant, and inconsistent with the statute, to require studies or other information that cannot be completed or generated within the established "reasonable period of time" (or even within the year following the submittal of the request). Proposed Rule § 121.13(c), 84 Fed. Reg. 44122.

To ensure that regulated parties can benefit from the transparent and effective process contemplated by Subpart D of the Proposed Rule, Exelon recommends that EPA encourage the

8

States to adopt procedural requirements for their certification processes that are similar to Subpart D's process governing certifications by the Administrator. Moreover, Exelon respectfully suggests that EPA establish stronger incentives for States to adopt clear procedural rules that (1) provide that requests for additional information from applicants can be made only pursuant to regulations or policies adopted by the States *in advance of the certification process*; and (2) clearly identify in advance what information applicants should provide in support of a request. Clear *ex ante* rules would avoid placing an unfair burden on the applicants to guess what must be included, to allow the State to approve a request within one year.[22] Absent such rules, there is an appreciable risk that States will take the position that additional information is required to evaluate a certification but cannot be provided within one year, and that States will seek to deny certification requests on this basis. EPA should underscore in its final rule preamble that denial of certification based on inadequate information—where the state did not clearly identify the need for such information through *ex ante* regulations—is likely to be vulnerable to reversal on judicial review.

The recommendations outlined above could be implemented by adding a provision at the end of Section 121.5 of the Proposed Rule—designated Section 121.5(g)—providing:

> Each certifying authority should adopt fair and clear procedural rules for the process governing requests for certifications, including rules governing pre-request consultations, requests for additional information made by the certifying authority after the request is received, and the provision of public notice and hearings. Such rules should clearly identify the specific information applicants must provide in support of their requests. States may at their election model their procedural rules on EPA's rules governing certification by the Administrator, *see* 40 C.F.R. Part 121, Subpart D.

In the alternative, EPA could promulgate guidance including similar language or otherwise providing States with a list of "best practices" that should be followed in the certification process.

**3.    Timeframe and Waiver**

Exelon strongly supports EPA's proposal to codify the D.C. Circuit's recent holding in *Hoopa Valley* that "the withdrawal-and-resubmission of water quality certification requests does not trigger new statutory periods of review."[23] Section 121.4(f) of the Proposed Rule clearly states that the "certifying authority is not authorized to request the project proponent to withdraw a certification request or to take any other action for the purpose of modifying or restarting the established reasonable period of time." 84 Fed. Reg. 44120.[24] Section 121.4(e) of the Proposed

---

[22] *See Exelon May 2019 Comments* at 5.
[23] 913 F.3d at 1103; *see Exelon May 2019 Comments* at 4–6.
[24] Similarly, Section 121.7(a)(2) provides that the certification requirement will be waived upon the certifying authority's "failure or refusal to act on a certification request." 84 Fed. Reg. 44121. The phrase "[f]ail or refuse to act" is defined in the Proposed Rule to mean that the "the certifying authority actually or constructively fails or refuses to grant or deny certification, or waive the certification requirement, within the scope of certification and within the reasonable period of time." Proposed Rule

Rule defines the time limit for action on a request as being no longer than "one year from receipt." *Id.* And Section 121.1(o) in turn defines the term "receipt" as "the date that a certification request is documented as received by a certifying authority in accordance with applicable submission procedures." *Id.*

As Exelon explained in its prior comments,[25] EPA's approach is consistent with recent decisions from courts and Federal agencies that have rejected the notion that the one-year clock begins to run when the State says it is ready to process the request, rather than when it receives the request from the applicant.

That said, Exelon recommends one change to further clarify these requirements. Specifically, Section 121.1(o) and the preamble should further clarify that States may not use their "applicable submission procedures" to introduce an unreasonable delay between the time that an agency receives a request and the time that the request is deemed "received." The phrase "applicable submission procedures" in the Proposed Rule could be interpreted by States to allow them to adopt "submission procedures" under which a request is not deemed "received" even though it is in the State's possession—*e.g.*, by specifying that a State will take six months to consider the request before deeming it received (or some other similar rule) or by deeming an application not "received" if it does not meet certain completeness criteria. States have tried that approach before, as by deeming received requests "incomplete" to avoid triggering the one-year clock Congress mandated in Section 401(a).[26]

To implement this recommendation, Exelon suggests that EPA modify Section 121.1(o) to provide simply that "*Receipt* means the date that a certification request is received by a certifying authority." Alternatively, at a minimum, EPA should include language in the final Rule preamble confirming that its reference to "applicable [State] submission procedures" refers only to ministerial procedures, not substantive or "completeness" criteria, and may not be read as an invitation for States to adopt rules that would prevent the one-year clock from beginning to run as soon as the request is in the certifying agency's possession.

**4.     Enforcement**

The preamble to the Proposed Rule correctly notes that Section 401 "does not provide an independent regulatory enforcement role for certifying authorities for conditions included in federal licenses or permits." 84 Fed. Reg. 44116. EPA has also recognized that Section 401 "does not provide an . . . ongoing role for certifying authorities to enforce certification conditions under federal law" and that this "role is reserved to the federal agency issuing the federal license

---

§ 121.1(h), 84 Fed. Reg. 44120. Likewise, Section 121.2 of the Proposed Rule should be revised to acknowledge the possibility of waiver: "Any applicant for a license or permit to conduct any activity which may result in a discharge shall provide the Federal agency either a certification from the certifying authority in accordance with this part or a written notice that the certification requirement has been waived" (suggested modifications underlined). 84 Fed. Reg. 44120; *see also* Proposed Rule 121.7(c), 84 Fed. Reg. 44121 ("A written notice of waiver from the Federal agency shall satisfy the project proponent's requirement to obtain a certification.").

[25] *See Exelon May 2019 Comments* at 7.
[26] *See id.* (discussing *City of Fredericksburg v. FERC*, 876 F.2d 1109, 1111–12 (4th Cir. 1999)).

or permit." *Id.* EPA has sought comment on "whether clarification on this point may be appropriate to include in the regulatory text." *Id.* The text of the Proposed Rule states that "[t]he Federal agency shall be responsible for enforcing certification conditions that are incorporated into a federal license or permit," but does not otherwise comment on State enforcement authority. Proposed Rule § 121.9(c), 84 Fed. Reg. 44121.

Exelon encourages EPA to include a provision within the text of the Proposed Rule itself that confirms the agency's conclusions concerning the scope of State enforcement authority. That could be accomplished by modifying the text of Section 121.9(c) of the Proposed Rule to read as follows (with suggested modifications underlined):

> (c) The Federal agency shall be <u>solely</u> responsible for enforcing certification conditions that are incorporated into a federal license or permit. <u>A certifying authority has no independent enforcement role with respect to any condition included in a federal license or permit and has no ongoing role in enforcing any certification condition under federal law once the condition has been incorporated into a federal license or permit</u>.

**5. Modification**

The Proposed Rule seeks comment on potential modifications to the regulation currently codified at 40 C.F.R. § 121.2(b), which provides that "[t]he certifying agency may modify the certification in such manner as may be agreed upon by the certifying agency, the licensing or permitting agency, and the Regional Administrator." EPA has proposed "to remove this provision from the regulatory text as it is inconsistent with [EPA's] role for new certifications." 84 Fed. Reg. 44117. EPA requests comment on whether it should maintain this oversight provision or serve some other "more involved oversight role." 84 Fed. Reg. 44117. EPA also requests comment on the related issue of so-called "reopener" provisions, which are certification "conditions that authorize certifications to be re-opened." 84 Fed. Reg. 44107. As EPA has correctly recognized, reopener provisions "may create regulatory uncertainty." *Id.*

Exelon appreciates EPA's approach to the issue of modifications and reopeners, and respects EPA's efforts to recognize the limits on its own authority under Section 401. Exelon agrees with EPA that the portion of Section 121.2(b) that requires the Regional Administrator to approve modifications to certifications should be deleted, as it is not grounded in the text of Section 401.

Exelon respectfully suggests that, rather than deleting 40 C.F.R. § 121.2(b) outright, this provision be revised to clarify that any modification of a certification—including any modification made pursuant to a reopener condition in an existing certification—has no effect unless and until it is approved by the Federal licensing or permitting agency pursuant to its own regulations. As one State Supreme Court explained, States do "not have statutory, regulatory, or federal authority to suspend or revoke a 401 Certification after it has been granted."[27] Based on

---

[27] *Triska v. Dep't of Health & Envt'l Control*, 355 S.E.2d 531, 533–34 (S.C. 1987); *see also Exelon May 2019 Comments* at 6.

Exelon's experience, an express provision of this nature would help clarify existing limits on States' authority and avoid potential abuses.

To implement these changes, Exelon respectfully requests that EPA add a new provision to the Proposed Rule, which would be designated Section 121.8(c). That subsection would provide as follows (with modifications against the existing 40 C.F.R. § 121.2(b) underlined):

> The certifying agency may modify the certification in such manner as may be agreed upon by the certifying agency <u>and</u> the licensing or permitting agency<u>, but no modification of a certification will take effect or be enforceable unless and until it is approved by the licensing or permitting agency pursuant to its own regulations.</u>

The proposed final clause is necessary because, absent such a clarification, the proposed subsection could be read as suggesting that State certifying authorities retain unilateral discretion to modify certification conditions without seeking sign-off from the appropriate Federal agency. This would make little sense, given that the licensing or permitting agency would have had the opportunity to assess the lawfulness of the modification had it been added to the certification during the initial certification process and that the licensing or permitting agency has sole responsibility for the enforcement of certification conditions. Indeed, the rules currently codified at 40 C.F.R. Sections 121.25 and 121.28 may be misread to suggest that Section 401 authorizes a State to engage in ongoing oversight, for the entire term of the license or permit, rather than serving a one-time "gating" function at the point when a Federal license or permit is first being sought or is being renewed. The language suggested above would confirm for States and regulated parties that this is not the case.

## **CONCLUSION**

Exelon appreciates EPA's careful work in crafting the Proposed Rule and believes that the changes proposed by the agency will better align implementation of Section 401 of the CWA with the text of the statute and Congressional intent. As explained above, Exelon recommends that EPA adopt several specific changes, which it believes would make the revised regulations even more effective. Exelon would be glad to discuss these changes with you in additional detail or to provide any further assistance that EPA may find useful as it works to finalize revisions to its Part 121 regulations.

Respectfully submitted,

*/s/ Joel Beauvais*

Joel Beauvais

Vice President & Deputy General
Counsel – Environment, Health & Safety
