Clare Ellis (SBN No. 317773)
cellis@HuntonAK.com
**HUNTON ANDREWS KURTH LLP**
50 California Street, Suite 1700
San Francisco, CA 94111
Telephone: (415) 975-3708
Facsimile: (415) 975-3701

George P. Sibley, III (VA Bar No. 48773) (*pro hac vice pending*)
gsibley@HuntonAK.com
Deidre G. Duncan (D.C. Bar No. 461548) (*pro hac vice pending*)
dduncan@HuntonAK.com
**HUNTON ANDREWS KURTH LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Telephone: (804) 788-8262
Facsimile: (804) 788-8218

*Counsel for Proposed Intervenor-Defendants
American Petroleum Institute and
Interstate Natural Gas Association of America*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| AMERICAN RIVERS, et al.;<br><br>Plaintiffs,<br><br>v.<br><br>ANDREW R. WHEELER, et al.,<br><br>Defendants. | First Filed Case: No. 3:20-cv-04636-WHA<br>Related Case: No. 3:20-cv-04869-WHA<br><br>**DECLARATION OF JOAN DRESKIN, FOR THE INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, IN SUPPORT OF THE COALITION'S MOTION TO INTERVENE IN SUPPORT OF DEFENDANTS**<br><br>CASE NO.: 3:20-CV-04636-WHA<br><br>Date:        October 8, 2020<br>Time:        8:00 a.m.<br>Courtroom:   12<br>Judge:       Hon. William H. Alsup |

STATE OF CALIFORNIA, et al.;

    Plaintiffs,

    v.

ANDREW R. WHEELER, et al.,

    Defendants.

CASE NO.: 3:20-CV-04869-WHA

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

1. My name is Joan Dreskin. I am Senior Vice President and General Counsel of the Interstate Natural Gas Association of America (INGAA). My business address is 20 F Street, NW, Suite 450, Washington, DC 20001.

2. I am offering this declaration in support of the Motion by American Petroleum Institute and Interstate Natural Gas Association of America (collectively the "Coalition") to Intervene as Defendants in the above captioned case.

3. INGAA is a non-profit trade association representing interstate natural gas transmission pipelines ("interstate pipelines") operating in the United States. INGAA is comprised of 25 members, representing the vast majority of the interstate natural gas pipeline companies in the U.S. INGAA members operate approximately 200,000 miles of pipelines. The interstate pipeline network serves as an indispensable link between natural gas producers and the American homes and businesses that use the fuel for heating, cooking, generating electricity and manufacturing a wide variety of U.S. goods, ranging from plastics to paint to medicines and fertilizer.

4. U.S. natural gas production is expected to increase to 130 billion cubic feet per day by 2035, spurred by growing markets, if available supplies are developed, and it is estimated that investment in new oil and gas infrastructure will total $791 billion from 2018 through 2035, averaging $44 billion per year. Natural gas also will serve as a backstop to help firm up variable renewables, like wind and solar, which are expected to grow. This translates to the need for thousands of miles of new and replacement pipe to meet market demand or to modernize existing pipeline facilities.

5. INGAA members construct and operate interstate natural gas pipelines in response to demonstrated public need for the delivery of natural gas, requiring infrastructure that typically spans multiple state boundaries. The Federal Energy Regulatory Commission (FERC) must issue a certificate of "public convenience and necessity" based on this demonstrated need before INGAA members may construct and operate these pipelines. As documented by statistics compiled by FERC, INGAA members construct hundreds of miles of new and expanded interstate pipelines each year.

6. Due to the public need to transport natural gas long distances, projects developed by INGAA

1

DECLARATION OF JOAN DRESKIN IN SUPPORT OF THE COALITION'S
MOTION TO INTERVENE IN SUPPORT OF DEFENDANTS
CASE NO.: 3:20-cv-04636-WHA, 3:20-CV-04869-WHA

1  members unavoidably cross wetlands and other waters of the United States regulated by the Clean
2  Water Act (CWA).  Where a proposed pipeline project may result in a discharge into waters of the
3  United States, CWA section 401 requires the project applicant to provide the federal agency with the
4  certification of the state that the discharges in the state comply with applicable water quality
5  standards.  If the state fails or refuses to act on the request for certification within a reasonable time
6  not to exceed one year, the applicant's duty to provide the certification is waived.  The federal
7  agency (such as FERC or the U.S. Army Corps of Engineers (Corps)) is precluded from authorizing
8  the activity resulting in the discharge unless the certification is provided or waived.  33 U.S.C.
9  § 1341.

10  7.     Section 401 establishes an important balance in the respective roles and responsibilities of
11  federal and state/tribal authorities.  Like other statutes built on the principle of cooperative
12  federalism, section 401 defines the State's role within the context of a uniform federal framework.
13  The language of section 401, however, is ambiguous with regard to the scope of the certifying
14  authority's review, determination, and condition-setting.

15  8.     Ambiguities in a draft non-binding guidance document issued by the U.S. Environmental
16  Protection Agency (EPA) on implementation of section 401 exacerbated the statute's ambiguities.
17  Relying on that document, some States and Tribes expanded their section 401 review to include
18  considerations unrelated to water quality requirements.  Certain States have denied certification for
19  INGAA member projects for reasons unrelated to water quality, such as the project's perceived
20  climate change impacts or general political opposition to hydraulic fracturing or fossil fuels.  This
21  manner of implementation of section 401 frustrates the CWA's federal-state balance and has resulted
22  in delays to interstate natural gas pipeline projects that the federal government has determined to be
23  in the public interest.

24  9.     FERC-approved energy infrastructure projects proposed by INGAA members also have been
25  significantly delayed when States evade the statutory time limit on certification or have relied on this
26  draft EPA section 401 guidance document as a basis to exceed this timeframe.

27  10.    For example, on August 22, 2013, one of INGAA's members submitted a certification
28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA  94111

request for the Constitution Pipeline, a $683 million, 124-mile natural gas pipeline designed to connect natural gas production in Pennsylvania to demand in northeastern markets. The New York State Department of Environmental Conservation (NYSDEC) requested additional information and deemed the request complete in December 2014. In April 2015, NYSDEC requested that the INGAA member withdraw and resubmit its request in order to restart the waiver period. In April 2016, nearly three years after the project's initial request for certification, NYSDEC denied water quality certification. Following litigation over NYSDEC's determination, FERC determined in August 2019 that NYSDEC had waived its section 401 authority. Nevertheless, after years of delay, the project's sponsor halted investment in the pipeline and cancelled the project in February 2020.

11.     In November 2015, an INGAA member submitted a certification request to NYSDEC for the Millennium Valley Lateral project, a 7.8-mile pipeline connecting a natural gas mainline to a new natural gas-fueled combined cycle electric generation facility in New York. In August 2017, nearly two years after the project's initial request for certification, NYSDEC denied certification on the grounds that FERC's environmental review of the project lacked an adequate analysis of the potential downstream greenhouse gas emissions, not water quality concerns. In September 2017, FERC concluded that NYSDEC's 21-month delay constituted waiver of the certification requirement, and the U.S. Court of Appeals for the Second Circuit (Second Circuit) affirmed FERC's determination in March 2018. *New York State Dep't of Envtl. Conservation v. Fed. Energy Regulatory Comm'n*, 884 F.3d 450 (2d Cir. 2018).

12.     On March 2, 2016, an INGAA member submitted a request for water quality certification to the NYSDEC for the $500 million Northern Access project. The project includes approximately 99 miles of new pipeline facilities, the majority of which will be co-located within existing rights-of-way. The project received water quality certification from the Pennsylvania Department of Environmental Conservation in January 2017 and FERC's approval of the project in February 2017 after 31 months of environmental review. On April 7, 2017, however, NYSDEC denied water quality certification. On August 6, 2018, FERC issued an order concluding that NYSDEC waived its authority to act on the certification because it exceeded the statutory deadline. Both NYSDEC

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

1  and Sierra Club filed rehearing requests, which FERC subsequently denied on April 2, 2019. Sierra
2  Club filed an appeal with the Second Circuit challenging the FERC waiver order and subsequent
3  order denying rehearing; this case is currently pending. On February 5, 2019, the Second Circuit
4  found that NYSDEC's denial letter lacked sufficient information to show any rational connection
5  between the facts found and choices made. The Second Circuit vacated and remanded the denial
6  with instructions for NYSDEC to more clearly articulate the basis for the denial and how that basis
7  is connected to the existing administrative record. In August 2019, NYSDEC issued a second denial
8  of Norther Access's certification request. The pipeline appealed this decision to the Second Circuit;
9  this case has been stayed, pending a decision in the FERC waiver and rehearing case.

10  13.   In December 2017, the Commonwealth of Virginia approved a water quality certification for
11  the Atlantic Coast Pipeline, a $5.1 billion pipeline project proposed by INGAA members that would
12  transport gas produced in the Marcellus Shale region to the Mid-Atlantic region of the United States.
13  In an unprecedented step, Virginia included conditions regulating activities in upland areas that may
14  indirectly affect state waters, beyond the scope of federal CWA jurisdiction and the project's direct
15  discharges to navigable waters. According to Virginia, "all proposed upland activities associated
16  with the construction, operation, maintenance, and repair of the pipeline, any components thereof or
17  appurtenances thereto, and related access roads and rights-of-way," are subject to the stringent
18  conditions of the certification.

19  14.   In August 2020, the State of North Carolina denied water quality certification for Mountain
20  Valley Pipeline Southgate for reasons other than water quality. Although FERC has determined that
21  the public convenience and necessity requires approval of the $468 million, 75-mile natural gas
22  pipeline project, North Carolina denied water quality certification to one of INGAA's members
23  because the State determined that the purpose of the project was "unachievable" due to the
24  "uncertainty" of completion of a different pipeline project.

25  15.    Given the significant ramifications to interstate pipeline projects, INGAA has a substantial
26  interest in ensuring that the CWA section 401 certification process preserves the important role of
27  States in protecting water quality, while at the same time providing appropriate limits on the scope
28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

4

DECLARATION OF JOAN DRESKIN IN SUPPORT OF THE COALITION'S
MOTION TO INTERVENE IN SUPPORT OF DEFENDANTS
CASE NO.: 3:20-cv-04636-WHA, 3:20-CV-04869-WHA

of and time period for review and the bases for denying or conditioning certification.

16. Consistent with its members' interests in the implementation of the CWA section 401 water quality certification process, INGAA has participated in various administrative actions seeking clarification of that process. On October 18, 2017, INGAA asked the Corps to clarify that the CWA section 401 review process starts upon the State's receipt of the original written request for certification, and to enforce Corps regulations regarding when state waiver occurs. *See* INGAA Comments on Corps; Subgroup of the Department of Defense Regulatory Reform Task Force, Review of Existing Rules, 82 Fed. Reg. 33,470 (July 20, 2017) (Docket ID No. COE-2017-0004).

17. INGAA supported the policy goals described in the President's April 2019 Executive Order 13868, *Promoting Energy Infrastructure and Economic Growth*, which directed EPA to review CWA section 401 and the EPA's existing certification regulations and propose new section 401 regulations. This support was reflected in INGAA's May 24, 2019, comments filed in response to EPA's solicitation of recommendations for reforming its section 401 regulations. Comments in Response to EPA's Request for Pre-Proposal Recommendations, Docket ID No. EPA-HQ-OW-2018-0855-0043.

18. To protect its significant interests in the water quality certification process, INGAA filed comments in response to EPA's Proposed Rule, *Updating Regulations on Water Quality Certification*, 84 Fed. Reg. 44,080 (Aug. 22, 2019) (Docket ID No. EPA-HQ-OW-2019-0405-0918). These comments are part of the administrative record that was before EPA when it promulgated the final 401 Rule. *Final Rule, CWA Section 401 Certification Rule,* EPA, 85 Fed. Reg. 42,210 (July 13, 2020) (the "401 Rule").

19. Due to the importance of the certification process to INGAA members, INGAA invested significant time and resources to join with other industry organizations in filing an *amici curiae* brief in *Constitution Pipeline Co., LLC v. New York State Dep't of Envtl. Conservation*, 868 F.3d 87 (2d Cir. 2017) and an *amici* brief in support of Constitution Pipeline Co.'s petition for *writ of certioarari*, which was ultimately denied by the U.S. Supreme Court. *Constitution Pipeline Co., LLC v. New York State Dep't of Envtl. Conservation*, 138 S. Ct. 1697 (2018). INGAA and the other

1  coalition members filed *amici* briefs to provide the perspective of the broader impacts of certification
2  denials on the development of much-needed natural gas infrastructure and to defend their interests in
3  an efficient, transparent, and predictable permitting process.

4  20.  The extent of interstate pipeline construction and maintenance, and INGAA members'
5  corresponding requests for state water-quality certification, are likely to increase based on current
6  and projected domestic and global demand for natural gas.  The abundant supply of natural gas from
7  domestic shale gas supplies in the U.S. has resulted in stable, affordable natural gas prices.  This has
8  increased demand for affordable natural gas and for new gathering, transmission and distribution
9  pipelines to bring the domestic natural gas to customers.

10  21.  In addition, INGAA members are involved in ongoing efforts to modernize the pipeline
11  system that may trigger section 401 requirements.  Interstate natural gas pipeline construction and
12  maintenance activities are typically conducted on tight schedules designed to ensure the safety,
13  security, and reliability of the natural gas pipeline network, and to meet the growing demands of
14  natural gas consumers, which makes the predictability and efficiency of the section 401 process
15  critical.  Delays and/or certification denials can prevent INGAA members from upgrading vital
16  natural gas infrastructure and from performing these critical and time-sensitive maintenance
17  activities.

18  22.  As a result of increased demand for natural gas and efforts to modernize the natural gas
19  pipeline network, INGAA members will have a number of projects that will soon request
20  certification, and those certifications would likely be subject to EPA's 401 Rule.

21  23.  However, if Plaintiffs obtain the relief that they request here – i.e., a judgment declaring that
22  the 401 Rule violates the Administrative Procedure Act or CWA – INGAA members' upcoming
23  projects would not realize the benefits of timely and appropriately focused section 401 reviews.  A
24  predictable permitting process is necessary to develop infrastructure that provides reliable, clean, and
25  affordable energy to the public.  If the 401 Rule is set aside, INGAA's members would be forced to
26  operate under a regulatory structure that is unpredictable and lacks regulatory certainty.  These
27  projects could face years of additional delays and substantial additional costs, without any
28

Hunton Andrews Kurth LLP
50 California Street, Suite 1700
San Francisco, CA 94111

commensurate benefit to the aquatic environment. States would be able to continue to condition or deny certification for INGAA member projects on the basis of policy considerations unrelated to water quality and delay making certification decisions in an effort to prevent projects from moving forward.

24. The process of applying for and obtaining federal authorizations is time consuming, expensive, and subject to regulatory uncertainty. Accordingly, many important maintenance, construction, and improvement activities may be delayed or otherwise encumbered if the 401 Rule is declared to be unlawful, and States can return to a patchwork of various interpretations under a regulatory process established before the CWA. This inconsistency and lack of regulatory certainty will significantly harm INGAA's members as they try to plan projects that costs millions, if not billions of dollars, while also potentially impeding their ability to make improvements necessary to safely and reliably deliver natural gas to their customers. The cost of these services may also increase if INGAA's members cannot rely on timely section 401 certifications.

25. Based on INGAA's participation in the rulemaking process, and its members' extensive experience with the water quality certification process throughout the United States, INGAA's participation in litigation would likely enhance the Court's understanding of the history, purpose, development, and implementation of the program. In addition, INGAA's participation as an intervenor would likely aid the Court in understanding the ramifications of this litigation on the interstate natural gas industry, and, by extension, on the national economy. As part of a coalition with other industry interests, INGAA will make legal arguments that will aid the Court's understanding and disposition of the issues.

I, Joan Dreskin, certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 4, 2020.

*Joan Dreskin*

_____

Joan Dreskin
Senior Vice President and General Counsel
Interstate Natural Gas Association of America
20 F Street, NW
Suite 450
Washington, DC  20001