Andrew Hawley (CA Bar No. 229274)
Western Environmental Law Center
1402 3rd Avenue, Ste. 1022
Seattle, Washington 98101
hawley@westernlaw.org
tel: 206-487-7250

Daniel James Cordalis (CA Bar No. 321722)
Cordalis Law, P.C.
2910 Springer Drive
McKinleyville, California 95519
dcordalislaw@gmail.com
tel: 303-717-4618

Peter M. K. Frost, *appearance pro hac vice*
Sangye Ince-Johannsen, *appearance pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Boulevard, Ste. 340
Eugene, Oregon 97401
frost@westernlaw.org
sangyeij@westernlaw.org
tel: 541-359-3238 / 541-778-6626

*Attorneys for Plaintiffs American Rivers,*
*American Whitewater, California Trout, Idaho Rivers United*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN RIVERS, *et al.*, | Case No. 3:20-cv-04636-WHA |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | Administrative Procedure Act Case |
| ANDREW R. WHEELER, *et al.*, | |
| Defendants, | |
| and | |
| STATE OF LOUISIANA, *et al.*, | |
| Defendant-Intervenors. | |

**INTRODUCTION**

1.     This lawsuit concerns the public's right to clean water, free-flowing rivers, abundant fish and wildlife, and properly functioning aquatic systems. When Congress passed the Clean Water Act amendments of 1972, it confirmed a national effort to reverse the rampant degradation and destruction of the Nation's oceans, rivers, lakes, watersheds, and wetlands. The Clean Water Act establishes a comprehensive regulatory framework that protects these waters that all Americans rely on for drinking water and to support activities like boating, swimming, and fishing.

2.     Congress declared a single objective for the Clean Water Act: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To this end, although Congress intended an integration of both state and federal authority, states retain primary authority to abate water pollution. 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . .").

3.     The states' authority to protect and manage their waters to benefit their citizens and all Americans is replete throughout the Act. An essential component of this structure is the states' and authorized tribes' authority under Section 401 of the Clean Water Act to determine whether and how a prospective federally-permitted or -licensed activity complies with requirements of state law. 33 U.S.C. § 1341. Section 401 empowers states and tribes to protect the people, fish, wildlife, and ecosystems that rely on clean, healthy, and resilient rivers, lakes, wetlands, oceans, and other waters.

4.     Under Section 401, no federal permit or license may be issued for any activity that may result in a discharge into waters of the United States, unless the state or authorized tribe where the discharge would originate either certifies the discharge will comply with state water quality requirements, or waives certification. 33 U.S.C. § 1341(a)(1). As a result, state or tribal certification is required for a range of projects that require federal approval, including natural gas pipelines, hydropower development and relicensing, industrial plants, municipal facilities, and wetland development.

5.      Notably, the Section 401 certification process allows the public to participate meaningfully in decision-making concerning activities that may result in discharges to our nation's waters, through the public notice and comment procedures implemented by the states and tribes. 33 U.S.C. § 1341(a)(1). This allows people to have a voice in the decisions that will affect how they may use and enjoy their waters for the many recreational, spiritual, aesthetic benefits they provide.

6.      On July 13, 2020, Defendant Andrew R. Wheeler and Defendant U.S. Environmental Protection Agency ("the EPA") published a final rule revising the regulations implementing Section 401. Clean Water Act Section 401 Certification Rule, 85 Fed. Reg. 42,210 (July 13, 2020) ("Final Rule"). Among the many flaws in the Final Rule, the EPA unlawfully narrows the applicability of Section 401; circumscribes the scope of review of the certifying state or tribe; limits the information on the proposed federal project made available to states, tribes, and the public to inform the certification determination; restricts the conditions the state or tribe may impose to ensure state or tribal laws are met; and empowers the federal licensing or permitting agency to effectively overrule a state or tribal determination of whether such laws are met.

7.      When it promulgated the Final Rule, the EPA violated the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*. ("APA") and the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*. As a result, Plaintiffs seek an order declaring the Final Rule, in whole or in part, unlawful, and setting it or its unlawful provisions aside, because they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A) & (C).

## JURISDICTION & VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). The Final Rule constitutes final agency action subject to judicial review. 5 U.S.C. § 704. This Court has authority to grant the requested relief pursuant to 28 U.S.C. §§ 2201, 2202; and 5 U.S.C. §§ 706(2)(A) & (C).

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers or agencies of the United States, and one or more Plaintiffs has its principal place of

1   business within this district. Venue is also proper in this district pursuant to 28 U.S.C. §

2   1391(e)(1)(A), because Defendant U.S. Environmental Protection Agency resides in the district

3   within the meaning of 28 U.S.C. § 1391(c)(2).

4   ## INTRADISTRICT ASSIGNMENT

5   10.   Assignment to the San Francisco Division is appropriate because the Final Rule will

6   affect numerous federal projects or activities located within the division, and because one or

7   more plaintiffs is headquartered or has an office within the division, and has diverted its

8   resources in response to the Final Rule. Civil L.R. 3-2(c).

9   ## PARTIES

10   11.   Plaintiffs, along with their members, are committed to protecting the chemical, physical,

11   and biological integrity of the Nation's waters.

12   12.   Plaintiff American Rivers works to protect wild rivers, restore damaged rivers, and

13   conserve clean water for people and nature. Since 1973, American Rivers has protected and

14   restored more than 150,000 miles of rivers through education and advocacy efforts, on-the-

15   ground projects, and an annual America's Most Endangered Rivers® campaign. Headquartered in

16   Washington, D.C., American Rivers has offices across the country, including in Berkeley, and

17   Nevada City, California, and has approximately 355,000 members, supporters, and volunteers,

18   including approximately 10,000 in California. American Rivers works in 11 priority river basins

19   across the nation (Puget Sound and Columbia, Sacramento/San Joaquin, Northern Rockies,

20   Colorado River, Upper Mississippi, Great Lakes, Apalachicola-Chattahoochee-Flint, Southern

21   Appalachians and Carolinas, Chesapeake Bay, Delaware River, Connecticut River) and there are

22   numerous projects requiring federal permits in each of those which are potentially impacted by

23   the Final Rule.

24   13.   Plaintiff American Whitewater is a national nonprofit organization, founded in 1954,

25   whose mission is to conserve and restore America's whitewater resources and to enhance

26   opportunities to enjoy them safely. American Whitewater is a membership organization with

27   approximately 6,000 members, representing a broad diversity of individual whitewater

28   enthusiasts, river conservationists, and more than 100 local paddling club affiliates across

America. American Whitewater is a primary advocate for preserving and protecting whitewater rivers throughout the United States, and connects the interests of human-powered recreational river users with ecological and science-based data to achieve the goals within its mission. As a national river conservation nonprofit, American Whitewater's mission is to protect and restore America's whitewater rivers and to enhance opportunities to enjoy them safely. American Whitewater's vision is that our nation's remaining wild and free-flowing rivers stay that way, our developed rivers are restored to function and flourish, that the public has access to rivers for recreation, and that river enthusiasts are active and effective river advocates.

14.     Plaintiff California Trout was founded in 1971 and is a nonprofit conservation organization that strives to solve the state's resource issues while balancing the needs of wild fish and people. California Trout is driven by science to restore vibrance and abundance to California's freshwater ecosystems by working to ensure resilient wild fish thrive in healthy waters. California Trout believes that abundant wild fish indicate healthy waters and healthy waters benefit all Californians. Through strong partnerships in key geographies where wild fish influence the community, California Trout drives innovative, science-based solutions that work for the diverse interests of fish, farms, commerce, and people. California Trout is headquartered in San Francisco, California, with a field office in Arcata, California. California Trout has approximately 10,000 members in California. For more than 20 years, California Trout has participated in the hydropower relicensing process through the Federal Energy Regulatory Commission and through the state water quality certification process. California Trout's goal in these instances has been to represent the public interest in minimizing the environmental impact of hydropower generation on rivers and watersheds, including but not limited to aquatic habitat, fisheries, recreational use, and access.

15.     Plaintiff Idaho Rivers United is a conservation organization founded in 1990, with a mission to protect and restore Idaho's rivers on behalf of all who love the freedom, adventure, and solitude they provide. Idaho Rivers works to safeguard Idaho's imperiled wild steelhead and salmon, protecting and enhancing stream flows and riparian areas, and defending and promoting the wild and scenic qualities of our wild rivers. Idaho Rivers involves its 5,000 volunteers and

members to protect wild rivers, keep drinking water clean, defend at-risk populations of fish, establish in-stream flows, and minimize the impacts of dams on Idaho's rivers.

16.    Plaintiffs are national, regional, and state public-interest environmental organizations with a combined membership numbering thousands of members. On behalf of these members, Plaintiffs advocate to protect rivers and streams, and for the people and animal and plant species that depend on clean and abundant water. Plaintiffs frequently participate in state certification determinations under Section 401, and are directly injured by the Final Rule's attempt to narrow the applicability, scope, and outcome of Section 401 certifications.

17.    Plaintiffs as organizations monitor and comment on projects requiring federal licenses or permits that may affect water quality across the country.

18.    American Rivers is concerned about the impact the Final Rule will have on 401 Certification processes and decisions on numerous rivers throughout California. For example, on August 29, 2019, Federal Energy Regulatory Commission ("FERC") accepted an application for modifications at the Camp Far West Hydroelectric Project on the Bear River in Yuba, Nevada, and Placer Counties, California. This project has the potential to impact the Bear River significantly, and thus American Rivers' members' use and enjoyment of the river and the surrounding area. The project proponent has not applied for a 401 Certification for this project. As a result, the Final Rule will apply to any 401 Certification of this project, and American Rivers is concerned that it and its members will not be able to advocate for and protect their interests in the Bear River through that process because of the limitations found in the Final Rule.

19.    American Rivers also is participating in the ongoing review of the Goldendale Energy Storage Project, a closed-loop pumped storage project, in Washington State close to the Columbia River near the John Day Dam. There, the Washington Department of Ecology recently began the 401 Certification review process. American Rivers is concerned that the state, FERC, or both will apply the Final Rule to the review project in a manner that will limit both the time and information available to the public as part of the process and circumscribe the scope of review or terms and conditions the state may prescribe as part of Certification. Consequently, the

Plaintiffs' First Amended Complaint
Case No. 3:20-cv-04636-WHA              6

Final Rule frustrates American Rivers' mission of protecting wild rivers, restoring damaged rivers, and conserving clean water for people and nature.

20.     Similarly, over the last 30 years, American Whitewater has participated in the hydropower relicensing process at well over 100 projects through FERC and through the state water quality certification process, with the goal of representing the public interest in those proceedings. American Whitewater has participated in FERC licensing proceedings throughout the country, including but not limited to the following projects in California: Pit 1 (P-2687); Pyramid Lake (P-2426); Tuolumne (P-2299); Kern 3 (P-2290); Yuba Bear Drum Spalding (P-2266,2310); Middle Yuba (P-2246); Merced (P-2179); Chili Bar (P-2155); Piru Creek (P-2153); McCloud Pit (P-2106); UARP (P-2101); Oroville (P-2100); South Feather (P-2088); MF American River (P-2079); Big Creek 4 (P-2017) Rock Creek Cresta/NF Feather (P-1962)' Kaweah (P-298); Pit 3 4 5 (P-233); Mokelumne (P-137); Kerckhoff (P-96); Eel (P-96).

21.     Through its work on hydroelectric projects, American Whitewater has seen how the Final Rule has already been used, and will be used, to prevent states from using their authority under Section 401. For example, the project proponent of the Morrisville Hydroelectric Project, which impacts the Lamoille River, Elmore Brook, and the Green River in Vermont, recently cited the new regulations in support of its motion to stay the State of Vermont Superior Court's consideration of the state-issued 401 Certification of the project—a certification which requires the release of water to allow whitewater boating, the result of American Whitewater's advocacy on behalf of its members. The requested stay, which the court did not grant, was meant to allow FERC additional time to consider a petition arguing that the State of Vermont had waived its 401 Certification authority over the project. FERC has yet to make a decision on that petition, but American Whitewater is concerned FERC will rely on the Final Rule to find waiver and ignore the terms and conditions enumerated in the state's 401 Certification.

22.     American Whitewater and its members have a significant ongoing interest in the relicensing of the hydropower projects on the Mongaup River, a tributary to the Delaware River in southern New York. There, the licensee, Eagle Creek Renewable Energy, has filed the final license application, and American Whitewater anticipates that FERC will file a Notice of Ready

for Environmental Analysis by the end of the year. The licensee will then file an application for water quality certification with the State of New York within 60 days of the notice. From American Whitewater's perspective, the major issues in relicensing are recreation, minimum flows, lake levels, fish passage, and endangered species, all of which must be considered in the 401 Certification review process. American Whitewater has a particular interest in the boating opportunities associated with this project because it is one of the closest whitewater reaches to New York City and supports paddlers of wide-ranging abilities. American Whitewater is concerned that under the Final Rule it, and its members, will lose an important opportunity to advocate for appropriate scheduled whitewater releases and boating access at the project. The Final Rule thus frustrates American Whitewater's mission of protecting and restoring America's whitewater rivers and enhancing opportunities to enjoy them safely.

23.    California Trout is one of the FERC project applicants for the Potter Valley Project. The Potter Valley Project is located on the Eel River and the East Branch Russian River in Mendocino and Lake Counties, California. The existing facilities include Lake Pillsbury, a 2,300-acre storage reservoir impounded by Scott Dam; the 106-acre Van Arsdale Reservoir, impounded by the Cape Horn Diversion Dam; and a tunnel and penstock across a natural divide to the powerhouse located in the headwaters of the Russian River Basin. The Project was built to store, then divert, Eel River water to a powerhouse located on the Russian River. In June 2019, California Trout submitted a Notice of Intent to File an Application for the Potter Valley Project, along with four other entities, and has subsequently taken steps towards implementing a plan for a project that would remove of Scott Dam, which blocks access for salmon and steelhead to nearly 300 miles of prime spawning and rearing habitat, and create new facilities to enable continued diversion of water from the Eel to the Russian River. Therefore, as an applicant for the Potter Valley Project License, California Trout will be directly affected by the 401 Certification process necessary to acquire the license from FERC and a CWA permit from the Corps of Engineers.

24.    California Trout and its members have provided oral and written comments to state resource agencies for the inclusion of conditions in state water quality certifications of

Plaintiffs' First Amended Complaint
Case No. 3:20-cv-04636-WHA          8

hydropower projects that would assure the protection of designated and existing uses, including but not limited to the protection of aquatic habitat, threatened and endangered species, river access, improvement to the flow regime that has been altered by project operations. In order to provide a meaningful opportunity for the states to determine whether a hydropower project meets state water quality standards, California Trout asserts that the states must have sufficient time and information to complete their environmental review of all project impacts. Absent a meaningful and robust review of project impacts on rivers, hydropower projects will fail to protect designated and existing uses, including but not limited to angling. California Trout believes this is true for all projects, Potter Valley included. California Trout has expended a significant amount of staff time analyzing and discussing the impact of new EPA regulations limiting states' ability to assure that federally licensed energy projects meet state water quality standards. Based on these efforts, California Trout believes Final Rule thus frustrates its mission of restoring California's freshwater ecosystems so that they may support resilient wild fish populations.

25.     Idaho Rivers United regularly relies on the process related to state-issued 401 Certifications to advocate of its interests, and its members' interests. First, Idaho Rivers United is regularly involved in the licensing of hydroelectric projects. For example, the Felt Hydroelectric Project, a 7.45-megawatt, located on the Teton River near the City of Tetonia, in Teton County, Idaho, is currently undergoing relicensing FERC. Idaho Rivers United is actively participating in this process. It indents to rely on the section 401 Certification process to ensure the impacts of the project on important issues, such as the Yellowstone cutthroat trout and boating access, are addressed during the licensing process. However, Idaho River United believes that the restrictions placed on the state's review of the project will limit that process's effectiveness.

26.     Second, EPA is the permitting authority under section 402 of the CWA, 33 U.S.C. § 1342, in Idaho. While some elements of the permitting program have been delegated to the state, EPA retains the permitting authority over federal facilities, general and individual stormwater permits, and biosolids until July 1, 2021. As a result, before EPA may issue any such permit, the applicant must request that the state certify the project under section 401. Idaho River United

1    routinely comments such permits and the corresponding section 401 Certifications. Currently,

2    EPA is taking public comment on four stormwater permits—namely, the City of Nampa

3    municipal separate stormwater sewer system (MS4), the Canyon Highway District No. 4 MS4,

4    the Ada County Highway District MS4, and Idaho Transportation Department District #3 MS4—

5    all of which will require 401 Certifications from the state. These MS4 systems discharge into

6    rivers and waterbodies used and enjoyed by Idaho River United members, and but for the

7    restrictions place on the state's review by the Final Rule, the necessary 401 Certification could

8    provide a means for those members to advocate for greater protections for those waters.

9    27.    Because the Final Rule undercuts the states' authority to review these projects, many

10   projects will pollute and fill more waters than they would under the prior rule, and many would-

11   be permit applicants will dredge, fill, and pollute without undergoing a meaningful review of

12   their impacts. This will undercut the Plaintiffs' ability to, on behalf of and for the benefits of

13   their members, protect water quality, cripple their ability to monitor the development of harmful

14   projects and participate in the permitting process of such projects, and deprive the organizations

15   of information they rely on to educate their members, propose legislation, and consider litigation.

16   As a result, the Final Rule will stymie Plaintiffs' ability to provide these vital services to their

17   members, and frustrates their organizational missions.

18   28.    As a result, Plaintiffs have been forced—and will continue to be forced—to divert limited

19   resources from core mission programs to assess the Final Rule's harms and develop new

20   strategies to defend the waters their members use and enjoy. For example, under the restrictions

21   the Final Rule places on the information that an applicant must provide to support the initiation

22   of a review under Section 401, and the limited time the state has to complete its review, in order

23   to continue carrying out their missions the organizations must now obtain, organize, and provide

24   additional information on the impacts of proposed projects necessary to allow the state to make a

25   reasoned decision on whether the project complies with state law. Collecting, organizing, and

26   submitting this information, which otherwise should be provided by the project proponent,

27   requires significant time and resources.

28

Plaintiffs' First Amended Complaint
Case No. 3:20-cv-04636-WHA          10

29.     The Final Rule undermines how states and tribes use Section 401 to impose the terms and conditions necessary to comply with the state or tribal laws. The plaintiffs thus will be left to rely on other state and federal laws and permitting programs to advocate for similar protections. Determining if, and how, that will be accomplished has required, and will continue to require, the reallocation of staff time and resources to research the potential local, state, and federal laws that address the impacts to local waters, and understand the procedures, requirements, and limitations of these laws in order to assess how they might be used to replace the process and protections offered under Section 401. However, based on the organizations' experience and belief, these mechanisms will likely prove to be inadequate substitutes.

30.     Since the Final Rule was promulgated, staff members at American Whitewater have spent numerous hours analyzing the Final Rule and its implications, and sharing this analysis with state resource agencies in California, New York, Massachusetts, Oregon, Washington, and Vermont. American Whitewater has expended and is continuing to expend a significant amount of time analyzing, discussing, educating its members and the public, and advising resource agencies, tribes, and other environmental organizations on the Final Rule. These activities include, but are not limited to, publishing articles in American Whitewater's journal, website, and social media channels describing the new EPA regulations and their impact on whitewater boating. This work is in addition to the considerable efforts made before the passage of the Final Rule to analyze, understand, and share information on the steps the administration took leading up to the Final Rule. But for the actions of the EPA in promulgating these new regulations, the time spent on these activities, which collectively is over 400 hours of staff time, would have been devoted to other activities in furtherance of the organization's mission.

31.     American Rivers has redirected resources toward educating, empowering, and advocating on behalf of its members as a result of the Final Rule. American Rivers created a website (www.defendcleanwater.org) to provide information and raise awareness about the EPA rule changes. American Rivers created informational materials, analyses, and briefing papers to explain the EPA rule change to members of the Hydropower Reform Coalition, a coalition of conservation and recreation organizations that track and participate in hydropower licensing

proceedings. American Rivers has spent resources developing education and outreach materials to educate the public and elected officials about the rule changes and to explain what EPA has done in a way that is understandable to people unfamiliar with Section 401 of the Clean Water Act and its importance to the hydropower licensing process. In support of these efforts, American Rivers has spent over $18,000, which would have been spent on other organizational priorities if not for EPA's actions.

32.     Plaintiffs will be required to expend additional time and resources on educating and engaging their members on how to participate in the state process under the new regulations. This work will require the organizations to educate their members on both the new federal rules and any changes to the states' rules that may occur as a result. In addition, at the same time, the organizations will be working to educate and inform their members on how best to use alternative processes, under federal, state, and local laws, that may be used to fill in the gap in protections for waterbodies left by the Final Rule.

33.     California Trout has expended a significant amount of staff time analyzing and discussing the impact of new EPA regulations limiting California's ability to ensure that federally licensed energy projects meet state water quality standards. California Trout has four staff members devoting a significant amount of staff time participating in the active FERC processes for the Klamath Dams Hydropower Project and the Potter Valley Project. As a result, of EPA's actions, these staff members have participated in countless with nonprofit partners and state and federal resource agencies regarding the guidance, proposed and final Section 401 Certification Rule. Specifically, since the publication of the Final Rule, California Trout staff have spent numerous hours discussing the new rule and its implications with state resource agencies California. But for the actions of the EPA in promulgating these new regulations, the time expended on these activities would have been devoted to other activities in furtherance of the organization's mission.

34.     Idaho Rivers United also has diverted a significant amount of staff time analyzing and discussing the impact of new EPA regulations, including significant time analyzing Executive Order 13868, Clean Water Act Section 401 Guidance for Federal Agencies, States and Tribes,

Proposed Rule Updating Regulations on Water Quality Certification, and final Clean Water Act Section 401 Certification Rule. Specifically, Idaho Rivers United participated in numerous discussions with other members of the Hydropower Reform Coalition and state and federal resource agencies regarding the guidance, proposed and final Section 401 Certification Rule. Since the publication of the final rule by the EPA "Updating Regulations on Water Quality Certification," Idaho River United's staff have worked with state and tribal resource agencies in Idaho, Oregon, and Washington, as well as other environmental organizations, to understand the impact of the rule on federal relicensing of hydropower projects in Idaho. In addition, Idaho Rivers United has written or contributed to several articles and editorials in the Idaho Rivers United newsletter, website, and social media channels describing the new EPA regulations and their impact on recreational activities in Idaho. This additional work would not have been required if EPA had not developed and issued the Final Rule.

35.     The Final Rule will also harm the Plaintiffs' members' aesthetic, recreational, educational, spiritual, and financial interests. Plaintiffs' members regularly visit local rivers, streams, and wetlands for birding, wildlife observation, fishing, paddling, kayaking, hiking, and photography. Some of the Plaintiffs' members regularly travel through the country to participate in these activities. Some of Plaintiffs' members rely on clean water for their livelihoods, including for businesses that provide kayak tours, paddleboard rentals, and boat charters.

36.     Steve Rothert is a member of American Rivers. Mr. Rothert spends his time fishing, boating, viewing wildlife, and exploring the well-known and lesser-known public jewels along the Bear River, in addition to regularly visiting the Feather River and Yuba River. As a result of his countless indelible experiences on the Bear River from its headwaters to its confluence with the Feather River, Mr. Rothert has devoted considerable time to working to protect these places, in part, by participating in the 401 Certification process for various federal projects. For example, Mr. Rothert provided numerous comments and recommendations to the California State Water Resources Control Board's 401 certification proceeding on PG&E's Drum Spaulding and Nevada Irrigation District's Yuba-Bear project, focusing on: 1) maintaining adequate flows to support healthy fish populations and riparian habitat; 2) ensuring the projects

are adequate to adapt to the changing climate conditions, and 3) ensuring the projects maintained conditions to support recreation (boating, fishing, wildlife viewing) in the project-affected reaches. Mr. Rothert believes the Final Rule unlawfully narrows the applicability of Section 401 and prevents states and tribes from protecting the full array of water quality standards and beneficial uses of our waterways, limits the scope of review of the certifying state or tribe, limits the information on proposed FERC hydropower projects made available to states, tribes, and the public to inform the certification determination, restricts the conditions the state or tribe may impose to ensure state or tribal water quality laws are met, and improperly empowers the federal licensing or permitting agency to effectively overrule a state or tribal determination of whether such laws are met. As a result, Mr. Rothert believes the Final Rule will harm him because it will remove an important tool to protect the flows that support the fly fishing, boating, swimming, and wildlife viewing that means so much to him, and could halt and even reverse the progress made in the Bear, Yuba, Feather and many other rivers in California toward restoring the incalculable value healthy rivers provide the public.

37.     Robert Center is a member of American Whitewater. Mr. Center regularly paddles on rivers throughout California, including the Yuba, American, Feather, Tuolumne, Kern, and Pit rivers, as his primary means to access the natural landscape. As a result, protecting the health of these rivers has been Mr. Center's primary pursuit over the past twenty years. Yet, many of the rivers where Mr. Center engages in whitewater boating are affected by dams that are licensed by FERC, including but not limited to the following hydropower projects: Yuba Bear/Drum Spaulding Yuba River Development Project, Upper American River Project, Chili Bar Project, Pit #1, Pit 3 4 5, Kern River #3, Don Pedro. Mr. Center is concerned that the Final Rule will limit his ability to engage in whitewater boating on these rivers because it will restrict states' ability to protect whitewater boating as a use.

38.     A member of California Trout, who is the field and lab director for UC Davis Center for Watershed Sciences, where he works to understand better how watersheds and the rivers that flow through them work, to ensure that future generations will have the same opportunities that he has been lucky to have, is concerned about the impact the Final Rule will have on his ability

to fish on rivers in California. Over the past 20 years, he has engaged in angling on the Yuba, American, Feather, Tuolumne, McCloud, Pit, Fall, Klamath, and Trinity Rivers in California. These rivers are each impacted by federally-licensed hydroelectric projects. Many of these projects, such Yuba Bear/Drum Spaulding Yuba River Development Project, Upper American River Project, Pit #1, Pit 3 4 5, Kern River #3, and the Klamath Hydroelectric Project, either are or will soon go through relicensing, which will require a state-issued 401 Certification. Given his significant interest in continuing to fish and otherwise use and enjoy these waters, he is concerned that the Final Rule will limit his ability to participate in a public process to assure that FERC-licensed hydropower projects meet state water quality standards.

39.     By restricting the applicability, scope of review, the scope of permissible conditions, and finality of state certifications, the Final Rule restricts the Plaintiffs' and their members' participation in certification determinations. By restricting the applicability, scope of review, the scope of permissible conditions, and finality of state certifications, the Final Rule restricts Plaintiffs' and their members' access to information about federally-permitted or -licensed activities. The Final Rule deprives the Plaintiffs and their members of information critical to their organizational missions by severely limiting the information required for a valid certification request. By accelerating the certification process and limited the range of actions that state and tribes may take to respond to a request for certification, the Final Rule threatens to deprive the Plaintiffs and their members of the opportunity to participate in full and complete state certification decisions.

40.     Defendant Andrew R. Wheeler is the Administrator of the U.S. Environmental Protection Agency. Mr. Wheeler is sued in his official capacity. Mr. Wheeler oversees the EPA's implementation of the Clean Water Act.

41.     Defendant U.S. Environmental Protection Agency is an agency of the U.S. Government that has primary responsibility for implementing the Clean Water Act.

/// /// ///

/// /// ///

/// /// ///

**LEGAL BACKGROUND**

**I.     The Clean Water Act**

42.     In 1972, Congress adopted comprehensive amendments to the Clean Water Act in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

43.     In the Clean Water Act, Congress stated its policy "to recognize, preserve, and protect the primary responsibilities of the States … to plan the development and use … of land and water resources … ." 33 U.S.C. § 1251(b). Congress added further, that "[e]xcept as expressly provided in this Act, nothing in this Act shall … be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C. § 1370.

44.     Federally-recognized Indian tribes may be authorized by the EPA under Section 518 of the Clean Water Act to carry out certain of the same functions as states, including Section 401 certification authority. 33 U.S.C. § 1377(e).

45.     The EPA administers the Clean Water Act, and is authorized to promulgate "such regulations as are necessary to carry out [its] functions" under the Act. 33 U.S.C. § 1361(a).

**II.    Section 401 of the Clean Water Act**

46.     Under Section 401 of the Clean Water Act, no federal permit or license may issue for any activity that may result in a discharge into waters of the United States, unless the state or authorized tribe ("certifying authority") where the discharge would originate either certifies that the discharge will comply with state water quality requirements, or waives certification. 33 U.S.C. § 1341(a)(1).

47.     The EPA acts as the certifying authority on behalf of tribes it has not authorized to administer Section 401, and where the discharge would originate on lands under exclusive federal jurisdiction.

48.     Section 401 applies broadly to any proposed federally licensed or permitted activity that may result in any discharge into a water of the United States. 33 U.S.C. § 1341(a)(1).

49.     Section 401 instructs states and authorized tribes to establish procedures for public notice of all certification applications. 33 U.S.C. § 1341(a)(1).

50.     If the certifying authority fails or refuses to act on a request for certification "within a reasonable period of time (which shall not exceed one year) after receipt of" a request for certification, certification is deemed waived. 33 U.S.C. § 1341(a)(1).

51.     Section 401 mandates that any certification issued pursuant thereto "shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations, … and with any other appropriate requirement of State law set forth in such certification." 33 U.S.C. § 1341(d). Any such limitation or requirement "shall become a condition on any Federal license or permit subject to the provisions of this section." *Id.*

### III.     The Administrative Procedure Act

52.     The APA provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

53.     Final agency actions are reviewable under the APA. 5 U.S.C. § 704. Promulgation of a final rule is "final agency action" under the APA. 5 U.S.C. § 551(13).

54.     Under the APA, a court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

### FACTS

### I.     Application of Section 401

55.     For the past 50 years, states have exercised the certification authority preserved by Section 401 for activities that require federal approval, such as hydropower licenses and relicensing, natural gas pipelines, fossil fuel plants and export terminals, industrial and municipal facilities, and the development of wetlands.

56.     These reviews consider and address impacts from such activities in making certification determinations under Section 401, including impacts to water quality and quantity, ecosystems, sensitive species and their habitat, watershed hydrology, water and non-water related recreation, and aesthetic value.

57.     States have imposed a broad array of conditions on activities subject to the Section 401 certification requirement—including conditions not related to the triggering discharge—that are necessary to ensure compliance with state law requirements.

58.     States have denied certification for activities that would cause violations of state law requirements, including state law requirements that were not promulgated pursuant to the Clean Water Act.

59.     States have enacted laws and regulations establishing the rules and processes for public notification and participation in determinations concerning requests for certification under Section 401.

60.     Plaintiffs and their members have participated and intend to continue participating in state certification determinations, including in areas within the Northern District of California.

61.     Plaintiffs and their members rely on information obtained through state certification procedures to understand better proposed projects and activities that may impact their interests.

62.     On April 10, 2019, President Trump issued Executive Order 13,868, directing EPA to review Section 401; issue new guidance to states, tribes, and federal agencies; and propose new regulations implementing Section 401. Executive Order No. 13,868: Promoting Energy Infrastructure and Economic Growth, 84 Fed. Reg. 15,495 (April 10, 2019).

63.     The stated purpose of Executive Order 13868 was to "fully realize th[e] economic potential" of the United States' coal, oil, natural gas, and other energy resources, by "promot[ing] efficient permitting processes and reduce regulatory uncertainties that currently make energy infrastructure projects expensive and that discourage new investment." 84 Fed. Reg. at 15,495. According to the executive order, "[o]utdated Federal guidance and regulations regarding section 401 … are causing confusion and uncertainty and are hindering the development of energy infrastructure." 84 Fed. Reg. at 15,496.

64.     On June 7, 2019, the EPA issued its "Clean Water Act Section 401 Guidance for Federal Agencies, States and Authorized Tribes." This guidance offered the EPA's opinion on the time within which a state or tribe must make a certification decision; the grounds for denying or conditioning a certification to water quality requirements; and the type of information that the state needs to make its certification decision.

65.     In August 2019, the EPA published an economic analysis of existing Section 401 processes, and its proposed Section 401 rulemaking. EPA, *Economic Analysis for the Proposed Clean Water Act Section 401 Rulemaking*, NEPIS 810R19001A (Aug. 2019). In its economic analysis, the EPA summarized four "denials and other high-profile section 401 certification cases." The EPA relied on these four "case studies," which were based on the proponent's failure to address significant water resource impacts, failure to adequately mitigate impacts to water quality, and unavoidable adverse impacts to the local environment as a result of not meeting state water quality standards, to highlight the cost of certification denial on project proponents. In particular, the EPA stated in its economic analysis that denial could delay proposed projects increasing costs above original estimates, cause the project proponent to forego a project after investing funds and staff time, and entail legal costs and further resources in challenging a denial in court. The EPA stated further that recent denials of large infrastructure projects have "highlighted the potential for certification 401 certification denials to have broader economic impacts," suggesting that such denials "could jeopardize the reliability of gas-fired electric generators." In its economic analysis, the EPA suggested that requiring a "complete application" before starting the clock for 401 certification "has caused confusion and delays," and represents "an opportunity cost to the project proponent." According to a Western States Water Council report cited by the EPA in its economic analysis, "incomplete requests are the most common cause of section 401 review delay." The EPA further suggested that certifying authorities and project proponents engage in a "withdrawal and resubmit" process, effectively extending the project timeline beyond one year.

66.     The EPA's economic analysis recounts the outcome of survey given to 50 states about their section 401 certification processes. According to the EPA's economic analysis, responses to

1   this survey "indicate that the average length of time for states to issue a certification decision

2   once they receive a complete request is 132 days," and that "denials are uncommon, with 17

3   states averaging zero denials per year and other states issuing denials rarely." Information from

4   another survey made available to EPA by the Western States Water Council "further suggests

5   that denials are uncommon, and most decision [sic] are made between 40-90 days."

6   **II.      The EPA's Rulemaking**

7   67.     On August 22, 2019, the EPA published in the Federal Register a proposed rule entitled

8   "Updating Regulations on Water Quality Certification" ("Proposed Rule"). 84 Fed. Reg. 44,080–

9   44,122 (Aug. 22, 2019).

10   68.     The Proposed Rule provided the public with an opportunity to file comments until

11   October 21, 2019.

12   69.     Over 125,000 public comments were submitted on the proposed rule. Plaintiffs American

13   Rivers, American Whitewater, and Idaho Rivers United submitted comments on the Proposed

14   Rule during the public comment period, including in a letter dated October 21, 2019, and

15   submitted electronically to EPA Docket No. EPA-HQ-OW-2019-0405 on behalf of the

16   Hydropower Reform Coalition and its member organizations. EPA-HQ-OW-2019-0405-0803. In

17   addition, American Whitewater commented separately. EPA-HQ-OW-2019-0405-0783.

18   70.     The EPA received numerous extensive critiques of the proposed rule, including from

19   states, tribes, and Plaintiffs, detailing the many flaws in it.

20   71.     For example, numerous comments, including from the states and tribes, explained that

21   the delay in processing 401 certification requests, when they occurred, often were the result of a

22   lack of information provided by the project applicant. Many of these comments explained that

23   the limited information required under the proposed rule would exacerbate these problems by

24   limiting the information that must be provided to the certifying entity. Other comments noted

25   that by failing to require more, detailed information in a certification application, or allowing the

26   states to decide what information should be required, is inconsistent with the Clean Water Act

27   and some state laws.

28

Plaintiffs' First Amended Complaint
Case No. 3:20-cv-04636-WHA          20

72.     Similarly, many commenters noted that the proposal process would allow project proponents to dictate the timing of a certification review, potentially beginning the process before the certifying agency is able (because of resources, staffing, or available information) to properly review the application, and upsetting the long-standing relationships between states and federal agencies on how applications are noticed and processed. In addition, many commenters noted that proposed regulations would lead to more uncertainty, not less, on when an application was received.

73.     Other comments noted the Clean Water Act authorizes the certifying authorities, not the federal agencies, to set the reasonable period of time for a review of an application. These comments highlighted that the proposed rule did not account for the suite of factors that the certifying authority would need to consider in making these decisions, included but not limited to: requirements of state law; the need for administrative review; the underlying license or permit; agency resources; and individual project needs such as studies that require seasonal field work.

74.     Several commenters also objected to the limitations placed on the certifying authorities' ability to manage the time for review, noting that the proposed rule did not account for significant projects, changes in the project, and other factors that may require the state to adjust the time necessary to review a project.

75.     Other comments noted that the additional justifications and documentation requirements imposed for granting certification with conditions and denials would be burdensome and add to the complexity of and time required for decisions. Many commenters noted that the provisions allowing the federal agencies to review these decisions and effectively "veto" a certification conditions and denials is inconsistent with the plain language of the Clean Water Act, would undermine the authority of the states and tribes to protect their waters and communities, and would add a potential second round of litigation—in the federal courts—to each certification decision, thus further complicating and delaying the review process.

76.     In sum, these comments, particularly from the states and tribes, demonstrated how the proposed rule would add significant uncertainty to the 401 review process, and make it more difficult—not less—for a certifying authority to complete the necessary review.

77.     Notably, despite recognizing that "Congress enacted section 401 of the CWA to provide States and authorized Tribes with an important tool to help protect the water quality of federally regulated waters within their borders in collaboration with federal agencies," nowhere in the EPA's explanation of or justifications for the Final Rule does the agency explain how this rule will work to better protect waters of the United States. Further, many commenters noted that the restrictions placed on the scope of analysis permitted under the Final Rules would undermine the states' and tribes' ability to protect water quality. Indeed, as several commenters pointed out, the EPA failed to undertake any analysis of what impact this rule will have on water quality.

78.     Despite these many critiques and concerns raised by the states, tribes, and public, the EPA retained most of the most problematic components in the Final Rule. As a result, this rule will not address any of the legitimate concerns about the current 401 regulations and, in fact, will sow further confusion about the process for obtaining a 401 certification, while at the same time unlawfully curtailing state and tribal authority under the law. As a result, the Final Rule is both inconsistent with and unresponsive to the comments submitted, and the record does not support EPA's stated rationales for the Final Rule.

**III.    The Final Rule**

79.     On July 13, 2020, the EPA published the Final Rule in the Federal Register. 85 Fed. Reg. 42,210 (July 13, 2020).

80.     The Final Rule provides that Section 401 certification is triggered when any federally-licensed or -permitted activity "may result" in "a discharge from a point source into a water of the United States." Final Rule at 42,285 (to be codified at 40 C.F.R. §§ 121.2, 121.1(f)).

81.     The Final Rule provides that the timetable for certification starts immediately upon receipt of a "certification request," rather than upon receipt of a "complete application." Final Rule at 42,243 & 42,285 (to be codified at 40 C.F.R. §§ 121.1(c), 121.1(m), 121.6(a)). The Final Rule states that a "certification request" must be a written, signed and dated communication that

requests the review of the project under Section 401, and certifies that it correctly and accurately identifies: the proposed project; its proponents; the applicable underlying federal license or permit; and the location and nature of any potential discharge that may result from the proposed project and the location of receiving waters; includes: a description of any methods and means proposed to monitor the discharge and the equipment or measures planned to treat, control, or manage the discharge; a list of all other federal, interstate, tribal, state, territorial, or local agency authorizations required for the proposed project, including all approvals or denials already received; and documents that a pre-filing meeting request was submitted to the certifying authority at least 30 days prior to submitting the certification request. Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.5(b)–(c)).

82.     The Final Rule limits the scope of a certifying authority's review to "assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements." Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.3).

83.     Under the Final Rule, the term "discharge" is defined as "a discharge from a point source into a water of the United States." Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.1(f)).

84.     Under the Final Rule, "water quality requirements" means "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States." Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.1(n)).

85.     The Final Rule directs federal agencies that issue permits or licenses requiring Section 401 certification to establish the "reasonable period of time" for a certifying authority to act on a certification request, "either categorically or on a case-by-case basis." Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.6(a)).

86.     The Final Rule provides that once the timeline for certification has been triggered by receipt of a certification request, it cannot be stopped or restarted, even if the project proponent fails to provide requested information. Final Rule at 42,286 (to be codified at 40 C.F.R. § 121.6(e)).

87.     The Final Rule allows certification decisions to be based only on the impacts of point source discharges associated with the proposed project or activity, and not on other impacts of the activity as a whole. Final Rule at 42,251 & 42,285 (to be codified at 40 C.F.R. §§ 121.3, 121.1(e), 121.1(n)).

88.     The Final Rule empowers the federal permitting or licensing agency to determine whether a certifying authority's denial complied with the rule's procedural requirements, and to deem the certification requirement waived where it concludes that the certifying authority's denial did not comply with the rule's procedural requirements. Final Rule at 42,286 (to be codified at 40 C.F.R. § 121.9(a)(2)).

89.     The Final Rule empowers the federal permitting or licensing agency to determine whether a condition imposed by the certifying authority complied with the rule's requirements, before incorporating it in the underlying federal permit or license. Final Rule at 42,286 (to be codified at 40 C.F.R. §§ 121.9(b), 121.10(a)).

## FIRST CLAIM FOR RELIEF

### Violation of the Clean Water Act

*(The Final Rule unlawfully restricts powers Congress preserved for the States)*

90.     Plaintiffs reallege all previous paragraphs.

91.     The Clean Water Act authorizes the EPA to promulgate "such regulations as are necessary to carry out [its] functions under the [Clean Water Act]." 33 U.S.C. § 1361(a).

92.     The Clean Water Act provides that "[e]xcept as expressly provided in this Act, nothing in this Act shall … be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C. § 1370.

93.     The EPA has limited "functions" to "carry out" under Section 401, namely: to act as the certifying authority where the discharge triggering Section 401 occurs on land under exclusive federal jurisdiction or on behalf of a tribe it has not authorized to administer Section 401; and to determine whether a discharge may affect the water quality of another state, and take certain actions following such a determination. 33 U.S.C. §§ 1341(a)(1)–(2). The EPA has no other

"functions" to "carry out" under Section 401, and therefore has no statutory authority to prescribe regulations interpreting or implementing the rest of Section 401.

94.     The Final Rule narrows the applicability of Section 401, circumscribes the scope of the states' and authorized tribes' review, limits the conditions a state or authorized tribe may impose in granting certification, and empowers federal licensing or permitting agencies to effectively overrule a state or authorized tribe's certification determination.

95.     The EPA's decision to impose limits on state and tribal certification authority is arbitrary; capricious; not in accordance with law; and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §§ 706(2)(A) & (C).

**SECOND CLAIM FOR RELIEF**

**Violation of the Clean Water Act**

***(The Final Rule's unlawful provisions concerning the timeline for certification)***

96.     Plaintiffs reallege all preceding paragraphs.

97.     Section 401 provides that states and authorized tribes "shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications." 33 U.S.C. § 1341(a)(1).

98.     The Final Rule establishes requirements governing the states' and authorized tribes' implementation of their certification processes under Section 401, including but not limited to:

      a)     mandating when the certification timeline shall begin (Final Rule at 42,243 & 42,285 (to be codified at 40 C.F.R. §§ 121.1(c), 121.1(m), 121.6(a)));

      b)     limiting the type and scope of information the applicant must provide (Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.5(b)–(c)));

      c)     restricting the state's or tribe's authority to require the submission of additional information (Final Rule at 42,262);

      d)     restricting the state's or tribe's authority to manage the timing of its review process (Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.6)); and

e)      preventing the state or tribe from identifying the amount of time it will need to conduct its certification review (Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.6)).

99.     The EPA's decision to interpret and regulate the timeline for certification, which is the sole prerogative of the certifying authority, is arbitrary, capricious, and not in accordance with law; and also in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §§ 706(2)(A) & (C).

100.    The EPA's interpretation of "certification request" as requiring only limited information about the proposed project or activity is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

101.    The EPA's decision to limit the types of actions the certifying authorities may take in response to a request for certification is arbitrary, capricious, or not in accordance with law; and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §§ 706(2)(A) & (C).

102.    The EPA's decision to allow other federal agencies to define the "reasonable period of time" for acting on a certification request is arbitrary, capricious, or not in accordance with law; and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §§ 706(2)(A) & (C).

### THIRD CLAIM FOR RELIEF

### Violation of the Clean Water Act

*(The Final Rule unlawfully limits Section 401's applicability to activities that may result in point source discharges)*

103.    Plaintiffs reallege all preceding paragraphs.

104.    Section 401 requires certification for any federally-licensed or -permitted activity "may result in any discharge into the navigable waters." 33 U.S.C. § 1341(a)(1).

105.    The Clean Water Act provides that "[t]he term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants." 33 U.S.C. § 1362(16).

106.    The terms "discharge of a pollutant" and "discharge of pollutants," in turn, mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

107.    The Final Rule limits the application of Section 401 to activities that may result in a "discharge from a point source." Final Rule at 42,285 (to be codified at 40 C.F.R. §§ 121.1(f), 121.2).

108.    The EPA's decision to limit the certification requirement to activities that may result in point source discharges is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

### FOURTH CLAIM FOR RELIEF

### Violation of the Clean Water Act

*(The Final Rule unlawfully limits the scope of—and permissible conditions on—certification to impacts of point source discharges on water quality)*

109.    Plaintiffs reallege all preceding paragraphs.

110.    Section 401(a) requires "the State in which the discharge originates or will originate" to certify that "any such discharge will comply with the applicable provisions of" specified sections of the Clean Water Act. 33 U.S.C. § 1341(a).

111.    Section 401(d) instructs the certifying authority to "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a federal license or permit will comply" with applicable provisions of the Clean Water Act and "any other appropriate requirement of State law." 33 U.S.C. § 1341(d). Any such limitations become a condition on the federal license or permit. *Id.*

112.    The Final Rule limits the scope of a certifying authority's review to water quality-related impacts from point source discharges. Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.3).

113.    The Final Rule limits the scope of a certifying authority's review to assuring compliance with "state or tribal regulatory requirements for point source discharges into waters of the United States." Final Rule at 42,285 (to be codified at 40 C.F.R. §§ 121.1(n), 121.3).

114.    The Final Rule prohibits a certifying authority from imposing conditions unrelated to water quality-related impacts from point source discharges. Final Rule at 42,230 & 42,286 (to be codified at 40 C.F.R. §§ 121.7(d), 121.9(b), 121.10(a)).

115.    The EPA's decision to limit the scope of a certifying authority's review to water quality-related impacts from point source discharges is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

116.    The EPA's decision to limit the scope of a certifying authority's review to compliance with "state or tribal regulatory requirements for point source discharges into waters of the United States" is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

117.    The EPA's decision to prohibit a certifying authority from imposing conditions unrelated to water quality-related impacts from point source discharges is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

118.    The EPA's decision to limit the scope of state and tribal certifications and the conditions they may impose, on account of constitutional limits applicable only to the federal government, is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

### FIFTH CLAIM FOR RELIEF

### Violation of the Clean Water Act

### *(The Final Rule unlawfully prohibits the certifying authority from considering or relying on State law in making a certification decision)*

119.    Plaintiffs reallege all preceding paragraphs.

120.    Section 401(d) instructs the certifying authority to "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a federal license or permit will comply" with applicable provisions of the Clean Water Act and "any other appropriate requirement of State law." 33 U.S.C. § 1341(d). Any such limitations become a condition on the federal license or permit. *Id*.

121.    The Final Rule limits the scope of a certifying authority "to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements." Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.3).

122.    The Final Rule defines "water quality requirements" to mean the "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States." Final Rule at 42,285 (to be codified at 40 C.F.R. § 121.1(n)).

123.    As a result, the Final Rule effectively prohibits a certifying authority from considering or relying on any other requirements of state law it considers "appropriate" when making its certification decision.

124.    The EPA's decision to limit the scope of a certifying authority's review in a manner that will prohibit the state from relying on any other appropriate requirement of state law is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

125.    The EPA's decision to limit the scope of state and tribal certifications and the conditions they may impose, on account of constitutional limits applicable only to the federal government, is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

**SIXTH CLAIM FOR RELIEF**

**Violation of the Clean Water Act**

***(The Final Rule unlawfully authorizes federal permitting and licensing agencies to review and overrule certification decisions)***

126.    Plaintiffs reallege all preceding paragraphs.

127.    Section 401(a)(1) provides that where the certifying authority "fails or refuses to act on a request for certification, within a reasonable period of time … after receipt of such request," the certification requirement "shall be waived." 33 U.S.C. § 1341(a)(1).

128.    Section 401(a)(1) prohibits the issuance of any federal license or permit before certification has either been granted or waived, and prohibits the issuance of any federal license or permit where certification has been denied. 33 U.S.C. § 1341(a)(1).

129.    Section 401(d) requires that any terms or conditions that the certifying authority includes as part of a certification "shall become a condition on any Federal license or permit subject to the provisions of this section." 33 U.S.C. § 1341(d).

130.    The Final Rule empowers federal permitting and licensing agencies to overturn the denial of a certification request upon determining that the certifying authority did not comply with the Final Rule's procedural requirements. Final Rule at 42,286 (to be codified at 40 C.F.R. § 121.9(a)(2)).

131.    Moreover, the Final Rule empowers the federal permitting and licensing agencies to refuse to include the terms and conditions imposed in a certification, upon determining that the certifying authority did not comply with the Final Rule's procedural requirements. Final Rule at 42,286 (to be codified at 40 C.F.R. § 121.10(a)).

132.    The EPA's decision to authorize federal permitting and licensing agencies to review and overrule certification decisions is arbitrary, capricious, or not in accordance with law; and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. §§ 706(2)(A) & (C).

## SEVENTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act

133.    Plaintiffs reallege all preceding paragraphs.

134.    A rulemaking is arbitrary and capricious if the agency relied on factors which Congress did not intend for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

135.    EPA's underlying rationale for the Final Rule is to remove the "confusion and uncertainty" that "are hindering the development of energy infrastructure."

136.    The Final Rule introduces new regulatory uncertainty for project proponents and the interested public; runs counter to the evidence presented by the states, tribes, and public on the root causes of any delays that may occur under the current regulations, and thus will not result in more efficient certification reviews; is based on the interest of developing of energy infrastructure and development projects at the expense of protecting water quality; fails to protect the primacy of the states and tribes in protecting and restoring waters within their

boundaries; and otherwise is premised on rationales that are inconsistent with the mandates, goals, and intent of the Clean Water Act.

137.     As a result, the EPA acted arbitrarily, capriciously, or not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A), by adopting the Final Rule.

**REQUEST FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court:

(1)     Declare the Final Rule, or portions thereof, are unlawful because they are in excess of the EPA's statutory jurisdiction, authority, or limitations, or short of its statutory right;

(2)     Declare the Final Rule, or portions thereof, are unlawful because they are arbitrary, capricious, or otherwise not in accordance with law;

(3)     Enter an order vacating the Final Rule or those portions determined to be unlawful;

(4)     Enjoin the EPA from implementing, applying, or enforcing the Final Rule or those portions of the Final Rule determined to be unlawful;

(5)     Grant Plaintiffs such additional and further relief as the Court may deem just, proper, and necessary.

Date:   September 29, 2020.              Respectfully submitted,

                                        */s/ Andrew Hawley*
                                        Andrew Hawley
                                        Daniel James Cordalis
                                        Peter M. K. Frost
                                        Sangye Ince-Johannsen

                                        Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing First Amended Complaint was electronically filed with the Clerk of the Court on September 29, 2020, using the Court's electronic filing system, which will send notification of said filing to the attorneys of record that have, as required, registered with the Court's system.

*s/ Andrew Hawley*
Andrew Hawley
