XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON
ERIC KATZ
Supervising Deputy Attorneys General
CATHERINE M. WIEMAN, SBN 222384
TATIANA K. GAUR, SBN 246227
ADAM L. LEVITAN, SBN 280226
BRYANT B. CANNON, SBN 284496
LANI M. MAHER, SBN 318637
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6329
  Fax: (916) 731-2128
  E-mail: Tatiana.Gaur@doj.ca.gov
*Attorneys for Plaintiff State of California, by
and through Attorney General Xavier Becerra
and the State Water Resources Control Board*

ROBERT W. FERGUSON
Attorney General of Washington
KELLY T. WOOD *
CINDY CHANG *
Assistant Attorney Generals
Washington Office of the Attorney General
Environmental Protection Division
  800 5th Ave Ste. 2000 TB-14
  Seattle, Washington 98104
  Telephone: (206) 326-5493
  E-mail: Kelly.Wood@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

LETITIA JAMES
Attorney General of New York
BRIAN LUSIGNAN *
Assistant Attorney General
Office of the Attorney General
Environmental Protection Bureau
  28 Liberty Street
  New York, NY 10005
  Telephone: (716) 853-8465
  Fax: (716) 853-8579
  E-mail: brian.lusignan@ag.ny.gov
*Attorneys for Plaintiff State of New York*

[Additional Parties and Counsel Listed on
Signature Pages]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, BY AND THROUGH ATTORNEY GENERAL XAVIER BECERRA AND THE STATE WATER RESOURCES CONTROL BOARD, STATE OF WASHINGTON, STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, | Case No.: 3:20-cv-4869<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*) |

1  **STATE OF VERMONT, COMMONWEALTH OF**
   **VIRGINIA, STATE OF WISCONSIN, AND THE**
2  **DISTRICT OF COLUMBIA,**
                                    Plaintiffs,
3
            **v.**
4
   **ANDREW R. WHEELER, IN HIS OFFICIAL**
   **CAPACITY AS ADMINISTRATOR OF THE UNITED**
5  **STATES ENVIRONMENTAL PROTECTION**
   **AGENCY, AND THE UNITED STATES**
6  **ENVIRONMENTAL PROTECTION AGENCY,**

7                                 Defendants.

8

9          Plaintiffs, the States of California, Washington, New York, Colorado, Connecticut,

10  Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North

11  Carolina, Oregon, Rhode Island, Vermont, Wisconsin, the Commonwealths of Massachusetts and

12  Virginia, the District of Columbia, and the California State Water Resources Control Board, by

13  and through their respective Attorneys General, allege as follows against defendants Andrew R.

14  Wheeler, in his official capacity as Administrator of the United States Environmental Protection

15  Agency (EPA), and EPA (collectively, Defendants):

16                              **INTRODUCTION**

17          1.1      This lawsuit challenges a final rule issued by the Defendants, entitled "Updating

18  Regulations on Water Quality Certification," 85 Fed. Reg. 42,210 (July 13, 2020) (Rule). The

19  Rule upends fifty years of cooperative federalism by arbitrarily re-writing EPA's existing water

20  quality certification regulations to unlawfully curtail state authority under the Clean Water Act,

21  33 U.S.C. §§ 1251 *et seq*. (CWA or the Act).

22          1.2      The CWA's primary objective is "to restore and maintain the chemical, physical

23  and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In achieving that goal,

24  Congress recognized the critical and important role states play in protecting and enhancing waters

25  within their respective borders. *Id*. § 1251(b). And, Congress sought to preserve the States'

26  preexisting and broad authority to protect their waters. To those ends, the Act specifically

27  provides that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary

28  responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the

                                        2
                        ──────────────────────────────

development and use (including restoration, preservation, and enhancement) of land and water resources ….” *Id*.

1.3     This preservation of state authority is present throughout the Act. Congress preserved for each State the authority to adopt or enforce the conditions and restrictions the state deems necessary to protect its state waters, so long as the state does not adopt standards that are less protective of waters than federal standards. *Id*. § 1370. State standards, including those of the Plaintiff States, may be and frequently are more protective. And, critical to the current action, Congress in section 401 of the Act, 33 U.S.C. § 1341 (section 401), expressly authorized States to independently review the water quality impacts of projects that may result in a discharge and that require a federal license or permit to ensure that such projects do not violate state water quality laws.

1.4     Where a State denies a water quality certification under section 401, Congress specifically prohibited federal agencies from permitting or licensing such projects. *Id*. § 1341(a)(1).

1.5     Congress also broadly authorized States to include conditions in state certifications necessary to ensure an applicant's compliance with any "appropriate requirement of State law." *Id*. § 1341(a), (d). The conditions in state certifications must be incorporated as conditions in federal permits. *Id*. § 1341(d). In this way, section 401 prevents the federal government from using its licensing and permitting authority to authorize projects that could violate state water quality laws. *See generally, id.* § 1341.

1.6     EPA has long acknowledged and respected the powers preserved for the States in section 401. In fact, until 2019, EPA's regulations and every guidance document issued by EPA for section 401 certifications—spanning three decades and four administrations—expressly recognized states' broad authority under section 401 to condition or deny certification of federally permitted or licensed projects within their borders. The Supreme Court and Circuit Courts of Appeals have affirmed that broad state authority under section 401.

1.7     In April 2019, however, President Trump signed Executive Order 13868, directing EPA to issue regulations that reduce the purported burdens current section 401 certification

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

requirements place on energy infrastructure project approval and development, thus effectively prioritizing such projects over water quality protection. Executive Order on Promoting Energy Infrastructure and Economic Growth, 84 Fed. Reg. 15,495 (Apr. 15, 2019) (Executive Order 13868). EPA issued the Rule pursuant to Executive Order 13868.

1.8 The Rule violates the Act and unlawfully usurps state authority to protect the quality of waters within their borders.

1.9 Contrary to the language of section 401, Supreme Court precedent, and EPA's long-standing interpretation, the Rule prohibits States, including Plaintiff States, from considering how a federally approved project, as a whole, will impact state water quality, instead unlawfully limiting the scope of state review and decision-making to point source discharges into narrowly defined waters of the United States. *Cf. PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology* (*PUD No. 1*), 511 U.S. 700, 711 (1994) ("The language of [Section 401(d)] contradicts petitioners' claim that the State may only impose water quality limitations specifically tied to a 'discharge'" because the text "allows the State to impose 'other limitations' on the project in general.").

1.10 Similarly, the Rule would unlawfully limit states' review and decision-making authority under section 401 by allowing only consideration of whether a federally licensed project will comply with state water quality standards and requirements regulating point source discharges. But section 401 contains no such limitation, instead broadly authorizing States to impose any condition necessary to ensure an applicant complies with "any other appropriate requirement of State law." 33 U.S.C. § 1341(d). Both EPA and the Courts have long recognized the broad scope of the phrase "appropriate requirement of State law." *See PUD No. 1*, 511 U.S. at 712-13 (Section 401(d) "author[izes] additional conditions and limitations on the activity as a whole"; these conditions and limitations include "state water quality standards … [which] are among the 'other limitations' with which a State may ensure compliance through the § 401 certification process").

1.11 The Rule would also interfere with the States' ability to apply their own administrative procedures to their review of applications for water quality certification, instead

4

imposing onerous federal control over virtually every step of the administrative process. The Rule requires States to take action within a time limit imposed by the federal permitting agency based on a minimal list of required information. State agencies appear to be discouraged from obtaining additional information if that information cannot be developed and provided within that time limit, even for major infrastructure projects that pose significant risk to a wide variety of state water resources for decades. Even when a State is able to make a certification decision before the expiration of the time limit imposed by the federal agency, the federal agency could *still* determine that the State waived its authority if it concludes that the State failed to provide certain information to the federal agency required by the Rule. This Federal dictate of state administrative procedures is fundamentally inconsistent with the cooperative federalism scheme established by the CWA in general, and with the preservation of broad state authority affirmed by section 401 in particular.

1.12 EPA's departure from 50 years of consistent administrative and judicial precedent by narrowing state authority under section 401 is contrary to Congress's 1972 enactment of the CWA, which by its terms expressly preserved state authority by incorporating the language of section 401 essentially unchanged from its predecessor statute, the Water Quality Improvement Act of 1970. EPA claims that this drastic change is justified based on its "first holistic analysis of the statutory text, legislative history, and relevant case law." 85 Fed. Reg. at 42,215. However, nothing in the text, purpose, or legislative history of section 401, no matter how "holistically" considered, supports the Rule's substantial infringement on state authority. The Rule unlawfully interprets a statute that is "essential in the scheme to preserve state authority to address the broad range of pollution" affecting state waters, *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 386 (2006) (*S.D. Warren*), to instead restrict state authority to do so.

1.13 By attempting to limit the scope of state section 401 water quality certifications and by imposing new, unjustified, and unreasonable substantive limits, time constraints, and procedural restrictions on States' review of and decisions on section 401 certification applications, the Rule is a radical departure from past EPA policy and practice, is unlawful, and

1  abandons the decades-long successful cooperative federalism approach Congress intended in the

2  CWA.

3    1.14    As set forth below, the Rule is arbitrary, capricious, an abuse of discretion,

4  contrary to the CWA and binding precedent, and in excess of EPA's authority under the

5  Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C). Accordingly, Plaintiff States seek a

6  declaration that the Rule violates the Clean Water Act and the Administrative Procedure Act, 5

7  U.S.C. § 551 *et seq.* (APA), and request that the Court set aside and vacate the Rule.

8                    **JURISDICTION AND VENUE**

9    2.1    This action raises federal questions and arises under the CWA and the APA. This

10  Court has jurisdiction over the States' claims pursuant to 28 U.S.C. § 1331 (action arising under

11  the laws of the United States) and 5 U.S.C. §§ 701-706. An actual controversy exists between the

12  parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory,

13  injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, and 5 U.S.C. §§ 701-706.

14    2.2    The United States has waived sovereign immunity for claims arising under the

15  APA. 5 U.S.C. § 702.

16    2.3    The States are "persons" within the meaning of 5 U.S.C. § 551(2), authorized to

17  bring suit under the APA to challenge unlawful final agency action. 5 U.S.C. §§ 701(2), 702.

18    2.4    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because

19  plaintiff State of California resides within the district and this action seeks relief against federal

20  agencies and officials acting in their official capacities.

21                    **INTRADISTRICT ASSIGNMENT**

22    3.1    Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of

23  this action to any particular location or division of this Court.

24                         **PARTIES**

25    4.1    The Plaintiff States are sovereign states of the United States of America. The

26  States bring this action in their sovereign and proprietary capacities. As set out below, the Rule

27  directly harms the States' interests, including, but not limited to, environmental harms, financial

28  harms that flow from implementing EPA's radical shift in policy, and limits on powers

6

specifically reserved to the States by Congress in the Act. The States also bring this action as *parens patriae* on behalf of their citizens and residents to protect public health, safety, and welfare, their waters, natural resources, and environment, and their economies.

4.2     Defendant EPA is the federal agency with primary regulatory authority under the Act and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

4.3     Defendant Andrew R. Wheeler is sued in his official capacity as Administrator of the EPA and bears responsibility, in whole or in part, for the acts complained of in this Complaint.

## STATUTORY AND REGULATORY BACKGROUND
### The Administrative Procedure Act

5.1     Federal agencies are required to comply with the APA's rulemaking requirements in amending or repealing a rule.

5.2     Under the APA, a federal agency must publish notice of a proposed rulemaking in the Federal Register and "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c).

5.3     "[R]ule making" means "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5).

5.4     An agency that promulgates a rule that modifies its long-standing policy or practice must articulate a reasoned explanation and rational basis for the modification and must consider and evaluate the reliance interests engendered by the agency's prior position. *See, e.g., Dep't of Homeland Security v. Regents of the University of Ca.*, ___ S. Ct. ___, Slip Op. at 23-26 (June 18, 2020); *Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency does not have authority to adopt a regulation that is "manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *see also* 5 U.S.C. § 706(2)(C).

5.5     The APA authorizes this Court to "hold unlawful and set aside agency action, findings and conclusions" it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise

1  not in accordance with law" or taken "in excess of statutory jurisdiction, authority, or limitations,

2  or short of statutory right." 5 U.S.C. § 706(2).

3  **The Clean Water Act**

4  5.6  The Act's objective is to "restore and maintain the chemical, physical, and

5  biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

6  5.7  In furtherance of that primary objective, Congress both preserved and enhanced

7  the States' authority to protect the quality of state waters. The Act provides that "[i]t is the policy

8  of the Congress to recognize, preserve, and protect the primary responsibilities and rights of

9  States to prevent, reduce, and eliminate pollution, to plan the development and use (including

10  restoration, preservation, and enhancement) of land and water resources …." *Id*. § 1251(b). As

11  such, "Congress expressed its respect for states' role[s] through a scheme of cooperative

12  federalism …." *United States v. Cooper*, 482 F.3d 658, 667 (4th Cir. 2007).

13  5.8  Congress's preservation of pre-existing state authority is evident throughout the

14  Act. For example, section 303 of the Act authorizes states, subject to baseline federal standards,

15  to determine the level of water quality they will require and the means and mechanisms through

16  which they will achieve and maintain those levels. 33 U.S.C. § 1313.

17  5.9  Section 510 of the Act states that "nothing in [the Act] shall … preclude or deny

18  the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A)

19  any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting

20  control or abatement of pollution" as long as such requirements are at least as stringent as the Act.

21  *Id*. § 1370.

22  5.10  Section 401 of the Act provides that "[a]ny applicant for a Federal license or

23  permit to conduct any activity … which may result in any discharge into the navigable waters,

24  shall provide the licensing or permitting agency a certification from the State in which the

25  discharge originates or will originate … that any such discharge will comply with the applicable

26  provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title." *Id*. § 1341(a)(1). Section

27  401(d) broadly states that "[a]ny certification provided … shall set forth any effluent limitations

28  and other limitations, and monitoring requirements necessary to assure that any applicant for a

8

1    Federal license or permit will comply with any applicable effluent limitations and other

2    limitations … and with any other appropriate requirement of State law set forth in such

3    certification, and shall become a condition on any Federal license or permit subject to the

4    provisions of this section." *Id*. § 1341(d).

5          5.11    The authority reserved to States in section 401 is meaningful and significant. In

6    enacting section 401, Congress sought to ensure that all activities authorized by the federal

7    government that may result in a discharge would comply with "State law" and that "Federal

8    licensing or permitting agencies [could not] override State water quality requirements." S. Rep.

9    92-313, at 69, *reproduced in* 2 Legislative History of the Water Pollution Control Act

10    Amendments of 1972 ("Legislative History Vol. 2"), at 1487 (1973).

11         5.12    States' authority under section 401 to impose conditions on a federally permitted

12    or licensed project is not limited to water quality controls specifically tied to a "discharge."

13    Rather, section 401 "allows [states] to impose 'other limitations' on the project in general to

14    assure compliance with various provisions of the Act and with 'any other appropriate requirement

15    of State law.'" *PUD No. 1*, 511 U.S. at 711. Thus, while section 401(a)(1) "identifies the category

16    of activities subject to certification—namely, those with discharges"—section 401(d) authorizes

17    additional conditions and limitations "*on the activity as a whole* once the threshold condition, the

18    existence of a discharge, is satisfied." *Id*. at 711-12 (emphasis added). Section 401's "terms have

19    a broad reach, requiring state approval any time a federally licensed activity 'may' result in a

20    discharge…, and its object comprehends maintaining state water quality standards." *S.D. Warren*,

21    547 U.S. at 380. Furthermore, "Congress intended that [through section 401, States] would retain

22    the power to block, for environmental reasons, local water projects that might otherwise win

23    federal approval." *Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991).

24         5.13    The Act imposes only one restriction on the timeframe of state certification review

25    and decision-making: if a State "fails or refuses to act on a request for certification, within a

26    reasonable period of time (which shall not exceed one year) after receipt of such request, the

27    certification requirements of this subsection shall be waived." 33 U.S.C. § 1341.

28

1    5.14    In the quarter of a century since the Supreme Court's decision in *PUD No. 1*,

2    Congress has not limited or otherwise amended the language of section 401.

3    **EPA's Longstanding Section 401 Regulations and Guidance**

4    5.15    In 1971, EPA promulgated regulations regarding state water quality certifications

5    pursuant to section 21(b) of the Water Quality Improvement Act of 1970—the CWA's

6    predecessor (1971 Regulations). *See* 36 Fed. Reg. 22,369, 22,487 (Nov. 25, 1971). Congress

7    carried over the provisions of section 21(b) in section 401 of the CWA of 1972 with only "minor"

8    changes. Senate Debate on S. 2770 (Nov. 2, 1971), *reproduced in* Legislative History Vol. 2 at

9    1394.

10    5.16    In the Water Pollution Control Act Amendments of 1972, now known as the Clean

11    Water Act, Congress directed EPA to "promulgate guidelines establishing test procedures for the

12    analysis of pollutants that shall include the factors which must be provided in any certification

13    pursuant to section [401] of this [Act] or permit application pursuant to section 402 of this [Act]."

14    33 U.S.C. § 1314(h). This is the only instruction that Congress gave EPA with regards to

15    implementing section 401. EPA did so, as codified in 40 C.F.R. Part 136 (defining the scientific

16    methods for analyzing a wide array of pollutants).

17    5.17    Following the 1972 amendments and the enactment of section 401, Congress

18    directed EPA to modify other existing regulations but did not direct EPA to revise its existing

19    1971 Regulations.

20    5.18    Accordingly, EPA continued to apply the 1971 Regulations to implement section

21    401 following the CWA's enactment in 1972.

22    5.19    Not only does the Rule conflict with the Act's express protection of state interests

23    under section 401, the Rule is a significant departure from, and contrary to, EPA's 1971

24    Regulations.

25    5.20    Pursuant to EPA's 1971 Regulations, when issuing a section 401 certification,

26    states are required to include a statement certifying that a permitted "activity," not just a point

27    source discharge, will comply with water quality standards. *See* former 40 C.F.R. § 121.2(a)(3)

28    (June 7, 1979). Furthermore, "water quality standards" was broadly defined to include standards

10

1  established pursuant to the CWA, as well as any "State-adopted water quality standards." *Id*. §

2  121.1(g).

3       5.21    The 1971 Regulations did not permit federal agencies to determine whether state

4  denials or conditional certifications met specified requirements and were therefore effective or

5  not. Moreover, a State could only waive its authority under section 401 if it provided express

6  written notification of such waiver or failed to act on a certification request within a reasonable

7  period of time. *Id*. § 121.16(b) (June 7, 1979).

8       5.22    In April 1989, EPA's Office of Water issued a section 401 certification guidance

9  document entitled "Wetlands and 401 Certification—Opportunities and Guidelines for States and

10  Eligible Indian Tribes" (1989 Guidance).

11       5.23    EPA's 1989 Guidance acknowledged that section 401 "is written very broadly

12  with respect to the activities it covers." 1989 Guidance at 20. The 1989 Guidance further stated

13  that "'[a]ny activity, including, but not limited to, the construction or operation of facilities which

14  *may* result in *any discharge*' requires water quality certification." *Id*. (emphasis in original). The

15  1989 Guidance explained that the purpose of the water quality certification requirement in section

16  401, "was to ensure that no license or permit would be issued for an activity that through

17  inadequate planning or otherwise could in fact become a source of pollution." *Id*. at 20.

18       5.24    The 1989 Guidance contemplated broad state review of federally permitted or

19  licensed projects and stating the "imperative" principle that "all of the potential effects of a

20  proposed activity on water quality—direct and indirect, short and long term, upstream and

21  downstream, construction and operation—should be part of a State's [401] certification review."

22  *Id*. at 22, 23. The 1989 Guidance also provided examples of conditions that States had

23  successfully placed on section 401 certifications. These included watershed management plans,

24  fish stocking, and noxious weed controls. *Id*. at 24, 54-55. EPA noted that "[w]hile few of these

25  conditions [were] based on traditional water quality standards, all [were] valid" under section

26  401. *Id*. at 24. EPA further noted that "[s]ome of the conditions [were] clearly requirements of

27  State or local law related to water quality other than those promulgated pursuant to the [CWA]

28  sections enumerated in Section 401(a)(1)." *Id*.

11

5.25    Consistent with the text of section 401 and EPA's 1971 Regulations, the 1989 Guidance narrowly construed the circumstances under which a State would waive its authority to review certification requests under section 401: a waiver would be deemed to have occurred only if a state failed to act within "a reasonable period of time (which shall not exceed one year) after receipt" of a certification request. *Id*. at 31.

5.26    The 1989 Guidance also advised States to adopt regulations requiring that applicants submit information to ensure informed decision-making. *Id*. Further, the 1989 Guidance encouraged States to "link the timing for review to what is considered a receipt of a complete application." *Id*. As an example, EPA cited a Wisconsin regulation requiring a "complete" application before the agency review time began. *Id*., *citing* Wisconsin Administrative Code, NR 299.04. The 1989 Guidance noted that pursuant to the same Wisconsin regulation, the state agency would review an application for completeness within 30 days of receipt and could request any additional information needed to make a certification decision. *Id*. (currently, these requirements are codified in Wisconsin Administrative Code, NR 299.03).

5.27    EPA issued additional section 401 guidance in April 2010 entitled "Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool for States and Tribes" (2010 Guidance). The 2010 Guidance was consistent with and affirmed EPA's longstanding recognition of States' broad authority preserved under the CWA and enhanced by section 401.

5.28    In the 2010 Guidance, EPA stated that, "[a]s incorporated into the 1972 [CWA], § 401 water quality certification was intended to ensure that no federal license or permit would be issued that would prevent states or tribes from achieving their water quality goals, or that would violate [the Act's] provisions." 2010 Guidance at 16. Relying on the Supreme Court's controlling decision in *PUD No. 1*, the 2010 Guidance confirmed that "once § 401 is triggered, the certifying state or tribe may consider and impose conditions on the project activity in general, and not merely on the discharge, if necessary to assure compliance with the CWA and with any other appropriate requirement of state or tribal law." *Id*. at 18. For example, EPA explained that "water quality implications of fertilizer and herbicide use on a subdivision and golf course might be

12

1    considered as part of a § 401 certification analysis of a CWA § 404 permit that would authorize

2    discharge of dredged or fill material to construct the subdivision and golf course." *Id.*

3         5.29    In line with EPA's long-standing position, the 2010 Guidance maintained an

4    expansive view of the scope of other state laws appropriately considered under section 401

5    certification reviews: "It is important to note that, while EPA-approved state and tribal water

6    quality standards may be a major consideration driving § 401 decision[s], they are not the only

7    consideration." *Id.* at 16.

8         5.30    The 2010 Guidance acknowledged that States establish requirements for what

9    constitutes a complete application and highlighted the fact that the timeframe for state review of a

10   section 401 certification request "begins once a request for certification has been made to the

11   certifying agency, *accompanied by a complete application*." *Id.* at 15-16 (emphasis added).

12        5.31    In the years following EPA's issuance of its 1989 and 2010 guidance documents,

13   Congress has neither limited nor otherwise amended the language of section 401.

14                        **Executive Order 13868 and Section 401 Certifications**

15        5.32    On April 10, 2019, President Trump issued Executive Order 13868, upending

16   EPA's longstanding broad interpretation of state authority to protect water quality under section

17   401.

18        5.33    Intended to promote and speed infrastructure development, particularly in the coal,

19   oil, and natural gas sectors, Executive Order 13868 directed EPA to evaluate ways in which

20   section 401 certifications have "hindered the development of energy infrastructure." 84 Fed. Reg.

21   at 15,496. Executive Order 13868 failed to acknowledge the critical role of section 401

22   certifications to the Act's primary purpose of restoring and maintaining the chemical, physical,

23   and biological integrity of the Nation's waters, and to preserving States' authority to do so.

24        5.34    Executive Order 13868 directed the EPA Administrator to undertake a number of

25   actions related to section 401 certifications. First, Executive Order 13868 required the

26   Administrator, within 60 days, to (1) examine the 2010 Guidance and issue superseding guidance

27   to States and authorized tribes; and (2) issue guidance to agencies to reduce the burdens on

28   energy infrastructure projects caused by section 401's certification requirements. Second,

1   Executive Order 13868 required the Administrator, within 120 days, to review EPA's section 401

2   regulations for consistency with Executive Order 13868's energy infrastructure and economic

3   growth goals and publish revised regulations consistent with those goals. Third, Executive Order

4   13868 required the Administrator to finalize the revised regulations no later than 13 months from

5   April 10, 2019.

6       5.35    Executive Order 13868 also required all federal agencies that issue licenses or

7   permits requiring section 401 certification to, within 90 days of the final EPA Rule, "initiate a

8   rulemaking to ensure their respective agencies' regulations are consistent with" the EPA Rule.

9   Exec. Order No. 13868, Sec. 3(d).

10      5.36    In response to Executive Order 13868, on June 7, 2019, EPA issued a document

11  entitled "Clean Water Act Section 401 Guidance for Federal Agencies, States, and Authorized

12  Tribes" with a stated purpose of facilitating implementation of Executive Order 13868 (2019

13  Guidance). The 2019 Guidance attempted to impose substantially shorter timeframes for, and

14  narrow the permissible scope of, state review. Although the 2019 Guidance was issued without

15  notice and opportunity for comment, all of the Plaintiff States submitted a letter to EPA objecting

16  to the guidance. Concurrently, the EPA Administrator informed the States he was withdrawing and

17  rescinding the 2010 Guidance.

18      5.37    On August 22, 2019, EPA published the proposed Rule in the Federal Register

19  with only a 60-day public comment period that closed on October 21, 2019. 84 Fed. Reg. 44,080.

20      5.38    Along with the proposed Rule, EPA published its "Economic Analysis for the

21  Proposed Clean Water Act Section 401 Rulemaking" (Economic Analysis). In keeping with

22  Executive Order 13868, the 23-page Economic Analysis focused largely on the economic effects

23  of states' section 401 certification conditions and denials for the energy industry projects.

24      5.39    The Economic Analysis failed to consider the potential economic impacts from

25  decreased water quality caused by the Rule's limitations on the scope of States' section 401

26  authority.

27      5.40    EPA held public hearings on the proposed Rule on September 5, 2019, and

28  September 6, 2019, in Salt Lake City, Utah. Several Plaintiff States gave oral testimony at the

14

1  public hearings, including Washington and New York. Plaintiff States also submitted written

2  comments on the proposed Rule on October 17 and 21, 2019.

3  **The Final Section 401 Rule**

4      5.41    On June 1, 2020, EPA released a pre-publication version of the final Rule, entitled

5  "Clean Water Act Section 401 Certification Rule." In announcing the final Rule, the

6  Administrator stated that EPA was "following through on President Trump's Executive Order to

7  curb abuses of the Clean Water Act that have held our nation's energy infrastructure projects

8  hostage, and to put in place clear guidelines that finally give these projects a path forward."[1]

9      5.42    On July 13, 2020, EPA published the final Rule in the Federal Register. 85 Fed.

10  Reg. 42,210. By its terms, the Rule becomes effective 60 days following the publication date.

11      5.43    The final Rule is a radical departure from prior EPA policy and practice regarding

12  section 401, drastically curtailing state authority under section 401 in a way that is contrary to: (1)

13  the plain language, structure, purpose, and legislative history of the CWA; (2) binding Supreme

14  Court precedent interpreting section 401; and (3) EPA's own guidance on section 401, which

15  spans decades and multiple administrations, resulting in significant reliance by the States.

16  Moreover, the Rule unlawfully limits States' section 401 authority.

17      5.44    The Rule asserts, without rational basis, that it will reduce regulatory uncertainty

18  and increase predictability for States, tribes and project proponents. 85 Fed. Reg. at 42,236,

19  42,242. The Rule conflicts with the CWA's text, structure, purpose, and intent, as well as

20  longstanding agency guidance and controlling precedent, and forces the States to amend their

21  own section 401 laws. As a result, the Rule will in fact cause increased confusion and uncertainty

22  that will ensue while the States attempt to revise their statutes and regulations related to section

23  401 and the States, federal agencies, and project proponents litigate and attempt to implement and

24  comply with the Rule's requirements.

25

26

27

28      [1] https://www.epa.gov/newsreleases/epa-issues-final-rule-helps-ensure-us-energy-security-and-limits-misuse-clean-water-0

1    Limits on Scope of Section 401 Certification Review

2         5.45    The Rule unlawfully limits the applicability and scope of section 401 certifications

3    to impacts from specific, point source discharges to waters of the United States, thus prohibiting

4    States from conditioning water quality certifications to assure the effects of the project as a whole

5    do not violate water quality standards. 85 Fed. Reg. 42,285 (to be codified at 40 C.F.R. §§ 121.1;

6    121.3).

7         5.46    Confining the scope of section 401 certification to point source discharges is

8    contrary to the Act's plain language and the Supreme Court's decision in *PUD No. 1*. In *PUD No.*

9    *1*, the Supreme Court held that, while section 401(a)(1) "identifies the category of activities

10   subject to certification—namely, those with discharges"—section 401(d) "is most reasonably read

11   as authorizing additional conditions and limitations on *the activity as a whole* once the threshold

12   condition, the existence of a discharge, is satisfied." *Id.* at 711-12 (emphasis added).

13        5.47    EPA acknowledges that the Rule departs from the controlling precedent in *PUD*

14   *No. 1*, *see, e.g.,* 85 Fed. Reg. at 42,231, but asserts that *Nat'l Cable & Telecomm. Ass'n v. Brand*

15   *X Internet Serv.*, 545 U.S. 967 (2005) (*Brand X*) allows EPA to effectively overrule the Supreme

16   Court's *PUD No. 1* decision. *Brand X*, however, does not permit EPA to overrule binding

17   Supreme Court precedent or adopt an interpretation that is not in accordance with the law.

18        5.48    In limiting the scope of section 401 certifications to impacts from specific, point

19   source discharges, the Rule abandons without a rational explanation EPA's previous position

20   articulated in the 1989 Guidance that "it is imperative for a State review to consider all potential

21   water quality impacts of the project, both direct and indirect, over the life of the project." 1989

22   Guidance at 22. Similarly, the Rule abandons without a rational explanation EPA's position set

23   forth in the 2010 Guidance that "the certifying state or tribe may consider and impose conditions

24   on the project activity in general, and not merely on the discharge, if necessary to assure

25   compliance with the CWA and with any other appropriate requirement of state or tribal law."

26   2010 Guidance at 18.

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Limits on Appropriate Requirements of State Law

5.49    In direct conflict with the Act's language and Congressional intent, the Rule also unlawfully limits the term "other appropriate requirements of State law" in Section 401(d) to "water quality requirements," newly defined as the "applicable provisions of §§ 301, 302, 303, 306, and 307 of the Clean Water Act, and state or tribal regulatory requirements for point source discharges into waters of the United States." *See* 85 Fed. Reg. at 42232 (to be codified as 40 C.F.R. § 121.1(n))

5.50    By restricting the definition of "water quality requirements," the Rule potentially excludes a broad range of state and tribal law directly applicable to water quality that has been used for decades to evaluate and condition federally licensed or permitted projects.

5.51    In limiting "water quality requirements" only to specified provisions of the Act and those state and tribal laws related to "point source discharges," the Rule not only abandons but runs contrary to EPA's longstanding position that "[t]he legislative history of [section 401] indicates that the Congress meant for the States to impose whatever conditions on [federally permitted projects] are necessary to ensure that an applicant complies with all State requirements that are related to water quality concerns." 1989 Guidance at 23.

5.52    The Rule also departs from EPA's longstanding position that "[t]he legislative history of Section 401(d) indicates that Congress meant for the States to condition certifications on compliance with any State and local law requirements related to water quality preservation" and that "conditions that relate in any way to water quality maintenance are appropriate." *Id*. at 25-26.

5.53    EPA fails to provide a rational explanation for its complete departure from its longstanding interpretation of section 401. With its sudden departure from an established regulatory approach, EPA also failed to consider the reliance interests of states that have developed section 401 certification procedures and water quality control programs in reliance on EPA's prior, longstanding interpretation of section 401.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Restrictions on Certification Request Process

5.54    The Rule also sets out new procedures for the submission and evaluation of section 401 certification requests. These procedures plainly conflict with the CWA's text and purpose.

5.55    Prior to the Rule, the States or other certifying authorities and EPA together determined the types of information an applicant was required to submit in a section 401 certification request. In contrast, the Rule enumerates an insufficient and minimal list of information project proponents are directed to provide in a section 401 certification application. *Compare* 40 C.F.R. § 121.3 (June 7, 1979), *with* 85 Fed. Reg. at 42,285 (to be codified as 40 C.F.R. § 121.5). Contrary to *PUD No. 1*, the Rule does not require project applicants to provide information related to the water quality impacts caused by the proposed activity as a whole. Rather, the Rule merely requires each applicant to identify the "location and nature" of potential discharges and the "methods and means" by which the discharge(s) will be monitored and managed, along with other, limited information. 85 Fed. Reg. at 42,285 (to be codified as 40 C.F.R. § 121.5f(b)-(c)).

5.56    Although the Rule allows States and other certifying authorities to request additional information from project applicants, EPA attempts to limit this in the Preamble by suggesting that—regardless of whether such information is sufficient to fully evaluate water quality impacts—the requested information is to be limited to whatever can be "produced and evaluated within the reasonable time." 85 Fed. Reg. at 42,246.

5.57    The Rule also sets out a procedure whereby federal agencies must establish a "reasonable period of time" by which certifying authorities must act on requests for section 401 certifications, either categorically or on a case-by-case basis. 85 Fed. Reg. at 42,285-286 (to be codified as 40 C.F.R. § 121.6). Pursuant to the Rule, this time period cannot exceed one year under any circumstances. *Id.* (to be codified as 40 C.F.R. § 121.6(a)). Moreover, this reasonable time period is to be measured from the certifying authority's "receipt" of the certification request, rather than the certifying authority's receipt of the complete certification application. *Id.* at 42,285 (to be codified as 40 C.F.R. § 121.1(m)).

5.58     The Rule further prohibits a certifying authority from requesting that a project applicant withdraw a certification request and resubmit it with additional information to extend the timeframe for review, even where the request lacks information necessary for the certifying authority to conduct a proper review. *Id*. at 42,285-286 (to be codified as 40 C.F.R. § 121.6(e)). This interpretation is in conflict with section 401's purpose of preserving state authority.

5.59     The Rule prescribes a broad range of circumstances under which a state's section 401 review authority is deemed waived because of a state's purported failure to follow certain newly-included procedural requirements. *Id*. (to be codified as 40 C.F.R. § 121.9). Where a certifying authority fails to grant, grants with conditions, or denies a certification application within the reasonable time period, as determined by the federal agency, it waives its ability to do so. *Id*. (to be codified as 40 C.F.R. § 121.9(a)(2)). Additionally, where a certifying authority does not meet the Rule's procedural requirements in certifying or denying a section 401 application, the certification or denial will be deemed waived. *Id*. And where a condition imposed by a certifying authority is not supported by the required information, the condition is deemed waived. *Id*. In addition, where a certifying authority certifies an application without following the procedural requirements set forth in the Rule, the certification will be deemed waived. *Id*. (to be codified as 40 C.F.R. § 121.9(b)).

5.60     Taken together, these procedural requirements of the Rule impermissibly expand the waiver provision of section 401 in conflict with the Act's language and Congressional intent.

5.61     Further, these procedural requirements of the Rule significantly impair the ability of States and other certifying authorities to fully and efficiently review project proposals for water quality impacts and will likely result in an increase of certification denials for lack of sufficient information.

5.62     These unprecedented restrictions also conflict with existing state practices, procedures, and regulations on initiating section 401 certification review, many of which were developed in reliance on EPA's long-standing position on these requirements.

# HARMS TO PLAINTIFF STATES

6.1     The Rule harms the sovereign, environmental, economic, and proprietary interests of Plaintiff States.

6.2     The States' respective jurisdictions encompass a substantial portion of the United States. Along with countless other waterbodies and wetlands, the water resources found within Plaintiff States include the entirety of the Pacific Coast from Mexico to Canada, large portions of the Atlantic Coast, the Great Lakes and Lake Champlain, Chesapeake Bay and its tributaries, and the majority of the Columbia River. Plaintiff States contain headwaters formed in the Sierra Nevada, Cascades, Rocky, and Appalachia mountains. Many of the nation's largest rivers originate in and/or flow through the Plaintiff States, including the Mississippi, the Columbia, the Colorado, and the Hudson. The States have a fundamental obligation to protect these waters and wetlands, both for their own economic interests and on behalf of the millions of residents and thousands of wildlife species that rely on them for survival. Many States also legally hold both the surface and groundwaters within their borders in trust for their residents.

6.3     The Rule significantly impairs Plaintiff States' abilities to protect the quality of these waters. In the Act, Congress preserved the States' broad, existing powers to adopt the conditions and restrictions necessary to protect state waters, so long as those efforts were not less protective than federal standards. To those ends, the States have long exercised section 401 authority to protect against adverse impacts to water quality from federally licensed or permitted activities within state borders.

6.4     As described in detail above, the Rule unlawfully curtails both the scope of water quality-related impacts that the States can address, and the sources of state law on which States can base certification review and decisions for federally licensed or permitted projects. For example, the Rule narrowly defines the scope of 401 certification as "limited to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements." 85 Fed. Reg. 42,250. The definition of "water quality requirements" in the Rule, in turn, further narrows the scope to only specified provisions of the Act and state and tribal

1     regulatory requirements "for point source discharges into waters of the United States." 85 Fed.

2     Reg. 42,285 (to be codified at 40 C.F.R. § 121.1(n)).

3          6.5      Consistent with longstanding relevant Supreme Court and lower court decisions,

4     section 401 certification practice, and EPA guidance, when evaluating requests for section 401

5     certification the States have used section 401 to review all potential water quality impacts from a

6     proposed project, both upstream and downstream and over the life of the proposed project. The

7     States also have reviewed impacts as they relate to both "waters of the United States" and state

8     waters, including groundwater, as defined under their respective state laws. In doing so, the States

9     have assessed project impacts pursuant to a broad range of appropriate water-related state law

10     requirements, including requirements applicable to both point and non-point sources of water

11     pollution.

12          6.6      For example, the States have used section 401 authority to address water quality

13     impacts that, depending on the circumstances, may not be non-point: turbidity associated with

14     dam reservoir wave action and pool level fluctuations, aquatic habitat loss, contamination of

15     groundwater supplies, contaminant loading from spills and discharges associated with over-water

16     industrial activities, impacts on stream flows, and wetland fill. States have also used section 401

17     authority in the context of large water supply projects to require mitigation to address long-term

18     impacts from operation, such as hydrologic modifications and water quality degradation

19     associated with enhanced stratification in new and expanded reservoirs. Impacts such as

20     stormwater runoff, whether or not related to any particular point source discharge contemplated

21     by the Rule, may have significant detrimental effects on water quality in and around project sites.

22     In the case of western water diversion projects, stormwater runoff may adversely impact different

23     river basins. Section 401 certifications have been one of the primary mechanisms the States have

24     used to mitigate these impacts when associated with federally licensed and permitted projects.

25     The Rule's limitation to point source impacts will prevent States from addressing and preventing

26     these harms under their section 401 authority, to the detriment of the States' proprietary interests

27     in the quality of those waters, their related ecosystems, and the general health and well-being of

28     their residents.

6.7     In addition to impacts to state waters themselves, the Rule also directly harms other state economic and proprietary interests.

6.8     For example, many States own or hold in trust the fish and other wildlife populations within their borders, and have certain statutory obligations to protect these resources. Because the Rule prevents the States from fully protecting the aquatic habitat and resources those species rely upon for survival, the Rule will result in direct harms to wildlife and wildlife populations.

6.9     Increased pollution, degradation and loss of waters, as well as other impacts to water quality as a result of the Rule also will impair the States' water recreation industries by making waters less desirable for fishing, boating, and swimming, and curtailing commercial and tax revenues associated with such activities.

6.10    The States have relied on the 1971 Regulations and EPA's longstanding practice and guidance interpreting section 401 broadly to authorize protection of water quality from federally licensed or permitted projects within their borders. Over the decades since the promulgation of the 1971 Regulations, the States have expended significant resources to develop and implement their own regulatory programs based on that broad interpretation of section 401. The Rule upends the States' section 401 programs and will force the States to significantly revise these programs to conform to the Rule's requirements.

6.11    The Rule will cause the States to incur direct financial harms. For example, the Rule will force States to hire additional personnel to process requests for section 401 certifications on the truncated timelines and with the additional procedures established by the Rule. Washington alone allocated over $600,000 to hire the additional staff it anticipates will be required in order to conduct section 401 certification reviews under the Rule. This expenditure is for the 2020 fiscal year alone, and is an expense that is expected to continue year-over-year well into the future. Connecticut anticipates needing to hire at least two additional professional staff, and Wisconsin estimates expending an additional $170,000 annually for additional staff to comply with the Rule. While state budgets are nearly always constrained, the effective date of the

1 Rule comes during that time when states are facing a projected $555 billion shortfall over the next
2 two fiscal years due to the impact of the COVID-19 pandemic.

3     6.12    Most, if not all, of the States will incur costs related to the expensive and time-
4 consuming process of revising their laws and regulations in order to conform to the Rule.

5     6.13    New Jersey, New York, and California, among other states, have robust
6 application review and public comment processes outlined in both state law and regulation that
7 will need to be overhauled in light of the Rule and EPA's dramatic shift in section 401 policy.
8 These changes to state laws and regulations require investment of the same regulatory resources
9 required to review and process section 401 certifications, none of which were considered in
10 EPA's economic review of the proposed rule and potential harms.

11     6.14    Finally, the States have relied on EPA's longstanding and consistent interpretation
12 of section 401 as conferring broad authority on the States to protect water quality within their
13 respective jurisdictions, whether those impacts occur from a specific discharge or by operation of
14 a project as a whole, consistent with the statutory text and Supreme Court precedent.

15     6.15    By abandoning this long-standing position and policy, the Rule substantially
16 degrades the primary mechanism by which States have ameliorated or avoided impacts to state
17 waters from federally licensed and/or permitted activities, contrary to Congress's intent. As a
18 result, the Rule forces the States either to incur the financial and administrative burdens
19 associated with instituting or expanding their water protection programs or to bear the burdens of
20 degraded waters.

21     6.16    Expanding water protection programs will require difficult and time-consuming
22 processes involving state program creation and expansion, state legislative and regulatory
23 changes, and state appropriation and expenditures. And, the Rule compromises the States' long
24 reliance on section 401 to ensure the full scope of state water quality protections apply to
25 activities that are otherwise preempted from state regulation.

26     6.17    Applicants for section 401 certification have also relied on EPA's longstanding
27 position that section 401 allows an applicant to work with a state certifying authority to define a
28 mutually acceptable scope and timeframe for agency review. By forcing state certifying agencies

to unnecessarily limit the scope and timeframe of their review, the Rule increases the chances that section 401 requests will be needlessly denied, leading to administrative inefficiencies and unnecessary litigation, and the loss or delayed benefits of projects that would have been certified had the States been operating under the previous regime. In its haste to promote energy infrastructure pursuant to President Trump's Executive Order—a consideration that is not entertained in any capacity by the text or purpose of the Act—EPA utterly failed to assess the unintended impacts the Rule will have on the States and the regulated parties seeking certification under section 401.

6.18    The relief sought herein will redress these and other injuries caused by the Rule.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Arbitrary and Capricious and Not in Accordance with Law**
**Unlawful Implementation of Section 401 of the Clean Water Act**
**in Violation of the Administrative Procedure Act**
**(5 U.S.C. § 706)**

7.1    Plaintiff States re-allege the facts set out in Paragraphs 1.1 through 6.18 as though fully set out herein.

7.2    The APA provides that this Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A).

7.3    Agency action is not in accordance with the law if the agency fails to interpret and implement the statutory language consistent with the statute's text, structure, and purpose and with controlling Supreme Court precedent.

7.4    The Rule, including but not limited to Sections 121.1, 121.3, 121.5, 121.6, 121.7, 121.8, and 121.9, is an unlawful and impermissible implementation of section 401 of the Clean Water Act, 33 U.S.C. § 1341, as interpreted by the United States Supreme Court, because it unlawfully limits the States' authority granted to them by Congress through enactment of the Act.

7.5    As a result, the Rule must be set aside as arbitrary, capricious, and not in accordance with law.

24

**SECOND CAUSE OF ACTION**
**Arbitrary and Capricious and Not in Accordance with Law**
**Disregard of Prior Agency Policy and Practice**
**in Violation of the Administrative Procedure Act**
**(5 U.S.C. § 706)**

7.6     Plaintiff States re-allege the facts set out in the Paragraphs 1.1 through 6.18 as though fully set out herein.

7.7     When an agency promulgates a rule that modifies its long-standing policy or practice, it must articulate a reasoned explanation and provide a rational basis for doing so.

7.8     An agency modifying or abandoning its long-standing policy or position must consider and take into account the reliance interests that are impacted by the change.

7.9     In adopting the Rule, Defendants failed to provide a reasoned explanation for defying the Supreme Court's long-standing interpretation of section 401 and abandoning their own long-standing policy and practice of interpreting section 401 as a broad reservation of states' rights.

7.10     The Rule lacks a rational basis because—despite EPA's assertions to the contrary—the Rule will increase uncertainty and decrease predictability in the section 401 certification process.

7.11     Defendants also failed to consider and take into account the serious reliance interests engendered by the Agency's prior long-standing policy and position regarding state authority under section 401.

7.12     For these reasons, the Rule, including but not limited to Sections 121.1, 121.3, 121.5, 121.6, 121.7, 121.8, and 121.9, is arbitrary, capricious, and not in accordance with law, and must be set aside.

**THIRD CAUSE OF ACTION**
**Arbitrary and Capricious and Not in Accordance with Law**
**Failure to Consider Statutory Objective and Impacts on Water Quality**
**in Violation of the Administrative Procedure Act**
**(5 U.S.C. § 706)**

7.13     Plaintiff States re-allege the facts set out in the Paragraphs 1.1 through 6.18 as though fully set out herein.

25

7.14　Agency action is not in accordance with law if the agency fails to consider the applicable statutory requirements.

7.15　Agency action is arbitrary and capricious if the agency fails to consider important issues, considers issues that Congress did not intend for it to consider, or fails to articulate a reasoned explanation for the action.

7.16　When Defendants promulgated the Rule, they were required to consider whether it met the Act's objective of restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters as set forth in 33 U.S.C. § 1251(a).

7.17　The protection of water quality is the paramount interest that must be considered by Defendants when promulgating regulations for the administration of the Clean Water Act, including those defining the contours of state authority to condition or deny section 401 certification requests.

7.18　Defendants promulgated the Rule without weighing its adverse impacts to the Nation's waters. Directed by an Executive Order aimed at increasing domestic energy production without any consideration of water quality, Defendants relied on factors that Congress did not intend for it to consider. Defendants also failed to consider how those impacts undermine, rather than further, the Act's objective of restoring and maintaining the integrity of the Nation's waters.

7.19　The Rule, including but not limited to Sections 121.1, 121.3, 121.5, 121.6, 121.7, 121.8, and 121.9, conflicts with the Clean Water Act's objective to protect water quality. As a result, the Rule is arbitrary and capricious and not in accordance with law.

### FOURTH CAUSE OF ACTION
#### Agency Action in Excess of Jurisdiction
#### (5 U.S.C. § 706)

7.20　Plaintiff States re-allege the facts set out in the Paragraphs 1.1 through 6.18 as though fully set out herein.

7.21　Under the APA, the Court "shall . . . set aside agency action" that is taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

26

7.22    In issuing the Rule, EPA relies on sections 401 and 501 of the Act. However, section 401 does not grant EPA any rulemaking authority for procedures and responsibilities expressly reserved for states, and section 501(a) limits EPA to prescribing "such regulations as are necessary to carry out [the Administrator's] functions under [the] Act." 33 U.S.C. § 1361.

7.23    The Rule exceeds EPA's authority to adopt regulations necessary to carry out the agency's functions under the Act, and instead intrudes on the "responsibilities and rights" Congress explicitly left to the states. *Id.* §§ 1251(b), 1341, 1361.

7.24    EPA also relies on section 304 of the Act, in which Congress directed EPA to, "promulgate guidelines establishing test procedures for the analysis of pollutants that shall include the factors which must be provided in any certification pursuant to section 401 of this Act or permit application pursuant to section 402 of this Act." 33 U.S.C. § 1314(h). But nothing in section 304 authorizes EPA to promulgate regulations that infringe upon state authority or dictate state law or administrative procedures in reviewing requests for and granting or denying certifications pursuant to section 401.

7.25    Because the Rule exceeds EPA's rulemaking authority under the Act, it must be set aside.

## RELIEF REQUESTED

WHEREFORE, the States respectfully request that this Court issue a judgment and order:

1.    Declaring that in developing and adopting the Rule, EPA acted arbitrarily and capriciously and not in accordance with law, abused its discretion, and exceeded its statutory jurisdiction and authority;

2.    Declaring the Rule unlawful, setting it aside, and vacating it;

3.    Awarding the Plaintiff States their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

4.    Awarding the Plaintiff States such additional and further relief as the Court may deem just, proper, and necessary.

Respectfully submitted this 21st day of July, 2020,

ROBERT W. FERGUSON
Attorney General of Washington

/s/ Kelly T. Wood
KELLY T. WOOD*
CINDY CHANG*
Assistant Attorneys General
Washington Office of the Attorney General
Environmental Protection Division
800 5th Avenue, Suite 2000, TB-14
Seattle, WA 98104-3188
Telephone: (206) 326-5493
E-mail: Kelly.Wood@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

XAVIER BECERRA
Attorney General of California
SARAH E. MORRISON
ERIC KATZ
Supervising Deputy Attorneys General
CATHERINE M. WIEMAN
ADAM L. LEVITAN
BRYANT B. CANNON
LANI M. MAHER
Deputy Attorneys General

/s/ TATIANA K. GAUR
Tatiana K. Gaur
Deputy Attorney General
*Attorneys for Plaintiff State of California, by and through Attorney General Xavier Becerra and the State Water Resources Control Board*

LETITIA JAMES
Attorney General of the State of New York

/s/ Brian Lusignan
BRIAN LUSIGNAN *
Assistant Attorney General
Office of the Attorney General
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
(716) 853-8465
Fax: (716) 853-8579
E-mail: brian.lusignan@ag.ny.gov
*Attorneys for Plaintiff State of New York*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

For the STATE OF COLORADO

PHILIP J. WEISER
Attorney General of Colorado

/s/ Carrie Noteboom
CARRIE NOTEBOOM *
ANNETTE QUILL *
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
E-mail: Carrie.noteboom@coag.gov
E-mail: Annette.quill@coag.gov


For the STATE OF ILLINOIS

KWAME RAOUL
Attorney General of Illinois


/s/ Jason E. James
MATTHEW J. DUNN *
Chief, Environmental Enforcement/Asbestos
Litigation Division
JASON E. JAMES*
Assistant Attorney General
69 W. Washington Street, 18th Floor
Chicago, IL 60602
Telephone: (312) 814-0660
E-mail: jjames@atg.state.il.us


For the STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland



/s/ John B. Howard, Jr.
JOHN B. HOWARD, JR. *
Special Assistant Attorney General
Office of the Attorney General
300 Saint Paul Place, 20th Floor
Baltimore, MD 21202
Telephone: (401) 576-6970
E-mail: jbhoward@oag.state.md.us

For the STATE OF CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

/s/ Jill Lacedonia
JILL LACEDONIA*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
Telephone: (860) 808 5250
E-mail: Jill.lacedonia@ct.gov


For the STATE OF MAINE

AARON M. FREY
Attorney General of Maine


/s/ Jillian R. O'Brien
JILLIAN R. O'BRIEN, cal. SBN 251311
Assistant Attorney General
6 State House Station
Augusta, ME 04333
Telephone: (207) 626-8800
E-mail: Jill.obrien@maine.gov



For the COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General of Massachusetts


/s/ Matthew Ireland
MATTHEW IRELAND *
TURNER SMITH
Assistant Attorneys General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
E-mail: Matthew.ireland@mass.gov
E-mail: Turner.smith@mass.gov

29

| | |
|---|---|
| For the STATE OF MICHIGAN | For the STATE OF MINNESOTA |
| DANA NESSEL<br>Attorney General of Michigan | KEITH ELLISON<br>Attorney General of Minnesota |
| /s/ Gillian E. Wener<br>GILLIAN E. WENER*<br>Assistant Attorney General<br>Michigan Department of Attorney General<br>Environment, Natural Resources and<br>Agriculture Division<br>P.O. Box 30755<br>Lansing, MI 48909<br>Telephone: (517) 335-7664<br>E-mail: wenerg@michigan.gov | /s/ Peter N. Surdo<br>PETER N. SURDO *<br>Special Assistant Attorney General<br>Minnesota Attorney General<br>445 Minnesota St.<br>Town Square Tower Suite 1400<br>St. Paul, MN 55101<br>Telephone: (651) 757-1061<br>E-mail: Peter.surdo@ag.state.mn.us |
| For the STATE OF NEVADA | For the STATE OF NEW JERSEY |
| AARON D. FORD<br>Attorney General of Nevada | GURBIR S. GREWAL<br>Attorney General of New Jersey |
| /s/ Heidi Parry Stern<br>HEIDI PARRY STERN *<br>Solicitor General<br>Office of the Nevada Attorney General<br>555 E. Washington Ave., Ste. 3900<br>Las Vegas, NV 89101<br>E-mail: hstern@ag.nv.gov | /s/ Lisa Morelli<br>LISA MORELLI, Cal. SBN 137092<br>Deputy Attorney General<br>Environmental Permitting and Counseling<br>R.J. Hughes Justice Complex<br>P.O. Box 093<br>Trenton, NJ 08625<br>Telephone: (609) 376-2804<br>E-mail: Lisa.Morrelli@law.njoag.gov |
| For the STATE OF NEW MEXICO | For the STATE OF NORTH CAROLINA |
| HECTOR BALDERAS<br>Attorney General of New Mexico | JOSHUA H. STEIN<br>Attorney General of North Carolina |
| /s/ William G. Grantham<br>WILLIAM G. GRANTHAM*<br>Assistant Attorney General<br>Consumer & Environmental Protection Division<br>P.O. Drawer 1508<br>Santa Fe, NM 87504-1508<br>Telephone: (505) 717-3520<br>E-mail: wgrantham@nmag.gov | /s/ Taylor H. Crabtree<br>DANIEL S. HIRSCHMAN<br>Senior Deputy Attorney General<br>TAYLOR H. CRABTREE*<br>Assistant Attorney General<br>ASHER P. SPILLER*<br>Assistant Attorney General<br>North Carolina Department of Justice<br>P.O. Box 629<br>Raleigh, NC 27602<br>Telephone: (919) 716-6400<br>E-mail: tcrabtree@ncdoj.gov<br>E-mail: aspiller@ncdoj.gov |

30

| | | |
|---|---|---|
| 1 | For the STATE OF OREGON | For the STATE OF RHODE ISLAND |
| 2 | ELLEN F. ROSENBLUM<br>Attorney General of Oregon | PETER F. NERONHA<br>Attorney General of Rhode Island |
| 3 | | |
| 4 | /s/ Paul Garrahan | /s/ Alison B. Hoffman |
| 5 | PAUL GARRAHAN *<br>Attorney-in-Charge<br>Natural Resources Section | ALISON B. HOFFMAN*<br>Special Assistant Attorney General<br>Office of the Attorney General |
| 6 | Oregon Department of Justice<br>1162 Court St. NE | 150 South Main Street<br>Providence, RI 02903 |
| 7 | Salem, OR 97301<br>Telephone: (503) 947-4593 | E-mail: ahoffman@riag.ri.gov |
| 8 | E-mail: Paul.garrahan@doj.state.or.us | |
| 9 | | |
| 10 | For the STATE OF VERMONT | For the COMMONWEALTH OF VIRGINIA |
| | THOMAS J. DONOVAN, JR. | MARK R. HERRING |
| 11 | Attorney General of Vermont | Attorney General of Virginia |
| 12 | | |
| 13 | /s/ Laura B. Murphy | /s/ David C. Grandis |
| 14 | LAURA B. MURPHY *<br>Assistant Attorney General<br>Vermont Attorney General's Office | DONALD D. ANDERSON<br>Deputy Attorney General<br>PAUL KUGELMAN, JR. |
| 15 | Environmental Protection Division<br>109 State Street | Senior Assistant Attorney General<br>Chief, Environmental Section<br>DAVID C. GRANDIS* |
| 16 | Montpelier, VT 05609<br>Telephone: (802) 828-3186 | Senior Assistant Attorney General<br>Office of the Attorney General |
| 17 | E-mail: laura.murphy@vermont.gov | 202 North Ninth Street<br>Richmond, VA 23219 |
| 18 | | Telephone: (804) 225-2741<br>E-mail: dgrandis@ oag.state.va.us |
| 19 | FOR THE STATE OF WISCONSIN | |
| | JOSHUA L. KAUL | FOR THE DISTRICT OF COLUMBIA |
| 20 | Attorney General of Wisconsin | KARL A. RACINE |
| 21 | | Attorney General for the District of<br>Columbia |
| 22 | /s/ Gabe Johnson-Karp<br>GABE JOHNSON-KARP* | |
| 23 | Assistant Attorney General<br>Wisconsin Department of Justice | /s/ Brian Caldwell<br>BRIAN CALDWELL* |
| 24 | Post Office Box 7857<br>Madison, WI 53702-7857 | Assistant Attorney General<br>Social Justice section |
| 25 | Telephone: (608) 267-8904<br>Fax: (608) 267-2223 | Office of the Attorney General for the<br>District of Columbia |
| 26 | Email: johnsonkarpg@doj.state.wi.us | 441 Fourth Street, N.W. Ste. #600-S<br>Washington, D.C. 20001 |
| 27 | * Application for admission pro hac vice<br>pending or forthcoming | Telephone: (202) 727-6211<br>E-mail: Brian.caldwell@dc.gov |
| 28 | | |

31

**SIGNATURE ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from each of the other signatories.

DATED: July 21, 2020                              /s/ Tatiana K. Gaur
                                                  Tatiana K. Gaur

LA2019102310
63443609.docx

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF