ROB BONTA
Attorney General of California
SARAH E. MORRISON
ERIC KATZ
Supervising Deputy Attorneys General
CATHERINE M. WIEMAN, SBN 222384
TATIANA K. GAUR, SBN 246227
ADAM L. LEVITAN, SBN 280226
BRYANT B. CANNON, SBN 284496
LANI M. MAHER, SBN 318637
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6329
  Fax: (916) 731-2128
  E-mail:  Tatiana.Gaur@doj.ca.gov
*Attorneys for Plaintiff State of California, by
and through Attorney General Rob Bonta and
the State Water Resources Control Board*

ROBERT W. FERGUSON
Attorney General of Washington
KELLY T. WOOD (*admitted pro hac vice*)
GABRIELLE GURIAN (*admitted pro hac vice*)
Assistant Attorneys General
Washington Office of the Attorney General
Ecology Division
  2425 Bristol Court SW
  Olympia, Washington 98501
  Telephone: (360) 586-5109
  E-mail:  Kelly.Wood@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*[Additional Plaintiffs and Counsel Listed on
Signature Pages]*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| In Re<br><br>Clean Water Act Rulemaking | CASE NO. 20-cv-04636-WHA<br>(lead consolidated)<br>Applies to all actions<br><br>**DECLARATION OF EILEEN SOBECK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR REMAND**<br><br>Courtroom: 12, 19th Floor<br>Date: August 26, 2021<br>Time: 12:00 P.M. |
|---|---|

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **1** of **22**

1          1.          I am Eileen Sobeck, Executive Director of the State Water Resources Control

2    Board ("State Water Board" or "Board").  I submit this declaration to demonstrate that

3    California's interests have been and are being adversely impacted by the rule entitled "Clean

4    Water Act Section 401 Certification Rule" ("401 Rule") promulgated by the United States

5    Environmental Protection Agency ("U.S. EPA") on July 13, 2020.  Although U.S. EPA has

6    announced its intent to reconsider and revise the 401 Rule, it is unlikely to complete the

7    process until spring 2023 at the earliest.  Thus, under the schedule proposed by U.S. EPA, the

8    harms experienced by California are ongoing and will continue, at a minimum, for multiple

9    years while the 401 Rule is in effect.

10          2.          The 401 Rule has caused and will continue to cause considerable harm to the

11   State of California.  Since the September 11, 2020 effective date of the 401 Rule, California's

12   efforts to protect the state's water quality have been, and will continue to be, drastically

13   impaired.  In addition to the effects on California's sovereign authority to protect water quality

14   and the resulting environmental harms, California has experienced administrative and

15   programmatic injury.  As described below, the 401 Rule creates confusion and uncertainty,

16   complicates the certification process, and delays projects with public health and safety

17   implications.  Moreover, the 401 Rule's harms are particularly acute in the hydropower

18   licensing context, where federal licenses issued by the Federal Energy Regulatory Commission

19   ("FERC") are in effect for up to 50 years.  Without the ability to address the water quality

20   impacts of an activity subject to Section 401 certification as a whole and to modify conditions

21   to protect water quality during the decades-long term of the FERC license, permanent

22   environmental damage is likely to occur.  These harms will continue to occur while the 401

23   Rule is in effect.

24          3.          In preparing this declaration, I relied on my professional experience and training

25   which have provided me a strong basis to determine ongoing and future harms caused by the

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **2** of **22**

1    401 Rule.  If called upon to testify about the matters discussed herein, I could and would testify
2    competently hereto.

3                                    **PERSONAL BACKGROUND**

4           4.      I have been employed as the Executive Director of the State Water Board since
5    2017.  My duties and responsibilities include overseeing all divisions and offices of the State
6    Water Board, including the Division of Water Rights and the Division of Water Quality.  The
7    Division of Water Rights is responsible for issuing Section 401 water quality certifications
8    ("certifications") for activities or facilities subject to FERC licensing or involving the diversion
9    or use of water.  The Division of Water Quality is responsible for issuing certifications related
10   to discharges not associated with a FERC license or appropriation of water.  The Division of
11   Water Quality also coordinates certification responsibilities for the nine Regional Water
12   Quality Control Boards ("Regional Water Boards").

13          5.      Prior to joining the State Water Board, I headed the National Oceanic and
14   Atmospheric Administration as the Assistant Administrator at the United States Department of
15   Commerce from 2014 to 2017.  Prior to that work, I served as the United States Department of
16   the Interior's Acting Assistant Secretary for Insular Affairs (2012-2014) and its Deputy
17   Assistant Secretary for Fish, Wildlife and Parks (2009-2012).  I also worked for 25 years at the
18   United States Department of Justice, ultimately serving as Deputy Assistant Attorney General
19   for Environment and Natural Resources, from 1999 to 2009.  I received my Juris Doctor and
20   Bachelor of Arts degrees from Stanford University.

21         **CERTIFICATIONS ISSUED UNDER CLEAN WATER ACT SECTION 401**

22          6.      Section 401 of the Clean Water Act ("Section 401") requires that every
23   applicant for a federal permit or license for an activity that may result in a discharge to waters
24   of the United States provide a certification from the state in which the discharge occurs that the
25   activity will meet requirements adopted under specific Clean Water Act sections as well as
26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **3** of **22**

1  "other appropriate requirements of state law." 33 U.S.C. § 1341(a), (d).  Any conditions of

2  issuing such a certification become part of the federal permit or license. *Id.* § 1341(d).

3      7.    Section 401 allows each state to designate an agency responsible for reviewing

4  and approving or denying water quality certification requests. 33 U.S.C. § 1341(a)(1).  In

5  California, the State Water Board is the agency with certification authority.  Cal. Water Code §

6  13160; Cal. Code Regs. tit. 23, §§ 3830-3838, 3855-3861, 3867-3869.

7      8.    Section 401 is the means by which the State Water Board ensures federally

8  permitted or licensed projects meet state water requirements.

9      9.    In California, the State Water Board and the nine Regional Water Quality

10  Control Boards (collectively, "Water Boards") issue water quality certifications.  The Water

11  Boards issue about 1,000 water quality certifications each year.

12      10.    In the past three years, the Water Boards have issued almost 3,000 water quality

13  certifications related to discharges not associated with a FERC license.

14      11.    In the past three years, the Division of Water Rights has issued 29 certifications,

15  including amendments, related to FERC licenses or other federal permits or licenses relating to

16  the diversion or use of water.

17      12.    The Water Boards most commonly issue certifications for two types of federal

18  permits and licenses: (1) dredge or fill permits issued by the United States Army Corps of

19  Engineers ("USACE") pursuant to Section 404 of the Clean Water Act; and (2) hydropower

20  licenses issued by FERC.

21      13.    The State Water Board issues certifications for discharges that may fall under

22  the jurisdiction of more than one Regional Water Quality Control Board or involve an

23  appropriation of water, a hydroelectric facility where the proposed activity requires a FERC

24  license or amendment to a FERC license, or any other diversion of water for domestic,

25  irrigation, power, municipal, industrial, or other beneficial use.

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **4** of **22**

14.     All other water quality certifications are issued by the Regional Water Board with jurisdiction over the region in which a discharge may occur.

**IMPACT OF THE 401 RULE**

15.     I have reviewed the 401 Rule, and my knowledge and experience allow me to understand the impacts of the 401 Rule.  Pursuant to the State Water Board's regulations, as the Executive Director, I have been delegated authority "to take all actions connected with applications for certification, including issuance and denial of certification."  Cal. Code Regs. tit. 23, § 3838(a).  I am familiar with the processes and issues associated with certifications, including compliance with the 401 Rule.  I have also conferred with my staff to further identify the impacts of the 401 Rule to date and anticipated in the future.

16.     U.S. EPA's drastic departure from its long-standing regulations and guidance has necessitated programmatic changes and the expenditure of resources to meet the new procedural and substantive requirements of the 401 Rule.  Water Boards staff have expended hundreds of hours trying to adjust certifications to satisfy the requirements of the 401 Rule. Because the regulations are vague and therefore subject to arbitrary application, the federal permitting and licensing agencies do not have a settled interpretation or application of the regulations.  Therefore, these resource expenditures by the Water Boards are expected to continue in the future.

17.     The 401 Rule is having a substantial impact on the Water Boards with regard to USACE Nationwide Permits.  The State Water Board issued general water quality certifications for 18 USACE Nationwide Permits:  1, 3a, 4, 5, 6, 9, 10, 11, 12, 14, 20, 22, 28, 32, 36, 54, 57, and 58.  The USACE determined that the certifications for Nationwide Permits 12, 57, and 58 were invalid due to the 401 Rule.  In addition, the USACE has indicated that it intends to determine that the certifications for the remaining Nationwide Permits were invalid due to the 401 Rule.  Based on data collected over the past five years, these determinations will

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **5** of **22**

require the Water Boards to process approximately 135 individual water quality certifications that would otherwise have been addressed by the general water quality certifications.  The estimated additional workload associated with these individual water quality certifications is approximately 3,700 staff hours annually for each year the 401 Rule remains in effect.  This is roughly equivalent to two full-time staff who, as a result of the 401 Rule, will not be available to work on other, higher water quality priorities for the Water Boards.

18.     The Water Boards have also had to make programmatic adjustments due to the 401 Rule.  For example, in some instances where the USACE has found waiver of the Water Boards' Section 401 certification authority based on the 401 Rule, the Water Boards have had to issue additional state water quality approvals, known as waste discharge requirements, to protect water quality.  These additional approvals result in greater resource expenditures for largely the same result as under the prior rules.

19.     Project proponents requesting water quality certification have disputed the applicability of the 401 Rule.  For example, some entities challenging certifications issued by the Board have argued that the 401 Rule should be applied retroactively to applications or requests filed before its effective date notwithstanding U.S. EPA guidance to the contrary.  This has led to increasingly adversarial proceedings, which result in additional delay and expenditure of resources, even when the 401 Rule does not apply.

20.     The USACE has also found conditions required to be included in certifications pursuant to California law to be waived under the 401 Rule's requirements.  The Emergency Drought Salinity Barrier Project, described below in greater detail, is one such instance.

21.     The 401 Rule has introduced a high level of uncertainty and confusion into the certification process in California which inhibits, rather than promotes, the system of cooperative federalism established by the Clean Water Act.  Both the Lake Fordyce Dam Safety Project and Emergency Drought Salinity Barrier Project, discussed below, show how

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **6** of **22**

1  this has required Water Boards staff to spend time and resources addressing questions and

2  situations created or left unanswered by the 401 Rule.

3       22.    If it remains in effect, the 401 Rule will also have impacts on California's water

4  quality that will last for multiple generations and may be irreversible.  The discussion below

5  regarding certifications for FERC-licensed hydropower facilities demonstrates how the 401

6  Rule significantly restricts California's ability to ensure that hydropower projects will comply

7  with water quality standards and other state law requirements.  Due to the long terms of FERC

8  licenses, which can last up to 50 years, resulting environmental damage will last for decades

9  and possibly permanently.

10                     **A.  Lake Fordyce Dam Safety Project**

11       23.    The Lake Fordyce project provides one example of how the 401 Rule has

12  created uncertainty and confusion, complicating the certification process and consuming

13  additional State Water Board staff resources and time, and delaying projects with public safety

14  implications.

15       24.    Lake Fordyce Dam, initially constructed between 1873 and 1882 from soil and

16  rock material, has a long history of seepage.  Previous efforts to reduce seepage by

17  constructing new design features and repair existing design features have been unsuccessful.

18       25.    While all dams have some seepage, uncontrolled seepage is a safety concern as

19  it can lead to erosion, damage to concrete structures, and dam failure.

20       26.    In California, the Division of Safety of Dams ("DSOD") within the Department

21  of Water Resources regulates dams to prevent failure, safeguard life, and protect property.

22  Lake Fordyce Dam and Fordyce Reservoir are under the jurisdiction of DSOD.

23       27.    DSOD has classified Lake Fordyce Dam as having an extremely high

24  downstream hazard potential, meaning that dam failure when Fordyce Reservoir (also referred

25

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **7** of **22**

to as Lake Fordyce) is full is expected to cause considerable loss of human life or result in an inundation area with a population of 1,000 or more.

28.    In 2005, DSOD instituted a seepage threshold for Lake Fordyce Dam.  Seepage at the dam exceeded this threshold in 2011, and DSOD subsequently required the owner of Lake Fordyce Dam, Pacific Gas & Electric Company ("PG&E"), to submit a plan and schedule to mitigate the seepage.

29.    PG&E engaged in a multi-year planning and engineering effort to develop a seepage mitigation plan as required by DSOD.  As the seepage mitigation project proposed by PG&E includes the discharge of dredged and fill material into waters of the United States, PG&E applied to USACE for a Clean Water Act Section 404 permit.

30.    On May 26, 2020, PG&E submitted a request for water quality certification to the State Water Board.  While Lake Fordyce Dam does not have hydropower production, it is part of the FERC-licensed Drum-Spaulding Hydroelectric Project, which is owned and operated by PG&E.  Accordingly, the State Water Board received and processed PG&E's application for certification.  *See* Cal. Code Regs. tit. 23, § 3855.

31.    The State Water Board worked diligently to analyze the environmental and water quality impacts of PG&E's proposed seepage mitigation project.  The Board requested and received an extension of time until October 31, 2020 from the USACE to model project impacts on turbidity and analyze whether compliance with California's water quality standards could be achieved.

32.    The State Water Board was the California Environmental Quality Act ("CEQA") lead agency for the project.  As part of the project's CEQA process, on September 24, 2020, the State Water Board released a draft Initial Study/Mitigated Negative Declaration for public review and comment.  After considering the comments received, on October 30,

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **8** of **22**

2020 the State Water Board adopted a Mitigated Negative Declaration and Mitigation Monitoring and Reporting Program.

33.     On October 30, 2020, the State Water Board also issued a water quality certification for the project, which set forth 29 conditions.  These conditions were incorporated into the Section 404 permit subsequently issued by USACE.

34.     Project work was expected to begin in July 2021 and take place between July and October for three construction years, with a possibility that limited activities would occur in a fourth construction year.

35.     On March 24, 2021, PG&E reached out to the State Water Board and USACE to discuss changes to the project.  Based on further engineering analysis, PG&E had determined that one aspect of the previously approved project, cofferdam installation, would be unsafe, and proposed changes related to this aspect of the project.  PG&E subsequently provided an overview of its proposed changes.

36.     On May 18, 2021, State Water Board staff met with USACE's Sacramento District to discuss and identify a potential procedural path for certifying and permitting PG&E's proposed changes in light of the 401 Rule.

   a.  During the meeting, USACE's Sacramento District expressed the opinion that the 401 Rule would apply, and that, under USACE's their interpretation of the 401 Rule, certifications cannot be amended or modified.

   b.  State Water Board staff explained that because the terms of the October 2020 certification did not allow for the implementation of PG&E's proposed changes, the certification would need to be amended.  Board staff also explained that, based on a U.S. EPA Fact Sheet providing answers to frequently asked

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **9** of **22**

1  questions,[1] PG&E's proposed changes to this existing project should be

2  processed under the previously applicable Clean Water Act Section 401

3  regulations because PG&E had submitted its certification request prior to the

4  September 11, 2020 effective date of the 401 Rule.  State Water Board staff

5  provided USACE's Sacramento District with a link to this U.S. EPA document

6  and requested that USACE consider U.S. EPA's and Board staff's positions.

7  37.   On May 19, 2021, USACE's Sacramento District informed the State Water

8  Board that after internal discussion and debate, USACE management continued to interpret the

9  401 Rule as prohibiting modifications to a certification after issuance, even when the request

10  for certification was submitted before the effective date of the 401 Rule.  According to

11  USACE, the key inquiry was whether "the modified activity constitutes as 'material change'

12  that has a potential to violate [water quality] standards without an update to the [certification]."

13  If so, USACE would consider it a new action subject to the procedural requirements of the 401

14  Rule.

15  38.   On May 24, 2021, USACE' Sacramento District informed the State Water

16  Board that after discussing the State Water Board's position with management, the question

17  would be reviewed by officials at USACE's headquarters in Washington, D.C.

18  39.   On May 27, 2021, USACE's Sacramento District informed the State Water

19  Board that Sacramento District management had agreed that certifications may be modified or

20  amended regardless of the date of issuance if the request for certification was received prior to

21  the September 11, 2020 effective date of the 401 Rule.  USACE stated that it would be able to

22  modify the Section 404 permit and refer to an amended certification issued by the State Water

23  Board.

24

25  [1] Available at https://www.epa.gov/sites/production/files/2020-
06/documents/frequently_asked_questions_fact_sheet_for_the_clean_water_act_section_401_certification_rule.p

26  df.

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **10** of **22**

40.     On June 3, 2021, the State Water Board communicated with PG&E and USACE's Sacramento District, setting forth the steps and information necessary to move forward and request an amendment to the October 2020 certification.  The State Water Board and PG&E subsequently engaged an environmental consultant to assess and analyze PG&E's proposed changes as required by CEQA, discussed the scope of environmental review work and documentation, and began the environmental review process.

41.     On June 24, 2021, PG&E requested an amendment to the certification and provided the necessary information.  PG&E, the environmental consultant, and the State Water Board subsequently executed a Memorandum of Understanding for Preparation of Environmental Documents.  On July 2, 2021, the State Water Board issued a notice of PG&E's request for water quality certification amendment.

42.     Board staff was actively engaged with the environmental consultant, reviewing PG&E's proposed changes and analyzing their impacts when, on July 8, 2021, USACE's Sacramento District requested a telephone meeting to discuss the project.

43.     On July 9, 2021, USACE's Sacramento District informed the State Water Board via telephone that officials at USACE's headquarters in Washington, D.C. had determined that the 401 Rule applied to PG&E's proposed changes and, based on the USACE's interpretation of the 401 Rule, the October 2020 certification could not be amended.

44.     On July 15, 2021, USACE's Sacramento District emailed the State Water Board, relaying guidance provided by USACE headquarters to USACE districts regarding interpretation of the 401 Rule.  The email explained that USACE districts had been instructed that "in the absence of a 'material change' determination by the permitting agency [], proposed project modifications (if approved) may proceed subject to the terms and conditions of the existing [certification];" if, on the other hand, the permitting agency determines that proposed project modifications do constitute a 'material change,' a new certification is required, and all

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **11** of 22

1   procedural requirements of the 401 Rule must be followed, beginning with a request for a pre-

2   filing meeting.  With regard to the Lake Fordyce project, USACE explained that it had

3   determined that, absent additional information from PG&E or the State Water Board indicating

4   that a water quality standard or standards established in the existing certification would be

5   violated by PG&E's proposed changes, PG&E's proposed changes do not constitute a

6   'material change.'  USACE did not specify a timeline for providing this additional information,

7   or a date on which its preliminary determination would become final.  USACE did, however,

8   state that unless it made a 'material change' determination for the Lake Fordyce project, if the

9   State Water Board were to issue a certification amendment, USACE would not make that

10  amendment a binding condition of the USACE permit.  The USACE also thanked the State

11  Water Board for its "continued patience and understanding" as USACE "navigate[s] the new

12  401 WQC rule."

13        45.      Due to USACE's changed position, the State Water Board found itself yet again

14  faced with numerous questions left unanswered by U.S. EPA in the 401 Rule and

15  accompanying explanatory text in the preamble to the 401 Rule.  *See* 85 Fed. Reg. at 42,210-

16  284.

17        46.      Under USACE's most recent position, changes in certification conditions

18  needed as a result of changed circumstances, including changes in the project, cannot be

19  accomplished by amending the certification, and the certifying agency must instead issue an

20  entirely new certification.  Previously, no applicant or federal agency has argued that the State

21  Water Board lacks authority to amend a certification in response to a request by the applicant.

22        47.      Issuing an entirely new certification, including following the procedures and

23  making the findings required by the 401 Rule, would require the State Water Board to devote

24  much more time and resources than would be required for an amendment, even if there were

25  no changes made to the project.  If the State Water Board issues a new certification under the

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **12** of **22**

401 Rule, it would also run the risk that conditions of certification that are now in effect and uncontested will be deemed waived by USACE based on the USACE's interpretation of the limits on state authority adopted in the 401 Rule.

48.     The State Water Board is currently evaluating potential paths for proceeding with the certification process for PG&E's proposed changes to this project with public safety implications.  As PG&E has requested an amendment to the October 2020 certification, not an entirely new certification, and has not requested a pre-filing meeting as required by the 401 Rule, the Board finds itself in an unprecedented procedural posture.

49.     Staff and management from the Division of Water Rights and attorneys from the Board's Office of Chief Counsel have had multiple internal meetings and exchanged numerous emails to try to understand and discuss USACE's positions and find a way forward with the certification process for this important public safety-related project.  As the events discussed in the preceding paragraphs show, even where the 401 Rule may not apply, considerable State Water Board resources are being consumed due to uncertainty and confusion introduced by the 401 Rule.  This additional workload has also occurred at a time when Board staff are extremely busy due to the extreme drought conditions in California.

50.     USACE's varying positions on this project show that federal agencies are struggling to interpret and apply the 401 Rule, further compounding the harm from the rule.

### B.  Emergency Drought Salinity Barrier Project

51.     The Emergency Drought Salinity Barrier Project provides an example of how the 401 Rule has created uncertainty and confusion, complicating and delaying the certification process for an urgently needed project during a state of emergency.

52.     San Francisco Bay and the Sacramento–San Joaquin Delta Estuary ("Delta") are the hub of California's water supply system and the most valuable estuary and wetlands system on the West Coast, serving cities, farms, fishing communities, boaters, and fish and wildlife.

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page 13 of 22

1    Water from the Delta is exported to more than 25 million people in the San Francisco Bay

2    Area, Southern California, and other areas of the state.

3         53.    In 2021, extreme drought conditions and unusually warm temperatures depleted

4    the expected runoff from the Sierra-Cascade snowpack, resulting in a historic and

5    unanticipated reduction of water supply from reservoirs and stream systems, including the

6    Delta watershed.  The extreme drought conditions created the risk of contamination of fresh

7    water supplies conveyed through the Delta, water scarcity, and degraded habitat for fish and

8    wildlife species.

9         54.    On May 10, 2021, California Governor Gavin Newsom proclaimed a state of

10   emergency in multiple California watersheds, including the Delta.  This proclamation directed

11   the Department of Water Resources ("DWR") to take actions addressing potential salinity

12   issues, including the potential installation of emergency drought salinity barriers at locations

13   within the Delta to "conserve water for use later in the year to meet state and federal

14   Endangered Species Act requirements, preserve to the extent possible water quality in the

15   Delta, and retain water supply for human health and safety uses."  Additionally, the

16   proclamation suspended Water Code section 13247, which requires state agencies to comply

17   with water quality control plans approved by the State Water Board, and suspended CEQA for

18   actions taken pursuant to the directive.

19        55.    As the project includes the discharge of dredged and fill material into waters of

20   the United States, DWR applied to USACE for a Clean Water Act Section 404 permit.  DWR

21   sought, and received, emergency authorization from the USACE under Regional General

22   Permit 8 – Emergency Repair and Protection Activities ("RGP 8") pursuant to Section 404.  As

23   determined by the USACE, an emergency situation is "one which would result in an

24   unacceptable hazard to life, a significant loss of property, or an immediate, unforeseen, and

25   significant economic hardship if corrective action requiring a Department of the Army permit

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **14** of 22

1   is not undertaken within a time period less than the normal time to process the request under

2   standard processing procedures."

3        56.        On May 14, 2021, DWR applied to the State Water Board for water quality

4   certification for the Emergency Drought Salinity Barrier Project.  The certification request was

5   subject to the 401 Rule.

6        57.        According to DWR, without the protection of the drought salinity barrier,

7   saltwater intrusions from the San Francisco Bay could render Delta water unusable for

8   agricultural needs, impair habitat for aquatic species, and affect roughly 25 million

9   Californians who rely on the export of this water for domestic use.

10       58.        The purpose of the Emergency Drought Salinity Barrier Project is to control

11  saltwater intrusion into certain portions of the Delta and conserve water in upstream reservoirs

12  for other uses.  The project involves installing embankment rock at a specific location in the

13  Delta.

14       59.        On May 24, 2021, USACE determined that the reasonable period of time to

15  grant certification was 60 days, resulting in a certification deadline of July 13, 2021.  However,

16  given the emergency drought conditions, DWR wanted to proceed with the project as soon as

17  possible.

18       60.        On Friday, May 28, 2021, the State Water Board issued a certification for the

19  project, which set forth 25 conditions, including three conditions required by the California

20  Code of Regulations.  The Board transmitted the certification electronically to DWR and

21  USACE.

22       61.        Later that day, USACE sent an email to the State Water Board stating:  " . . .

23  Conditions 10, 11, 15, 16, 20, 23, 24, and 25, do not contain a statement explaining why the

24  condition is necessary to assure that the discharge from the proposed project will comply with

25  water quality requirements.  Therefore, these conditions do not meet the requirements of 40

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page 15 of 22

1    CFR 121.7(d)(1)."  USACE's email requested additional information or rationale for the

2    enumerated conditions by noon on June 1, 2021.

3            62.     Monday, May 31, 2021 was Memorial Day.  To comply with USACE's request,

4    State Water Board staff worked long hours over the holiday weekend to prepare the requested

5    information.

6            63.     The State Water Board submitted the supplemental information requested by

7    USACE on June 1, 2021.  The general conditions addressed monitoring and data accessibility

8    (Condition 10), compliance with the state and federal Endangered Species Acts (Condition 11),

9    compliance with applicable federal, state, or local laws (Condition 15); compliance in the event

10   that authorities and responsibilities are transferred to successor agencies (Condition 16), and

11   the scope of the Board's approval (Condition 20).  In addition, the certification included

12   standard conditions required by the Board's regulations, providing for modification or

13   revocation on administrative or judicial review (Condition 23), the scope of the certification as

14   not applying to FERC-licensed hydroelectric facilities (Condition 24), and requiring total

15   payment of any fees (Condition 25).  The Board provided a rationale for each condition and

16   explained that the conditions at issue address the scope and legal effect of the certification and

17   other legal requirements that may apply to the project.

18           64.     Later on June 1, 2021, USACE responded, stating: "The supplemental

19   information you provided only includes the requisite information for conditions 10 and 16,

20   therefore, in accordance with 40 CFR 121.9(b), conditions 11, 15, 20, 23, 24, and 25 are

21   waived."

22           65.     Three of the conditions USACE found to be waived (conditions 23, 24 and 25)

23   are required by regulation to be included in water quality certifications.  *See* Cal. Code Regs.

24   tit. 23, § 3860.  These conditions place the permittee on notice that the certification action may

25   be modified or revoked following administrative or judicial review and ensure that any

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **16** of 22

applicant for a federal license or permit for an activity which may result in a discharge into waters of the United States is subject to the appropriate state certification.  The conditions also require payment of a fee as a condition of certification, which in this case was based on the discharge's threat to water quality and complexity.

66.     In other certification proceedings involving nationwide permits, however, USACE has accepted similar simple rationale as sufficient for these standard conditions required by the State Water Board's regulation.  This demonstrates the inconsistent application of the 401 Rule within a single federal agency.

67.     On June 2, 2021, the USACE authorized the proposed activity under RGP 8.

68.     On June 2, 2021, DWR transmitted a notice of intent to begin construction activities that evening.

69.     The speed with which this certification progressed and with which DWR began construction were in response to the urgent need for the Emergency Drought Salinity Barrier Project to address conditions during a state-declared emergency.  The State Water Board expeditiously issued the certification consistent with past practices, its own regulations, and the specific circumstances before it.  Citing the 401 Rule, however, the USACE effectively delayed an emergency drought project despite issuing its own emergency authorization for the project.  The uncertainty regarding conditions that are permissible in a certification under the 401 Rule (as well as variations in interpretations by different federal agencies or divisions of federal agencies) resulted in an unnecessary and undesirable delay for this critical project.

70.     Equally of concern, the 401 Rule impairs the state's sovereignty by impeding the Water Boards' ability to impose conditions that will ensure that the proposed activity will comply with water quality standards and other appropriate requirements of state law.  As an example, one of the conditions the USACE rejected based on 401 Rule provides that the certification may be revised as required by decisions on administrative appeal and judicial

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **17** of **22**

review.  Allowing the 401 Rule to stay in place will effectively deprive the state courts of their authority to grant relief in an action seeking judicial review of a water quality certification. This is but one example of state law requirements that do not fit within the 401 Rule.

### C. FERC-Licensed Hydropower Facilities

71.     The 401 Rule has particularly grave implications for California's ability to protect water quality in the hydropower licensing context, where FERC licenses are in effect for multiple decades.  In this context, the 401 Rule causes confusion, fosters uncertainty, and creates inconsistencies for reasons similar to those described above.  It also significantly diminishes California's ability to protect water quality impacts resulting from the whole of the hydropower activity and to modify the certification in light of changing circumstances over the years.

72.     Because the Federal Power Act preempts the field of hydropower regulation absent an exception to preemption, and FERC project licenses are valid for a fixed period of up to 50 years, water quality certifications for FERC license applications provide the State Water Board with a singular opportunity to ensure compliance with the state's water quality standards and other requirements.  Many hydropower projects in California have operated under an initial FERC license with limited water quality or environmental protection conditions for decades because they were constructed and began operating prior to environmental laws such as the Clean Water Act and CEQA.

73.     Before the U.S. EPA completes its new Section 401 rulemaking in mid-2023, Board staff anticipates receiving multiple requests for certification associated with FERC-related projects, including FERC license applications, FERC-related maintenance projects, and drought-related requests for flow variances.  For example, by December 2022, staff expects approximately four applications for FERC licenses, four applications for FERC-related maintenance projects, and at least six requests for flow variances.  These expected requests for

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **18** of 22

certification represent a considerable workload for staff, which is increased due to the additional requirements imposed by the 401 Rule.

74.     Through the adoption of water quality control plans, the Water Boards designate the beneficial uses of water that are to be protected (such as municipal and industrial, agricultural, and fish and wildlife beneficial uses), water quality objectives for the reasonable protection of the beneficial uses and the prevention of nuisance, and a program of implementation to achieve the water quality objectives.  The Water Boards also employ other state law authorities to protect water quality, such as waste discharge requirements.

75.     Hydropower projects, however, present complex water quality issues that often are not readily addressed through the state's other regulatory authorities, due to field preemption by the Federal Power Act.  The 401 Rule strips the state of its authority to fully address impacts associated with activities reviewable under Section 401, but otherwise exempt from state water quality regulation.

76.     Hydropower projects cause water quality impacts that, depending on the circumstances, may not be attributable to a point-source discharge.  Common water quality impacts resulting from hydropower operations and facilities include: changes in turbidity, sediment, temperature, dissolved oxygen, algal productivity, siltation, and erosion; aquatic habitat loss; barriers to fish passage;  algal-produced toxins;  alterations to stream geomorphology;  and reductions in stream flows.

77.     California has more than 100 FERC-licensed hydropower facilities.

78.     Prior to the 401 Rule, the State Water Board imposed, or considered the need for certification conditions to protect water quality on project activities that fall outside the typical understanding of point-source discharges, such as requirements for minimum instream flows and ramping rates; temperature management; aquatic invasive species management; plans for gravel replenishment, large woody material placement and other habitat measures;

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **19** of 22

reservoir operation plans; erosion and sediment management plans; and monitoring and management of dissolved oxygen, mercury, pesticides, and other constituents of concerns. Previously issued certifications have typically included management, monitoring, and reporting measures to ensure compliance with water quality measures and to identify potential modifications if circumstances change.  The certifications also contained conditions to address point source discharges.  In its certifications, the State Water Board has historically reserved authority to modify the conditions of the certification for specified reasons, including to incorporate changes in technology, sampling, or methodologies, provide for adaptive management, to implement new or revised water quality standards, or to otherwise ensure that the continued hydropower facility operation does not violate water quality objectives or impair beneficial uses.  These reservations of authority provided the State Water Board with sufficient assurance that the project would comply with water quality standards and other appropriate requirements of state law throughout the term of its multi-decade FERC license.

79.     As one specific example, temperature management can be a material issue associated with hydropower facilities.  Hydropower facilities (such as dams and reservoirs) and their associated operations alter the temperature regime of rivers, often to the detriment of cold-water species such as salmonids and other aquatic plants and animals that have adapted to colder waters.  Water stored in reservoirs greatly increases the surface area exposed to solar heating and reduces the amount of water protected by shade.  Large reservoirs "stratify" in summer:  the water is warmer at the surface and cooler below the thermocline in deeper waters. Absent any control devices, or multi-level intakes, downstream temperature management is primarily achieved directly through flow management.  In addition to changes in temperature due to reservoir storage and release, reservoirs also modify the temperature regime of downstream reaches by diminishing the volume of water below diversions for hydropower generation.  Hydroelectric dams, which are generally built to take advantage of mountain

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **20** of **22**

1  gradients, also can trap fish in the typically warmer, valley reaches of a river, absent effective

2  fish passage.  Thus, in addition to the thermal impacts of the hydropower dams themselves, the

3  facilities can prevent fish from reaching waters of appropriate temperature upstream.

4       80.    As a result, diversions, reservoir storage, and dams contribute to altered water

5  temperatures and flow regimes that negatively impact salmonids and other native fish,

6  encourage warm-water and non-native fishes, and alter the base of the food web.  In addition,

7  such conditions allow undesirable and nuisance algae (e.g., Microcystis), and submerged

8  aquatic vegetation (e.g., Egeria) to become established and potentially widespread.  In sum,

9  temperature impacts are directly related to hydroelectric facility construction and operations.

10  Thus, as appropriate, certifications include requirements for temperature management and

11  monitoring to ensure protection of water quality and beneficial uses of water.

12       81.    Because FERC licenses are granted for decades, the State Water Board must act

13  comprehensively to protect the state's water quality in stream systems affected by FERC

14  projects.  Prior to the 401 Rule, the State Water Board could condition certification to address

15  water quality impacts from the activity as a whole.  While the 401 Rule remains in effect, it

16  will confine the State Water Board's authority to the regulation of point source discharges, thus

17  restricting the state's ability to protect beneficial uses and to address water quality problems

18  from nonpoint sources of pollution.  Moreover, the 401 Rule impairs the California's ability to

19  protect water quality if water quality standards or other appropriate requirements of state law

20  are revised or adopted, through adaptive management of water quality parameters, or if

21  circumstances change over the decades that the FERC license is in effect.  If the State Water

22  Board cannot act to protect water quality through water quality certification now, then the

23  harm to the state's water quality over the decades-long life of a FERC license is likely to be

24  permanent.

25

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page 21 of 22

1

82.     I declare under penalty of perjury under the laws of the United States that the

2

foregoing is true and correct, and that this declaration was executed on July 26, 2021 in

3

Sacramento, California.

4

5

6

*Eileen Sobeck*

Eileen Sobeck
Executive Director
State Water Resources Control Board

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Declaration of Eileen Sobeck in Support of Plaintiffs' Opposition to Motion for Remand
Case No. 4:20-cv-04636-WHA (consolidated)

Page **22** of **22**