1    **TROUTMAN PEPPER HAMILTON SANDERS LLP**

2    Elizabeth Holt Andrews (SBN 263206)          Charles Sensiba (admitted *pro hac vice*)
     elizabeth.andrews@troutman.com               charles.sensiba@troutman.com
3    Three Embarcadero Center, Suite 800          401 9th Street N.W., Suite 1000
     San Francisco, California 94111-4057         Washington, D.C. 20004
4    Telephone:    415.477.5700                   Telephone:    202.274.2850
     Facsimile:    415.477.5710                   Facsimile:    202.274.2994
5
     Misha Tseytlin (admitted *pro hac vice*)     Andrea W. Wortzel (admitted *pro hac vice*)
6    misha.tseytlin@troutman.com                  andrea.wortzel@troutman.com
     Sean T.H. Dutton (admitted *pro hac vice*)   1001 Haxall Point, 15th Floor
7    sean.dutton@troutman.com                     Richmond, VA 23219
     227 W. Monroe Street, Suite 3900             Telephone:    804.697.1406
8    Chicago, IL 60606-5085                       Facsimile:    804.697.1339
     Telephone:    312.759.1920
9    Facsimile:    312.759.1939

10                                                *Attorneys for Intervenor Defendant*
                                                  *National Hydropower Association*

11   **Additional Counsel listed in signature blocks**

12

**UNITED STATES DISTRICT COURT**
13   **NORTHERN DISTRICT OF CALIFORNIA**
     **SAN FRANCISCO DIVISION**

14

| | |
|---|---|
| In re: Clean Water Act Rulemaking | Lead Case No. 3:20-CV-04636-WHA |
| | Related Case Nos. |
| | 3:20-CV-04869-WHA |
| | 3:20-CV-06137-WHA |
| | **INTERVENOR DEFENDANTS' SUPPLEMENTAL BRIEF ON *ALLIED-SIGNAL* FACTORS** |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

## INTRODUCTION

The Plaintiffs want this Court to strike down EPA's 2020 Clean Water Act Section 401 Certification Rule.  But to get that extraordinary relief, they must prove that EPA acted arbitrarily, capriciously, or contrary to law when promulgating the Rule.  EPA, for its part, wants to revisit the policy decisions reflected in the Certification Rule.  But to change the Rule at all, EPA must go through notice and comment rulemaking.  The fact that Plaintiffs and EPA want these things at the same time does not relax their respective burdens before this Court.

Plaintiffs in these consolidated actions have not met the exacting burden for vacating the Certification Rule.  EPA has not confessed error or admitted that any aspect of the Rule is legally deficient, and the Intervenor Defendants continue to defend every aspect of the Rule in any event. The Court has not received full merits briefing and has made no adjudication of error.  If the *Allied-Signal* test is applicable at all in this scenario—and it is not—Plaintiffs must show at the very first step of that test that there is some legal deficiency serious enough to justify the disruptive consequences of vacatur.  The abbreviated discussion of the merits in Plaintiffs' responses to EPA's motion to remand without vacatur presents only a limited engagement with *some* of the many features of the Certification Rule and relies on the incorrect premise that EPA has conceded the Rule is unlawful.  It falls well short of the predicate necessary to justify vacating agency action. Plaintiffs have not fully briefed any aspect of the Rule, let alone all of the Rule's many complicated, detailed provisions and how Plaintiffs believe a severability analysis should apply here.

The disruption that vacatur of the Rule would wreak on many states and the regulated community is profound.  EPA promulgated the Certification Rule to fill a regulatory void that has existed for nearly 50 years.  The absence of clarity about basic features of the section 401 certification process spawned a series of abuses that distorted the cooperative-federalism framework on which the Clean Water Act depends.  Vacating the Rule would invite the return of those abuses and cast substantial uncertainty over dozens of pending certification requests and the processes states have implemented in the wake of the Certification Rule.  That uncertainty will lead inexorably to regulatory chaos, which will trigger needless litigation.

1   The states of Arkansas, Louisiana, Mississippi, Missouri, Montana, Texas, West Virginia,

2   and Wyoming (collectively the "State Defendants"), American Petroleum Institute ("API"),

3   Interstate Natural Gas Association of America ("INGAA"), and National Hydropower Association

4   ("NHA") (collectively "Intervenor Defendants") intervened in this case because they have

5   substantial interests that would be impaired should the Rule be vacated.  Vacating the Rule without

6   holding Plaintiffs to their well-established burden as challengers to agency action would violate

7   Intervenor-Defendants' basic right as a party in civil litigation—the right to be heard on the merits

8   of the dispute and put Plaintiffs to their proof.  Plaintiffs' request for vacatur should be denied.

9   **BACKGROUND**

10      **A.      Clean Water Act**

11      Since 1970, "[a]ny applicant for a Federal license or permit to conduct any activity . . .

12  which may result in any discharge into the navigable waters . . . shall provide the licensing or

13  permitting agency a certification from the State in which the discharge originates or will originate."

14  Water Quality Improvement Act of 1970, Pub. L. 91-224, 84 Stat. 91, 108 (Apr. 3, 1970).  In 1972,

15  Congress enacted the Clean Water Act ("CWA"), a "total restructuring" and "complete rewriting"

16  of the nation's water pollution control laws, including the provision requiring certification.  *City of*

17  *Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (quoting legislative history); *see also* Federal Water

18  Pollution Control Act Amendments of 1972, Pub. L. 92-500, 86 Stat. 816, 877 (Oct. 16, 1972)

19  (codified at 33 U.S.C. § 1341).  Of particular relevance here, Congress narrowed the certification

20  requirement from "*activity* [that] will be conducted in a manner which will not violate applicable

21  *water quality standards*," 84. Stat. at 108 (emphases added), to a certification only "that any such

22  *discharge* will comply with *the applicable provisions of sections 301, 302, 306, and 307 of this*

23  *Act,*" 86 Stat. at 877 (emphases added).  Congress also created a prominent role for states and tribes

24  in implementing the new regulatory program.  *See* 33 U.S.C. 1251(b).

25      The CWA uses a "cooperative federalism" approach to achieve its aims.  It carves out

26  complementary roles for federal agencies, on the one hand, and states and tribes, on the other.

27  CWA Section 401 gives each state and tribe an important but limited say in the licensing of federal

28

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1   projects that could affect water quality.  Specifically, federal agencies cannot license activities that

2   may result in a discharge into waters of the United States until the state or authorized tribe where

3   the discharge would originate certifies that the discharge will comply with applicable water quality

4   requirements or waives the Section 401 requirement, either affirmatively or through inaction.  33

5   U.S.C. § 1341.  Section 401 authority is powerful—when triggered, state certification or waiver is

6   an essential requirement for the federally-licensed activity to proceed.  But to preserve the CWA's

7   federal-state balance, that authority is also limited—Section 401 only authorizes states to address

8   water quality, and only within reasonable time limits that can never exceed one year.

9   **B.      Certain States Abused Their Section 401 Certification Authority**

10   Despite the statutory change in 1972, EPA failed to revise its prior regulations, promulgated

11   in 1971, that governed the certification process, which is known as a 401 Certification. As a result,

12   for nearly fifty years, EPA's regulations were incongruent with the new statutory language. *Cf.*

13   NPDES; Revision of Regulations, 44 Fed. Reg. 32,854, 32,856 (June 7, 1979) (indicating need for

14   updated certification rules).  Certain states began using the incongruity and ambiguities in EPA's

15   prior regulations effectively to veto projects based on non-water quality considerations, such as

16   preferences regarding energy policy, which infringes on the federal government's exclusive

17   authority.

18   A particularly egregious example is Washington State's treatment of the Millennium Bulk

19   Terminals – Longview LLC project.  In the course of a five-year review of the project, the State

20   compiled an Environmental Impact Statement that expressly concluded that the terminal would not

21   result in significant adverse effects on water quality, aquatic life, or designated uses; and that any

22   potential water quality impacts could be fully mitigated.  Ex. 1, Joint Fuel & Petroleum Industry

23   Comments To Clean Water Act Section 401 Rule.  And yet, the State denied the certification

24   request based on concerns about capacity of the interstate rail system, the impact of trains operating

25   anywhere in that system, and impacts on the overall capacity of the Federal Columbia River

26   Navigation Channel to accommodate additional vessels at state ports.  *Id.*

27   Other examples abound in the administrative record.  In December 2017, Virginia approved

28   a water quality certification for the Atlantic Coast Pipeline, a $5.1 billion pipeline project that

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

would transport gas produced in the Marcellus Shale region to the Mid-Atlantic region of the United States.  Dreskin Decl. ¶ 13 (Dkt. 56-2).  Virginia then included conditions regulating activities in upland areas that may indirectly affect state waters beyond the scope of federal CWA jurisdiction and the project's direct discharges to navigable waters.  *Id.*  According to Virginia, "all proposed upland activities associated with the construction, operation, maintenance, and repair of the pipeline, any components thereof or appurtenances thereto, and related access roads and rights-of-way," are subject to the stringent conditions of the certification.  *Id.*  Another example took place in August 2020, when North Carolina denied water quality certification for Mountain Valley Pipeline Southgate, one of INGAA's members, for reasons outside of water quality.  *Id.* ¶ 14.  The State determined that the purpose of the project was "unachievable" due to the "uncertainty" of completing a different pipeline project even though FERC had determined that the public convenience and necessity required approval of the $468 million, 75-mile natural gas pipeline project.  *Id.*

States have also unlawfully exploited the regulatory ambiguity to extend the amount of time they have to act on a certification request, which can effectively kill a project.  One example is the Constitution Pipeline, a $683 million, 124-mile natural gas pipeline designed to connect natural gas production in Pennsylvania to demand in northeastern markets.  Dkt. 84-1 ¶ 12.  The New York State Department of Environmental Conservation ("NYSDEC") requested additional information and deemed the request complete in December 2014.  *Id.*  In April 2015, NYSDEC requested that the API member withdraw and resubmit its request in order to restart the statutory period of time that NYSDEC had to act on the request.  *Id.*  In April 2016, nearly three years after the project's initial request for certification, NYSDEC denied water quality certification.  Following litigation over NYSDEC's determination, Federal Energy Regulatory Commission ("FERC") determined in August 2019 that NYSDEC had waived the Section 401 certification requirement.  *Id.* Nevertheless, after years of delay, the project's sponsor halted investment in the pipeline and cancelled the project in February 2020.  *Id.*

The Millennium Pipeline Company faced a similar roadblock when it submitted a certification request to NYSDEC for the Millennium Valley Lateral project, a 7.8-mile pipeline

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1    connecting a natural gas mainline to a new natural gas-fueled combined cycle electric generation

2    facility in New York. *Id.* ¶ 13. Nearly two years after the project's initial request for certification,

3    NYSDEC denied certification on the grounds that FERC's environmental review of the project

4    lacked an adequate analysis of the potential downstream greenhouse gas emissions, not water

5    quality concerns. *Id.* In September 2017, FERC concluded that NYSDEC's twenty-one-month

6    delay constituted waiver of the certification requirement, and the Second Circuit agreed. *See N.Y.*

7    *State Dep't of Env't Conservation v. Fed. Energy Regul. Comm'n*, 884 F.3d 450 (2d Cir. 2018).

8        A number of courts have recognized that allowing states to delay the start of the period of

9    review violates the CWA's plain text. The Second Circuit concluded that the CWA creates a

10   "bright-line rule" that the "receipt" of a Section 401 request is the beginning of the state's one-year

11   period for review. *Id.* at 455. As the D.C. Circuit explained, "the purpose of the waiver provision

12   is to prevent a State from indefinitely delaying a federal licensing proceeding by failing to issue a

13   timely water quality certification under Section 401." *Alcoa Power Generating Inc. v. FERC*, 643

14   F.3d 963, 972 (D.C. Cir. 2011). The D.C. Circuit thereafter invalidated the process of withdrawing

15   and refiling the same Section 401 request in order to restart the review period. *Hoopa Valley Tribe*

16   *v. FERC*, 913 F.3d 1099, 1104 (D.C. Cir. 2019).

17       **C.    EPA Adopts The Section 401 Certification Rule**

18       An update to the 1971 regulations was necessary to conform the regulations to the 1972

19   CWA amendments and to provide necessary clarity and transparency that would also remedy the

20   abuses described above. 85 Fed. Reg. 42,210 (July 13, 2020). EPA explained that "[t]he Agency's

21   longstanding failure to update its regulations created the confusion and regulatory uncertainty that

22   were ultimately the cause of those controversial section 401 certification actions and the resulting

23   litigation." 85 Fed. Reg. 42227. In particular, EPA cited the D.C. Circuit and Second Circuit

24   decisions discussed above as recognizing that allowing states to extend their review beyond one

25   year is contrary to the CWA. *Id.*

26       The Rule fixes these problems. The Rule begins by defining fourteen key terms, most of

27   which are not defined in the Clean Water Act. 40 C.F.R. § 121.1; *see also* 85 Fed. Reg. at 42237

28

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

1   (describing the need for definitional clarity achieved through EPA's rulemaking process). The Rule

2   then reaffirms EPA's longstanding interpretation of when a water quality certification is required

3   under Clean Water Act section 401. 40 C.F.R. § 121.2; 85 Fed. Reg. 42237 ("Section 121.2 of the

4   final rule is consistent with the Agency's longstanding interpretation and is not intended to alter the

5   scope of applicability established in the CWA."). The Rule sets out the scope of certification, as

6   developed through the rulemaking process. 40 C.F.R. § 121.3.  The Rule provides a procedure to

7   ensure meaningful coordination occurs between project proponents and state and tribal certifying

8   authorities before the certification process even begins. 40 C.F.R. § 121.4 (Pre-filing meeting

9   request). The Rule lays out a uniform procedure for establishing the reasonable period of time for

10   states and tribes to act on a certification request, clear rules for when that period of time begins and

11   ends, and a procedure for communicating to all parties when the period of time begins and ends.

12   40 C.F.R. §§ 121.5–9.  The Rule requires an action on a certification request, whether it is a grant,

13   grant with conditions, or a denial of certification, to be in writing and to contain certain information

14   that explains the state or tribe's action. 40 C.F.R. § 121.7; 85 Fed. Reg. 42256 (explaining that such

15   requirements are intended to promote the development of comprehensive administrative records

16   for certification actions and to increase transparency).  The Rule describes the effect of certain

17   actions and explains how waiver of the certification requirement can occur proactively or by

18   operation of law. 40 C.F.R. §§ 121.8–9. The Rule also provides a procedure for neighboring

19   jurisdictions to participate in the certification process, as required by the Clean Water Act, 40

20   C.F.R. §§ 121.12; describes how certification conditions are to be enforced, 40 C.F.R. §§ 121.11;

21   and describes EPA's role as a certifying authority and advisor, 40 C.F.R. §§ 121.13–16.

22   **D.      Plaintiffs Bring This Lawsuit, EPA Moves To Remand Without Vacatur, And
           Then Plaintiffs Ask This Court To Vacate The Rule.**

23

24       Plaintiffs are three groups who filed complaints in this Court: Idaho Rivers United,

25   American Rivers, California Trout, and American Whitewater (collectively "Plaintiff American

26   Rivers"), Dkt. 75; twenty states and the District of Columbia (collectively "Plaintiff States"), Dkt.

27   96; and Columbia Riverkeeper, Sierra Club, Suquamish Tribe, Pyramid Lake Paiute Tribe,

28

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1  Orutsaramiut Native Council (collectively "Plaintiff Tribes"), Dkt. 98.   Intervenor Defendants

2  moved to intervene to defend the Rule, Dkt. 27, and this Court granted their motions, Dkt. 62.

3        On January 20, 2021, President Biden directed "all executive departments and agencies . . .

4  to immediately review and, as appropriate and consistent with applicable law, take action to address

5  the promulgation of Federal regulations and other actions during the last 4 years that conflict with"

6  the new Administration's objectives.  EO 13,990, 86 Fed. Reg. 7,037 (Jan. 25, 2021).  In a press

7  statement the same day, the Administration identified the Certification Rule as among those that

8  would be reviewed under President Biden's Executive Order.[1]

9        On June 2, 2021, EPA pointed to the Executive Order and announced it intended to

10  reconsider and revise the Certification Rule.  *Notice of Intention to Reconsider and Revise the Clean*

11  *Water Act Section 401 Certification Rule*, 86 Fed. Reg. 29541 (June 2, 2021).  EPA then moved for

12  remand without vacatur in this case, Dkt. 143 at 2, among others.  Although EPA noted "substantial

13  concerns" with some portions of the Rule, EPA made clear that it was not confessing error.  *Id.* at

14  13.  Without filing a motion of their own, Plaintiffs argued for vacatur in their oppositions, while

15  failing to meaningfully discuss most aspects of the Rule.  *See generally* Dkts. 145–47.

16  **ARGUMENT**

17  **I.    Plaintiffs Are Not Entitled To Vacatur Because They Have Utterly Failed To Show
      That They Satisfy The First *Allied-Signal* Factor**

18      **A.    Plaintiffs Failed To Establish The Necessary Legal Predicate For Application
      Of The First *Allied-Signal* Factor, Rendering Such Relief Unavailable**

19

20        Plaintiffs failed to establish the predicate for vacatur and thus the application of the first

21  *Allied-Signal* factor—that the rule is, in fact, unlawful—and thus their request for vacatur should

22  be denied on that basis alone.  The first *Allied-Signal* factor asks how "serious[ ]" the agency's

23  errors are.  *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir.

24  1993).  This assessment of error can only logically occur after a court has concluded that a legal

25  error has occurred.  *See id.* (applying the two-factor test after determining that the agency acted

26

27  ---

[1] Fact Sheet: List of Agency Actions for Review, White House (Jan. 20, 2021),
https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-

28  ofagency-actions-for-review/.

without "reasoned decision-making"); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (same).  And there is good reason for that well-established approach.  Vacating a rule prior to adjudicating the merits affords plaintiffs complete relief without ever proving the merits of their case, while also circumventing the Administrative Procedure Act's ("APA") notice-and-comment requirements for repeal of a rule.  *See Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 5 (D.D.C. 2009) ("[G]ranting vacatur here would allow the Federal defendants to do what they cannot do under the APA, repeal a rule without public notice and comment, without judicial consideration of the merits."); *accord Maine v. Wheeler,* No. 1:14-cv-00264-JDL, 2018 WL 6304402, at *3 (D. Me. Dec. 3, 2018); *California v. Regan*, No. 20-cv-03005-RS, 2021 WL 4221583, at *1 (N.D. Cal. Sept. 16, 2021) ("there has been no evaluation of the merits—or concession by defendants—that would support a finding that the rule should be vacated").  And unlike the cases that Plaintiffs cite to advocate that vacatur before full adjudication on the merits is permissible, *see* Dkts. 146 at 19, 147 at 2–3, here there remains a live controversy between the parties regarding the legality of the Rule because Intervenor Defendants would vigorously defend every aspect of the Rule from legal challenge.

To the extent that it ever would be appropriate for a court to vacate a rule that a party in the case is defending on the merits without issuing a decision on the rule's legality—and to be clear, it would *never* be permissible—that type of relief could only be ordered after full merits briefing. To illustrate, the district court in *Pascua Yaqui Tribe v. EPA*, No. CV-20-00266-TUC-RM, __ F. Supp. 3d __, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021), vacated a rule without making a merits determination on the rule's legality,[2] but at least in that case the plaintiffs submitted a full 61-page

---

[2] The *Pascua Yacqui Tribe* court observed that two Ninth Circuit cases indicate that "in the Ninth Circuit, remand with vacatur may be appropriate even in the absence of a merits adjudication." *Pascua Yaqui Tribe*, 2021 WL 3855977 at *4 (citing *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012); *Safer Chemicals, Healthy Fams. v. EPA*, 791 F. App'x 653 (9th Cir. 2019)). But both of those Ninth Circuit cases involved different circumstances than those presented here. In *California Communities Against Toxics*, no party defended EPA's reasons for adopting the rule as legally permissible, with EPA seeking to salvage the rule based on new reasoning not found in the administrative record, 688 F.3d at 993, which it cannot do, *see id.* (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).  Similarly, in *Safer Chemicals*, EPA asked for remand with vacatur, thus conceding the rule was unlawful, and no party opposed such relief.  791 F. App'x at 656.

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1    merits brief, *see* No. CV-20-00266-TUC-RM, Dkt. 48, and intervenor-defendants submitted a

2    response in support of the rule, *see id.* Dkt. 77.  The court considered all of these fully briefed and

3    developed merits arguments and only then concluded that there were serious errors on the first

4    *Allied-Signal* factor, finding "fundamental, substantive flaws."  *Pasqua Yaqui Tribe*, 2021 WL

5    3855977, at *5.  Here, on the other hand, as discussed in more detail below, Plaintiffs have not fully

6    briefed any aspect of their legal challenges to the Rule, let alone all of the Rule's many complicated,

7    detailed provisions and how they would approach the issue of severability.

8          **B.      The Limited Discussion of the Merits That Plaintiffs Submitted Is Insufficient**
             **For This Court To Hold That Any Aspect Of The Rule Is Unlawful Under**

9          **The First *Allied-Signal* Factor, Let Alone That The Entire Rule Is Unlawful**

10           Plaintiffs have failed to present to this Court anything resembling a developed argument as

11   to why any aspect of the Rule fails on the first *Allied-Signal* factor, which provides an independently

12   sufficient basis for denying their request.  In particular, the State Plaintiffs do not develop any

13   argument that any aspect of the Rule is unlawful, instead claiming that EPA, as a general matter,

14   admitted the Rule's illegality in various statements.  *See* Dkt. 146 at 20–21.  The Tribes Plaintiffs,

15   in turn, also fail to develop any argument that the Rule is unlawful, merely listing three general

16   considerations—"(1) the agency failed to provide sufficient justification for departing from a half

17   century of practice and policy related to the interpretation and implementation of Section 401; (2)

18   it based its decision to do so on an [Executive Order] aimed at promoting fossil fuel infrastructure,

19   not clean water; and (3) EPA did not present any explanation for how the [ ] Rule would be more

20   protective of water quality," Dkt. 145 at 12—and then parroting the Plaintiff States' claim that EPA

21   somehow admitted these errors, Dkt. 145, at 12–13.  American Rivers Plaintiffs do make a few

22   brief arguments on a couple of aspects of the Rule, Dkt. 147 at 4–10, while pointing to the same

23   claimed concession by EPA, *see* Dkt. 147 at 9, 10, but such perfunctory analysis is nowhere near

24   developed enough for this Court to make any judgment as to the Rule's legality.

25           As a threshold matter, all of these Plaintiffs are simply wrong that EPA conceded the Rule's

26   illegality, and any such concession would be legally insufficient in any event, given that Intervenor

27   Defendants are parties in this case and defend fully every aspect of the Rule.  EPA has

28

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

unequivocally denied that it made any concession.  *See generally* Sept. 30, 2021 Hr'g.  Instead, EPA merely stated that it "will undertake a new rulemaking effort to propose revisions due to substantial concerns with the existing Rule." Dkt. 143 at 2, *see id.* at 7, 8; *see* Dkt. 155 at 2–3.  EPA could not in fact concede anything as to the Rule's legality without violating the APA.  EPA is currently in the middle of its rulemaking process, Dkt. 153 at 2; *see* Dkt. 155 at 3, during which process the agency must keep an open mind on all issues, including as to whether to retain the entire Rule, *Rural Cellular Ass'n v. F.C.C.*, 588 F.3d 1095, 1101 (D.C. Cir. 2009); Dkt. 155 at 2–3.

Plaintiffs also failed to satisfy the first *Allied-Signal* factor because the few merits arguments that they briefly mention are mismatched entirely with the full vacatur remedy that they seek.  The Rule is complex and multifaceted, with many operative provisions that cover numerous topics.  *See supra* pp. 6–7.  Plaintiffs assert that the errors in the Rule are significant, but their arguments only touch on a few discrete sections, which Plaintiffs discuss out of context, Dkt. 146 at 20–21, or only offer passing speculative harms, rather than cite to actual alleged legal errors in the Rule, Dkt. 146 at 4–14.  At most, Plaintiffs address a fraction of the Rule's provisions, cherry-picking from EPA's statements in its briefing rather than the Rule itself, *see* Dkt. 146 at 20–21, and vaguely alluding to "other detrimental provisions" without any elaboration, *see, e.g.*, Dkt 146 at 7.  Plaintiffs also fail to provide any severability analysis, which would be mandatory if Plaintiffs want this Court to vacate the entire Rule.  *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351–52 (D.C. Cir. 2019).  For example, Plaintiffs do not even attempt to argue that EPA "would [not] have adopted" the various aspects of the Section 401 Rule if some other aspects were declared invalid. *Id.*  Courts, after all, must ordinarily "limit the solution to the problem" that the plaintiff has demonstrated.  *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006)).

The same conclusion follows if this Court looks at the specific, brief arguments that the various Plaintiffs groups included in their vacatur requests.

The State Plaintiffs make no substantive argument with regard to the legality of any aspect of the Rule.  *See generally* Dkt. 146.

The Tribes Plaintiffs' one-paragraph merits "argument" is conclusory and without merit.

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

1    *See* Dkt. 145 at 11–12.  The Tribes Plaintiffs make broad claims about the Rule's "serious legal

2    errors," namely that the Rule "runs afoul" of the CWA's text, purpose, and "cooperative federalist

3    framework" without developing these claims beyond a brief description of the Rule's purported

4    effect.  Dkt. 145 at 11–12.  Such an undeveloped argument fails.  *Cal. Pac. Bank v. Fed. Deposit*

5    *Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018) ("Inadequately briefed and perfunctory arguments

6    are [ ] waived."); *Wells Fargo Bank, N.A. v. Renz*, 795 F. Supp. 2d 898, 911 (N.D. Cal. 2011).

7    Notably, EPA addressed concerns related to these issues in the Rule's preamble.  *See* 85 Fed. Reg.

8    42226 (responding to public comments that the "rule is inconsistent with the concept of cooperative

9    federalism"), *id.* at 42228–29 (responding to public comments about the Rule's adherence to the

10   statutory text and outlining the scope of EPA authority to clarify the statute), *see also* 42215 (listing

11   the changes made to the proposed Rule after consideration of public comments).  The Tribes

12   Plaintiffs do not even attempt to explain what aspect of EPA's discussion was legally incorrect with

13   any sufficient clarity to allow Defendant Intervenors to address that argument, or for this Court to

14   evaluate whether that argument carries the day under the first *Allied-Signal* factor.

15          The American Rivers Plaintiffs, in turn, offer various critiques of the Section 401 Rule that

16   are too conclusory and meritless to prevail under the first *Allied-Signal* factor.

17          These Plaintiffs' attack on the Rule's scope of certification is insufficiently developed for

18   this Court to evaluate this aspect of the Rule's legality and, in any event, is wrong.  *See* Dkt. 147 at

19   5–7.  They argue that the Rule's scope of certification "is inconsistent with the Clean Water Act"

20   and that the definitions of "discharge" and "water quality requirements" "bear little resemblance to

21   how the Clean Water Act defines those terms."  Dkt. 147 at 5–7.  But the Clean Water Act does not

22   provide "a single, clear, and unambiguous definition of the appropriate scope of section 401" and

23   Section 401 does not define the terms "discharge" or "water quality requirements," eliminating any

24   possible direct inconsistencies.  85 Fed. Reg. 42250.  Moreover, the Rule's scope of certification

25   and related definitions were drafted to "reasonably resolve any ambiguity" in the statute, after

26   taking into consideration "the text and structure of the Act, as well as the history of modifications

27   between the 1970 version and the 1972 amendments."  *Id.*  The Rule was developed after

28   consideration of all public comments, including "varying interpretations" described in the

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

-12-                              Case No. 3:20-CV-04636-WHA

preamble.  *Id.* at 42256.  The final definition of "water quality requirements" "strikes a balance among various competing considerations while remaining loyal to the text of the CWA" and with an intent to "provide additional clarity and regulatory certainty for certifying authorities, project proponents, and federal licensing and permitting agencies."  *Id.*  EPA fully and correctly engaged with the text and history of the Act with regard to the Section 401 certification process.  *See* 85 Fed. Reg. 42229–30 (describing the scope of certification under the Rule in the context of the CWA's text and history), *id.* at 42230–36 (engaging in a plain text analysis of the statute and showing how the definitional clarifications in the Rule are supported by the ordinary meaning of the text); *see also* 40 C.F.R. §§ 121.2–121.11 (laying out the uniform set of certification procedures).  These Plaintiffs do not explain what aspect of EPA's discussion or legal conclusions were legally insufficient. Their arguments fail to offer any concrete reasoning, and, therefore, are not sufficiently developed.  *See Cal. Pac. Bank*, 885 F.3d at 570; *Renz*, 795 F. Supp. 2d at 911.

The American Rivers Plaintiffs claim that the Rule is unlawful because it limits states and tribes to considering potential impacts of only the "discharge" from a proposed project, rather than "the activity as a whole," pointing to *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700 (1994)*; see* Dkt. 147 at 5–7.  As EPA explained in the Rule preamble, in 1972 Congress replaced the word "activity" in section 401(a) with the word "discharge" to reflect the "total restructuring" and "complete rewriting" of the statutory framework to regulate discharges under the Clean Water Act.  85 Fed. Reg. 42251.  "The final rule gives due weight to Congress' intentional choice to change the language in section 401(a) to ensure that 'discharges' from federally licensed or permitted activities, rather than the activity as a whole, comply with appropriate water quality requirements."  *Id.*  EPA concluded in the Rule preamble that the text of section 401 is not unambiguous and that "the variation in public comments received" demonstrates that "section 401 is susceptible to a multitude of interpretations."  *Id.*  Further, as described in the Rule's preamble, the Supreme Court in *PUD No. 1* analyzed section 401 and EPA's prior regulations and concluded, based on its interpretation, that certification conditions and limitations could be based on the activity as a whole, not just the discharge. 85 Fed. Reg. 42251.  The American Rivers Plaintiffs appear to believe that the Supreme Court's decision was based on a plain language

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

analysis of the Clean Water Act, such that EPA would have no authority to interpret this language. But "[n]owhere in the opinion does the Court conclude that section 401 is unambiguous. In fact, the Supreme Court in *PUD No. 1* offered its own interpretation of the ambiguous language in section 401 when it 'reasonably read' the scope of section 401 to allow conditions and limitations on the activity as a whole." *Id.* EPA also noted that the Court "found the EPA's regulations to be consistent with the Court's own reasonable reading of the language in sections 401(a) and (d)." *Id.* These Plaintiffs assert that *PUD No. 1* is "binding," Dkt. 147 at 5, but fail to acknowledge that EPA analyzed applicable law and concluded that the scope of certification established in 40 C.F.R. § 121.3 "is not foreclosed by the holding in *PUD No. 1*" because the Court's conclusion "did not follow from the unambiguous terms of the statute," and thus the agency could use its delegated rulemaking authority to adopt a different approach, 85 Fed. Reg. 42251.

The American Rivers Plaintiffs' limited argument that the Rule limits or circumscribes states' abilities to implement their certification programs is meritless. The American Rivers Plaintiffs offer no support for their sweeping assertion that the Rule "impermissibly intrudes on the states' and tribes' ability to effectively manage their 401 certification programs and meaningfully review federally licensed projects." Dkt. 147 at 7–9. As such, this perfunctory argument is also waived. *See Cal. Pac. Bank*, 885 F.3d at 570; *Renz*, 795 F. Supp. 2d at 911. In any event, Plaintiff American Rivers' discontent with the procedures set out in the Certification Rule is just that— subjective discontent. But nothing suggests that these procedures are illegal. The Certification Rule simply establishes predictable and consistent procedures for certification processes, regardless of what state or tribe is issuing certification. EPA explained in the Rule preamble, "[a]s the Agency charged with administering the CWA, as well as a certifying authority in certain instances, the EPA is responsible for developing a common regulatory framework for certifying authorities to follow when completing section 401 certifications." 85 Fed. Reg. 42211 (footnote omitted). Throughout the Rule preamble, EPA provides legal rationale and support for each of the procedures that the American Rivers Plaintiffs complain are illegal, but the Plaintiffs do not acknowledge let alone rebut EPA's analysis or conclusions. *See, e.g.*, 85 Fed. Reg, 42240–43 (explaining the basis for a pre-filing meeting request and responding to public comments concerning same); 42243–49

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

(explaining the rationale for establishing a specific set of information to be included in a certification request; the statutory basis for starting the reasonable period of time "upon receipt" of a certification request; and responding to public comments concerning same); 42258–63 (explaining the timeline for certification actions; concluding that federal permit and licensing agencies "should continue to [establish the reasonable period of time] as they have done for the past several decades"; explaining the factors that must be considered when establishing the reasonable period of time; providing federal agencies maximum flexibility in establishing the reasonable period of time by declining to adopt a default reasonable period of time of six months; explaining procedures for requesting an extension of the established reasonable period of time; explaining that the Clean Water Act does not contain any provisions for tolling the reasonable period of time for any reason; providing legal citations to applicable case law; responding to public comments concerning same).

## II. Vacating The Rule Would Cause Significant Disruption To Pending Section 401 Reviews

The Certification Rule fills a gaping regulatory void.  It sets basic rules for the section 401 process, including a common rule for defining when the clock starts on a state's reasonable period of time to act on a certification request and procedures for establishing how much time is reasonable.  And critically, it more clearly defines the scope of authority granted by Congress in section 401, so that section 401 cannot be used by states to make policy decisions squarely reserved to the federal government and thereby impair the interests of other states.  Vacating the rule would eliminate these salutary improvements and return to the dysfunction fostered by EPA's decades-long failure to set basic rules for the section 401 process.

Most problematic is the interstate conflict that a return to the old regime is sure to foster.  Before the Certification Rule, some states—including some Plaintiff States—used the prior outdated rules to exert control over activities in other states and to protect their own industries.[3]

---

[3] The abuses under the prior rule raise issues of constitutional magnitude.  Indeed, "[o]ne of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976).  A particular "source of

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

*See, e.g.,* Lighthouse Resources Letter (Dkt. 27-7 at 1–4).  Even when states did not outright deny

section 401 certifications, they imposed uncertainty, never-ending demands for information,

interminable delays, and conditions unrelated to the discharges actually regulated by the CWA.

The result was to greatly increase the cost of some interstate projects and fully defeat others, with

attendant harms to other states' economies and ability to develop their natural resources.  *See* Rorick

Decl (Dkt. 56-1); Dreskin Decl. (Dkt. 56-2). Curbing such abuses is a core benefit of the Rule.

There is no reason to think the abuses won't return if the Certification Rule is vacated.[4]

More practically, the Rule would upend the substantial progress made by states and federal

agencies to improve the section 401 process in the wake of the Certification Rule.  Reinstating the

prior rule would result in substantial disruption from general whipsawing of both regulators and

regulated entities.  Ex. 2, Declaration of David M.S. Dewhirst ¶ 8.  Such uncertainty and the

attendant risk of delay deters large capital projects that benefit the Intervenor Defendant States

economically and, indeed, which are necessary for the development of their natural resources.  *Id.*

¶¶ 7-9.  And that is without even considering the likely return of the outright abuses the Certification

---

dissatisfaction was the peculiar situation of some of the States, which having no convenient ports
for foreign commerce, were subject to be taxed by their neighbors, [through] whose ports, their
commerce was carryed on."  *Id.* (quoting Records of the Federal Convention of 1787 (M. Farrand
ed. 1966)).  "By prohibiting States from discriminating against or imposing excessive burdens on
interstate commerce without congressional approval, [the Commerce Clause] strikes at one of the
chief evils that led to the adoption of the Constitution, namely, state tariffs and other laws that
burdened interstate commerce."  *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542 (2015)
(citations omitted); *see also Tenn. Wine and Spirits Retailers Assoc. v. Thomas,* 139 S. Ct. 2449,
2459 (2019) ("[W]e have long held that this Clause also prohibits state laws that unduly restrict
interstate commerce[.]"); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 545 (1949) (holding
denial of license for new milk facility to be unconstitutional protectionism).  Accordingly, a State
certainly "may not use the threat of economic isolation" to control its sister states.  *Great Atl. &
Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 379 (1976).

[4] The Intervenor Defendant States asserted as affirmative defenses that Plaintiffs had "neither
factual nor legal support for injunctive or equitable relief," "[a]ny claim for injunctive or equitable
relief is barred by Plaintiffs' unclean hands," and "Plaintiffs' theories would render the Clean Water
Act unconstitutional in whole or part."  Answer (Dkt. 82) at 20. Intervenor Defendant States have
not had the opportunity to take discovery on these defenses, but the existing record supports
widespread unclean hands by Plaintiffs, such that any claim to equitable relief is barred.  *See, e.g.*,
Lighthouse Resources Letter (Dkt. 27-7); Rorick Decl. (Dkt. 56-1) ¶¶ 11-15; Dreskin Decl. (Dkt.
56-2) ¶¶ 8-14.

Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1   Rule was intended to address.  At the federal level, multiple federal agencies have applied the new

2   rule to pending actions.  Since 2020, EPA has issued a number of implementation documents,

3   including recommended best practices and template certifications that can be used by states and

4   tribes in different circumstances.  EPA, 2020 Rule Implementation Materials.[5]  And FERC

5   completed its own notice-and-comment rulemaking in March 2021 to set a uniform one-year

6   deadline for states to complete certification actions on FERC authorizations and to explain how

7   that time-period would be calculated.  Waiver of the Water Quality Certification Requirements of

8   Section 401(a)(1) of the Clean Water Act, 86 Fed. Reg. 16298 (Mar. 29, 2021).

9           Vacating the Rule would cast doubt on these independent regulatory actions, and the

10   businesses and municipalities that need section 401 certifications for critical infrastructure projects

11   would shoulder the burden of that disruption.  *See* Dreskin Decl. (Dkt. 56-2) ¶¶ 21, 23. These new

12   rules and procedures are now being applied to thousands of pending requests for section 401

13   certifications.  *See* Moyer Decl. ¶ 14, *N. Plains Resource Council v. U.S. Army Corps of Eng'rs*,

14   No. 4:19-cv-44 (D. Mont. Apr. 27, 2020), Dkt. 131-1 (explaining that "[o]n average, the Corps

15   receives 3,000 standard individual permit applications annually.").  INGAA members alone have

16   numerous certification requests pending for projects that involve billions of dollars in capital

17   investment.  *See, e.g.,* Dreskin Decl. (Dkt. 56-2) ¶¶ 14, 22, 24.  NHA members have 30 federal

18   license applications that require section 401 certifications and expect another 54 projects will be

19   required to submit licensing applications between now and October 1, 2022.  Ex. 3, Declaration of

20   Dennis Cakert ¶ 10.  And that's just a thin sliver of the potential harm to the regulated community.

21   Section 401 certificates are required for all manner of infrastructure projects requiring federal

22   licenses, the vast majority of which are not connected to natural gas, petroleum projects, or

23   hydropower.

24           Vacating the Rule—especially without any actual finding that any particular portion of it is

25   deficient—casts substantial uncertainty over all of those pending authorizations and raises a host

26   of questions that lack any clear answer:

27

28   [5] Available at https://www.epa.gov/cwa-401/2020-rule-implementation-materials.

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

- What regulations would apply?

- What effect would the rule have on section 401 rulemakings by other agencies?

- Would pending certification requests need to be resubmitted?

- Would states be free engage in the same scope and timing abuses that plagued the old regime?

Open questions such as these will cause substantial delay in completing pending section 401 reviews.  Ex. 3, Cakert Decl. at ¶ 11; Dreskin Decl. (Dkt. 56-2) ¶¶ 21, 23, 24.  Those delays will impose substantial costs on the regulated community and delay critical reliability and maintenance projects.  Dreskin Decl. (Dkt. 56-2) ¶¶21, 23.  And the swirl of uncertainty is sure to invite future litigation.

The prejudice to Intervenor Defendants of vacating the Rule is real and cannot be mitigated.  In contrast, Plaintiffs each have the ability to seek redress for the prejudice they claim to suffer through further administrative or judicial process.  Administratively, EPA and the U.S. Army Corps of Engineers have both indicated their willingness to address concerns raised by Plaintiffs within the context of the existing rule.[6]  Judicially, each Plaintiff here can challenge any particular application of the Rule that causes the harms they claim they will suffer.  *See* Pls.' Opp'n to EPA's Motion to Remand Without Vacatur at 9–11 (Dkt. 145).

**CONCLUSION**

If the Court is not persuaded by EPA's arguments that remand without vacatur is appropriate here, the solution is to deny the EPA's remand motion and proceed to merits briefing.  Vacating the Rule without affording Intervenor Defendants the opportunity to defend the rule on the merits, as Plaintiffs request, violates the most fundamental right of a party in civil litigation—the right to be heard on the merits of the dispute.

---

[6] Joint EPA Army Memorandum on 401 Implementation (Aug. 19, 2021), available at https://www.epa.gov/cwa-401/2020-rule-implementation-materials.

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1

2          Respectfully submitted,

3

4    Dated: October 4, 2021          TROUTMAN PEPPER HAMILTON SANDERS LLP

5                                    By:  */s/ Elizabeth Holt Andrews*
                                         Elizabeth Holt Andrews*
6                                        Misha Tseytlin (admitted *pro hac vice*)
                                         Charles Sensiba (admitted *pro hac vice*)
7                                        Andrea W. Wortzel (admitted *pro hac vice*)
                                         Sean T.H. Dutton (admitted *pro hac vice*)
8
                                         *Attorneys for Intervenor Defendant*
9                                        National Hydropower Association

10

11                                   JEFF LANDRY
                                     ATTORNEY GENERAL OF LOUISIANA
12

13                                   By:  */s/ Joseph S. St. John*
                                         Elizabeth B. Murrill, Solicitor General
                                         (admitted *pro hac vice*)
14                                       Joseph S. St. John, Deputy Solicitor
                                         General (admitted *pro hac vice*)
15                                       Ryan M. Seidemann, Assistant Attorney
                                         General (admitted *pro hac vice*)
16
                                         *Attorneys for State Intervenor Defendants*
17                                       States of Arkansas, Louisiana, Mississippi,
                                         Missouri, Montana, Texas, West Virginia,
18                                       and Wyoming

19

20                                   HUNTON ANDREWS KURTH LLP

21                                   By:  */s/ George P. Sibley, III*
                                         Clare Ellis
22                                       George P. Sibley, III
                                         (admitted *pro hac vice*)
23                                       Deidre G. Duncan (admitted *pro hac vice*)

24                                       *Attorneys for Intervenor Defendants*
                                         American Petroleum Institute and
25                                       Interstate Natural Gas Association of
                                         America

26

27   * Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of the document
     has been obtained from each of the other Signatories.  */s/ Elizabeth Holt Andrews*
28

                    Intervenor Defendants' Supplemental Brief on the *Allied-Signal* Factors