# EXHIBIT 1

   

August 2, 2021

**_Via Regulations.gov_**

Water Docket
U.S. Environmental Protection Agency
EPA West, Room 3334
1301 Constitution Ave., NW
Washington, DC 20004

Re:   Comments from American Fuel & Petrochemical Manufacturers, American Petroleum
Institute, the American Exploration and Production Council, and the Independent
Petroleum Association of America in response to the U.S. Environmental Protection
Agency's request for comment on reconsidering and revising the Clean Water Act Section
401 Certification Rule
(EPA-HQ-OW-2021-0302)
86 Fed. Reg. 29,541 (June 2, 2021)

To whom it may concern:

This letter provides comments from the American Fuel & Petrochemical Manufacturers
("AFPM"), the American Petroleum Institute ("API"), the American Exploration and Production
Council ("AXPC"), and the Independent Petroleum Association of America ("IPAA")
(collectively, "the Associations") in response to the U.S. Environmental Protection Agency's
("EPA's" or "the Agency's") request for comment on reconsidering and revising the Agency's
2020 Clean Water Act Section 401 Certification Rule[1] ("401 Certification Rule").[2]  As explained
in more detail below, the 401 Certification Rule provided long-overdue clarification on the role of
states and other certifying authorities under Section 401 of the Clean Water Act ("CWA" or "the
Act").

The clarifications furnished in the 401 Certification Rule were also necessary to address some
states' misuse of Section 401 certification procedures in pursuit of policy goals wholly distinct
from considerations of potential water quality impacts.  Indeed, the 401 Certification Rule was
also necessary to incorporate a growing body of case law interpreting Section 401 of the Act
consistent with Congress's intent to preserve for states a highly circumscribed role in evaluating a
proposed project's potential impacts on certain enumerated CWA provisions.

The Associations therefore recommend EPA refrain from altogether setting aside the 401
Certification Rule.  If EPA intends to promulgate revisions to portions of the 401 Certification

---

[1] 85 Fed. Reg. 42,210 (July 13, 2020).
[2] 86 Fed. Reg. 29,541 (June 2, 2021).

Rule, we urge the Agency to do so in a way that adheres to congressional intent, conforms to relevant current and pending court decisions, and restrains misuse of Section 401 certification procedures.  Indeed, as EPA considers revisions to the 401 Certification Rule, we are optimistic that the Agency will recognize that Congress did not intend CWA Section 401 to allow a single state to wield disproportionate power over projects of national importance, and to further recognize that the imposition of reasonable limits on the disproportionate use of Section 401 certification authority is consistent with the principles of cooperative federalism.

To that end, and the interest of constructively engaging with EPA in this reconsideration process, the Associations provide the following comments.  Because of the length of this letter, we have included a table of contents below.

## **TABLE OF CONTENTS**

**Page**

I.  SUMMARY .................................................................................................................4

II.  THE ASSOCIATIONS AND THEIR INTERESTS ...........................................................6

III.  GUIDELINES FOR INTERPRETING CWA SECTION 401 ...........................................7

 a.  Consideration of the context for, and role of, CWA Section 401 certifications............8

  1.  Natural Gas Act of 1938 ...................................................................................8

  2.  National Environmental Policy Act ...............................................................10

  3.  Other federal statutes with impact reviews and opportunities for stakeholder engagement ....................................................................................................11

  4.  EPA must implement CWA Section 401 in accordance with Congress's intent to assert exclusive federal jurisdiction through statutes like the NGA and in the context of more comprehensive environmental review processes Congress established through NEPA and other statutes ..................................................13

 b.  Reasonable limits on the Section 401 certification process are consistent with principles of cooperative federalism..........................................................................................15

 c.  The legislative history of the CWA illustrates the reasonable limits Congress intended for the Section 401 certification process....................................................................17

      d.   Any revisions to the 401 Certification Rule must include provisions sufficient to meaningfully enforce Congress's statutorily prescribed time limits ..........................21

           1.   Enforcing the CWA's Section 401 deadlines requires a clear and objective starting point for review ...................................................................................23

           2.   EPA must prohibit states from artificially extending timeframes by stopping and restarting the certification process ...........................................................25

      e.   Section 401 certification is required only when a federally licensed or permitted activity has the potential to result in a discharge from a point source to navigable waters......27

      f.   The scope of certifying authorities' Section 401 review and conditioning authority is not unbounded, and must be interpreted in accordance with the text, structure, and history of the Act ...............................................................................................30

           1.   "Applicant" ...........................................................................................31

           2.   "Any other appropriate requirement of State law" .................................32

IV.   RESPONSES TO EPA'S QUESTIONS FOR CONSIDERATION ......................................35

   1.   Pre-filing meeting requests .........................................................................35

   2.   Certification request....................................................................................36

   3.   Reasonable period of time ...........................................................................37

   4.   Scope of certification ..................................................................................39

   5.   Certification actions and federal agency review ...............................................42

   6.   Enforcement................................................................................................44

   7.   Modification................................................................................................45

   8.   Neighboring jurisdictions.............................................................................46

   9.   Data and other information ..........................................................................48

   10.  Implementation Coordination ......................................................................49

V.   CONCLUSION.................................................................................................50

## I.      SUMMARY

The Associations urge EPA to refrain from substantially revising the 401 Certification Rule.[3]  The final rule provided a long-overdue and increasingly necessary clarification of the role of states and other certifying authorities under Section 401 of the Act.

Section 401 certification proceedings be efficient, reasonably predictable, and appropriately focused on potential water quality impacts.  Our members are on the forefront of a transformational era of increased domestic oil and natural gas production that has greatly enhanced U.S. energy security and lowered consumer costs.  The growth of domestic oil and natural gas production and our ability to responsibly develop these resources in new areas of the country have created the need for more infrastructure to safely bring these resources to refineries and processing facilities, and ultimately, consumers.  While there has been a great deal of discussion about an energy transition away from fossil fuels, experts agree acknowledge that modern society will continue to depend on oil and natural gas for several decades. As these products are needed in the world, it makes sense to expand and update America's energy infrastructure.  Prudent investment for the safe and environmentally responsible movement of these critically important resources is important for affordability and environmental protection.  To those opposed to any oil or natural gas development, permitting of America's energy infrastructure needs are viewed as convenient opportunities to deploy regulatory and litigation strategies designed to delay needed projects and sever resources from markets.  This is counter-productive since the products are needed worldwide and such opposition only increases costs and environmental risks, risks good-paying jobs, and endangers energy security.

The need for an efficient and appropriately regulated certification process extends well beyond our industry.   President Biden recently announced his support for a Bipartisan Infrastructure Framework that the White House anticipates will fund "transformational and historic investments in clean transportation infrastructure, clean water infrastructure, universal broadband infrastructure, clean power infrastructure, remediation of legacy pollution, and resilience to the changing climate."[4]  Many of these types of projects require federal licensing or permitting actions that will trigger Section 401 certification proceedings.

The Associations therefore urge EPA to continue to interpret Section 401 in a manner that reasonably limits the ability of single state to wield disproportionate power over interstate projects of national importance.  The efficient permitting of essential infrastructure projects requires the collaboration of state and federal authorities and the consideration of state and national interests.  In enacting Section 401, Congress preserved an important role for states in evaluating the water quality impacts of federal infrastructure projects, but it did not prescribe that role without limit or to the detriment of federal licensing or permitting authorities.

---

[3] 85 Fed. Reg. 42,210 (July 13, 2020).

[4]      *See*      https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/24/fact-sheet-president-biden-announces-support-for-the-bipartisan-infrastructure-framework/.

More specifically, Section 401 preserves for states the highly circumscribed role of evaluating a proposed project's potential impacts on certain enumerated CWA provisions. CWA Section 401 does not empower a state to deny a certification request based on generalized objections about hydrocarbon development, or concerns about the continued role of fossil fuels in product manufacturing and power generation.  Nor does CWA Section 401 allow states to deny or condition certification based on potential environmental impacts of the proposed project other than potential point source discharges to waters of the United States that can result in possible violations of water quality standards.[5]

The text, structure, and history of Section 401 reflect Congress's recognition that certain projects of national importance could not be subjected to the parochial interests of a single state.  And yet, as acknowledged by the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), "it is now commonplace for states to use Section 401 to hold federal licensing hostage."[6] Using Section 401 "to hold federal licensing hostage,"[7] or basing state certification decisions on policy considerations that cannot realistically be construed as credible concerns over water quality impacts is impermissible under the CWA and conflicts with several other statutes through which Congress tasked federal agencies with decision-making authority.

The Associations therefore urge EPA to ensure that the Agency's regulations adhere to Congress's readily discernable intent that Section 401 be implemented to provide states certification authority that is limited in time and scope.  We believe that the Agency must, at a minimum, retain those provisions of the 401 Certification Rule necessary to curb the well documented tactics a handful of states have utilized to artificially extend their review deadlines and improperly expand the scope of their certification and conditioning authority.  EPA's regulations implementing Section 401 can and should be appropriately tailored to curtail the known avenues for state misuse of Section 401, while preserving the important but highly circumscribed role Congress intended.

In Section III, the Associations provide interpretive guidelines that we believe can be useful to EPA as it reconsiders the 401 Certification Rule.  These guidelines interpret Section 401 utilizing the text and structure of the CWA, extensive analysis of case law, and a detailed legislative history of the Act and its key amendments.

Section III also describes the natural gas pipeline permitting process to illustrate the comprehensive review and approval process within which Section 401 certification is but one part. Natural gas permitting is only one example of the types of federal actions that can trigger Section 401 certifications, but it is a good example because it helps provide context necessary to understand why Congress limited the scope and duration of the Section 401 certification process.  Section III also explains why reasonable limits on Section 401 certification processes comport with principles

---

[5] 40 C.F.R. § 121.2(a)(3).

[6] *Hoopa Valley Tribe* v. *FERC ("Hoopa Valley")*, 913 F. 3d. 1099, 1104 (D.C. Cir. 2019).

[7] *Hoopa Valley*, 913 F. 3d. at 1104.

of cooperative federalism and are necessary to ensure that one state cannot inappropriately wield its Section 401 authority to the detriment of other states or the nation as a whole.

In Section IV, the Associations respond to each of the Agency's enumerated "questions for consideration." Each of our responses are grounded in a fundamental recognition that Congress, through Section 401, expressly assigned an important project review role for states and tribes, but it did so in the context of multiple statutes unambiguously preserving exclusive federal jurisdiction over certain projects and multiple other statutes subjecting those projects to environmental reviews beyond the limited scope of Section 401.

The Associations hope that these interpretive guidelines and responses will inform EPA's reconsideration of the 401 Certification Rule and any future interpretation of CWA Section 401.

## II.    THE ASSOCIATIONS AND THEIR INTERESTS

AFPM is a national trade association representing most U.S. refining and petrochemical manufacturing capacity. AFPM members strengthen economic and national security while supporting more than 3 million jobs nationwide. AFPM's member companies produce the gasoline, diesel, and jet fuel that drive the modern economy, as well as the chemical building blocks that are used to make the millions of products that make modern life possible. To produce these essential goods, AFPM members depend on all modes of transportation to move their products to and from refineries and petrochemical facilities and have made significant infrastructure investments to support and improve the safety and efficiency of the transportation system. AFPM member companies depend upon an uninterrupted, affordable supply of crude oil and natural gas as feedstocks for the transportation fuels and petrochemicals they manufacture. Pipelines are the primary mode for transporting crude oil and natural gas to refiners and petrochemical facilities and refined products from those same facilities to distribution terminals serving consumer markets. Pipelines provide a safe, reliable, efficient, and cost-effective way to move bulk liquids, particularly over long distances. AFPM member companies own, operate, and rely on pipeline infrastructure as part of their daily operations. AFPM member companies also are leaders in human safety and environmental responsibility. AFPM supports robust analyses of infrastructure projects to ensure that environmental impacts are appropriately considered.

API is a nationwide, non-profit trade association that represents all facets of the natural gas and oil industry, which supports 10.3 million U.S. jobs and nearly 8 percent of the U.S. economy. API's more than 600 member companies include large integrated companies, as well as exploration and production, refining, marketing, pipeline and marine businesses, and service and supply firms. API was formed in 1919 as a standards-setting organization, and API has developed more than 700 standards to enhance operational and environmental safety, efficiency, and sustainability. API and its members are committed to the safe transportation of natural gas, crude oil and petroleum products, and support sound science and risk-based regulations, legislation, and industry practices that have demonstrated safety benefits. API members engage in exploration,

production, and construction projects that routinely involve both state and federal water permitting and are, and will continue to be, affected by CWA Section 401.

The AXPC is a national trade association representing 29 of America's largest and most active independent natural gas and crude oil exploration and production companies. The AXPC's members are "independent" in that their operations are limited to the exploration for and production of natural gas and crude oil. Moreover, its members operate autonomously, unlike their fully integrated counterparts which operate in different segments of the energy industry, such as refining and marketing. The AXPC's members are leaders in developing and applying the innovative and advanced technologies necessary to explore for and produce the natural gas and crude oil that allows our nation to add reasonably priced domestic energy reserves in environmentally responsible ways.

The IPAA represents the thousands of independent oil and natural gas explorers and producers, as well as the service and supply industries that support their efforts, that will most directly be impacted by federal regulatory policies. Independent producers develop about 91 percent of American oil and natural gas wells, produce about 83 percent of American oil, and produce more than 90 percent of American natural gas and natural gas liquids. The IPAA is dedicated to ensuring a strong, viable American oil and natural gas industry, recognizing that an adequate and secure supply of energy is essential to the national economy.

## III.     GUIDELINES FOR INTERPRETING CWA SECTION 401

The Associations' responses to the Agency's enumerated "questions for consideration" follow in Section IV below. But the Associations believe it is important to furnish the analytical framework and interpretive guidelines that inform our construction of Section 401 and our specific recommendations for EPA's reconsideration of the 401 Certification Rule. We believe this background provides necessary context and support for the Associations' responses to the Agency's specific inquiries. And more broadly, we hope these interpretative guidelines will be useful to EPA as it reconsiders the 401 Certification Rule.

The Associations' members have a substantial interest in ensuring that the CWA Section 401 certification process preserves the important role of states in protecting water quality, while at the same time providing appropriate limits where states use their certification authority to achieve policy goals or outcomes unrelated to water quality. Therefore, the Associations provide interpretive guidelines that EPA should use to reasonably interpret important provisions of CWA Section 401. These interpretive guidelines follow from the text and structure of the Act, relevant case law, and  - where necessary to ascertain congressional intent - the legislative history of the Act and its key amendments.

The Association's framework was also informed by the way Congress structured the Act to promote cooperative federalism. Finally, our framework examines the Section 401 certification process in the context of other federal statutes that assign the federal government exclusive

7

jurisdiction over certain projects and/or provide alternate mechanisms for state review of federally permitted projects.

### a. Consideration of the context for, and role of, CWA Section 401 certifications

Under Section 401 of the CWA, "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters" must seek "a certification from the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions" of the CWA.[8]  Section 401 further provides that "[n]o license or permit shall be granted if certification has been *denied* by the State," but, if a state "*fails or refuses to act* on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived."[9]

The statute is clear on its face; however, when state certification authority under CWA Section 401 is read in the context of the exclusive jurisdiction preserved for the federal government in issuing certain permits and licenses, the narrow role of states under the CWA Section 401 program becomes even more apparent.

The Natural Gas Act of 1938 ("NGA") is an example of a statute that preserves exclusive jurisdiction for the federal government, and it is relevant to many of the Associations' members. The NGA illustrates that state Section 401 review is a component in a much larger, and more complex, interstate approval process that is inherently federal in nature.

### 1. NGA

Companies seeking to build interstate natural gas pipelines must first obtain federal approval.  The NGA provides the statutory framework for this process.[10]  Congress passed the NGA to ensure patch-work state-by-state regulatory regimes would not impede interstate commerce. Specifically, under Section 7(c) of the NGA, "a natural gas company must obtain from the Federal Energy Regulatory Commission ("FERC") a 'certificate of public convenience and necessity' before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce."[11]  In assessing "public convenience and necessity," FERC considers "all factors bearing on the public interest,"[12] including potential environmental impacts.[13]  "FERC will

---

[8] 33 U.S.C. § 1341(a)(1).

[9] *Id.* (emphasis added).

[10] 15 U.S.C. § 717.

[11] *Schneidewind v. ANR Pipeline Co.("Schneidewind")*, 485 U.S. 293, 302 (1988); *See also* 15 U.S.C. § 717f(c)(1)(A).

[12] *See Office of Consumers' Counsel v. FERC*, 655 F.2d 1132, 1146 (D.C. Cir. 1980).

[13] *See e.g.*, *Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 967–68 (D.C. Cir. 2000).

grant the certificate only if it finds the company able and willing to undertake the project in compliance with the rules and regulations of the federal regulatory scheme."[14]

FERC's authority under the NGA is exclusive: "Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce."[15] "FERC's exclusive purview" includes regulating "facilities [that] are a critical part of the transportation of natural gas and sale for resale in interstate commerce."[16] In this "exclusively federal domain," states may not regulate.[17]

Pipeline routing is the definitive example of an issue committed to FERC's exclusive authority.[18] Nor could it be otherwise. Determining an interstate pipeline's route—including which states it will cross, where it will do so, and how far it will travel within their borders—is a task that must be completed by a centralized body with the entire nation's public interest in mind, not by local "agencies with only local constituencies."[19] Otherwise, each state could say, "not in my backyard," thereby depriving other states and the nation of the pipeline's benefits and undermining the NGA's purpose of "ensur[ing] that natural gas consumers have access to an adequate supply of natural gas at 'just and reasonable rates.'"[20]

Thus, the NGA vests FERC with exclusive authority over all salient aspects of the natural gas pipeline permitting process to facilitate the nation's collective interest in promoting the safe movement of natural gas in interstate commerce. And while the NGA is necessarily limited to natural gas pipeline permitting, we believe it demonstrates why EPA must implement CWA Section 401 to prevent a single state from using its Section 401 certification authority to commandeer the exclusive jurisdiction that Congress provided to the federal government for projects of national importance.

---

[14] *Schneidewind*, 485 U.S. at 302.

[15] *Schneidewind* 485 U.S. at 305.

[16] *Schneidewind*, at 485 U.S. 308.

[17] *Schneidewind*, at 485 U.S. 305; *See, e.g., N. Natural Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 819–20, 822–24 (8th Cir. 2004) (NGA preempted state-law environmental provisions); *E. End Prop. Co. No. 1, LLC v. Kessel*, 851 N.Y.S.2d 565, 571 (N.Y. App. Div. 2007); *No Tanks Inc. v. Pub. Utils. Comm'n*, 697 A.2d 1313, 1315 (Me. 1997).

[18] *See Wash. Gas Light Co. v. Prince George's Cty. Council*, 711 F.3d 412, 423 (4th Cir. 2013) ("the NGA gives FERC jurisdiction over the siting of natural gas facilities"); *See also, e.g., Guardian Pipeline, LLC v. 529.42 Acres of Land*, 210 F. Supp. 2d 971, 975 (N.D. Ill. 2002) (where "FERC has approved the route … [a]ny objections to the condemnation of public land for the construction of a natural gas pipeline [are] preempted"); *Skyview Acres Co-op., Inc. v. Pub. Serv. Comm'n*, 558 N.Y.S.2d 972, 975 (N.Y. App. Div. 1990) (State's "authority [was] preempted … to the extent that it purported to approve the route of an interstate gas pipeline"); *No Tanks*, 697 A.2d at 1315 ("[State] review of safety and environmental issues surrounding the siting of the [natural gas] tank would be an attempt to regulate matters within FERC's exclusive jurisdiction").

[19] *Schneidewind*, 485 U.S. at 1316.

[20] *Wash. Gas*, 711 F.3d at 422–23.

The NGA also illustrates the important but highly circumscribed role of Section 401 reviews in light of the far more comprehensive federal environmental review process. Indeed, FERC has primary authority to consider a pipeline project's potential environmental impacts, which includes considering routes that could reduce environmental impacts.

Under the NGA, FERC is "the lead agency . . . for the purposes of complying with" the National Environmental Policy Act ("NEPA").[21]  Thus, "FERC undertakes its own environmental analysis pursuant to the requirements of" NEPA, "which . . . FERC considers in reaching its ultimate routing determination."[22]  Like the authority to issue certificates of public convenience and necessity, the authority to conduct this broader environmental analysis and to make routing decisions based on that analysis is exclusively within FERC's purview, except as to the narrow question of water-quality compliance under Section 401.[23]

> 2.    NEPA

For any "major Federal action[] significantly affecting the quality of the human environment," NEPA requires federal agencies to prepare "a detailed statement," known as an Environmental Impact Statement ("EIS"), on "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action."[24]

Preparing an EIS has three basic stages.  First, the agency must "determin[e] the scope of issues to be addressed," with the input of (among many others) "affected Federal, State, and local agencies."[25]  Second, the agency prepares a draft EIS, which must "disclose and discuss … all major points of view on the environmental impacts of the alternatives including the proposed action."[26]  The agency must then obtain comments from any other federal agency with relevant jurisdiction or expertise, "[a]ppropriate State and local agencies," and the public.[27]  Finally, the agency must prepare a final EIS that "respond[s] to comments," "discuss[es] … any responsible opposing view," and "indicate[s] the agency's response to the issues raised."[28]

---

[21] 15 U.S.C. § 717n(b)(1).

[22] *Skyview Acres*, 558 N.Y.S.2d at 975.

[23] 15 U.S.C. § 717b(d)(3); The NGA also preserves States' authority under the Coastal Zone Management Act and the Clean Air Act, 15 U.S.C. § 717b(d)(1)–(2), which are not at issue here.

[24] 42 U.S.C. § 4332(c) Agencies typically begin by preparing an Environmental Assessment, or EA, which must "provide sufficient evidence and analysis for determining whether" the project will have a "significant impact." 40 C.F.R. § 1508.9(a). If so, an EIS must be prepared. If not, the EA's thorough assessment helps ensure NEPA compliance. *See id.*

[25] 40 C.F.R. § 1501.7(a)(1).

[26] *Id.* § 1502.9(a).

[27] *Id.* § 1503.1(a).

[28] *Id.* § 1502.9(b).

These "'action-forcing' procedures" serve to ensure "that agencies take a 'hard look' at environmental consequences."[29]  Affected parties - including states - can challenge the adequacy of an agency's NEPA review and its consideration of an EIS by seeking judicial review of the final agency determination.[30]  The courts carefully review an agency's NEPA compliance to ensure that its "duty . . . to consider environmental factors not be shunted aside in the bureaucratic shuffle."[31] "NEPA itself does not mandate particular results," however: "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."[32]

For natural gas pipeline permitting, FERC's regulations require preparation of an EIS for "[m]ajor pipeline construction projects . . . using rights-of-way in which there is no existing natural gas pipeline."[33]  A FERC EIS must comply with the NEPA regulations and also summarize the project's "significant environmental impacts"; any "alternative . . . that would have a less severe environmental impact," which includes alternative routes; any potential "mitigation measures" and impacts that cannot be mitigated; and studies that might provide useful data.[34]

FERC's "public convenience and necessity" analysis carefully accounts for these environmental impacts, alternatives, and potential mitigation measures.  Based on this comprehensive process, FERC may deny approval, or it may require the adoption of alternatives or mitigation measures.[35] FERC's "environmental assessment . . . is not subject to modification" by state agencies; instead, they can submit comments to FERC or intervene in the FERC proceedings to offer their input and then, if necessary, seek judicial review.[36]  And with good reason: "Allowing all the sites and all the specifics to be regulated by agencies with only local constituencies would delay or prevent construction that has won approval after federal consideration of environmental factors and interstate needs."[37]

   3.   Other federal statutes with impact reviews and opportunities for stakeholder engagement

Importantly, while the NEPA review process provides meaningful opportunities for states and other stakeholders to engage with federal agencies on the potential impacts of a proposed federal action, the NEPA review process is far from the only avenue for state and local engagement.

---

[29] *Robertson* v. *Methow Valley Citizens Council ("Robertson")*, 490 U.S. 332, 350 (1989).

[30] *Robertson,* 490 U.S. at 345–46.

[31] *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,* 426 U.S. 776, 787 (1976).

[32] *Robertson*, 490 U.S. at 350.

[33] 18 C.F.R. § 380.6(a)(3).

[34] 18 C.F.R. § 380.7.

[35] *See e.g., Midcoast Interstate*, 198 F.3d at 966, 968.

[36] *Skyview Acres*, 558 N.Y.S.2d at 975; *See also* 18 C.F.R. § 385.214(c)(1); 15 U.S.C. § 717r(a).

[37] *No Tanks*, 697 A.2d at 1316.

Numerous other statutes provide mechanisms for state and stakeholder engagement on a wide variety of potential impacts from proposed federal projects:

- Endangered Species Act ("ESA")[38] - Section 7 of the ESA requires that federal agencies consult with the ESA administering services to ensure that any projects authorized, funded, or carried out by them are not likely to jeopardize the continued existence of any endangered species or threatened species, or result in the destruction or adverse modification of critical habitat of such species.

- National Historic Preservation Act ("NHPA")[39] - Section 106 of the NHPA and implementing regulations require federal agencies, before issuing a license (permit), to adopt measures when feasible to mitigate potential adverse effects of the licensed activity and properties listed or eligible for listing in the National Register of Historic Places. The Act's requirements are to be implemented in cooperation with state historic preservation officers.

- Coastal Zone Management Act ("CZMA")[40] – Under CZMA Section 307, applicants for federal licenses or permits must obtain from potentially impacted coastal states certification that the proposed project complies with the states' coastal zone management plan.

- Essential Fish Habitat Provisions ("EFH") of the Magnuson-Stevens Act – The EFH provisions promote the protection of essential fish habitat in the review of projects conducted under federal permits, licenses, or other authorities that affect or have the potential to affect such habitat.  EFH requires that federal agencies consult with the National Marine Fisheries Service for any permits which may adversely affect essential fish habitat identified under the Magnuson-Stevens Act.

These are just a few of the statutory provisions through which states and other stakeholders can engage with agencies like FERC, raise concerns about potential impacts from proposed federally licensed or permitted projects, and request consideration of alternatives.[41]  They are an important part of the cooperative federalism approach through which Congress apportioned jurisdiction between the federal government and the states.  These statutory provisions, and others like them, demonstrate that states have multiple opportunities outside of Section 401 to provide input on proposed federal projects.  They also provide context for the narrow but important jurisdiction conferred to states by Section 401.  In light of all these other meaningful engagement and review

---

[38] 16 U.S.C. §  1531 *et seq.*

[39] 16 U.S.C. §  470 *et seq.*

[40] 16 U.S.C. § 1451 *et seq.*

[41] Indeed, these are just a few of the examples of statutory provisions through which federal projects are reviewed and state feedback is solicited and considered.  For a large pipeline project that would traverse federal, state, and tribal lands, the statutory authorities under which the project is reviewed are far more numerous.

opportunities, one recognizes that the statutory requirement for states to focus their Section 401 reviews on water quality furthers, rather than undermines, cooperative federalism.

Further, the statutory provisions cited above do not represent the full extent of states' authority to address environmental impacts from the operation of federally licensed or permitted projects. States can and often do regulate the operation of federally licensed or permitted projects pursuant to authority delegated under the Clean Air Act ("CAA"),[42] the CWA,[43] as well as other statutes. Section 401 does not constrain states' authority under these statutes to issue and enforce environmental permits on the operation of federally licensed or permitted projects. Section 401 only limits states' roles in reviewing the potential impacts from certain projects that require federal licenses or permits.

> 4. <u>EPA must implement CWA Section 401 in accordance with Congress's intent to assert exclusive federal jurisdiction through statutes like the NGA and in the context of more comprehensive environmental review processes Congress established through NEPA and other statutes</u>

In this subsection, the Associations discuss Section 401 for natural gas pipeline permitting.[44]  By examining Section 401 in the context of other statutes, like the NGA and NEPA, one appreciates that Section 401 certification is but one part of a larger federal process.

As noted above, the NGA vests FERC with exclusive authority over all salient aspects of the natural gas pipeline permitting process, which facilitates the safe movement of natural gas in interstate commerce.  The rigorous process by which FERC analyzes the "public convenience and necessity" of a natural gas pipeline requires an extensive and meticulous review of potential environmental impacts, including consideration of potential impacts to water quality, drinking water resources, and aquatic species.  It is from this comprehensive analytical framework that CWA Section 401 carves out a carefully cabined exception to FERC's exclusive authority in this area by permitting states to certify whether potential discharges from a federally licensed project will comply with water-quality standards.[45]

Embedded within the text of CWA Section 401 are meaningful limits on the requirements to obtain a certification.  Most significantly, applicants are only required to obtain certification from states where a project could result in a *point source* discharge *to "navigable waters,"* defined in the

---

[42] *See* 42 U.S.C. §§ 7411(d); 7412.

[43] *See* 33 U.S.C. §§ 1342(b); 1344(g).

[44] While the Associations herein discuss Section 401 in the context of the NGA's federal approval process for natural gas pipelines, it is important to note that Section 401 certifications are important to a number of other types of essential energy projects.  All types of energy projects can require individual, regional, or nationwide general Section 404 permits that are also subject to state review under Section 401.

[45] 33 U.S.C. § 1341(a).

statute as "waters of the United States" ("WOTUS.")[46] Section 401 is not implicated for nonpoint discharges or other diffuse releases to groundwater. Nor is Section 401 implicated when the discharge enters purely state, rather than federal waterbodies. Thus, states can only deny a certification request based on potential point source discharges to WOTUS that can result in possible violations of water quality standards.

With few exceptions, courts have correctly construed this limited delegation as "[r]elinquish[ing] only one element of the otherwise exclusive jurisdiction granted [to FERC] …. It authorizes states to determine and certify only the narrow question whether there is 'reasonable assurance' that the construction and operation of a proposed project 'will not violate applicable water quality standards.'"[47] "Congress did not empower the States to reconsider matters unrelated to their water quality standards, which [FERC] has within its exclusive jurisdiction …."[48] Such second-guessing would "countermand the carefully worded authority of section 401(a)(1)" and "usurp the authority that Congress reserved for FERC."[49]

States exercising authority under CWA Section 401 must do so in a way that is reasonable and adequately explained.[50] When deciding whether or not to issue a certification, a state must examine "the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'"[51] Therefore, when a state endeavors to use Section 401 "to hold federal licensing hostage,"[52] or otherwise base its certification decision on policy considerations that cannot realistically be construed as credible concerns over water quality impacts, that determination is impermissible under the CWA and several other statutes through which Congress tasked federal agencies with decision-making authority.

The forgoing discussion focuses on natural gas pipeline permitting under the NGA to illustrate the comprehensive statutory framework within which the Section 401 certification process is conducted. However, it is by no means the only federal permitting or licensing program to trigger Section 401 certification processes. Nor is natural gas pipeline permitting the only licensing or licensing process to be misused by some states as a lever to pursue policy objectives unrelated to water quality. In fact, Section 404 permitting is perhaps the most common trigger for Section 401 permitting, and it impacts each segment of the energy industry and a wide variety of other industries as well. Therefore, as the agency tasked with implementing the CWA, EPA must ensure

---

[46] *See Oregon Natural Desert Assoc. v. Dombeck*, 151 F. 3d. 945 (9th Cir. 1998); *See also Oregon Natural Desert Assoc. v. US Forest Service*, 550 F.3d 778 (9th Cir. 2006).); 33 U.S.C § 1362(7).

[47] *Niagara Mohawk Power Corp*. v. *DEC*, 624 N.E.2d 146, 149 (N.Y. 1993).

[48] *Power Auth*. v. *Williams*, 60 N.Y.2d 315, 325 (N.Y. 1983).

[49] *Niagara Mohawk*, 624 N.E.2d at 150.

[50] *National Fuel Gas Supply Corporation v. New York State Dep't. of Envtl. Conservation*, 761 F. Appx. 68, 72 (2d Cir. Feb 5, 2019).

[51] *Appalachian Voices v. State Water Control Bd*., No. 18-1079, (4th Cir. 2019) (*quoting Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

[52] *Hoopa Valley Tribe* v. *FERC ("Hoopa Valley")*, 913 F. 3d 1099, 1104 (D.C. Cir. 2019).

that its regulations facilitate functional and efficient Section 401 certification processes. This means that any potential revisions to the 401 Certification Rule must perpetuate Section 401's important but highly circumscribed role for states, while prohibiting states from arrogating authority Congress exclusively entrusted to the federal government.

**b. Reasonable limits on the Section 401 certification process are consistent with principles of cooperative federalism**

Grounded on principles of cooperative federalism, the CWA establishes states as the primary permitting and enforcement authorities under Sections 402, 404, and a number of other provisions of the Act:

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this Act. It is the policy of Congress that the States manage the construction grant program under this Act and implement the permit programs under sections 402 and 404 of this Act. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution, and to provide federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination or pollution.[53]

Thus, in recognition of the states' sovereignty and the fact that states are best situated to regulate their own resources, the CWA required EPA to coordinate its water resource protection efforts with the states.[54] Nonetheless, while the Associations oppose federal intrusion in those areas where Congress preserved state primacy, we also recognize those circumstances where Congress deemed it necessary to rest primary decision-making authority with federal agencies and/or more closely circumscribe the otherwise broad authority of states.

In CWA Section 401, Congress prescriptively delineated a more narrow and focused role for states, so that the jurisdiction that the Act provides to states could not overwhelm or subsume the federal government's ability to issue licenses and permits for projects of national importance. Of particular relevance to the Associations' members, these projects of national importance include pipeline projects requiring "Notices to Proceed" from FERC and dredge-and-fill activities in WOTUS that require CWA Section 404 permits from the Army Corps. But Congress also designated federal agencies as the approval authorities for Section 402 industrial and municipal point source discharge permits issued by EPA, Army Corps permits issued under Sections 9 and 10 of the Rivers and Harbors Act ("RHA"), U.S. Coast Guard permits for bridges and causeways under Section 9

---

[53] 33 U.S.C. § 101(b).
[54] 33 U.S.C. § 101(g); 33 U.S.C. § 102(a).

15

of the RHA, hydroelectric projects requiring FERC licenses, and nuclear power plants licensed by the Nuclear Regulatory Commission ("NRC").

Congress certainly understood that projects authorized pursuant to these statutes would have localized impacts, but it viewed it as inappropriate to allow these projects to be principally steered by parochial interests.  Congress uniquely provided these boundaries in Section 401 because, unlike other provisions of the Act, like Sections 402 and 404, that direct federal agencies to cede authority to states when certain conditions of delegation are satisfied, Congress recognized that for certain federal projects, federal agencies must share their authority with, rather than cede their authority to, the states.

Congress's intent to reasonably limit the scope and duration of state Section 401 certifications is consistent with cooperative federalism.  States that have misused Section 401 certification authority can wield a disproportionate level of decision-making authority over a wide variety of essential interstate projects or other projects of national importance such as transportation infrastructure, nuclear and hydroelectric power generation facilities, energy distribution infrastructure, and projects requiring dredge-and-fill permits under Section 404.  Misapplying Section 401 to allow any state unilateral veto authority over these projects has adverse impacts, not only on project proponents and federal licensing and permitting authorities, but other states with interests in the project.

This was certainly the case with Washington State's denial of the Millennium Bulk Terminals – Longview LLC project.[55]  The project proponents intended the terminal to receive rail cars of coal mined principally in Montana and Wyoming so that the coal could be exported to overseas markets. Washington State employed various regulatory strategies to extend their certification review over five years before denying the certification request based on grounds having nothing to do with water quality.[56]  Having minimal financial interest in facilitating the export of a product that was not produced in the state and policy objections to coal-fired power generation, Washington State used its Section 401 certification authority to deny Montana and Wyoming access to foreign markets.  Thus, the exercise of expansive authority under Section 401 by one state harms, rather than serves, other states' rights.

Similar dynamics underlie many instances of state misuse of Section 401 certification authority in pipeline projects.  States along the proposed route of a pipeline that would not supply their state have occasionally used their Section 401 certification authority to block projects desperately needed by other states.  This acutely harmed New England consumers who pay significantly more

---

[55] WDEC, In the Matter of Denying Section 401 Water Quality Certification to Millennium Bulk Terminals-Longview, LLC, Order # 15417 (Sept. 26, 2017); *See also Montana v. Washington*, No 22o152, (motion by Montana and Wyoming for leave to file the bills of complaint denied June 28, 20921. Justice Thomas and Justice Alito indicated they would grant the motion).

[56] *See* Section IV.4.

for their electricity than the U.S. average in part because pipeline project delays have inhibited access to natural gas supplies from the Marcellus Shale.

The principles of cooperative federalism are also well served by preventing states from evading Section 401 statutory deadlines for review.  ''Congress intended Section 401 to curb a *state's* 'dalliance or unreasonable delay.''' [57]  In the permitting context, extensive delays in the 401 certification process can cause projects that are important to other states to be cancelled altogether.

In sum, principles of cooperative federalism simply do not provide states unbounded authority to subjugate the interests of one state to the parochial whims of another.  Cooperative federalism under Section 401 requires a balanced approach that conforms to the balance Congress itself struck when enacting Section 401.  As such, if the Agency revises the 401 Certification Rule, the Associations urge EPA preserve the important role of states under Section 401, but prevent states from misusing the certification process to unlawfully elevate their own interests over the interests of other states or the nation as a whole.

### c.   The legislative history of the CWA illustrates the reasonable limits Congress intended for the Section 401 certification process

While Congress amended the CWA's predecessor statutes, Federal Water Pollution Control Act of 1948 ("FWPCA"),[58] no statutory revision was more central to Congress's transformation of the FWPCA to today's CWA than the 1972 amendments to the FWPCA ("1972 Amendments").[59] Indeed, as Congress noted at the time, the 1972 Amendments represented a "total restructuring" and "complete rewriting" of the existing statutory framework.[60]  The transformative nature of the 1972 Amendments is critical to interpreting Section 401 for many reasons, including the need to distinguish court decisions that were based on EPA regulations predating the 1972 Amendments[61] from those court decisions that more directly interpreted Section 401 of the Act as it appears today.

Prior to the 1972 Amendments, the regulatory framework for the FWPCA, as amended by the Water Quality Act of 1965,[62] was based exclusively on ambient water quality standards that Congress anticipated would be used to develop standards for discharge to the receiving waters. While the predecessor Act regulated only water quality (largely as defined by states) and could only be used to regulate the discharging sources of impairment if water quality standards were not being met,[63] practical application of the framework demonstrated its ineffectiveness; between 1948

---

[57] *Hoopa Valley*, 913 F. 3d at 1104–05 (emphasis in original).

[58] Pub. L. No. 80-845, 62 Stat. 1155 (1948).

[59] Pub. L. No. 92-500, 86 Stat. 816 (1972).

[60] *City of Milwaukee* v. *Illinois,* 451 U.S. 304, 317 (1981) (quoting legislative history of 1972 amendments).

[61] *PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*, 511 U.S. 700, 712 (1994).

[62] Pub. L. No. 89-234, 79 Stat. 903 (1965).

[63] *See NDRC v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990). Thus, a discharger needed no permit to deposit pollutants into a water that had "room to spare" in achieving its water quality standards.

and 1972, the Act's enforcement framework "resulted in only one prosecution."[64]  This informed Congress's 1972 effort to amend the Act, and was the impetus for Congress's enactment of Section 301, which states, "Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful."[65]

Congress then defined "pollutant" quite broadly to mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."[66]  However, Congress much more narrowly defined the "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source," such as a pipe, ditch, or other "discernible, confined and discrete conveyance."[67]

Therefore, the newly enacted Section 301 made it unlawful for the first time to discharge pollutants into WOTUS from a point source unless the discharge complied with the CWA, including obtaining authorizations pursuant to the Section 402 National Pollutant Discharge Elimination System ("NPDES") permit program or the Section 404 dredge-and-fill permit program.[68]

Because of the 1972 Amendments, the NPDES permitting program now constitutes "[t]he primary means for enforcing these limitations and standards" from point sources.[69] Point source dischargers must now obtain NPDES permits that "place limits on the type and quantity of pollutants that can be released"[70] into WOTUS through point sources, and "defines, and facilitates compliance with, and enforcement of … a discharger's obligations under the [CWA]."[71]

The 1972 Amendments similarly resulted in the first ever regulation of the discharge of dredged or fill material into WOTUS, including certain wetlands.  Section 404 now requires putative dischargers to obtain a permit before any dredged or fill material may be discharged into WOTUS from activities such as fill for water resource development, infrastructure development, and mining projects.

In addition to fundamentally shifting the Act from its purely "harm-based" regulatory approach to its focus on point source discharges of pollutants to WOTUS, the 1972 Amendments also preserved a role for states and tribes.  These amendments first authorized states to assume program

---

[64] *See* David Drelich, *Restoring the Cornerstone of the Clean Water Act*, 34 COLUM. J. ENVTL. L. 267, 304 (2009).
[65] 33 U.S.C. § 1311(a).
[66] 33 U.S.C. § 1362(6).
[67] 33 U.S.C. § 1362(12), (14).
[68] 33 U.S.C. § 1342, 1344.
[69] *Arkansas et al. v. Oklahoma et al.*, 503 U.S. at 101 (1992).
[70] *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. at 102 (2004).
[71] *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. at 205 (1976).

authority for issuing Section 402 and 404 permits within their borders.[72]   States also became responsible for developing water quality standards for WOTUS within their borders,[73] developing total maximum daily loads ("TMDLs") for waters that are not meeting established water quality standards[74] while at the same time retaining authority to protect and manage waters that are not considered WOTUS.[75]

Most relevant here, however, the 1972 Amendments updated a preexisting state certification requirement (Section 21(b)) to create Section 401.   As with Section 401, Congress developed enacted Section 21(b) to "recognize[ ] the responsibility of Federal agencies to protect water quality whenever their activities affect public waterways."[76]   As Congress noted at the time, "[i]n the past, these [Federal] licenses and permits have been granted without any assurance that the [water quality] standards will be met or even considered."[77]

Because the state certification requirement in Section 21(b) under the FWPCA's water quality-based framework existed before Congress enacted the 1972 Amendments to focus on point source discharges to WOTUS, Section 21(b) required states to certify that "such *activity* will be conducted in a manner which will not violate applicable water quality standards."[78] The 1972 Amendments' changes to Section 21(b) were therefore intended to maintain consistency with the 1972 Amendments' broader focus on, and definition of, *point source discharges to WOTUS*.   In other words, because the predecessor Act regulated only water quality and could only be used to regulate the pollution-contributing sources of impairment if water quality standards were not being met, Congress drafted Section 21(b), and EPA promulgated its 1971 regulations pursuant to Section 21(b)[79] to focus on those *federal activities* that could adversely impact ambient water quality standards.   Once the 1972 Amendments fundamentally transformed the Act to provide authority to directly address discharges of pollutants rather than indirectly address pollutant discharges based on their impacts on water quality, Congress made a corresponding change to Section 21(b) so that it reflected the new prohibition and permitting regime for *discharges*.

As such, the Section 21(b)(1) requirement that the certifying authority certify "that such *activity* . . . will not violate water quality standards,"[80] was modified to state that the authority must certify "that any such *discharge* shall comply with the applicable provisions of sections 301, 302, 303,

---

[72] 33 U.S.C. § 1342(b), 1344(g).
[73] 33 U.S.C. §  1313, 1315.
[74] 33 U.S.C. § 1313(d).
[75] *See, e.g.,* 33 U.S.C. § 1251(b), 1251(g), 1370, 1377(a).
[76] S. Rep. No. 91-351, at 3 (1969).
[77] S. Rep. No. 91-351, at 3 (1969).
[78] Public Law 91-224, 21(b)(1), 84 Stat. 91 (1970) (emphasis added).
[79] *See NDRC v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990). Thus, a discharger needed no permit to deposit pollutants into a water that had "room to spare" in achieving its water quality standards.
[80] Public Law 91-224 § 21(b)(1) (emphasis added).

306, and 307 . . .."[81]   The 1972 Amendments also added an entirely new Section 4(d) which authorizes the imposition of certification conditions:

> to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 301 or 302 of this Act, standard of performance under section 306 of this Act, or prohibition, effluent standard, or pretreatment standard under section 307 of this Act, and with any other appropriate requirement of State law set forth in such certification . . .[82]

Thus, the 1972 Amendments maintained Section 21(b)'s focus on water quality impacts but adapted those certification requirements "to assure consistency with the bill's changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants."[83]   As explained by then-Senator Muskie, the sponsor of the legislation that would become Section 401:

> No polluter will be able to hide behind a Federal license or permit as an excuse for a violation of *water quality standard[s]*. No polluter will be able to make major investments in facilities under a Federal license or permit without providing assurance that the facility will comply with *water quality standards*. No State water pollution control agency will be confronted with a fait accompli by an industry that has built a plant without consideration of *water quality requirements*.[84]

The Senate Report that accompanied the 1972 Amendments likewise explained that Section 401:

> makes clear that any *water quality requirements* established *under State law*, more stringent than those requirements under this Act, also shall through certification become conditions on any Federal license or permit. The purpose of the certification mechanism provided in this law is to assure that Federal licensing or permitting agencies cannot override *State water quality requirements*.[85]

As the foregoing makes clear, Congress intended Section 401 certifications and conditions to focus exclusively on water quality.  Nothing in the legislative history of Section 401 reflects any intent to consider non-water quality considerations or conditions.

Notwithstanding the transformative nature of the 1972 Amendments, EPA did not update its 1971 regulations (implementing Section 21(b)), until promulgation of the 401 Certification Rule in

---

[81] 33 U.S.C. § 1341(a) (emphasis added).

[82] 33 U.S.C. § 1341(d).

[83] S. Rep. No. 92–414, at 69 (1971).

[84] 116 Cong. Reg. 8,984 (Mar. 24, 1970) (discussing section 21(b) of the Water Quality Improvement Act of 1970) (emphasis added).

[85] S. Rep. No. 92-414, at 69 (1971) (emphasis added).

2020.  Thus, for nearly five decades, the Agency's regulations remained out-of-step with Congress's most consequential changes to the CWA—the prohibition on point source discharges to WOTUS "[e]xcept as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of th[e] Act."[86]  The persistence of EPA's outdated 1971 implementing regulations is relevant to the Agency's current reconsideration of the 401 Certification Rule because a significant portion of the jurisprudence on Section 401, including the 1994 Supreme Court decision in *PUD No. 1 of Jefferson County v. Washington Department of Ecology*,[87] is based on courts deferring to EPA regulations that predate the 1972 Amendments.

The Associations also urge EPA to recognize that FWPCA Section 21(b) was enacted prior to the statutory requirement that the federal government consider the potential environmental impacts of its actions.  It provided states authority to examine the water quality impacts of federal actions in the absence of any federal obligation to examine their own obligations.  Section 401, on the other hand, is informed by the 1969 passage of NEPA, which requires the federal government to consider the potential environmental consequences—water quality-related or otherwise—of its actions.  While NEPA does not subsume the Section 401 water quality certification process, it does place Section 401 in a statutory context distinct from that which existed in 1971. The state water quality certification process is not the sole means by which potential environmental impacts of federal actions are identified, scrutinized, mitigated, or avoided.  The 1972 Amendments followed the passage of NEPA by a mere two years.  Congress understood the important role NEPA would play in examining the impacts of federal actions, including those subject to state certifications under Section 401.  Congress continued to view state water quality certifications as important, but it clearly did not intend them to duplicate NEPA's processes in scope, scale, or duration.  Section 401 was intended to be, and should remain, a focused inquiry on very specific types of discharges and a very narrow set of potential impacts.

### d.  <u>Any revisions to the 401 Certification Rule must include provisions sufficient to meaningfully enforce Congress's statutorily prescribed time limits</u>

As EPA considers revisions to the 401 Certification Rule, we urge the Agency to recognize that the deadlines Congress imposed in Section 401 are explicit, unambiguous, and binding.  The express text of Section 401 plainly states that a certifying authority waives its certification authority over a federal license or permit if the certifying authority "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request."  [88]  "[T]he purpose of the waiver provision is to prevent a State from indefinitely delaying a federal licensing proceeding by failing to issue a timely water quality certification under Section 401."[89]  Given the clarity of the CWA with respect to the one-year

---

[86] 33 U.S.C. § 1311(a).

[87] 511 U.S. 700, 712 ("*PUD No. 1*").

[88] 33 U.S.C. § 1341(a)(1).

[89] *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011).

deadline and the lack of ambiguity about the intended purpose of this language, the text of the CWA leaves EPA no room to interpret Section 401 as allowing certifying authorities any amount of time in excess of one year.[90]

Additionally, as explained by the D.C. Circuit, "while a full year is the absolute maximum, it does not preclude a finding of waiver prior to the passage of a full year."[91]  Determining the "reasonable period of time" within that one-year period has for several decades fallen within the purview of the federal licensing and permitting agencies.[92]  Relatedly, from the time EPA first promulgated its implementing regulations in 1971, federal licensing and permitting agencies have been tasked with determining when waiver occurs.[93]  Thus, although EPA may have some discretion in describing the factors that an agency should consider when determining the "reasonable period of time" and the occurrence of a waiver, the longstanding nature of this aspect of EPA's regulations will require the Agency to provide a robust and reasoned explanation of the need for the change.[94]

Finally, as the agency charged with implementing the CWA,[95] EPA must ensure that its implementing regulations include meaningfully and reasonably preclude certification tactics that are plainly intended to evade, rather than comply with, Section 401's congressionally mandated deadlines.  To that end, EPA's 401 Certification Rule examined the various ways in which a small minority of states have circumvented or attempted to circumvent certification deadlines.  While the Agency is not precluded from varying the measures needed to ensure that certifications are completed within a reasonable period of time (not to exceed one year), the Agency cannot ignore those known tactics certain that states have employed to evade deadlines.  As the implementation agency for the CWA, EPA must ensure that its regulations reasonably ensure statutory compliance,

---

[90] Consistent with our comments in Section III.f., the Associations believe that Congress's establishment of one-year as the outermost limit for Section 401 certifications reveals that Congress understood and expected Section 401 reviews to be narrowly focused on discharges from the federal project, rather than broader or more tangentially related impacts.

[91] *Hoopa Valley*, 913 F. 3d at 1104.

[92] *See* Army Corps regulations at 33 CFR § 325.1(b)(ii) (51 Fed. Reg. 41,236) (Nov. 13, 1986)); *See also* FERC Rules at 18 §5.23(b)(1) (68 Fed. Reg. 61,743)(Oct. 30, 2003)); *See also Constitution Pipeline Company, LLC*, 164 FERC P 61029, 2018 WL 3498274 (2018) ("[T]o the extent that Congress left it to federal licensing and permitting agencies, here the Commission, to determine the reasonable period of time for action by a state certifying agency, bounded on the outside at one year, we have concluded that a period up to one year is reasonable.").

[93] *See Millennium Pipeline Company, L.L.C.*, 860 F.3d at 700–01 (acknowledging that a project proponent can ask the federal agency to determine whether a waiver has occurred).

[94] *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[95] *See* 33 U.S.C. 1251(d) ("Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency . . . shall administer this chapter."); *Id*. at 1361(a); *Mayo Found. for Medical Educ. and Res. v. United States*, 562 U.S. 44, 45 (2011); *Hoopa* Valley, 913 F.3d at 1104; *Ala. Rivers Alliance v. FERC*, 325 F.3d 290, 296–97 (D.C. Cir. 2003); *Cal. Trout v. FERC*, 313 F.3d 1131, 1133 (9th Cir. 2002); *Am. Rivers, Inc. v. FERC*, 129 F. 3d 99, 107 (2d Cir. 1997).

rather than leaving loopholes.  Accordingly, EPA must, at a minimum, preclude those deadline circumvention tactics that courts have held to be improper.

> 1.   Enforcing the CWA's Section 401 deadlines requires a clear and objective starting point for review

EPA's regulations must reflect that the review period for a certification request begins when the project proponent submits the certification request to the certifying authority. This interpretation is required by the Act and, given examples where states have sought to toll the start date of their review long after their receipt of certification requests, this proposed interpretation is practically necessary.

Section 401 plainly states that:

> [i]f the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a *request for certification,* within a reasonable period of time (which shall not exceed one year) after *receipt* of such request, the certification requirements of this subsection shall be waived with respect to such Federal application.[96]

The plain meaning of this language is that the Act provides the timeframe for a certifying authority's review and instructs that the receipt of the request for certification begins the review period. The statutory text therefore created a "bright-line rule"[97] for identifying the start of the review period, without which the Act's review deadlines would be rendered meaningless.

Although the term "receipt" is clear and widely understood through its common usage, the Associations nonetheless believe that EPA must implement and enforce a regulatory definition of "receipt" to prevent certain states from strategically sidestepping straight-forward interpretations of the term to extend their review period beyond statutorily mandated time limits.  At a minimum, EPA, as the agency charged with implementing the CWA, must implement Section 401 of the Act to prohibit the impermissible constructions of the term "receipt" documented in the following examples.

For instance, the State of New York received a certification request for the Northern Access Pipeline on March 2, 2016.  New York denied the certification application on April 7, 2017 and argued that its denial was timely because: (1) the certification review did not begin until the state deemed the application "complete;" and (2) that the state asked and received consent from the project proponent to change the date on which the application was deemed received so that New

---

[96] 33 U.S.C. § 1341(a)(1) (emphasis added).
[97] *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018).

York's April 7, 2017 decision would appear to conform to the Section 401 time limits.[98] Notwithstanding New York's arguments, FERC concluded that the state waived its Section 401 obligation for failure to act within the prescribed deadlines,[99] and in two sequential decisions, the United States Court of Appeals for the Second Circuit ("Second Circuit") agreed.[100]

In the first case, the Second Circuit held that Section 401 prohibited New York from determining that the certification application was not "received" until the state deemed it complete.[101] The court reasoned that Section 401 provided a "bright-line rule regarding the beginning of the review," and that New York's approach would impermissibly "allow a state agency not only to dictate when the review process can begin but also to delay it indefinitely."[102]

The Second Circuit then remanded FERC's conditional approval back to the Commission to allow FERC to supplement its reasoning for the conditional approval. After FERC reaffirmed and further explained its approval, New York once again challenged the Commission's waiver determination. Once again, the Second Circuit held that Section 401 provides a "bright-line rule" that a state's action on a request for certification shall not exceed one year from receipt of such a request.[103] And regarding New York's agreement with the project proponent to stipulate that the application was received 36 days after it was actually received, the court held that "however modest and reasonable that extension may have been, allowing the state to dictate the beginning of review by agreement would 'blur th[e] bright-line rule into a subjective standard'"[104]

In another example, the New Jersey Department of Environmental Protection ("NJDEP") recently deemed as incomplete a certification request for a project proposed by PennEast Pipeline Company, LLC because the project proponent had not provided NJDEP with surveys of the entire pipeline route, including segments that had no rational relationship with potential water quality impacts.[105] Because this data request was irrelevant to the state's review of the proposed project's potential water quality impacts in New Jersey, it can only be construed as a tactic for delay. Indeed, the Supreme Court's June 29, 2021 decision in *PennEast Pipeline Co. v. New Jersey* suggests that

---

[98] *See N.Y. State Dep't of Envtl. Conservation v. Nat'l Fuel Gas Supply Corp.*, Slip Op. at No.s 19-1610-ag. 19-1618-ag (2d Cir. March 23, 2021); *See also N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018).

[99] *See Nat'l Fuel Gas Supply Corp.*, 164 FERC 61,084 at PP 35,42 (2018).

[100] *See N.Y. State Dep't of Envtl. Conservation v. Nat'l Fuel Gas Supply Corp.*, Slip Op. at No.s 19-1610-ag. 19-1618-ag (2d Cir. March 23, 2021); *See also N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, (2d Cir. 2018).

[101] *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d at 455.

[102] *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d at 455-456.

[103] *N.Y. State Dep't of Envtl. Conservation v. Nat's Fuel Gas Supply Corp.*, Slip Op. at No.s 19-1610-ag. 19-1618-ag at p. 17 (2d Cir. March 23, 2021).

[104] *N.Y. State Dep't of Envtl. Conservation v. Nat's Fuel Gas Supply Corp.*, Slip Op. at No.s 19-1610-ag. 19-1618-ag at p. 17 (quoting *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d at 455).

[105] Letter from Virginia Kop'Kash, Assistant Comm'r, N.J. Dep't of Envtl. Prot., Re: Freshwater Wetlands Individual Permit Application, DLUR File #0000-17-0007.2 FWW170001,

the state's efforts to expand its Section 401 review time were part of a larger effort to frustrate and forestall construction of the pipeline.[106]

While the CWA clearly directs how the Section 401 review deadlines should be applied, these decision leave no doubt that the Agency's regulations must prohibit the arbitrary and strategic tolling of Section 401 review periods.

### 2.  EPA must prohibit states from artificially extending timeframes by stopping and restarting the certification process

The CWA does not allow certifying authorities to stop and restart their review to artificially extend Section 401's statutorily prescribed deadlines.  And as the agency charged with implementing Section 401 of the Act, EPA's regulations must incorporate enforceable procedures that prohibit this manner of evading Section 401's statutory deadlines. Here again, the need for these restrictions is made evident by the actions of a handful of states that have increasingly relied on a "withdrawal and resubmittal" tactic to circumvent statutory deadlines.  Indeed, the D.C. Circuit's recent decision in *Hoopa Valley Tribe v. FERC* ("*Hoopa Valley*")[107] demonstrates the need for EPA to enforce regulations to compel compliance with the express Section 401 deadlines.

In *Hoopa Valley*, the D.C. Circuit considered whether California and Oregon could lawfully rely on a "withdrawal-and-resubmission scheme" to avoid the Section 401 deadline for certifying the relicensing of the Klamath Hydroelectric Project.[108]  The project proponent had originally submitted its certification requests to the states in 2006, and pursuant to the states' demand, withdrew and resubmitted the same certification requests annually for more than a decade.[109]  When the D.C. Circuit drafted its decision "*more than a decade later,* the states still ha[d] not rendered certification decisions."[110]  The court went bemoaned that:

> it is now commonplace for states to use Section 401 to hold federal licensing hostage.  At the time of briefing, twenty-seven of the forty-three licensing applications before FERC were awaiting a state's water quality certification, and four of those had been pending for *more than a decade.[111]*

While the problem identified by the D.C. Circuit was pervasive, its resolution was remarkably straight-forward.  According to the court, "[d]etermining the effectiveness of such a withdrawal-and-resubmission scheme is an undemanding inquiry because Section 401's text is clear."[112]

---

[106] 594 U.S. __ (Slip. Op. at 4) (June 29, 2021).
[107] 913 F. 3d 1099 (D.C. Cir. 2019).
[108] *Hoopa Valley*, 913 F. 3d at 1103.
[109] *Hoopa Valley*, 913 F. 3d at 1104.
[110] *Hoopa Valley*, 913 F. 3d at 1104 (emphasis in original).
[111] *Hoopa Valley*, 913 F. 3d at 1104 (emphasis in original).
[112] *Hoopa Valley*, 913 F. 3d at 1103.

> While the statute does not define 'failure to act' or 'refusal to act,' the states' efforts . . . constitute such failure and refusal within the plain meaning of these phrases. Section 401 requires state action within a reasonable period of time, not to exceed one year. California and Oregon's deliberate and contractual idleness defies this requirement. By shelving water quality certifications, the states usurp FERC's control over whether and when a federal license will issue. Thus, if allowed, the withdrawal-and-resubmission scheme could be used to indefinitely delay federal licensing proceedings and undermine FERC's jurisdiction to regulate such matters.[113]

The court explained that "Congress intended Section 401 to curb a *state*'s 'dalliance or unreasonable delay.'  This Court has repeatedly recognized that the waiver provision was created 'to prevent a State from indefinitely delaying a federal licensing proceeding.'"[114]  Therefore, the court "conclude[d] that California and Oregon have waived their Section 401 authority with regard to the Project."[115]

Recently, the U.S. Court of Appeals for the Fourth Circuit ("Fourth Circuit") rejected a FERC determination that North Carolina waived its Section 401 authority because the state took longer than one year to review a project proponent's initial certification application and two subsequent applications that were resubmitted after the initial application was withdrawn.[116]  The court held that FERC did not have a sufficient basis to conclude that North Carolina had colluded with the project proponent on the withdrawal and resubmittal of the certification applications to artificially extend the time.  Instead, the court found that the decision to withdraw and resubmit the initial and subsequent applications was made by the project proponent alone and without the direction of, or coordination with,  the state.[117]

The Fourth Circuit's reasoning appears to conflict with holdings in the D.C. Circuit[118] and the Second Circuit,[119] it is also not a particularly sweeping decision because the court made a fact-specific determination that the record did not support FERC's determination that the project proponent's withdrawal and resubmittal of the certification application was coordinated with the state.[120]  Simply put, the 401 Certification Rule does not prohibit project proponents from withdrawing and resubmitting certification applications.   The final rule only prohibits states and other certifying authorities from requesting applications be withdrawn and resubmitted in order to

---

[113] *Hoopa Valley*, 913 F. 3d at 1105.

[114] *Hoopa Valley*, 913 F. 3d at 1105-6 (internal citations omitted).

[115] *Hoopa Valley*, 913 F. 3d at 1105.

[116] *North Carolina Dep't of Envtl Quality v. FERC*, 2021 WL 2763265 (4ᵗʰ Cir. July 2, 2021).

[117] *North Carolina Dep't of Envtl Quality v. FERC*, 2021 WL 2763265.

[118] *See Hoopa Valley*, 913 F. 3d at 1105.

[119] *See N.Y. State Dep't of Envtl. Conservation v. See Nat's Fuel Gas Supply Corp.*, Slip Op. at No.s 19-1610-ag. 19-1618-ag (2d Cir. March 23, 2021); *See also N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018).

[120] *North Carolina Dep't of Envtl Quality v. FERC*, 2021 WL 2763265.

extend the Section 401 review time limit.  Thus, although it remains an outlier to the larger body of Section 401 jurisprudence, the Fourth Circuit's decision is not altogether inconsistent with the 401 Certification Rule.  Therefore, EPA's regulations must continue to stipulate that a certifying authority is not authorized to request the project proponent to withdraw a certification request or to take any other action to modify or restart the established reasonable period of time.

### e.  Section 401 certification is required only when a federally licensed or permitted activity has the potential to result in a discharge from a point source to navigable waters

The 401 Certification Rule must continue to clarify that Section 401 certification procedures are triggered by Section 401(a)(1) only when a federally licensed or permitted activity has the potential to result in a discharge *from a point source into a WOTUS*.  This restrained application of Section 401 is commanded by the text and structure of the CWA, consistent with the applicable case law, and in harmony with the Agency's longstanding interpretations.

As explained in Section III.c. above, the same 1972 Amendments through which Section 401 was enacted also shifted the Act's regulatory focus away from ambient standards and toward a prohibition and permitting framework for "the discharge of any pollutant by any person . . ."[121] The 1972 Amendments defined the phrase "discharge of any pollutant"[122] as "any addition of any pollutant to *navigable waters from any point source*."[123]

Congress then also further defined "navigable waters" as "the waters of the United States ["WOTUS"], including the territorial seas."[124]  While the precise contours of this definition are the subject of a great deal of debate, Congress clearly intended the definition of WOTUS, and therefore "navigable waters," to refer to a subset of surface waterbodies within the United States.  The Associations submitted comments in strong support of the Agency's most recent proposal to define WOTUS,[125] and we support the Navigable Waters Protection Rule that EPA and the Army Corps ultimately finalized.[126]  The Act's definition of "navigable waters" as WOTUS and the Agency's interpretation of "WOTUS" act as a limit on the types of projects subject to Section 401 certification procedures just as these definitions limit the scope of activities subject to the Section 402 NPDES program or the Section 404 dredge-and-fill program.  Like the permit requirements in Sections 402 and 404, Section 401 certification requirements are triggered based on discharges to WOTUS—not potential releases to groundwater, soil, isolated waterbodies, ephemeral flows, or any of the many other categories of waters that are outside of the definition of WOTUS.

---

[121] 33 U.S.C. § 1311(a).
[122] 33 U.S.C. § 1311(a).
[123] 33 U.S.C. § 1362(12) (emphasis added).
[124] 33 U.S.C. § 1362(7).
[125] 84 Fed. Reg. 4,154 (Feb. 14, 2019).
[126] 85 Fed. Reg. 22,250 (Apr. 21, 2020).

While these waters can trigger Section 401 certification, only a potential "discharge" into those waters will actually trigger Section 401 certification. As the Supreme Court noted in *S.D. Warren Co. v. Maine Board of Environmental Protection*, the CWA only defines the phrase "discharge of a pollutant,"[127] but for the term "discharge" that is used in Section 401, Congress only noted that it "includes a discharge of a pollutant, and a discharge of pollutants."[128] The Court therefore interpreted the term "discharge" according to its common usage as "flowing or issuing out," and held that water releases from a dam constituted "discharges" for purposes of triggering Section 401 even if the releases contained no pollutants.[129]

Interpreting "discharge" as "from any point source" accords with *S.D. Warren*, and provides the best reading of that decision. The CWA defines "point source" as "any discernible, confined and discrete conveyance . . ."[130] The tailrace that discharged effluent from the dam at issue in *S.D. Warren* is clearly encompassed within this definition of "point source." Moreover, by defining "discharge" as "flowing or issuing out," the Court strongly implies the need for a "discernible, confined and discrete conveyance."[131]

Defining "discharge" as effluent "flowing or issuing out" of a "point source" is also consistent with the text, structure, and legislative history of the Act. "Discharge" was first defined (albeit sparsely) in the same 1972 Amendments that created Section 401 and "overhauled the regulation of water quality," such that, according to the Ninth Circuit in *Oregon Natural Desert Association v. Dombeck*, "[d]irect federal regulation now focuses on reducing the level of effluent that flows from point sources."[132] Thus, wherever it is used in the CWA, the term "discharge" refers to the release of effluent from a point source.[133] And, as applied to Section 401, if a federally permitted or licensed project or activity does not release effluent through a point source, Section 401 certification is not required.[134]

Importantly, the Ninth Circuit revisited the holding in *Dombeck* after the *S.D. Warren* decision and held that the Supreme Court's decision in *S.D. Warren* supported its prior holding.[135] The court held that distinguishing point source discharges and nonpoint source pollution is an "organizational paradigm of the Act."[136] Point source discharges "tended to be more notorious

---

[127] "Discharge of a pollutant" means "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12).

[128] 547 U.S. 370 (2006) ("*S.D. Warren*") (quoting 33 U.S.C. § 1362(16)).

[129] *S.D. Warren*, 547 US at 378.

[130] 33 U.S.C. § 1362(14).

[131] 33 U.S.C. § 1362(14).

[132] *Oregon Natural Desert Association v. Dombeck ("Dombeck")*, 172 F.3d 1092 (9th Cir. 1998).

[133] *Dombeck*, 172 F.3d at 1098.

[134] *Dombeck*, 172 F.3d at 1099.

[135] *Or. Natural Desert Ass'n v. U.S. Forest Service ("ONDR")*, 550 F.3d 778 (9th Cir. 2008).

[136] *Or. Natural Desert Ass'n v. U.S. Forest Service*, 550 F.3d 778, 780 (9th Cir. 2008).

and more easily targeted"[137] and were therefore subjected to the CWA's broad prohibition against "the discharge of any pollutant."[138]  Consequently, the CWA does not regulate nonpoint source pollution through the NPDES permitting program.[139]  The Supreme Court has also recognized the CWA's disparate treatment of these types of pollution.[140]

"Virtually all water, polluted or not, eventually makes its way to navigable water."[141]  But Congress did not structure the CWA to require permits or Section 401 certification for any action that could cause a release into a WOTUS.  Rather, the legislative history of the 1972 Amendments shows that Congress intended that these provisions be triggered by discharges from point sources. Congress enacted Section 401 "to assure consistency with the bill's changed emphasis from water quality standards to effluent limitations based on the elimination of any discharge of pollutants [which by definition applies only to point sources]."[142]

This organizational paradigm is also revealed in Congress's 1977 addition of Section 303 (state water quality standards) to the list of provisions requiring Section 401 certifications ("1977 Amendment").  The legislative history surrounding the 1977 Amendment cannot be read as expanding the scope of the potential pollution sources subject to the state certification requirement under Section 401.  Rather, the history confirms that Section 401 was intended to reach only those sources covered by Section 301 of the CWA.

> The inserting of section 303 into the series of sections listed in section 401 is intended to mean that a federally licensed or permitted activity, including discharge permits under section 402, must be certified to comply with State water quality standards adopted under section 303. The inclusion of section 303 is intended to clarify the requirement of section 401. It is understood that section 303 is required by the provisions of section 301.[143]

EPA must recognize that Congress intended that Section 401's certification procedures apply only when a federally licensed or permitted activity has the potential to result in a discharge from a point source into a WOTUS.

---

[137] *Or. Natural Desert Ass'n v. U.S. Forest Service*, 550 F.3d 778, 780 (9th Cir. 2008).
[138] 33 U.S.C. § 1311(a).
[139] *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1140 n.4 (10th Cir. 2005).
[140] *County of Maui v. Hawaii Wildlife Fund ("Maui")*, 140 S. Ct. 1462, 1470 (2020).
[141] *Maui*, 140 S. Ct. at 1470.
[142] S. Rep. No. 414, 92d Cong., 1st Sess. 69 (1971).
[143] Conference Report on the 1977 CWA, H. Rep. No. 95-380 (95th Cong. 1st Sess. At 208 (1977). As previously noted, Section 301 applies only to "discharges" from "point sources" of pollution.

      **f.**     **The scope of certifying authorities' Section 401 review and conditioning authority is not unbounded, and must be interpreted in accordance with the text, structure, and history of the Act**

Section 401 affords states and tribes distinct and well-circumscribed authority to protect their water quality in the context of federal licensing and permitting processes that otherwise preempt state and tribal authority.  This specialized and limited role is reflected in the procedures, time limits, and subject matter restrictions that Congress applied throughout Section 401.

"Section 401(a)(1) identifies the category of activities subject to certification—namely, those with discharges".[144]  As noted in Section III.e. above, the Associations believe that the text, structure, and history of Section 401 demonstrate that Congress intended Section 401 certification to apply only when a federally licensed or permitted activity has the potential to result in a discharge from a point source into a WOTUS.[145]  Additionally, Section 401(a)(1) limits the scope of the certifying authority's inquiry to the "applicable provisions" of Sections 301, 302, 303, 306, and 307 of the CWA.[146]

Under Section 401(a)(1), a certifying authority's decision to grant or deny certification must be based on whether the discharge will comply with the applicable provisions of Sections 301, 302, 303, 306, and 307 of the Act:

> Any applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of this title.[147]

As such, limitations on the scope of a certifying authority's review under Section 401 are a function of the statutory constraints Congress imposed, rather than than the 401 Certification Rule.  For instance, the phrase "water quality requirements" appears throughout Section 401, but it is not defined in the statute.  Nonetheless, the enumerated provisions of the CWA (*i.e.*, Sections 301, 302, 303, 306, and 307) *are* specified within Section 401 and the requirements of those sections are a prerequisite to, and therefore delineate the scope of, the Section 401 certification. Thus, while the phrase "water quality requirements" is undefined, its meaning is clear.  "Water quality requirements" refer to the federal, state, or tribal requirements adopted pursuant to authority under Sections 301, 302, 303, 306, and 307.

---

[144] *PUD No. 1*, 511 U.S. 700, 711-12.

[145] The preceding section (III.e.) already provides the Associations' analysis in support of this interpretation, and we therefore refrain from repeating that discussion here.

[146] 33 U.S.C. § 1341(a)(1).

[147] 33 U.S.C. § 1341(a)(1).

In contrast to the more settled meanings throughout most of Section 401, Section 401(d) is one of the few provisions of Section 401 that affords meaningful room for interpretation. Section 401(d) requires a certification to:

> set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any *applicant* for a Federal license or permit will comply with [enumerated provisions of the CWA], and with *any other appropriate requirement of State law*.[148]

These two highlighted terms (*e.g.*, "applicant" and "any other appropriate requirement of state law") are the cause of most of the divergent interpretations of Section 401(d) certification authority.

### 1. "Applicant"

Section 401(a)(1) describes the prerequisites for, and the scope of, the Section 401 certification process. It states that the trigger for state certification is based on whether a federal permit/license applicant's activity may result in a "*discharge*,"[149] and it requires that a federal permit/license be withheld unless the applicant provides a state certification that the "*discharge*" will comply with specified water quality requirements.

Section 401(d) authorizes certifying authorities to include appropriate conditions in the certification described in Section 401(a)(1). But instead of characterizing the conditions as necessary to assure the "discharge's" compliance with water quality requirements, it describes the conditions as necessary to assure the "applicant" will comply with the specified water quality requirements.

Section 401(d)'s requirement that the certification "set forth" conditions and requirements for the *applicant*, and not the *discharge*, makes sense because the certification is not some abstraction; it is a document that a certifying authority gives to a person or entity, and it describes what that person or entity must do to ensure that its discharges comply with water quality requirements. This is consistent with the 1972 Amendments' "total restructuring" and "complete rewriting" of the CWA.[150] That 1972 restructuring of the Act generally, and Section 401 in particular, transformed the Act's regulatory regime away from the prior focus indirectly regulating activities through ambient standards toward direct regulation of discharges.

---

[148] 33 U.S.C. § 1341(d) (emphasis added).

[149] As noted, Section 401(a)(1) also requires the potential discharge to be from a federally permitted or licensed activity into WOTUS, *etc.* The Associations are abbreviating the Section 401(a)(1) terms here because this analysis is more directly focused on the term "discharge."

[150] *City of Milwaukee* v. *Illinois,* 451 U.S. 304, 317 (1981) (quoting legislative history of 1972 amendments).

Indeed, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used."[151]  Thus, viewed holistically, the authority to condition a certification under Section 401(d) supports the certifying authority's Section 401(a)(1) right to grant or deny a certification request. Together, the certification and any conditions form an integrated whole, the overarching purpose of which is to assure discharges from a federally licensed or permitted project will not violate water quality requirements.

In 1994, a divided Supreme Court appears to have disagreed with this interpretation in its *PUD No. 1* decision. In *PUD No.1*, the Court considered the interplay between Section 401(a)(1) and Section 401(d), and concluded that Section 401(d) "is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied."[152]

The Supreme Court's fact-specific holding in *PUD No.1* does not call into question the validity of the 401 Certification Rule, and it does not justify or even allow for the expansive interpretations that have been suggested by some.  As previously noted, the Court based its decision in large part on the deference it afforded the Agency's 1971 regulations,[153] which obviously predated Congress's 1972 enactment of Section 401.  But regulations cannot provide reasonable interpretations of the existing statutory language if they do not even interpret the existing statutory language. The Associations therefore agreed with EPA's determination in the 401 Certification Rule that *PUD No.1* does not preclude the Agency from adopting a different interpretation.[154]

## 2.    "Any other appropriate requirement of State law"

As previously noted, Section 401(d) requires a certification to:

> set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with [enumerated provisions of the CWA], and with *any other appropriate requirement of State law*.[155]

The CWA does not define what constitutes "any other appropriate requirement of state law."  The Agency must, however, heed the Supreme Court's admonition in *PUD No. 1* that, "[a]lthough § 401(d) authorizes the State to place restrictions on the activity as a whole, that authority is not unbounded."[156]  The Court went on to determine that a state requirement imposed to "ensure

---

[151] *Deal v. United States*, 508 U.S. 129, 132 (1993).
[152] *PUD No. 1*, 511 U.S. 700, 712.
[153] *PUD No. 1*, 511 U.S. 700, 712.
[154] 85 Fed. Reg. at 42,251 (*citing Nat'l Cable & Telecomm. Ass'n v. Brand X internet Serv.*, 545 U.S. 967, 982 (2005).
[155] 33 U.S.C. § 1341(d) (emphasis added).
[156] *PUD No. 1*, 511 U.S. 700, 712.

compliance with the state water quality standards adopted pursuant to § 303 of the Clean Water Act" was one such "appropriate requirement," but declined to "speculate on what additional state laws, if any, might be incorporated by this language."[157]

The scope Congress intended through use of the phrase "any other appropriate requirement" must therefore be discerned by looking to the specific provisions of the CWA that Congress expressly identified in Section 401. An agency, just like a court, must exhaust the tools of statutory interpretation before finding statutory text ambiguous,[158] and the agency's interpretation is only reasonable if it is within the bounds of the ambiguity. Using context to discern the meaning of specific terms falls "[u]nder the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'"[159] "While 'not an inescapable rule,' this canon 'is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.'"[160]

For example, in *Gustafson v. Alloyd Co.*, the Supreme Court considered a statute that defined the word "prospectus" as a "prospectus, notice, circular, advertisement, letter, or communication."[161] The Court held that although the word "communication" could in the abstract mean any type of communication, "it is apparent that the list refers to documents of wide dissemination," inclusion "of the term 'communication' in that list suggests that it too refers to a public communication."[162]

Without question, the phrase "any other appropriate requirement" is capable of many different meanings in the abstract, and some states have latched onto this phrase in attempts to greatly expand the conditions they can extract through the Section 401 certification process. For instance, the 401 Certification Rule cited to state certifications with conditions requiring "biking and hiking trails to be constructed, one-time and recurring payments to state agencies for improvements or enhancements that are unrelated to the proposed federally licensed or permitted project, and public access for fishing and other activities along waters of the United States."[163] The conditions Maryland sought to impose on the license for Exelon Generation Co., LLC's Conowingo dam and hydroelectric project presents another particularly egregious example of this practice.[164] Even though the project does not discharge phosphorus or nitrogen, "[a]s the cost of such a federal license, Maryland insists that the Conowingo Project remove the phosphorus and nitrogen that

---

[157] *PUD No. 1*, 511 U.S. 700, 712.

[158] *Cf. Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-15 (2019).

[159] *McDonnell v. United States ("McDonnell")*, 136 S. Ct. 2355 at 2368 (2015) (quoting *Jarecki v. G.D. Searle & Co. ("Jarecki")*, 367 U.S. 303, 307 (1961).

[160] *McDonnell*, 136 S. Ct. 2355 at 2368-69 (quoting *Jarecki.*, 367 U.S. at 307.

[161] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 573-574 (1995).

[162] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575.

[163] 85 Fed. Reg. at 42,257.

[164] *Exelon Generation Co. v. Grumbles*, 380 F. Supp. 3.d 1 (D.D.C. 2019).

33

flow downriver from New York, Pennsylvania, and Maryland. In lieu of cleaning the Susquehanna, Maryland would accept $172 million from Exelon each year for the next 50 years."[165]

In context, when employing the traditional tools of statutory interpretation, such requirements are clearly unlawful. The interpretive canon *noscitur a sociis* shows that the CWA cannot reasonably be interpreted to make allowance for such requirements.  The phrase "any other appropriate requirement" "follows an enumeration of four specific sections of the CWA that are all focused on the protection of water quality from point source discharges to waters of the United States."[166] Indeed, Section 401 in its entirety is replete with references to requirements deemed necessary to ensure compliance with "applicable effluent limitations" and "water quality requirements." Given the overall focus of Section 401, the phrase "any other appropriate requirement" must be interpreted to include only those EPA-approved provisions of state or tribal law that implement the Section 402 and 404 permit programs or otherwise control point source discharges to WOTUS.

EPA, in the 401 Certification Rule, reached a similar conclusion using the related *ejusdem generis* canon. Under this principle, where general words follow an enumeration of two or more things, they apply only to things of the same general kind or class specifically mentioned.[167] This canon also informed Justice Thomas's dissent in *PUD No. 1,* therefore the 401 Certification Rule mirrored Justices Thomas and Scalia's conclusion that "the general reference to 'appropriate' requirements of state law is most reasonably construed to extend only to provisions that, like other provisions in the list, impose discharge-related restrictions."[168]

As previously noted, this interpretation also accords with the legislative history of the 1977 Amendments that added Section 303, which governs state water quality standards and implementation plans, to Section 401's enumerated list of CWA provisions.  According to the Conference Report for the 1977 Amendments:

> The inserting of section 303 into the series of sections listed in section 401 is intended to mean that a federally licensed or permitted activity, including discharge permits under section 402, must be certified to comply with State water quality standards adopted under section 303. The inclusion of section 303 is intended to clarify the requirement of section 401. It is understood that section 303 is required by the provisions of section 301.[169]

---

[165] *Exelon Generation Co. v. Grumbles*,  380 F. Supp. 3.d at 3.

[166] Sections 301, 302, and 306 impose effluent limits on new and existing sources, Section 303 governs water quality standards and implementation plans, and Section 307 addresses pretreatment standards for effluents.

[167] *See Wash. State Dept. of Social and Health Services v. Keffeler*, 537 U.S. 371, 383–85 (2003).

[168] *PUD No. 1,* 511 U.S. at 728 (Thomas, J., dissenting).

[169] H. Rep. No. 95-380 (95th Cong. 1st Sess. (1977).

As relevant here, Section 303 is the provision through which EPA approves state standards - standards which, like those promulgated under Section 301, apply only to "discharges" from "point sources."

Therefore, the text, structure, and history of Section 401 requires the Agency to interpret Section 401(d) and the phrase "any other appropriate requirement" to include only those EPA-approved provisions of state or tribal law that implement the Section 402 and 404 permit programs or otherwise control point source discharges to WOTUS.

## IV.    RESPONSES TO EPA'S QUESTIONS FOR CONSIDERATION

### 1.    <u>Pre-filing meeting requests</u>

EPA promulgated the requirement that a project proponent submit a pre-filing meeting request to a certifying authority at least 30 days prior to submitting a certification request in order to help certifying authorities conduct reviews "within a reasonable period of time (which shall not exceed one year."[170]   As explained by the D.C. Circuit, "while a full year is the absolute maximum, it does not preclude a finding of waiver prior to the passage of a full year."[171]

This decision, and others like it,[172] leave little doubt that certifying authorities are not permitted to toll Section 401 review periods, even if the certifying authority believes it needs additional information to review the certification request. It is clear that some certifying authorities have issued requests in apparent attempts to circumvent review deadlines.  That said, in most instances, when a certifying authority requests additional information, it is in furtherance of a legitimate review, and not a delay tactic.  As such, we generally support early coordination between certifying authorities and project proponents, and other measures to help facilitate a thorough and efficient Section 401 review within statutorily mandated deadlines.

The Associations' members have not reported any issues or concerns specifically related to the pre-filing meeting requirements in the 401 Certification Rule, but given the short time since it was promulgated, it may be too soon to draw conclusions about the impact of the 401 Certification Rule's pre-filing meeting request requirement.  The Associations note, however, that the Army Corps and FERC have utilized similar pre-filing procedures for a number of years,[173] and our members have had positive experiences in those contexts.  Outside of the Section 401 context, pre-filing meeting requests are also frequently utilized by the Department of Interior and Bureau of Land Management in expediting permit reviews.  In these contexts, the Associations' members

---

[170] 85 Fed. Reg. at 42,240-42,242.

[171] *Hoopa Valley*, 913 F. 3d at 1104.

[172] *See N.Y. State Dep't of Envtl. Conservation v. See Nat's Fuel Gas Supply Corp.*, Slip Op. at No.s 19-1610-ag. 19-1618-ag (2d Cir. March 23, 2021); *See also N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018); *See also See Nat's Fuel Gas Supply Corp.*, 164 FERC 61,084 at PP 35,42 (2018).

[173] *See* 18 C.F.R. § 5.1(d)(1) and 33 C.F.R.  § 325.1(b).

report that the pre-filing coordination process has helped facilitate upfront discussions about projects, and allowed for a more efficient and timely exchange of information.

## 2.    Certification request

EPA's request for information conveys the Agency's concern that the 401 Certification Rule's definition of a "certification request" "constrains what states and tribes can require in certification requests, potentially limiting state and tribal ability to get information they may need before the CWA Section 401 review process begins."[174]    The Agency's concerns are based on a misapprehension of the role and purpose of the 401 Certification Rule's definition of "certification request."  The definition of "certification request" does not in any way limit the information that a certifying authority can request from a project proponent.  Instead, it sets forth the minimal elements necessary for a project proponent's submission to be considered a "certification request" that starts the statutory clock for a Section 401 review.  As explained by the Second Circuit:

> [t]he plain language of Section 401 outlines a bright-line rule regarding the beginning of review: the timeline for a state's action regarding a request for certification 'shall not exceed one year' after 'receipt of such request.' It does not specify that this time limit applies only for 'complete' applications. If the statute required 'complete' applications, states could blur this bright-line rule into a subjective standard, dictating that applications are 'complete' only when state agencies decide that they have all the information they need. The state agencies could thus theoretically request supplemental information indefinitely.[175]

The 401 Certification Rule's definition of "certification request" provides this bright line rule so that all parties are clear about when the review has commenced.  Identification of the specific elements of a "certification request" eliminates any confusion about whether the project proponent has, in fact, requested a certification and, at the same time, ensures that the certifying authority has the core information necessary to review the request.  This definition also helps certifying authorities by prohibiting project proponents from attempting to prematurely start the statutory clock by submitting requests that lack the basic information necessary for review, but it does not limit what certifying authorities can request be included in a project proponent's initial submission or after the submission.

The Associations recognize that, in most instances, when a certifying authority requests additional information, it is in furtherance of a legitimate review, and not a delay tactic.  For instance, it is likely that some highly complex projects may warrant the submittal of additional information either within or after the original certification request, but the 401 Certification Rule's definition of "certification request" can accommodate those project-specific requests as well.  Under the 401 Certification Rule's definition of "certification request," certifying authorities remain free to

---

[174] 86 Fed. Reg. at 29,543.
[175] *N.Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d at 455-56.

request information relevant to a project's potential water quality effects after the original submittal of the certification request, but doing so does not render the original certification request incomplete or provide a basis to restart the clock on the Section 401 review.

### 3.   Reasonable period of time

As previously noted, the express text of Section 401 plainly states that a certifying authority waives its certification authority over a federal license or permit if the certifying authority "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request."[176]  As explained by the D.C. Circuit, "while a full year is the absolute maximum, it does not preclude a finding of waiver prior to the passage of a full year."[177] This provision of Section 401 is necessary "to prevent a State from indefinitely delaying a federal licensing proceeding."[178]

The Associations are not aware of any issues with the 401 Certification Rule's determination that the federal licensing or permitting agency should establish the reasonable period of time for review of a certification request.  Nor do we believe it is improper for federal licensing or permitting agencies to serve this role. It is consistent with applicable case law,[179] and administrative precedent.[180]  This approach is also consistent with existing regulations promulgated by FERC, the Army Corps, and EPA itself.[181]

It also makes logical sense to commit the "reasonable period of time" determination to the agencies with decades of experience implementing their licensing and permitting programs.  Among the other insights gained from this experience, federal licensing and permitting agencies are well positioned to determine the review time reasonably necessary for a state to assess potential discharges from the federal project, rather than broader or more tangentially related impacts.  And in implementing the 401 Certification Rule, FERC and the Army Corps have both considered a full year to be a "reasonable period of time" for some projects, while for some smaller or simpler actions, the Army Corps has determined that certification review can be completed in less than a

---

[176] 33 U.S.C. § 1341(a)(1).

[177] *Hoopa Valley*, 913 F. 3d at 1104.

[178] *Hoopa Valley*, 913 F. 3d at 1105-6 (internal citations omitted).

[179] *See Millennium Pipeline Co. v. Seggos*, 860 F. 3d 696, 700 (D.C. Cir. 2017); *See also Hoopa Valley*, 913 F.3d at 1104 ("Thus, while a full year is the absolute maximum, it does not preclude a finding of waiver prior to the passage of a full year. Indeed, the [EPA]—the agency charged with administering the CWA—generally finds a state's waiver after only six months.")

[180] *Constitution Pipeline Company, LLC*, 164 FERC P 61029 (F.E.R.C.), ("[T]o the extent that Congress left it to federal licensing and permitting agencies, here the Commission, to determine the reasonable period of time for action by a state certifying agency, bounded on the outside at one year, we have concluded that a period up to one year is reasonable.")

[181] *See* FERC's regulations at 18 CFR 5.23(b)(2);  Army Corps' regulations at 33 CFR 325.2(b)(1)(ii); and EPA's regulations at 40 CFR 124.53(c)(3).

year.  We believe this shows that the 401 Certification Rule is being implemented appropriately by the federal licensing and permitting agencies using their expertise and experience.  It also shows that 401 Certification Rule's commitment of the "reasonable period of time" determination to the licensing and permitting agencies did not cause those agencies to arbitrarily reduce all certification review periods.

Furthermore, the Associations do not believe that states are the proper parties to determine the "reasonable period of time" for their Section 401 review.  As the D.C. Circuit has explained, "Congress intended Section 401 to curb a *state*'s 'dalliance or unreasonable delay.'"[182]  Thus, it is unclear how a regulatory interpretation that committed the "reasonable period of time" determination to states could prevent those states from using that discretion to unreasonably delay review of even the simplest certification requests.

While the Associations support the 401 Certification Rule's conclusion that the federal licensing and permitting agencies should determine the reasonable time periods for certifications applicable to their license or permit actions, we also agree with the factors that the 401 Certification Rule required the agencies to consider when setting timeframes for certification decisions.[183]  These considerations include: (1) the complexity of the proposed project; (2) the nature of any potential discharge; and, (3) the potential need for additional study or evaluation of water quality effects from the discharge.[184]  Regardless of the type of project under consideration or which federal agency is overseeing the certification process, these factors are relevant to ensuring that the timeframes are appropriately tailored and commensurate with the complexity of the task at hand.  These factors are also relevant to the federal agencies' goal of ensuring that certifying authorities focus their analysis and decision-making on the potential water quality effects of discharges from the proposed project.  Further, if the three factors described above fail to adequately capture all the considerations necessary to determine a "reasonable period of time," federal licensing and permitting agencies are free to consider additional factors.

In sum, while the Associations acknowledge that some states would prefer to establish and, if necessary, extend their Section 401 review deadlines, we urge EPA to recognize the examples of delay and misuse that make it necessary to clarify that federal agencies, and not states, should determine what review timelines within the statutorily mandated one-year maximum are reasonable.  As the D.C. Circuit has bemoaned, "it is now commonplace for states to use Section 401 to hold federal licensing hostage."[185]

Accordingly, if EPA decides to revise this provision of the 401 Certification Rule, it must remain cognizant that the "reasonable period of time" for review may not exceed one year because the

---

[182] *Hoopa Valley*, 913 F. 3d at 1105 (emphasis in original).
[183] 40 C.F.R. § 121.6(c).
[184] 40 C.F.R. § 121.6(c).
[185] *Hoopa Valley*, 913 F. 3d at 1104.

Agency has no discretion to interpret Section 401 as allowing certifying authorities any amount of time more than one year. And while the Associations do not oppose the involvement of certifying authorities in determining the "reasonable period of time" within the one-year limit, we urge EPA to recognize that it must implement Section 401 in a manner sufficient to curb a state's "dalliance or unreasonable delay."[186]

### 4.        Scope of certification

As detailed in Section III, the Associations believe that the 401 Certification Rule reasonably interpreted the scope of Section 401 certification review as well as the scope of requirements that certifying authorities can impose as conditions for certification.  The text, structure, and history of the Act reflect that Section 401 certification procedures are triggered by Section 401(a)(1) only when a federally licensed or permitted activity has the potential to result in a discharge from a point source into a WOTUS.

Further, because Section 401(a)(1) states that the certification must conclude that potential discharges "will comply with the applicable provisions of 301, 302, 303, 306, and 307," Section 401(a)(1) also therefore limits the scope of the certifying authority's inquiry to those enumerated provisions.  Thus, although the CWA does not define "water quality requirements," the meaning can be readily discerned by the scope of Section 401(a)(1).  "Water quality requirements" refer to the federal, state, or tribal requirements adopted pursuant to authority under Sections 301, 302, 303, 306, and 307.  While EPA could interpret "water quality requirements" more narrowly, the Agency is plainly precluded from defining the term such that its scope is more comprehensive than the limited scope of the Section 401 review.

The phrase "any other appropriate requirement" in Section 401(d) does not change Section 401's statutorily mandated limits on the scope of certification.  For one, Section 401(a)(1) delineates the scope of the Section 401 certification review; not Section 401(d).  Even if Section 401(d) could be construed as describing the scope of Section 401 review, the result is the same because the phrase "any other appropriate requirement" follows an enumeration of four specific sections of the Act that are all focused on the protection of water quality from point source discharges to WOTUS.

EPA's citation to the phrase "the activity as a whole" without describing the context of the Supreme Court's *PUD No. 1* decision creates an erroneous implication that the Court construed Section 401(d) as granting states limitless authority to condition approvals.[187]   That is not the case. The Supreme Court expressly explained that the authority described in *PUD No. 1* "is not unbounded."[188]   The Court then determined that a state requirement imposed to "ensure compliance with the state water quality standards adopted pursuant to § 303 of the Clean Water

---

[186] *Hoopa Valley*, 913 F. 3d at 1105.
[187] *PUD No. 1*, 511 U.S. 700, 712.
[188] *PUD No. 1*, 511 U.S. 700, 712.

Act" was an "appropriate requirement," but declined to "speculate on what additional state laws, if any, might be incorporated by this language."[189]

As Justices Thomas and Scalia cautioned in their dissent in *PUD 1*, "conditions that have little relation to water quality," if allowed, would significantly "disrupt[] the careful balance between state and federal interests" established under other statutory regimes.[190]  In fact, outside the specific context at issue in the Supreme Court's *PUD No. 1* decision, use of Section 401(d) to regulate "the activity as a whole" is statutorily prohibited in many key respects.

Recall that Section 401 provides states and tribes a narrow and temporally limited exemption from the otherwise exclusive jurisdiction that Congress bestowed on the federal government over certain types of projects of national importance such as power generation, energy distribution, and interstate transportation infrastructure.   For instance, FERC's authority under the NGA is exclusive: "Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce."[191]   "FERC's exclusive purview" includes the regulation of "facilities [that] are a critical part of the transportation of natural gas and sale for resale in interstate commerce."[192]   In this "exclusively federal domain," states may not regulate.[193]

The Supreme Court's fact-specific construal of Section 401(d) to allow states and tribes to regulate "the activity as a whole" cannot undo, and therefore must yield to, these larger statutorily mandated fields of preemption.   Whatever additional leeway the Supreme Court may have provided certifying authorities in the *PUD No. 1* decision, it did not and cannot overcome Congress's express directive that certain decisions are exclusively committed to the federal government. Indeed, even before the 401 Certification Rule was enacted, many courts had already recognized the need to restrain the types of conditions states can impose through Section 401 to those necessary to protect water quality.[194]   In recent years, FERC has also confirmed that conditions not directly related to the licensee's "activity" are improper under Section 401. In fact, although

---

[189] *PUD No. 1*, 511 U.S. 700, 712.

[190] *PUD No. 1*, 511 U.S. 700, 732-33.

[191] *Schneidewind* at 305.

[192] *Schneidewind* at 308.

[193] *Schneidewind* at 305; *See, e.g., N. Natural Gas Co. v.  Iowa Utils. Bd.*, 377 F.3d 817, 819–20, 822–24 (8th Cir. 2004) (NGA preempted state-law environmental provisions); *E. End Prop. Co. No. 1, LLC* v. *Kessel*, 851 N.Y.S.2d 565, 571 (N.Y. App. Div. 2007) (similar); *No Tanks Inc.* v. *Pub. Utils. Comm'n*, 697 A.2d 1313, 1315 (Me. 1997) (similar).

[194] *Am. Rivers v. FERC*, 129 F.3d 99, 107 (2d Cir. 1997) ("Section 401(d), reasonably read in light of its purpose, restricts conditions that states can impose to those affecting water quality in one manner or another."); *e.g., Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 754 (4th Cir. 2019) (upholding certification conditions when they "deal[t] with project-related activities"); *Miners Advocacy Council, Inc. v. State, Dep't of Envtl. Conserv.*, 778 P.2d 1126, 1138 (Alaska 1989); *Town of Arcadia Lakes v. S.C. Dep't of Health & Envtl. Control*, 745 S.E.2d 385, 389 (S.C. Ct. App. 2013) (upholding conditions that address "impacts to adjacent water bodies or wetlands resulting from the activity"); *Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 681 (Wash. 2004) (invalidating section 401 certification conditions that did not did not relate to the licensee's activity).

FERC interprets its governing statutes as compelling it to incorporate all state conditions into federal licenses, FERC has often noted its opinion that conditions "unrelated" to a project's activities are not proper Section 401 limitations.[195]

In addition to the above-referenced statutory and jurisprudential limits on the scope of states' Section 401 review and conditioning authority, we urge the Agency to consider the practical consequences of eliminating such limits. As noted throughout these comments, a handful of states have attempted to expand their Section 401 authority to block or constrain projects for reasons that have nothing to do with the protection of water quality. By broadly construing the scope of their Section 401 authority beyond what the CWA provides, some states demand project proponents develop and/or submit documentation wholly unrelated to water quality, such as environmental assessments of impacts to other environmental media, demonstrations of the need for the project, alternative route analyses, and analyses of air impacts, traffic impacts, and other reviews already undertaken by FERC or other federal agencies pursuant to the NEPA, the ESA, the NGA, and other statutes.[196] Indeed, the State of New York has routinely denied water quality certifications on grounds outside of water quality, expressing concern for the potential climate change impacts of projects and purported lack of assessment of such impacts.[197]

This implausibly broad construction of the scope of state review is perhaps most clearly exemplified in the Millennium Bulk Terminals – Longview LLC project in Washington State.[198] In the course of Washington State's 5-year review of the project, the state compiled an EIS that expressly concluded that the terminal would not result in significant adverse effects on water quality, aquatic life, or designated uses; and that any potential water quality impacts could be fully mitigated. And yet, even after concluding that the project would not adversely impact water quality, Washington State denied the certification request based on concerns about capacity of the interstate rail system, the impact of trains operating anywhere in that system, and impacts of the project on the overall capacity of the Federal Columbia River Navigation Channel to accommodate additional vessels at state ports.

---

[195] *See, e.g.*, Order Issuing New License, Portland Gen. Elec. Co., Project No. 2195- 011, 133 FERC 62281, at 64620 57, 2010 WL 11404139 (FERC Dec. 21, 2010); Order Issuing New License, Pub. Utility Dist. No. 1 of Snohomish Cty., Wash., Project No. 2157-188, 136 FERC 62188, at 64488 92, 2011 WL 13045891 (FERC Sept. 2, 2011); Order Issuing New License, Pub. Utility Dist. No. 1 of Douglas Cty., Wash., Project No. 2149-152, 141 FERC 62104, at 64270 53, 2012 WL 12372998 (FERC Nov. 9, 2012); *See also Mitchell Cty. Conservation Bd.*, Project No. 11530- 000—Iowa, 77 FERC 6202, 64458 n.4 (FERC Dec. 27, 1996) (refusing to require a hydropower licensee to spend project revenues on improvements at county parks "unrelated to the project").

[196] *Hoopa Valley*, 913 F.3d 1099, 1103-04; *Millennium Pipeline Co. v. Seggos*, 860 F.3d 696 (D.C. Cir. 2017).

[197] https://elibrary.ferc.gov/idmws/common/OpenNat.asp?fileID=14670874.

[198] WDEC, In the Matter of Denying Section 401 Water Quality Certification to Millennium Bulk Terminals- Longview, LLC, Order # 15417 (Sept. 26, 2017); *See also Montana v. Washington*, No 22o152, (Montana motion for leave to file the bills of complaint are denied June 28, 20921. Justice Thomas and Justice Alito indicated they would grant the motion).

To state the obvious, no aspect of the CWA's text, structure, or purpose can be construed to suggest that Congress envisioned Section 401 to authorize state certifications based on impacts wholly unrelated to water quality.  In many cases, Congress required that these impacts be assessed under different statutes.[199]  Further, while Section 401 provided states a limited role in reviewing the prospective impacts of proposed federally licensed or permitted projects, states may have other authority to regulate the operation of those projects.  As previously noted, states can, and often are, delegated permitting and enforcement authority under CWA Section 402 and 404, under the Clean Air Act, and through other federal statutes as well.  The more limited role for states under Section 401 does not diminish states' jurisdiction under these statutory provisions.  To the contrary, these other statutory provisions demonstrate that certification reviews are not the proper mechanism for addressing the potential environmental impacts that some states have misconstrued Section 401 to encompass.

## 5. Certification actions and federal agency review

EPA's Section 401 implementing regulations can reasonably require certifying authorities to include certain minimal information when they deny a certification request or request specific conditions as a prerequisite to certification.  Indeed, the very basic documentation that certifying authorities are required to provide under the 401 Certification Rule cannot credibly be viewed as burdensome or an intrusion on a state or tribe's authority under Section 401.

For instance, it is hardly unreasonable to require a certifying authority to identify the basis for denying a certification request.  The 401 Certification Rule merely requires the certifying authority to identify and cite to the water quality requirements that the proposed project will violate, and explain why the certifying authority believes that this violation will occur.[200]  A certifying authority that has denied a certification request will surely have this information readily available, and the most minimal standards of governance and administrative procedure affirms that when the government makes such a decision, it should provide some reasoned explanation of why it made that decision.

Similarly, if the certifying authority denies a certification request because the applicant failed to include information that the certifying authority deemed important, the 401 Certification Rule requires the certifying authority to merely identify what necessary information was omitted.[201]  Unless the certifying authority's denial is based on the applicant's failure to provide information

---

[199] For example, NEPA requires review of multi-media effects, while other statures address impacts to air (Clean Air Act), land (Resource Conservation and Recovery Act), wildlife (Endangered Species Act), and cultural resources (National Historic Preservation Act).

[200] 40 C.F.R. § 121.7.

[201] 40 C.F.R. § 121.7(e)(1)(iii); 40 C.F.R. § 121.7(e)(2)(iii).

wholly unrelated to the proposed project's discharge or potential impacts to water quality requirements,[202] this documentation requirement presents no burden at all.

The 401 Certification Rule's nominal documentation standards for certification conditions are quite reasonable as well. Certifying authorities that impose conditions on certification need only explain why the conditions are necessary to assure that discharges from the project comply with an identified federal, state, or local requirement.[203] The Associations cannot envision an instance wherein a certifying authority required adherence to a certification condition within the scope of Section 401 review, but was unable to readily articulate a rationale for that condition. Here again, to the extent this basic documentation requirement is burdensome at all, it is only in relation to those certifying authorities that misuse their Section 401 certification authority to impose conditions wholly unrelated to discharges or water quality requirements.[204]

The instances of certifying authorities' misuse of Section 401 certification and conditioning authority cited above throughout these comments illustrates why federal licensing and permitting agencies must conduct a facial review of the validity of certifications and conditions.[205] Such review is authorized under Section 401(a)(1), which makes clear that a federal agency must withhold the issuance of a federal license or permit until the applicant obtains the applicable water quality certifications and that, upon denial, a federal agency may not grant the license or permit.[206]

Federal agency review is also consistent with court decisions that have held that federal licensing and permitting agencies not only have the *authority* to determine whether certifying agencies have complied with Section 401 requirements, they have the *obligation* to make these determinations.[207] For instance, in *City of Tacoma, Washington* v. *FERC*, the D.C. Circuit explained that "[i]f the question regarding the state's section 401 certification is not the application of state water quality standards, but compliance with the terms of section 401, then [the federal agency] must address it. This conclusion is evident from the plain language of section 401: 'No license or permit shall be granted until the certification required by this section has been obtained or has been waived.'"[208]

---

[202] *See e.g., .N. Y. State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450, 455-56 (2nd Cir. 2018).

[203] 40 C.F.R. § 121.7(d)(1); 40 C.F.R. § 121.7(d)(2).

[204] *See e.g., Exelon Generation Co. v. Grumbles*, 380 F. Supp. 3.d 1 (D.D.C. 2019).

[205] *See* 40 C.F.R. § 121.7; 40 C.F.R. § 121.9.

[206] *See* 33 U.S.C. § 1341(a)(1) ("No license or permit shall be granted until the certification required by this section has been *obtained* or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.") (emphasis added).

[207] *See City of Tacoma v. FERC*, 460 F.3d 53, 67–68 (D.C. Cir. 2006); *Keating v. FERC*, 927 F.2d 616, 622–623, 625 (D.C. Cir. 1991); *See also Hoopa Valley*, 913 F.3d at 1105 ("had FERC properly interpreted Section 401 and found waiver when it first manifested more than a decade ago, decommissioning of the Project might very well be underway''); *See also Airport Communities Coalition v. Graves,* 280 F. Supp. 2d 1207, 1217 (W.D. Wash. 2003) (holding that the Army Corps had discretion not to incorporate untimely certification conditions).

[208] *City of Tacoma v. FERC*, 460 F.3d 53, 67-68 (D.C. Cir. 2006) (citing 33 U.S.C. § 1341(a)(1)).

The court went on to explain that even though the federal licensing or permitting agency did not need to "inquire into every nuance of the state law proceeding . . . it [did] require [the federal agency] to at least confirm that the state has facially satisfied the express requirements of section 401."[209]

The 401 Certification Rule strikes the proper balance between federal agencies' obligation to facially evaluate the basic validity of Section 401 certifications/conditions and the need to refrain from delving into the nuances of state or tribal law, or second-guessing the imposition of each condition.[210]   Under the 401 Certification Rule, federal licensing and permitting agencies are obligated to make a facial determination of the certifying authorities' observance of minimal procedural requirements, but are not permitted to delve into the substance and nuance of certification decisions or conditions.

Federal licensing and permitting agencies should communicate and coordinate with certifying agencies to avoid inadvertent waivers and any other procedural issues that could invalidate a certifying authorities' certification or conditions.  We also believe that federal agencies should, to the fullest extent of their authority, allow certifying authorities to correct easily addressed procedural violations.  We note, however, that Section 401 provides federal agencies no discretion to interpret Section 401 as allowing certifying authorities any amount of time in excess of one year.[211]   As such, no matter how minor or trivial, certifying authorities cannot make corrections after one year has elapsed.

### 6.    Enforcement

Federal licensing and permitting agencies have exclusive jurisdiction to enforce certification conditions under Section 401.  Section 401(a)(1) prescribes a temporally limited review role for states.  Once the state certification review process has been completed or been waived, exclusive jurisdiction reverts back to the federal licensing and permitting agencies.  If EPA were to implement Section 401 otherwise and promulgate a rule authorizing ongoing state oversight/enforcement of certification conditions, that rule would be in direct contravention of the statutorily mandated time limits Congress prescribed in Section 401.

Section 401(a)(4) also prohibits state enforcement of certification conditions.  Section 401(a)(4) instructs that "[p]rior to the initial operation of any federally licensed or permitted facility or activity" certifying authorities are authorized to ''review the manner in which the facility or activity shall be operated . . . '' for purposes of assuring that water quality requirements will not

---

[209] *City of Tacoma v. FERC*, 460 F.3d at 68.

[210] *See Am. Rivers, Inc. v. FERC*, 129 F. 3d 99, 107 (2d Cir. 1997).

[211] Consistent with our comments in Sections III.(e) and (f), the Associations believe that Congress's establishment of one-year as the outermost limit for Section 401 certifications reveals that Congress understood and expected Section 401 reviews to be narrowly focused on discharges from the federal project, rather than broader or more tangentially related impacts.

44

be violated.[212]  If the certifying authority finds that "such federally licensed or permitted facility or activity will violate . . . water quality requirements such Federal agency may, after public hearing, suspend such license or permit."[213]

Section 401(a)(4) thus describes the full extent of a state's post-certification authority.  States have a time-limited opportunity to conduct a pre-operational inspection of facilities for purposes of ascertaining compliance with water quality requirements.  Far from opening the door to state enforcement of certification conditions, Section 401(a)(4) only allows the state to notify the permitting or licensing agency.  Section 401(a)(4) then expressly describes the federal agencies' discretion to determine whether to bring an enforcement action pursuant to the state recommendation.

Similarly, Section 401 does not allow citizen suits to enforce certification conditions because EPA itself lacks authority to enforce certification conditions under Section 401.  EPA enforcement authority under the CWA comes from Section 309, which extends the Agency authority to bring actions for violations of Sections 301, 302, 306, 307, 308, 318, and 405, but not Section 401.[214] The CWA also allows for citizen suits, but only when the Agency fails or refuses to act.[215]  Indeed, the Associations believe it is implausible that Congress would grant private citizens greater enforcement authority than EPA.  Rather, citizen suit authority under the Act is "meant to supplement rather than supplant governmental action."[216]  Thus, EPA's lack of jurisdiction to enforce certification conditions means private citizens lack this authority as well.

## 7.    Modification

Section 401 of the CWA does not allow certifying authorities to modify previously issued certifications or to include "reopeners" in certification conditions.  As the Section 401 certification process is only part of a more comprehensive and protracted federal licensing or permitting process, timely issuance of certifications can be integral to the overall viability of essential energy and infrastructure projects.  Depending on the extent of a delay in obtaining the requisite certifications and authorizations or the level of uncertainty about the schedule or outcome for those processes, many important projects can be cancelled altogether.

Congress clearly understood the significant adverse impacts that delay and uncertainty could have on nationally important energy and infrastructure projects, such that it required states' exercise of Section 401 certification authority to be highly circumscribed and completed within "a reasonable

---

[212] 33 U.S.C. §1341(a)(4).

[213] 33 U.S.C. §1341(a)(4).

[214] 33 U.S.C. § 1319(a)(3)

[215] *See Askins v. Ohio Dep't of Agric.*, 809 F.3d 868, 873 (6th Cir. 2016) (suggesting citizens are "backup" to the EPA and states, which are the primary enforcers); *S.F. Baykeeper v. Cargill Salt Div.*, 481 F.3d 700, 706 (9th Cir. 2007) (citizens may sue "when the responsible agencies fail or refuse to do so").

[216] *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60-61 (1987).

period of time (which shall not exceed one year) . . ."[217]  Thus, although Congress afforded states an opportunity to review the potential water quality impacts of federally licensed and permitted projects, it crafted Section 401 to ensure that this carve-out from areas otherwise exclusively committed to the federal government was well-defined and precisely time-limited.

Allowing a certifying authority to revisit and modify an existing certification or to include "reopener" conditions that resurrect the certifying authority's Section 401 project review authority would render meaningless the express time limits Congress imposed in Section 401(a)(1).  Only Congress can change the time limits in Section 401(a)(1).  EPA has no discretion to extend these limits in any way, and neither do federal licensing and permitting agencies or certifying authorities. In this respect, Congress was explicit and clear – state certification review processes cannot extend beyond one year.

Certifying authorities that wish to engage on a federally licensed or permitted project outside of the Section 401 review period likely have many other opportunities.  Indeed, the Section 401 review process is often only one small part of a larger and more comprehensive framework for reviewing the need for, and impacts of, federally authorized projects.

## 8.  Neighboring jurisdictions

The 401 Certification Rule provided a necessary update to EPA's regulations implementing Section 401(a)(2).  Overall, these updates helped to increase the clarity and predictability of the procedural requirements Congress set forth in Section 401(a)(2).

The Associations' members have not reported any issues or concerns regarding the Agency's procedures for determining whether a federally licensed or permitted activity has the potential to result in a discharge that "may affect" water quality in neighboring jurisdictions.  The Associations also did not view the 401 Certification Rule's changes to 40 C.F.R. § 121.12(b) as rendering EPA's role "wholly discretionary."[218]  Instead, we viewed this citation to agency discretion as reflecting Section 401(a)(2)'s requirement that the effect of a discharge on a downstream jurisdiction's water quality be "determined by the Administrator."[219]

EPA's determination of whether a discharge "may affect" the water quality of another jurisdiction involves some discretion, but the Agency's discretion is not unbounded.[220]  Section 401 provides a "meaningful standard against which to judge the agency's exercise of discretion."[221]  Under Section 401(a)(2), EPA renders a determination about the likelihood that a potential upstream discharge will violate a water quality standard in a downstream jurisdiction.  When making that

---

[217] 33 U.S.C. § 1341(a)(1).

[218] 86 Fed. Reg. at 29,543.

[219] 33 U.S.C. § 1341(a)(2).

[220] *See Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.("Weyerhaeuser")*, 139 S. Ct. 361, (2018).

[221] *Weyerhaeuser Co.*, 139 S. Ct. at 370 (citation and quotation marks omitted).

determination, the Agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[222]  And courts can invalidate EPA's determination if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[223]

Although Section 401 provides judicially manageable standards that prescribe the considerations that must inform the Agency's "may affect" determination, if EPA proceeds with revising the 401 Certification Rule, it makes sense to include those considerations in the regulations.

If the Agency proposes such regulations, EPA's "may affect" determination considerations should be drawn directly from the text, structure, and history of Section 401.  As such, the Agency's rules should explain that the potential "discharge" under Section 401(a)(2) refers to effluent flowing or issuing from a point source to a WOTUS.  Additionally, the phrase "the quality of the waters of any other State"[224] must be interpreted consistent with the 401 Certification Rule's definition of "water quality requirements" so that the Agency's "may affect" determination is based on the likelihood that a discharge will cause a downstream violation of a federal, state, or tribal requirements adopted pursuant to authority under Sections 301, 302, 303, 306, and 307.  Further, because Congress's authority to enact the CWA, and Section 4(b)(2) in particular, derives from its power to regulate the "channels of interstate commerce" under the Commerce Clause,[225] the downstream "waters" that EPA must analyze must be limited to WOTUS, properly construed.

EPA's regulations should also include additional considerations that reflect the multi-jurisdictional nature of the Section 401(a)(2) "may affect" determination.  For instance, the Agency's regulations should reflect enhanced considerations of the volumes of effluent, the size, flow, and current water quality of the WOTUS, the distance between the potential discharge and the neighboring jurisdiction, and the impacts of other existing and anticipated discharges to the WOTUS.  These

---

[222] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, (1962)).

[223] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[224] 33 U.S.C. § 1341(a)(2).

[225] *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824); *See also United States v. Lopez*, 514 U.S. 549, 558–59 (1995) (describing the ''channels of interstate commerce'' as one of three areas of congressional authority under the Commerce Clause); *See also Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001). (term ''navigable'' indicates ''what Congress had in mind as its authority for enacting the Clean Water Act: Its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made.'' Nothing in the legislative history of the Act provides any indication that ''Congress intended to exert anything more than its commerce power over navigation.'' (*Id.* at 168 n.3)).

additional considerations will help avoid triggering the Section 401(b)(2) notification and coordination procedures based on more speculative assertions of downstream impacts.

### 9.    Data and other information

As the 401 Certification Rule took effect less than a year ago,[226] there has not been enough time to reasonably ascertain its impacts; particularly given that the short time since enactment occurred during a global pandemic, unprecedented lockdown orders, and social distancing requirements. For instance, assessing whether the 401 Certification Rule has made an aspect of the 401 certification process more or less efficient is greatly complicated by the fact that COVID protocols have also significantly impacted the efficiency of these processes during the same time period. As such, the Associations question whether any useful insights or reasonable conclusions about the performance of the 401 Certification Rule can be drawn from less than ten months of implementation during a pandemic.

Looking forward, however, we believe the regulatory reforms in the 401 Certification Rule will prove useful and necessary. EPA's notice of intent to reconsider and revise the 401 Certification Rule arises in the context of a changing energy market in which the United States has become a net exporter of natural gas,[227] and the resilience of the country's electric grid remains under review.[228] FERC has long recognized the importance of natural gas in bolstering the reliability of the electric grid.[229] This topic is increasingly important in light of recent extreme weather events and FERC's continued examination of the reliability and resilience of the bulk power system.[230] Further, the U.S. Energy Information Administration's 2021 Annual Report demonstrates that natural gas will remain an important part of the U.S. energy mix over the next 30 years, even with a significant increase in renewable resources.[231]

The United States also remains poised to serve the growing global need for natural gas and to provide important optionality in the market through U.S. LNG exports.[232] Since 2018, four U.S. LNG export facilities in the lower 48 states have entered service, bringing the total number

---

[226] *See* 85 Fed. Reg. at 42,210 (Effective date of Sept. 11, 2020).

[227] Dean Foreman, *As We Said – U.S. A Net Exporter of Total Energy*, API (Dec. 12, 2019), https://www.api.org/newspolicy-and-issues/blog/2019/12/12/as-we-said-us-a-net-exporter-of-total-energy. *See also* NERA Economic Consulting, *Macroeconomic Outcomes of Market Determined Levels of U.S. LNG Exports* (June 7, 2018).

[228] *See, e.g.*, *Technical Conference to Discuss Climate Change, Extreme Weather, & Electric System Reliability*, FERC (last updated Apr. 22, 2021), https://ferc.gov/news-events/events/technical-conference-discuss-climate-changeextreme-weather-electric-system.

[229] *1999 Certificate Policy Statement* at 25.

[230] *See supra* note 7.

[231] U.S. Energy Info. Admin., *Annual Energy Outlook 2021 with projections to 2050* at 7 (Feb. 2021).

[232] As the economic response to the pandemic has stabilized, so has global demand for natural gas. *See, e.g.*, Jeremiah Shelor, EIA's *Natural Gas Price Forecast Ticks Up to $3.05 on Exports, U.S. Demand*, Nat. Gas Intel. (May 11, 2021), https://www.naturalgasintel.com/eias-natural-gas-price-forecast-ticks-up-to-3-05-on-exports-u-s-demand/.

currently in operation to six, and several more are under construction or proposed and approved. This is relevant to EPA's reconsideration and potential revision to the 401 Certification Rule because many LNG export projects include interstate natural gas pipeline components that may be subject to any new certification regulations EPA adopts.  New LNG export projects will very likely also require additional interstate pipeline facilities, whether compressor stations or new laterals, to transport sufficient quantities of natural gas to their facilities.

Additionally, President Biden recently announced his support for a Bipartisan Infrastructure Framework that the White House anticipates will fund "transformational and historic investments in clean transportation infrastructure, clean water infrastructure, universal broadband infrastructure, clean power infrastructure, remediation of legacy pollution, and resilience to the changing climate."[233]  Projects such as these will require dredge-and-fill activities in WOTUS that require CWA Section 404 permits from the Army Corps; Army Corps permits issued under Sections 9 and 10 of the Rivers and Harbors Act ("RHA"); and U.S. Coast Guard permits for bridges and causeways under Section 9 of the RHA.  All of the actions are likely to trigger Section 401 certification requirements.

Moreover, on June 30, 2021, the White House Council for Environmental Quality ("CEQ") submitted a report to Congress on carbon capture, utilization, and sequestration ("CCUS Report").[234]   The CCUS Report noted that expanded use and deployment of CCUS technology will require an unprecedented buildout of $CO_2$ pipeline infrastructure, the Section 404 permitting for which CEQ recognized would trigger a potentially large number of state and tribal Section 401 certification reviews.[235]

### 10.    Implementation Coordination

The 401 Certification Rule took effect less than a year ago.[236]  Consequently, to the extent the 401 Certification Rule required any states and other certifying authorities to update their laws or regulations, those proceedings have either recently concluded or are still ongoing.  As the Agency considers whether and to what extent it will revise the 401 Certification Rule, we urge EPA to consider the recency of these changes and the burden and uncertainty associated with triggering another round of regulatory overhauls.

---

[233]    *See*    https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/24/fact-sheet-president-biden-announces-support-for-the-bipartisan-infrastructure-framework/.

[234] *See* https://www.whitehouse.gov/ceq/news-updates/2021/06/30/council-on-environmental-quality-delivers-report-to-congress-on-steps-to-advance-responsible-orderly-and-efficient-development-of-carbon-capture-utilization-and-sequestration/.

[235] *See* CCUS Report at 26, 61.

[236] *See* 85 Fed. Reg. at 42,210 (Effective date of Sept. 11, 2020).

The Associations also urge EPA to refrain from proposing changes to the 401 Certification Rule until the various challenges to the rule have been resolved.[237]  We believe that proposing revisions to the 401 Certification Rule prior to resolution of these challenges will create additional uncertainty and confusion, and may cause states and tribes to prematurely initiate proceedings to integrate new requirements.

For similar reasons, the Associations further recommend that EPA coordinate any proposed revisions to the 401 Certification Rule with other Administration efforts to revise federal project review requirements, such as CEQ's potential revisions to its regulations implementing NEPA or the Fish and Wildlife Service's potential revision of regulations implementing Section 7 of the Endangered Species Act ("ESA").  NEPA, Section 7 of the ESA, and Section 401 of the CWA are all part of the comprehensive federal project review framework.  And in fact, the project review provisions of these other statutes may provide the review and engagement opportunities that states sometimes misuse the Section 401 certification process to obtain.  As such, if EPA ultimately proceeds with proposing revisions to the 401 Certification Rule, we recommend that EPA sequence any potential revisions to the 401 Certification Rule so that they follow any changes to federal project review requirements in other statutes.  Doing so can avoid regulatory redundancy and better ensure complementary federal project review requirements are developed in a cohesive and consistent fashion.

## V.   CONCLUSION

The Associations appreciate the opportunity to provide comments on EPA's notice of intent to revise the 401 Certification Rule.  We supported the 401 Certification Rule as proposed and continue to support the rule because it provides needed clarity and certainty regarding the role of states and other certifying authorities under Section 401.  The reforms and regulatory updates promulgated through the 401 Certification Rule were long overdue, and given the misuse of Section 401 certification procedures by some states, were necessary.

The 401 Certification Rule is appropriately tailored to address those aspects of Section 401 that are most often misconstrued and/or misused by states and other certification authorities while respectfully adhering to the principles of cooperative federalism that Congress required in the CWA and other statutes.  The Associations therefore urge EPA to refrain from rescinding or substantially revising the 401 Certification Rule.

Should the Agency proceed to revise the 401 Certification Rule, the Associations urge EPA to do so in a way that meaningfully considers the detailed interpretive guidelines that we provided in Section III of these comments, and our specific responses to the Agency's enumerated "questions

---

[237] *See In re Clean Water Act Rulemaking*, Case 3:20-cv-04636-WHA (N.D. CA 2020) (*See* EPA's Motion for Remand without Vacatur (Doc. 143, filed July 1, 2021).

for consideration" in Section IV. As noted therein, EPA is obliged to implement the Act in accordance with its text and structure, as well as the discernable intent of Congress.

Congress, through Section 401, expressly assigned an important project review role for states and tribes, but it did so in the context of multiple statutes unambiguously preserving exclusive federal jurisdiction over certain projects and multiple other statutes subjecting those projects to environmental reviews beyond the limited scope of Section 401. Therefore, as the agency tasked with implementing the CWA, EPA must ensure that any potential revisions to the 401 Certification Rule perpetuate Section 401's important but highly circumscribed role for states, while prohibiting states from arrogating authority Congress exclusively entrusted to the federal government.

Thank you for your consideration of our comments. Please do not hesitate to reach out to us if we can be of further assistance on this important issue.

Robert Benedict
Vice President, Petrochemicals & Midstream
American Fuel & Petrochemical Manufacturers

Wendy Kirchoff
Vice President, Regulatory Policy
American Exploration & Production Council

Robin Rorick Vice President, Midstream
American Petroleum Institute

Dan Naatz
Senior Vice President of Government Relations and Political Affairs
Independent Petroleum Association of America

51