UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>CLEAN WATER ACT RULEMAKING.<br><br>This Document Relates to:<br><br>ALL ACTIONS. | No. C 20-04636 WHA<br>No. C 20-04869 WHA<br>No. C 20-06137 WHA<br><br>(Consolidated)<br><br>**ORDER RE MOTION FOR REMAND WITHOUT VACATUR** |

## INTRODUCTION

Plaintiff states, tribes, and non-profit conservation groups have challenged EPA's Clean Water Act certification rule, and now EPA moves to remand the proceedings without vacatur. For the reasons stated, the rule is remanded to the agency with vacatur.

## STATEMENT

The Federal Water Pollution Control Act Amendments of 1972, commonly known as the Clean Water Act, is the primary federal statute regulating water pollution. Congress enacted the Clean Water Act in 1972 — over then-President Nixon's veto — but the roots of the Act extend much farther back to 1899 and the Rivers and Harbors Act. That statute, often referred to as the Refuse Act, primarily ensured free and open navigability of the waters of the United States, but also prohibited the discharge of "refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any

navigable water of the United States," and authorized the Secretary of the Army to permit such discharges under certain conditions. *See* 33 U.S.C. §§ 407 *et seq.* In 1948, following an increase an industrialization throughout the country, Congress passed the Federal Water Pollution Control Act (FWPCA). *See generally* Joel Gross & Kerri Stelcen, Clean Water Act 2–7 (2d ed. 2012).

In 1969, two events would help foster a new environmental awareness in the United States and prompt the promulgation of amendments to the FWPCA: A catastrophic oil spill of three million gallons of crude off the coast of Santa Barbara (creating a thirty-five-mile slick); and a fire on the surface of the Cuyahoga River in northeast Ohio. A 1968 Kent State University symposium on the state of the Cuyahoga River is worth briefly quoting:

> The surface is covered with brown oily film observed upstream as far as the Southerly Plant effluent. In addition, large quantities of black heavy oil floating in slicks, sometimes several inches thick, are observed frequently. Debris and trash are commonly caught up in these slicks forming an unsightly floating mess. Anaerobic action is common as the dissolved oxygen is seldom above a fraction of a part per million. The discharge of cooling water increases the temperature by 10 to 15° F. The velocity is negligible, and sludge accumulates on the bottom. Animal life does not exist.

The Cuyahoga River Watershed: Proceedings of a Symposium Held at Kent State University 104 (George D. Cooke, ed., 1969); Gross & Stelcen, *supra*, at 7; Christine Mai-Duc, The 1969 Santa Barbara oil spill that changed oil and gas exploration forever, L.A. Times, May 20, 2015, https://www.latimes.com/local/lanow/la-me-ln-santa-barbara-oil-spill-1969-20150520-htmlstory.html.

Three years after these events, Congress passed the Clean Water Act. Section 101 of the act expressed Congress' goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The congressional declaration in Section 101(b) recited:

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the

2

exercise of his authority under this chapter.

Section 101(d) charged EPA to administer the act while Section 101(e) explicitly enshrined public participation into the statutory scheme:

> Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States.

Under Section 401 of the Clean Water Act, a federal agency may not issue a permit or license to an applicant that seeks to conduct any activity that may result in any discharge into the navigable waters of the United States unless a state or authorized tribe where the discharge would originate issues a water quality certification or waives the requirement. EPA is responsible for the certification by non-authorized tribes or when a discharge would originate from lands under exclusive federal jurisdiction. Importantly, "No [federal] license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be." 33 U.S.C. § 1341; *see also* Overview of CWA Section 401 Certification, epa.gov/cwa-401/overview-cwa-section-401-certification (last visited Oct. 21, 2021). Several major federal licensing and permitting schemes are subject to Section 401, such as National Pollutant Discharge Elimination System (NPDES) permits under Section 402, permits for discharge of dredged or fill material into wetlands under Section 404, Federal Energy Regulatory Commission (FERC) licenses for hydropower facilities and natural gas pipelines, and Rivers and Harbors Act Section Nine and Section Ten permits.

While EPA has promulgated myriad rules to administer the Clean Water Act, iterations of the administrative rule implementing Section 401 had remained, until recently, singular. EPA originally promulgated 40 C.F.R. Part 121 to implement water quality certifications for Section 21(b) of the FWPCA as it existed in 1971 — a year before the Clean Water Act amendments to the FWPCA. *See* 36 Fed. Reg. 22,487 (Nov. 25, 1971), redesignated at 37 Fed. Reg. 21,441 (Oct. 11, 1972), further redesignated at 44 Fed. Reg. 32,899 (June 7, 1979). EPA would continue to use this rule for the Section 401 licensing scheme. In brief, 40 C.F.R. Part 121 as promulgated set out: (i) the minimum procedural content of a certification to facilitate

3

EPA's administrative processes; (ii) the procedures for determining the effects of a license upon other, non-certifying states; (iii) the procedures the EPA Administrator employs to certify an application for a project under exclusive federal jurisdiction; and (iv) the procedures for EPA consultations on obtaining a license or permit. EPA employed this procedure for certifications as-is for half a century.

\* \* \*

On April 10, 2019, President Trump issued Executive Order 13,868, entitled *Promoting Energy Infrastructure and Economic Growth*. 84 Fed. Reg. 15,495 (Apr. 10, 2019). The order stated: "The United States is blessed with plentiful energy resources, including abundant supplies of coal, oil, and natural gas," and, the "Federal Government must promote efficient permitting processes and reduce regulatory uncertainties that currently make energy infrastructure projects expensive and that discourage new investment." To that end, Executive Order 13,868 asserted that "[o]utdated Federal guidance and regulations regarding section 401 of the Clean Water Act . . . are causing confusion and uncertainty and are hindering the development of energy infrastructure," and instructed EPA to review and issue new guidance regarding Section 401. *Id*. at 15,496.

Pursuant to the executive order, EPA revised its general Section 401 guidance in June 2019. Two months later, EPA published an economic analysis of existing Section 401 processes. That same month, in a publication dated August 22, 2019, EPA proposed an updated Section 401 certification rule with extensive revisions. After a very active public comment phase, EPA published the final rule in the Federal Register on July 13, 2020. The rule went into effect September 11, 2020. *See* Economic Analysis for the Proposed Clean Water Act Section 401 Rulemaking, NEPIS 810R19001A (Aug. 2019); Clean Water Act Section 401 Guidance for Federal Agencies, States and Authorized Tribes, www.epa.gov/sites/default/files/2019-06/documents/cwa_section_401_guidance.pdf (June 7, 2019); 84 Fed. Reg. 44,080 (Aug. 22, 2019); 85 Fed. Reg. 42,210 (July 13, 2020).

The new certification rule makes a variety of substantive changes to EPA's procedures for implementing Section 401. To state just a few examples, the new rule: (i) narrows the

scope of certification to ensuring that a discharge from a point source into a water of the United States from a federally licensed or permitted activity will comply with "water quality requirements" — another defined term narrowed to mean applicable provisions of Sections 301, 302, 303, 306, and 307 of the Clean Water Act; (ii) authorizes EPA to establish the reasonable amount of time for a certifying authority to certify a request; and (iii) authorizes EPA to determine whether a certifying authority's denial has complied with the rule's procedural requirements, and to deem certifications waived if not. *See* 40 C.F.R. pt. 121.

Plaintiff states, tribes, and non-profit conservation groups, many of which had strenuously objected to these and other changes to the certification rule, began suing, many the same day EPA published the final rule. Three cases eventually arrived before the undersigned by August 2020. The new certification rule became effective in September, and by October, eight states and three industry groups intervened as defendants. Then, in November, administrative momentum for the revised certification rule stalled after the election of President Biden, who declared his administration's policy:

> to listen to the science; to improve public health and protect our environment; to ensure access to clean air and water; to limit exposure to dangerous chemicals and pesticides; to hold polluters accountable, including those who disproportionately harm communities of color and low-income communities; to reduce greenhouse gas emissions; to bolster resilience to the impacts of climate change; to restore and expand our national treasures and monuments; and to prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals.

*Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, Exec. Order No. 13,990, 86 Fed. Reg. 7,037 (Jan. 20, 2021). The administration specifically listed the certification rule as one agency action set to be reviewed, and EPA stated its intent to promulgate a new certification rule in a notice published on June 6, 2021. The earliest EPA will be able to promulgate a revised rule is Spring 2023 (Goodin Decl. ¶ 27). *See* 86 Fed. Reg. 29,541 (June 2, 2021); Fact Sheet: List of Agency Actions for Review, www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review (Jan. 20, 2021).

EPA now moves to remand for further proceedings without vacatur. Due to plaintiffs' oppositions that requested remand *with* vacatur, intervenor defendants filed a motion to strike, which necessitated extra briefing on that matter. After oral argument held telephonically due to the COVID-19 pandemic, intervenor defendants were invited to file further briefing on the vacatur issue, which they did.

## ANALYSIS

### 1. THE APPLICABLE STANDARDS FOR REMAND AND VACATUR.

Ambiguities in statutes within an agency's jurisdiction to administer are, per *Chevron* and *Brand X*, delegations of authority to fill the statutory gap in a reasonable fashion. Under the Administrative Procedure Act (APA), a district court reviews a challenged federal agency action to determine whether it is arbitrary and capricious or otherwise not in accordance with law. Per the familiar taxonomy established by *SKF USA*, an agency typically takes one of five positions when its action is challenged in federal court: (i) it may defend the decision on previously articulated grounds; (ii) it may seek to defend the decision on grounds *not* previously articulated by the agency; (iii) it may seek remand to reconsider its decision because of intervening events outside the agency's control; (iv) it may seek remand even absent any intervening events, *without confessing error*, to reconsider its previous position; and (v) it may seek remand because it believes the original decision was incorrect on the merits and it wishes to change the result. *SKF USA Inc. v. United States*, 254 F.3d 1022, 1027–28 (Fed. Cir. 2001); *Nat'l Cable & Telecomm. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 980, 982 (2005); *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865–66 (1984); *Cal. Cmtys. Against Toxics v. EPA* (*CCAT*), 688 F.3d 989, 992 (9th Cir. 2012) (approving *SKF USA* taxonomy); 5 U.S.C. § 706(2).

An agency thus need not defend a challenged action in a district court and may instead voluntarily request the court to remand the action to the agency for further proceedings. Nor does an agency even need to admit error to justify voluntary remand. "Generally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *CCAT*, 688 F.3d at 992.

The deferential standard for reviewing an agency's request for voluntary remand can raise difficult issues when vacatur comes into play. When a district court rules that an agency action is defective due to errors of fact, law, or policy, the APA explicitly instructs that the court "shall . . . hold unlawful and set aside" the agency action. "This approach enables a reviewing court to correct error but, critically, also avoids judicial encroachment on agency discretion." 33 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 8381 (3d ed. 2021); 5 U.S.C. § 706(2). Nevertheless, our court of appeals has held that, when equity demands, a flawed rule need not be vacated. *See CCAT*, 688 F.3d at 992. Oftentimes, an agency may voluntarily request remand prior to a court's adjudication of the merits of the disputed action. The caselaw here is unsettled. Leaving an agency action in place while the agency reconsiders may deny the petitioners the opportunity to vindicate their claims in federal court and would leave them subject to a rule they have asserted is invalid. On the other hand, vacatur "of an action may allow an agency to abandon a legislative rule without going through the (extensive) trouble of developing a new one." Wright & Miller, *supra*, at § 8383. Our court of appeals has issued the broad guidance — albeit in opinions where the agency action had been found erroneous — that remand without vacatur is appropriate only in limited circumstances. *CCAT*, 688 F.3d at 994; *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

Contrasting policy implications have led to a split in authority regarding whether a court may order vacatur without first reaching a determination on the merits of the agency's action. *Compare Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1241–42 (D. Colo. 2011) (Judge John L. Kane), *with Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 135–36 (D.D.C. 2010) (Judge Emmet G. Sullivan). Our court of appeals has not had the opportunity to address this question directly, but its holding that even a flawed rule need not be vacated supports the corollary proposition that a flaw need not be conclusively established to vacate a rule. Other district courts in our circuit have consistently acknowledged they have the authority to vacate agency actions upon remand prior to a final determination of the action's legality. *See, e.g.*, *Pascua Yaqui Tribe v. EPA*, –––– F. Supp. 3d ––––, 2021 WL 3855977, at *4

7

(D. Ariz. Aug. 30, 2021) (Judge Rosemary Márquez); *All. for Wild Rockies v. Marten*, 2018 WL 2943251, at *2–3 (D. Mont. June 12, 2018) (Judge Dana L. Christensen); *N. Coast Rivers All. v. Dep't of the Interior*, 2016 WL 8673038, at *6 (E.D. Cal. Dec. 16, 2016) (Judge Lawrence J. O'Neill).

This order agrees with the foregoing opinions from district judges within our circuit that, when an agency requests voluntary remand, a district court may vacate an agency's action without first making a determination on the merits. Vacatur is a form of discretionary, equitable relief akin to an injunction. This order finds persuasive the reasoning in *Center for Native Ecosystems*, which explains that "because vacatur is an equitable remedy, and because the APA does not expressly preclude the exercise of equitable jurisdiction, the APA does not preclude the granting of vacatur without a decision on the merits." 795 F. Supp. 2d at 1241–42; *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542–43 (1987); *Coal. to Protect Puget Sound Habitat v. United States Army Corps of Engineers*, 843 Fed. App'x 77, 80 (9th Cir. 2021).

Our court of appeals has applied the familiar *Allied-Signal* test when considering vacatur of agency actions found to be erroneous, and this order finds the same factors applicable when considering voluntary remand prior to a conclusive decision on the merits. *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–151 (D.C. Cir. 1993). Under *Allied-Signal*, the "decision whether to vacate depends on [1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed." *Ibid.*; *see also CCAT*, 688 F.3d at 992 (adopting *Allied-Signal*). *Allied-Signal* can properly guide a vacatur analysis prior to a merits determination similar to the review of a motion for a preliminary injunction. In fact, the test in *Allied-Signal* explicitly arose from a preliminary injunction analysis. *See Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990).

The first prong of *Allied-Signal* — sometimes abridged in decisions where the court had made a merits determination — considers an agency action's deficiencies in order to evaluate

8

the "extent of doubt whether the agency chose correctly." Conclusive findings of agency error are thus sufficient but not necessary for this factor to support vacatur. The first prong may be measured in different ways, including: the extent the agency action contravenes the purposes of the statute in question; whether the same rule could be adopted on remand; and whether the action was the result of reasoned decisionmaking. *Pollinator*, 806 F.3d at 532; *Or. Nat. Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017) (Judge Michael Mosman) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314–15 (1982)); *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 185 (D.D.C. 2008). Because a district court's review of an agency's action begins and ends with the reasoning the agency relied on in making that decision, the final rule and its preamble provide valuable material with which to evaluate whether the agency employed reasoned decisionmaking. *See CCAT*, 688 F.3d at 993. As for the second prong of *Allied-Signal*, our court of appeals has engaged in a broad analysis of the potential consequences of vacatur. *See id.* at 994; *Pollinator*, 806 F.3d at 532–33.

2. **EPA AND INTERVENOR DEFENDANTS' OBJECTIONS TO VACATUR AND *ALLIED-SIGNAL*.**

Both EPA and intervenor defendants assert that this order cannot and should not consider whether to vacate the certification rule. Their host of arguments fails to persuade.

*First*, intervenor defendants contend in a separate motion to strike that plaintiffs' arguments for vacatur in their opposition briefing contravenes Federal Rule of Civil Procedure 7(b), Civil Local Rule 7-1(a), and the undersigned's standing order (Dkt. No. 148 at 2). An August 2021 order ensured that the parties fully briefed this issue concurrently with EPA's motion for voluntary remand (Dkt. No. 151). Upon review, this order finds that plaintiffs properly addressed the issue of vacatur. EPA has moved for remand *without vacatur*. Yet as our court of appeals has explicitly stated, "We order remand without vacatur only in 'limited circumstances.'" *Pollinator*, 806 F.3d at 532 (quoting *CCAT*, 688 F.3d at 994). EPA, in fact, quoted *CCAT* in its opening brief, but neglected to address why the instant action is the exception meriting remand without vacatur or why the default standard of vacatur stated in *CCAT* should not apply here. EPA cannot avoid the default standard by strategically tailoring

9

1    its briefing and requested relief, and intervenor defendants made a strategic choice not to
2    initially file any briefing on the subject. Intervenor defendants, regardless, were granted the
3    opportunity to file supplemental briefing on the vacatur issue and *Allied-Signal* (Intervenors
4    Br., Dkt. No. 172). So, they have had the last word. Plaintiffs will not be faulted for
5    addressing the issues that this order must address to render a decision. *See also N. Coast*
6    *Rivers All.*, 2016 WL 8673038, at *7.

7        *Second*, EPA and intervenor defendants argue that *Allied-Signal* is not the proper
8    standard here because there has been no ruling on the merits of the certification rule (Reply Br.
9    6; Intervenors Br. 8–9). As explained, *Allied-Signal* does not require a merits decision (and, in
10   fact, is based on the standard for a preliminary injunction). Neither EPA nor intervenor
11   defendants, it should be noted, attempt to suggest a substitute for *Allied-Signal* for our
12   purposes. Intervenor defendants attempt to distinguish *Pascua Yaqui Tribe* — a recent
13   decision from our sister court that vacated upon remand another EPA rule related to the Clean
14   Water Act — on the ground that the district court had before it the parties' fully-briefed
15   summary judgment motions (Intervenors Br. 9). But, the court's opinion did not rule on the
16   parties' summary judgment motions, which were dismissed without prejudice in the docket
17   entry for the remand order. *Pascua Yaqui Tribe*, No. C 20-00266, Dkt. No. 99, Aug. 30, 2021.
18   *Pascua Yaqui Tribe*, in fact, stated that it was not reaching the merits of the agency action:
19   "[I]n the Ninth Circuit, remand with vacatur may be appropriate even in the absence of a
20   merits adjudication. Accordingly, the Court will apply the ordinary test for whether remand
21   should include vacatur." 2021 WL 3855977, at *4.

22       *Third*, intervenor defendants state that plaintiffs "fail to provide any severability analysis,
23   *which would be mandatory* if [p]laintiffs want this Court to vacate the entire Rule" (Intervenors
24   Br. 11, emphasis added). The decision intervenor defendants cite to support this statement,
25   *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 351–52 (D.C. Cir. 2019), does not necessarily
26   mandate a severability analysis, and this order is not aware of any mandatory authority that
27   requires a severability analysis. Regardless, severance is not required here because, as
28   explained below, this order finds serious deficiencies in an aspect of the certification rule that,

United States District Court
Northern District of California

in EPA's words, "is the foundation of the final rule and [] informs all other provisions of the final rule." 85 Fed. Reg. at 42,256.

*Fourth*, in a footnote in its reply brief, EPA requests additional briefing regarding the scope of vacatur, citing *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (*see* Reply Br. 2 n. 2). EPA does not elaborate how a decision regarding standing to challenge the minimum essential coverage requirement of the Affordable Care Act has any bearing on our case here. Citing general statements of law does not warrant additional briefing, nor did EPA raise this request at our hearing after the intervenor defendants were permitted to provide supplemental briefing on the *Allied-Signal* analysis. This order has considered the proper scope of vacatur.

In sum, should remand be justified, this order will duly apply *Allied-Signal* as described to determine whether vacatur is the appropriate remedy in this dispute.

### 3. WHETHER REMAND OF THE CERTIFICATION RULE TO EPA IS WARRANTED.

This order now considers whether to remand the certification rule back to EPA for further proceedings. EPA says remand is appropriate because the request: (i) is made in good faith and reflects substantial and legitimate concerns with the rule; (ii) supports judicial economy; and (iii) would not cause undue prejudice to the parties (Br. 6–7).

Remand in this circuit, as EPA reminds us, is generally only refused when the agency's request is frivolous or made in bad faith. *See CCAT*, 688 F.3d at 992. The American Rivers plaintiffs argue EPA's request is frivolous because "the *process* EPA has laid out to address [its] concerns does not demonstrate a genuine commitment to a changed rule that will address all of those concerns" (American Rivers Opp. 16). This order notes some support for American Rivers' argument to deny EPA's remand request as frivolous due to the fact that the agency wholly omitted addressing vacatur until forced to by plaintiffs' opposition briefing, but will not deny remand on that basis alone. This order accordingly proceeds to consider the *SKF USA* taxonomy of positions an agency may take on a challenge to its action.

EPA asserts that its remand request here falls into the fourth category of actions under *SKF USA* — remand to reconsider a decision without confessing error (Br. 8). In this

11

situation, an agency "might argue, for example, that it wished to consider further the governing statute, or the procedures that were followed. It might simply state that it had doubts about the correctness of its decision." For an action with this type of posture, *SKF USA* advised that a district court has discretion not to remand, but "if the agency's concern is substantial and legitimate, a remand is usually appropriate." *SKF USA*, 254 F.3d at 1029.

EPA, as explained below, has certainly expressed substantial concerns with the current formulation of the certification rule (Br. 2–5). Plaintiffs have not presented evidence or argument sufficient to justify departing from the default rule permitting remand. The certification rule will be remanded to EPA for further proceedings.

### 4. WHETHER VACATUR OF THE CERTIFICATION RULE UPON REMAND IS WARRANTED.

This order now considers whether the *Allied-Signal* test supports vacatur upon remand of the certification rule. Each factor is considered in turn.

#### A. THE CERTIFICATION RULE'S DEFICIENCIES.

The first *Allied-Signal* factor considers the seriousness of the rule's deficiencies, thus evaluating the extent of doubt whether the agency correctly promulgated the rule. *See Allied-Signal*, 988 F.2d at 150–51. At the hearing, plaintiff states asserted that the most glaring deficiency in the current certification rule is a newly-inserted subsection defining the scope of certification, which they say impinges upon the Clean Water Act's principles of cooperative federalism. *See* 40 C.F.R. § 121.3. We start our *Allied-Signal* analysis with these revisions.

In *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, the Supreme Court affirmed that Section 401(d) confers on states the power to "consider all state actions related to water quality in imposing conditions on [S]ection 401 certificates." 511 U.S. 700, 710 (1994). The majority recognized that Section 401(a) contemplates state certification that a "discharge" will comply with certain provisions of the Clean Water Act while subsection (d) "expands the State's authority to impose conditions on the certification of a project" because it "refers to the compliance of the applicant, not the discharge." *Id.* at 711. *PUD No. 1* concluded that Section 401(d) "is most reasonably read as authorizing additional conditions

12

and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied." *Id.* at 712.

The revised scope of certification that EPA promulgated takes an *antithetical* position to *PUD No. 1* without reasonably explaining the change. The rule's scope of certification is "limited to assuring that a discharge from a Federally licensed or permitted activity will comply with water quality requirements," which the rule limits to Sections 301, 302, 303, 306, and 307 of the Clean Water Act. 40 C.F.R. § 121.3. EPA may, of course, take up different interpretations of Section 401, but a revised rule with unexplained inconsistencies suggests it is an unreasonable interpretation that is not entitled to deference under *Chevron*. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016); *Gomez-Sanchez v. Sessions*, 892 F.3d 985, 995 (9th Cir. 2018). EPA does not adequately explain in the preamble how it could so radically depart from what the Supreme Court dubbed the most reasonable interpretation of the statute. *PUD No. 1*, 511 U.S. at 712. The certification rule's preamble tries to address the sharp departure from *PUD No. 1* but falls back to claiming that the case was wrongly decided, and eventually sides with Justice Thomas' dissenting opinion. *See* 85 Fed. Reg. at 42,231. EPA now undermines that argument itself by declaring its intent to "*restore the balance* of state, Tribal, and federal authorities consistent with the cooperative federalism principles central to CWA section 401" (Goodin Decl. ¶ 11, emphasis added). The agency's recognition of its inconsistent interpretation of the scope of the certification compels the conclusion that the current rule is unreasonable. Accordingly, this order harbors significant doubts that EPA correctly promulgated the certification rule due to the apparent arbitrary and capricious changes to the rule's scope. *See City of Arlington v. FCC*, 569 U.S. 290, 307 (2013); *PUD No. 1*, 511 U.S. at 723 (Stevens, J., concurring) ("Not a single sentence, phrase, or word in the Clean Water Act purports to place any constraint on a State's power to regulate the quality of its own waters more stringently than federal law might require.").

Moreover, EPA's acknowledgment it intends to "restore" the principles of cooperative federalism indicates that the current scope of the certification rule is inconsistent with and contravenes the design and structure of the Clean Water Act, and thus does not warrant

13

deference. As noted in the Clean Water Act's congressional declaration of goals and policy: "It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b); *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 321 (2014). The rule's inconsistency with the purpose of the statute it interprets also supports vacatur.

Next, while EPA does not admit fault, it does signal it will not or could not adopt the same rule upon remand. The scope of certification is not the only problematic aspect of the rule. EPA's opening brief lists eleven aspects of the certification rule about which it has "substantial concerns." That list takes up two-and-a-half pages of its twelve-page brief, and includes:

- "the certification action process steps, including whether there is any utility in requiring specific components and information for certifications with conditions and denials; whether it is appropriate for federal agencies to review certifying authority actions for consistency with procedural requirements or any other purpose"

- "enforcement of CWA Section 401, including the roles of federal agencies and certifying authorities in enforcing certification conditions"

- "modifications and 'reopeners,' including whether the statutory language in CWA Section 401 supports modification of certifications or 'reopeners,'"

- "application of the Certification Rule, including impacts of the Rule on processing certification requests, impacts of the Rule on certification decisions, and whether any major projects are anticipated in the next few years that could benefit from or be encumbered by the Certification Rule's procedural requirements"

(Br. 3–5). These are not narrow issues. They address nearly every substantive change introduced in the current rule. Even without admitting error, the scope of potential revisions EPA is considering supports vacatur of the current rule because the agency has demonstrated that it will not or could not adopt the same rule upon remand.

In sum, in light of the lack of reasoned decisionmaking and apparent errors in the rule's scope of certification, the indications that the rule contravenes the structure and purpose of the Clean Water Act, and that EPA itself has signaled it could not or will not adopt the same rule

14

upon remand, significant doubt exists that EPA correctly promulgated the rule. The first *Allied-Signal* factor supports vacatur of the certification rule.

### B. THE DISRUPTIVE CONSEQUENCES OF VACATUR.

The second *Allied-Signal* factor considers the disruptive consequences of vacatur. Intervenor defendants argue that "[r]einstating the prior rule would result in substantial disruption from general whipsawing of both regulators and regulated entities" and raise several hypothetical procedural issues (Intervenors Br. 16, 18). The rule has only been in effect for thirteen months. This is insufficient time for institutional reliance to build up around the current rule, which has been under attack since before day one. This order finds vacatur will not intrude on any justifiable reliance.

Moreover, the whipsawing intervenor defendants would ascribe to vacatur clearly arose from EPA's promulgation of a revised certification rule that dramatically broke with fifty years of precedent, and subsequent complete course reversal by the agency less than nine months later. EPA asserted in a June 2021 notice that it will not reinstate wholesale the previous certification rule from 1971 (Goodin Decl. ¶ 13). However, EPA's statements here that it will "restore" the principles of cooperative federalism and that it plans to address nearly every substantive change the current certification rule introduced suggest vacatur will prove less disruptive than leaving the current rule in place until Spring 2023.

Our court of appeals has measured the disruptive consequences of vacating an EPA rule by measuring the extent to which a faulty rule could result in possible environmental harm. To that end, our court of appeals has chosen not to vacate an EPA rule when setting aside listing of a snail species as endangered would have risked potential extinction of that species, and when vacating could have, in part, led to air pollution that would undermine the goals of the Clean Air Act. On the other hand, our court of appeals did vacate an EPA action that could have affected sensitive bee populations. *See Pollinator*, 806 F.3d at 532–33 (bees); *CCAT*, 688 F.3d at 994 (air); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (snails).

15

Plaintiffs have established that significant environmental harms will likely transpire should remand occur without vacatur. This order finds particularly persuasive the State of Washington's example concerning three hydropower dams on the Skagit River. These dams will each require Section 401 certifications prior to EPA's promulgation of a replacement for the current certification rule. As noted in the State of Washington's brief, "because FERC licenses for dams will last between 30–50 years, the lack of adequate water quality conditions attached to these licenses will have adverse impacts for a *generation*" (States Opp. 7). As Loree' Randall, Washington's Section 401 Policy Lead, explains, the new certification rule curtails restrictions certifying authorities can impose on dams to limit increases in water temperature. The threatened Chinook salmon that reside in the Skagit River are vulnerable to these changes in water temperature, which puts at risk a primary food source for the endangered Southern Resident Orca population in Puget Sound, of which there are currently only seventy-three, the lowest number in over four decades (Randall Decl. ¶¶ 7, 10–11).

Intervenor defendants argue that overreach by certifying authorities under the old rule led to negative economic effects, pointing to several energy projects that failed or had additional restrictions placed upon them (Intervenors Br. 4). This order duly considers the economic effects of vacatur — and temporary reinstatement of the previous rule — but notes that our court of appeals has focused more on environmental consequences when considering whether to vacate EPA rules, and the Clean Water Act has the express goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Progress towards this goal carries inherent economic effects. This order finds the disruptive environmental effects should remand occur without vacatur described by plaintiffs outweighs the disruptive economic consequences of vacatur described by intervenor defendants. The economic harms intervenor defendants proffer also do not outweigh the significant doubts that EPA correctly promulgated the current certification rule. *See Pollinator*, 806 F.3d at 532; *CCAT*, 688 F.3d at 994; *Zinke*, 250 F. Supp. 3d at 775; *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242–43 (N.D. Cal. 2015) (Judge Nathanael M. Cousins). This order finds the second *Allied-Signal* factor supports

16

vacatur because the disruptions caused by vacatur and the imposition of an interim rule do not outweigh the deficiencies of the current rule.

Finally, EPA and intervenor defendants have cited several cases that also reviewed the certification rule (Reply Br. 2). This order considers the analysis in each of these opinions, to the extent they seriously and substantively examined remand and vacatur, but ultimately finds *Pascua Yaqui Tribe*, an opinion on another EPA rule with the most thorough analysis, to be the most persuasive. 2021 WL 3855977. In that opinion, Judge Rosemary Márquez of our circuit vacated EPA's rule that narrowed the definition of "waters of the United States" upon remand to the agency. In two of the decisions EPA cited here, Judge Richard Seeborg of our district filed short orders remanding to EPA challenges to the rule at issue in *Pascua Yaqui Tribe*, finding the issue of vacatur moot (Dkt. No. 161). *See California v. Regan*, No. C 20-03005 RS, Dkt. No. 271 (N.D. Cal. Sept. 16, 2021); *WaterKeeper All., Inc. v. EPA*, No. C 18-03521 RS, Dkt. No. 125 (N.D. Cal. Sept. 16, 2021). In dicta, both brief orders stated the court would have been disinclined to impose vacatur. Both orders, however, based that conclusion on a previous order that denied a motion for a preliminary injunction on the ground that plaintiffs were unlikely to succeed on the merits proving the rule was legally erroneous. *See California v. Regan*, No. C 20-03005 RS, Dkt. No. 171 (N.D. Cal. June 19, 2020). These orders, accordingly, premised their disinclination to impose vacatur on an issue evaluated by the first *Allied-Signal* prong, which here supports vacatur.

In sum, the *Allied-Signal* factors support vacatur of the certification rule upon remand to EPA, which will result in a temporary return to the rule previously in force until Spring 2023, when EPA finalizes a new certification rule. *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005).

**CONCLUSION**

As explained, the motion for remand is **GRANTED**. Upon remand the current certification rule, 40 C.F.R. Part 121, is **VACATED**.

Intervenor defendants' motion to strike (Dkt. No. 148) is **DENIED**. Being unnecessary for the resolution of this motion, EPA's request for judicial notice (Dkt. No. 157) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated: October 21, 2021.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE