Clare Ellis (SBN No. 317773)
cellis@HuntonAK.com
**HUNTON ANDREWS KURTH LLP**
50 California Street, Suite 1700
San Francisco, CA 94111
Telephone: (415) 975-3708
Facsimile: (415) 975-3701

George P. Sibley, III (VA Bar No. 48773) (*pro hac vice*)
gsibley@HuntonAK.com
Deidre G. Duncan (D.C. Bar No. 461548) (*pro hac vice*)
dduncan@HuntonAK.com
**HUNTON ANDREWS KURTH LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
Telephone: (804) 788-8262
Facsimile: (804) 788-8218

*Counsel for Defendant-Intervenors*
*American Petroleum Institute and*
*Interstate Natural Gas Association of America*

Additional counsel listed in signature block

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: Clean Water Act Rulemaking | Lead Case No. 3:20-CV-04636-WHA |
| | Related Case Nos.<br>3:20-CV-04636-WHA<br>3:20-CV-06137-WHA |
| | **INTERVENOR DEFENDANTS'**<br>**MOTION FOR STAY PENDING**<br>**APPEAL** |
| | Date: December 2, 2021<br>Time: 8:00 A.M.<br>Courtroom: 12, 19th Floor<br>Judge: Hon. William H. Alsup |

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................................2

II.    BACKGROUND ..............................................................................................................3

    A.    Clean Water Act .................................................................................................3

    B.    Certain States abused their Section 401 certification authority. ......................4

    C.    EPA adopts the Section 401 Certification Rule. ..............................................6

    D.    This lawsuit and the Order vacating the Rule ..................................................7

III.    ARGUMENT ...................................................................................................................9

    A.    Intervenor Defendants are likely to succeed on the merits. .............................9

        1.    The APA requires a complete administrative record and full briefing on the merits before a reviewing court may set aside agency action. ....................10

        2.    The Court's application of the Allied-Signal factors was erroneous. .........13

    B.    Intervenor Defendants will be irreparably harmed absent a stay. ...........................19

        1.    Industry Intervenors' members are experiencing economic harm. .............19

        2.    Intervenor Defendants are being irreparably harmed by deprivation of statutory rights under the APA. ...................................................................21

        3.    Vacatur reimposes harms of constitutional magnitude. ..............................22

    C.    Plaintiffs will not be substantially injured by a stay, which would serve the public interest. ....................................................................................................23

IV.    CONCLUSION ..............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado v. Wolf,*
 952 F.3d 999 (9th Cir. 2020)....................................................................................9

*Alcoa Power Generating Inc. v. FERC,*
 643 F.3d 963 (D.C. Cir. 2011) ...........................................................................6, 17

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
 988 F.2d 146 (D.C. Cir. 1993) ...................................................................... *passim*

*Ayotte v. Planned Parenthood of N. New England,*
 546 U.S. 320 (2006)..................................................................................................15

*Block v. North Dakota,*
 461 U.S. 273 (1983)..................................................................................................10

*California v. Regan,*
 No. 20-cv-03005-RS, 2021 WL 4221583 (N.D. Cal. Sept. 16, 2021)................14, 17

*Carlson v. Postal Regul. Comm'n,*
 938 F.3d 337 (D.C. Cir. 2019) ...........................................................................15, 17

*Carpenters Indus. Council v. Salazar,*
 734 F. Supp. 2d 126 (D.D.C. 2010) ..........................................................................11

*Center for Native Ecosystems v. Salazar,*
 795 F. Supp. 2d 1236 (D. Colo. 2011) ...............................................................11, 12

*City of Milwaukee v. Illinois,*
 451 U.S. 304 (1981)....................................................................................................3

*Community for Creative Non-Violence v. Turner,*
 893 F.2d 1387 (D.C. Cir. 1990) ................................................................................17

*Consumer Energy Council of Am. v. FERC,*
 673 F.2d 425 (D.C. Cir. 1982) ..................................................................................21

*Croew & Dunlevy, P.C. v. Stidham,*
 640 F.3d 1140 (10th Cir. 2011)..................................................................................20

*Crow Indian Tribe v. United States,*
 965 F.3d 662 (9th Cir. 2020)......................................................................................9

*Dep't of the Army v. Blue Fox, Inc.,*
 525 U.S. 255 (1999)..................................................................................................10

*Fund For Animals v. Norton*,
   281 F. Supp. 2d 209 (D.D.C. 2003) ................................................................22

*Great Atl. & Pac. Tea Co. v. Cottrell*,
   424 U.S. 366 (1976) .........................................................................................22

*Grupo Mexicano de Desarrollo, SA v. Alliance Bond Fund*,
   527 U.S. 308 (1999) .........................................................................................12

*Hoopa Valley Tribe v. FERC*,
   913 F.3d 1099 (D.C. Cir. 2019) .........................................................................6

*Idaho v. Coeur d'Alene Tribe*,
   794 F.3d 1039 (9th Cir. 2015) ..........................................................................20

*Invenergy Renewables LLC v. United States*,
   476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ...................................................21

*K2 Am. Corp. v. Roland Oil & Gas, LLC*,
   653 F.3d 1024 (9th Cir. 2011) ..........................................................................10

*Lair v. Bullock*,
   697 F.3d 1200 (9th Cir. 2012) ............................................................................9

*Lane v. Pena*,
   518 U.S. 187 (1996) .........................................................................................10

*Maine v. Wheeler*,
   No. 1:14-cv-00264-JDL, 2018 WL 6304402 (D. Me. Dec. 3, 2018) ...............14

*Michelin Tire Corp. v. Wages*,
   423 U.S. 276 (1976) .........................................................................................22

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009) .....................................................................21

*N. Plains Resource Council v. U.S. Army Corps of Eng'rs*,
   No. 4:19-cv-44 (D. Mont. Apr. 27, 2020), ECF No. 131-1 .............................19

*Nat. Res. Def. Council v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) ...........................................................................15

*Nat'l Cable & Telecomm'cns Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) .........................................................................................15

*Nat'l Parks Conservation Ass'n v. Salazar*,
   660 F. Supp. 2d 3 (D.D.C. 2009) ................................................................11, 14

*Nken v. Holder*,
   556 U.S. 418 (2009) ...........................................................................................9

INTERVENOR DEFENDANTS' MOTION FOR STAY PENDING APPEAL

*Nollan v. California Coastal Commission*,
 483 U.S. 825 (1987)........................................................................................22

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*,
 632 F.3d 1111 (9th Cir. 2011)....................................................................12, 13

*Phillip Morris USA Inc. v Scott*,
 561 U.S. 1301 (2010) (Scalia, J., in chambers) ........................................20

*Pollinator Stewardship Council v. EPA*,
 806 F.3d 520 (9th Cir. 2015)........................................................................14

*Porter v. Warner Holding Co.*,
 328 U.S. 395 (1946)........................................................................................12

*PUD No. 1 of Jefferson County v. Washington Department of Ecology*,
 511 U.S. 700 (1994)........................................................................................15

*Regan v. Time, Inc.*,
 468 U.S. 641 (1984)........................................................................................17

*Rural Cellular Ass'n v. FCC*,
 588 F.3d 1095 (D.C. Cir. 2009) ..................................................................13

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947)........................................................................................16

*Silvers v. Sony Pictures Entm't, Inc.*,
 402 F.3d 881 (9th Cir. 2005) (en banc)......................................................10

*State Dep't of Envtl. Conservation v. FERC*,
 884 F.3d 450 (2d Cir. 2018)......................................................................6, 17

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed.
R.R. Admin.*,
 988 F.3d 1170 (9th Cir. 2021)......................................................................21

*Trump v. Sierra Club*,
 140 S. Ct. 1 (2019).........................................................................................9

*United States v. Orr Water Ditch Co.*,
 391 F.3d 1077 (9th Cir. 2004)......................................................................9

*Valentine v. Collier*,
 956 F.3d 797 (5th Cir. 2020)........................................................................22

*Weinberger v. Romero-Barcelo*,
 456 U.S. 305 (1982)........................................................................................12

**Statutes**

5 U.S.C. § 551(5) ..................................................................................................21

5 U.S.C. § 553(b), (c) ...........................................................................................21

5 U.S.C. § 706 .......................................................................................................12

5 U.S.C. § 706(2) .............................................................................................10, 11

28 U.S.C. § 1291 .....................................................................................................8

28 U.S.C. § 1292(a)(1) ............................................................................................9

33 U.S.C. 1251(b) ...................................................................................................3

Administrative Procedures Act .................................................................... *passim*

Clean Water Act ........................................................................................... *passim*

EPA's 2020 Clean Water Act Section 401 ................................................... *passim*

Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500, 86
    Stat. 816, 877 (Oct. 16, 1972) (codified at 33 U. S.C. § 1341) ...............3, 4

Judiciary Act, 1789 (1 Stat. 73) ............................................................................12

Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion
    in Administrative Law,* 53 Duke L.J. 291, 291-292 (2003).........................12

Water Quality Improvement Act of 1970, Pub. L. 91-224, 84 Stat. 91, 108 (Apr. 3,
    1970) ..............................................................................................................3

**Other Authorities**

40 C.F.R. § 121.1 ....................................................................................................6

40 C.F.R. §§ 121.2–121.11 ...................................................................................16

40 C.F.R. § 121.3 ....................................................................................................7

40 C.F.R. § 121.4 ....................................................................................................7

40 C.F.R. §§ 121.5–9 ..............................................................................................7

40 C.F.R. § 121.7 ....................................................................................................7

40 C.F.R. §§ 121.8–9 ..............................................................................................7

40 C.F.R. § 121.11 ..................................................................................................7

INTERVENOR DEFENDANTS' MOTION FOR STAY PENDING APPEAL

40 C.F.R. § 121.11 ..........................................................................................................17

40 C.F.R. § 121.12 ............................................................................................................7

40 C.F.R. §§ 121.13–16 ....................................................................................................7

44 Fed. Reg. 32,854, 32,856 (June 7, 1979) ...........................................................4, 17

85 Fed. Reg. 42,210 (July 13, 2020)............................................................... *passim*

86 Fed. Reg. 16,298 (Mar. 29, 2021) .............................................................................18

86 Fed. Reg. 29,541 (June 2, 2021) .................................................................................8

EO 13,990, 86 Fed. Reg. 7037 (Jan. 25, 2021) .............................................................8

Fact Sheet: List of Agency Actions for Review, White House (Jan. 20, 2021),
    https://www.whitehouse.gov/briefing-room/statements-
    releases/2021/01/20/fact-sheet-listofagency-actions-for-review/ ...............................8

Federal Rule of Appellate Procedure 8(a)(1)(A) .............................................................1

Federal Rule of Civil Procedure 62.................................................................................1

Joint EPA Army Memorandum on 401 Implementation (Aug. 19, 2021), available
    at https://www.epa.gov/cwa-401/2020-rule-implementation-materials....................23

INTERVENOR DEFENDANTS' MOTION FOR STAY PENDING APPEAL
121097839v1 253256.000008

**NOTICE OF MOTION AND MOTION**
**FOR STAY PENDING APPEAL**

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Thursday December 2, 2021, at 8:00 a.m., before the Honorable William H. Alsup of the United States District Court for the Northern District of California, in Courtroom 12 on the 19th Floor of the Philip E. Burton Courthouse and Federal Building, 450 Golden Gate Avenue, San Francisco, California, Intervenor Defendants the States of Arkansas, Louisiana, Mississippi, Missouri, Montana, Texas, West Virginia, and Wyoming (collectively the "State Defendants"), American Petroleum Institute (API), Interstate Natural Gas Association of America (INGAA), and National Hydropower Association (NHA)[1] will and hereby do move this Court for an Order staying its Order dated October 21, 2021 ("Order") (ECF No. 173) and Final Judgment (ECF No. 176) pending their appeal of the Order and Final Judgment to the United States Court of Appeals for the Ninth Circuit.

This motion is made pursuant to Federal Rule of Civil Procedure 62 and Federal Rule of Appellate Procedure 8(a)(1)(A), which authorize the District Court to stay an action, order, or judgment, pending resolution of an appeal.  The motion is based on this notice of motion; the accompanying memorandum and proposed order; all pleadings and filings in these matters; and such oral argument as the Court deems necessary.  Intervenor Defendants are concurrently filing their notices of appeal.  Intervenor Defendants have conferred with the other parties and have been advised that Plaintiffs oppose the Motion and Defendants reserve their position pending review of the Motion.

---

[1] This filing represents the views of the NHA, a nonprofit national association dedicated exclusively to preserving and expanding clean, renewable, affordable hydropower and marine energy resources. With over 250 member companies, this filing does not necessarily represent the views of any individual member.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

Intervenor Defendants[2] joined this litigation so they could defend EPA's 2020 Clean Water Act Section 401 Certification Rule[3] if, after a change in administration, EPA chose not to do so. They advocated strongly for EPA to fill a nearly 50-year void in the Clean Water Act regulatory landscape—rules for implementing Section 401.   The Rule reflects the outcome of that administrative process.  It clarifies basic aspects of the Section 401 process, such as how time limits will be calculated and the scope of permissible State review.  Intervenor Defendants favor the Rule and the policy choices it implements.

Plaintiffs in these consolidated cases do not favor the Rule and want it vacated judicially. The new federal administration wants to revisit the Rule and revise it administratively to implement different policy choices.  The Administrative Procedures Act (APA) provides the rules for how Plaintiffs and the new EPA can attempt to achieve their aims.  To secure judicial vacatur, Plaintiffs must show the Rule was unlawful under the APA's deferential standard of review.  The new EPA must go through the APA's notice-and-comment rulemaking process to change the Rule administratively.  In these ways, the APA prevents sweeping changes in federal law based merely on judicial or administrative fiat and gives all stakeholders, like Intervenor Defendants here, the opportunity to be heard.

The Court's decision to vacate the Rule without adjudicating the merits subverts the core purpose of the APA.  As the Court has acknowledged, even when a federal agency confesses error, most courts have refused to allow Plaintiffs and newly-installed federal administrators to bypass the APA's clear requirements.  Yet, the Court found persuasive the reasoning of a single district judge who concluded that residual equitable powers authorize courts to facilitate an end run around

---

[2] The States of Arkansas, Louisiana, Mississippi, Missouri, Montana, Texas, West Virginia, and Wyoming (collectively the "State Intervenors"), American Petroleum Institute (API), Interstate Natural Gas Association of America (INGAA) and National Hydropower Association (NHA).

[3] 85 Fed. Reg. 42,210 (July 13, 2020) (the "Rule").

the APA.  As explained below, that court's reasoning is badly flawed.  This Court should not have relied on it.

Intervenor Defendants will appeal and ask the Ninth Circuit to address the question. The Court should stay its Order (ECF No. 173) until that appeal is resolved.  As explained below, Intervenor Defendants have identified a strong basis for success on the merits.  And they already are experiencing harm due to the Court's Order.  The U.S. Army Corps of Engineers has paused permit authorizations, delaying critical infrastructure and vital maintenance and repair projects. That disruption is not in the public interest.

## II.   BACKGROUND

### A.   Clean Water Act

Since 1970, "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters . . . shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate." Water Quality Improvement Act of 1970, Pub. L. 91-224, 84 Stat. 91, 108 (Apr. 3, 1970).  In 1972, Congress enacted the Clean Water Act (CWA), a "total restructuring" and "complete rewriting" of the nation's water pollution control laws, including the provision requiring certification. *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (quoting legislative history); *see also* Federal Water Pollution Control Act Amendments of 1972, Pub. L. 92-500, 86 Stat. 816, 877 (Oct. 16, 1972) (codified at 33 U. S.C. § 1341).  Of particular relevance here, Congress narrowed the certification requirement from "*activity* [that] will be conducted in a manner which will not violate applicable *water quality standards*," 84 Stat. at 108 (emphases added), to a certification only "that any such *discharge* will comply with Act," 86 Stat. at 877 (emphases added). Congress also created a prominent role for States and Tribes in implementing the new regulatory program.  33 U.S.C. 1251(b).

The CWA uses a "cooperative federalism" approach to achieve its aims.  It carves out complementary roles for federal agencies, on the one hand, and States and Tribes, on the other. CWA Section 401 gives each State and Tribe an important but limited say in the licensing of federal projects that could affect water quality.  Specifically, federal agencies cannot license activities that

INTERVENOR DEFENDANTS' MOTION FOR STAY PENDING APPEAL

may result in a discharge into waters of the United States until the State or authorized Tribe where the discharge would originate certifies that the discharge will comply with applicable water quality requirements or waives the Section 401 requirement, either affirmatively or through inaction.  33 U.S.C. § 1341.  Section 401 authority is powerful—when triggered, State/Tribal certification or waiver is an essential requirement for the federally-licensed activity to proceed.  But to preserve the CWA's federal-State balance, that authority is also limited—Section 401 only authorizes States and Tribes to address water quality, and only within reasonable time limits that can never exceed one year.

### B.    Certain States abused their Section 401 certification authority.

Despite the statutory change in 1972, EPA failed to revise its prior regulations, promulgated in 1971, that governed the certification process.  As a result, EPA's regulations were incongruent with the new statutory language. *Cf.* NPDES; Revision of Regulations, 44 Fed. Reg. 32,854, 32,856 (June 7, 1979) (indicating need for updated certification rules).

Certain States began using the disconnect between the text of the CWA and EPA's prior regulations to effectively veto projects based on non-water quality considerations, such as energy policy, which infringes on the federal government's exclusive authority.  A particularly egregious example is Washington State's treatment of the Millennium Bulk Terminals – Longview LLC project.  In the course of a five-year review of the project, the State Environmental Impact Statement expressly concluded that the terminal would not result in significant adverse effects on water quality, aquatic life, or designated uses; and that any potential water quality impacts could be fully mitigated.  *See* ECF No. 172-1.  And yet, the State denied the certification request based on concerns about capacity of the interstate rail system, the impact of trains anywhere in that system, and impacts on the overall capacity of the Federal Columbia River Navigation Channel to accommodate additional vessels at State ports.  *Id.*

Other examples abound in the administrative record.  In December 2017, Virginia approved a water quality certification for the Atlantic Coast Pipeline, a $5.1 billion pipeline project that would transport gas produced in the Marcellus Shale region to the Mid-Atlantic region of the United States.  *See* ECF No. 56-2 at ¶ 13.  Virginia then included conditions regulating activities in upland

INTERVENOR DEFENDANTS' MOTION FOR STAY PENDING APPEAL

areas that may indirectly affect State waters beyond the scope of federal CWA jurisdiction and the project's direct discharges to navigable waters.  *Id.*  According to Virginia, "*all* proposed upland activities associated with the construction, operation, maintenance, and repair of the pipeline, any components thereof or appurtenances thereto, and related access roads and rights-of-way," are subject to the stringent conditions of the certification.  *Id.* (emphasis added).  Another example took place in August 2020, when North Carolina denied water quality certification for Mountain Valley Pipeline Southgate, one of INGAA's members, for reasons outside of water quality.  *Id.* ¶ 14.  The State determined that the purpose of the project was "unachievable" due to the "uncertainty" of completing a different pipeline project even though FERC had determined that the public convenience and necessity required approval of the $468 million, 75-mile natural gas pipeline project.  *Id.*

States also have unlawfully exploited the regulatory ambiguity to extend the amount of time they have to act on a certification request, which can effectively kill a project.  One example is the Constitution Pipeline, a $683 million, 124-mile natural gas pipeline designed to connect natural gas production in Pennsylvania to demand in northeastern markets.  ECF No. 84-1 ¶ 12.  The New York State Department of Environmental Conservation (NYSDEC) requested additional information and deemed the request complete in December 2014.  *Id.*  In April 2015, NYSDEC requested that the pipeline withdraw and resubmit its request in order to restart the statutory period of time that NYSDEC had to act on the request.  *Id.*   In April 2016, nearly three years after the project's initial request for certification, NYSDEC denied water quality certification. Following litigation over NYSDEC's determination, the Federal Energy Regulatory Commission (FERC) determined in August 2019 that NYSDEC had waived the Section 401 certification requirement. *Id.*  Nevertheless, after years of delay, the project's sponsor halted investment in the pipeline and cancelled the project in February 2020.  *Id.*

The Millennium Pipeline Company faced a similar roadblock when it submitted a certification request to NYSDEC for the Millennium Valley Lateral project, a 7.8-mile pipeline connecting a natural gas mainline to a new natural gas-fueled combined cycle electric generation facility in New York.  *Id.* ¶ 13.  Nearly two years after the project's initial request for certification,

NYSDEC denied certification on the grounds that FERC's environmental review of the project lacked an adequate analysis of the potential downstream greenhouse gas emissions, not water quality concerns. *Id.* In September 2017, FERC concluded that NYSDEC's twenty-one-month delay constituted waiver of the certification requirement, and the Second Circuit agreed. *See State Dep't of Envtl. Conservation v. FERC*, 884 F.3d 450 (2d Cir. 2018).

A number of courts have recognized that allowing States to delay the start of the period of review violates the CWA's plain text. The Second Circuit concluded that the CWA creates a "bright-line rule" that the "receipt" of a Section 401 request is the beginning of the State's one-year period for review. *Id.* at 455. As the D.C. Circuit explained, "the purpose of the waiver provision is to prevent a State from indefinitely delaying a federal licensing proceeding by failing to issue a timely water quality certification under Section 401." *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011). The D.C. Circuit thereafter invalidated the process of withdrawing and refiling the same Section 401 request in order to restart the review period. *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1104 (D.C. Cir. 2019).

**C.      EPA adopts the Section 401 Certification Rule.**

An update to the 1971 regulations was necessary to conform the regulations to the 1972 CWA amendments and to provide necessary clarity and transparency that would also remedy the abuses described above. 85 Fed. Reg. 42,210 (July 13, 2020). EPA explained that "[t]he Agency's longstanding failure to update its regulations created the confusion and regulatory uncertainty that were ultimately the cause of those controversial section 401 certification actions and the resulting litigation." *Id.* at 42,227. EPA also cited the D.C. Circuit and Second Circuit decisions discussed above as recognizing that allowing States to extend their review beyond one year is contrary to the CWA. *Id.*

The Rule fixes these problems. The Rule begins by defining fourteen key terms, most of which are not defined in the CWA. 40 C.F.R. § 121.1; *see also* 85 Fed. Reg. at 42,237 (describing the need for definitional clarity achieved through EPA's rulemaking process). The Rule then reaffirms EPA's longstanding interpretation of when a water quality certification is required under CWA Section 401. 40 C.F.R. § 121.2; 85 Fed. Reg. at 42,237 ("Section 121.2 of the final rule is

consistent with the Agency's longstanding interpretation and is not intended to alter the scope of applicability established in the CWA.").  The Rule sets out the permissible scope of certification, as developed through the rulemaking process.  40 C.F.R. § 121.3.  The Rule provides a procedure to ensure meaningful coordination occurs between project proponents and State and Tribal certifying authorities before the certification process even begins.  40 C.F.R. § 121.4 (Pre-filing meeting request).  The Rule lays out a uniform procedure for establishing the reasonable period of time for States and Tribes to act on a certification request, clear rules for when that period of time begins and ends, and a procedure for communicating to all parties when the period of time begins and ends.  40 C.F.R. §§ 121.5–9.  The Rule requires an action on a certification request, whether it is a grant, grant with conditions, or a denial of certification, to be in writing and to contain certain information that explains the State or Tribe's action or else certification is waived.  40 C.F.R. § 121.7; 85 Fed. Reg. 42,256 (explaining that such requirements are intended to promote the development of comprehensive administrative records for certification actions and to increase transparency).  The Rule describes the effect of certain actions and explains how waiver of the certification requirement can occur proactively or by operation of law. 40 C.F.R. §§ 121.8–9. The Rule also provides a procedure for neighboring jurisdictions to participate in the certification process, as required by the CWA, 40 C.F.R. § 121.12; describes how certification conditions are to be enforced, 40 C.F.R. § 121.11; and describes EPA's role as a certifying authority and advisor, 40 C.F.R. §§ 121.13–16.

### D.    This lawsuit and the Order vacating the Rule

Plaintiffs are three groups who filed complaints in this Court: Idaho Rivers United, American Rivers, California Trout, and American Whitewater (collectively "Plaintiff American Rivers"), ECF No. 75; twenty States and the District of Columbia (collectively "Plaintiff States"), ECF No. 96; and Columbia Riverkeeper, Sierra Club, Suquamish Tribe, Pyramid Lake Paiute Tribe, Orutsaramiut Native Council (collectively "Plaintiff Tribes"), ECF No. 98. Intervenor Defendants moved to intervene to defend the Rule, ECF No. 27, and this Court granted their motions, ECF No. 62.

On January 20, 2021, President Biden directed "all executive departments and agencies . . . to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years that conflict with" the new Administration's objectives. EO 13,990, 86 Fed. Reg. 7037 (Jan. 25, 2021).  In a press statement the same day, the Administration identified the Rule as among those that would be reviewed under President Biden's Executive Order.[4]

On June 2, 2021, EPA pointed to the Executive Order and announced it intended to reconsider and revise the Certification Rule.  86 Fed. Reg. 29,541 (June 2, 2021).  EPA then moved for remand *without* vacatur in this case, ECF No. 143 at 2, among others.  Although EPA noted "substantial concerns" with some portions of the Rule, EPA made clear that it was not confessing error.  *Id.* at 13.  Without filing a motion of their own, Plaintiffs argued for vacatur in their oppositions, while failing to meaningfully discuss most aspects of the Rule.  *See generally* ECF Nos. 145–47.  Intervenor Defendants filed a motion to strike the oppositions to the extent that they requested remand with vacatur, a request that must be presented in a motion.  ECF No. 148.  On September 30, 2021, this Court held a hearing on EPA's motion to remand without vacatur and Intervenor Defendants' motion to strike.  ECF No. 170.  Recognizing that granting vacatur without giving Intervenor Defendants any opportunity to respond to such request would be improper, this Court gave Intervenor Defendants the opportunity to file a supplemental brief on the *Allied-Signal* analysis regarding vacatur of the Rule.  ECF No. 170.  Intervenor Defendants filed their supplemental brief on October 4, 2021.  ECF No. 172.

On October 21, 2021, this Court vacated and remanded the Rule to EPA.  ECF No. 173 ("Order").  The Order constitutes the final decision of the Court in this action within the meaning of 28 U.S.C. § 1291.  By vacating the Rule in its entirety, the Order disposes of all substantive claims in the case, and the Court has now issued Final Judgment (ECF No. 176).  In the Order, the Court issued a definitive ruling, over Intervenor Defendants' objections, that it was authorized to

---

[4] Fact Sheet: List of Agency Actions for Review, White House (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-listofagency-actions-for-review/.

vacate federal agency action without first finding the action unlawful based on a review of the administrative record.  Intervenor Defendants' position, which this Court definitively ruled against, is that federal district courts lack the authority to vacate agency action without making the record-based findings the APA commands.  That position has no relevance to EPA's action on remand, and EPA has no authority to address the legality of this Court's decision in those proceedings.  Consequently, an appeal is the only way Intervenor Defendants' position can be considered and vindicated.  *See Crow Indian Tribe v. United States*, 965 F.3d 662, 676 (9th Cir. 2020).  In addition, the Order has the substantial effect of an injunction with respect to the State Intervenors and is thus appealable under 28 U.S.C. § 1292(a)(1).  *See United States v. Orr Water Ditch Co.*, 391 F.3d 1077, 1081 (9th Cir. 2004).  By eliminating the Rule, the Court's Order necessarily directs States to abandon procedures implemented under the 2020 Rule in favor of procedures compliant with the regulations the Rule replaced.

**III.   UNDERLINE[ARGUMENT]**

   In deciding whether to grant a stay, a court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). In the Ninth Circuit, a "sliding scale" approach is used.  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020). Under this approach, "the elements . . . are balanced so that a stronger showing of one element may offset a weaker showing of another." *Id.*  The first two stay factors are "the most critical." *Lair*, 697 F.3d at 1204. Indeed, a sufficient showing of a fatal legal defect heavily favors a stay.  *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019).  Applying these factors, the Order is an extraordinary overreach that should be stayed pending appeal.

   **A.   Intervenor Defendants are likely to succeed on the merits.**

   Intervenor Defendants are likely to succeed on the merits of their appeal for two reasons: (1) this Court erred in applying the *Allied-Signal* analysis without addressing the merits of Plaintiffs' claims; and (2) this Court misapplied the *Allied-Signal* analysis, even if it is applicable.

1

2

      **1.**      **The APA requires a complete administrative record and full briefing on the merits before a reviewing court may set aside agency action.**

3

"Federal district courts are 'courts of limited jurisdiction.'" *K2 Am. Corp. v. Roland Oil &*

4

*Gas, LLC*, 653 F.3d 1024, 1027 (9th Cir. 2011). They only have that jurisdiction that Congress has

5

granted them. In the APA, Congress gave federal district courts original jurisdiction to review the

6

final actions of federal agencies. In that grant of jurisdiction, Congress authorized federal courts

7

to set aside a final agency action, if the action is "found" to be "arbitrary, capricious, an abuse of

8

discretion, or otherwise not in accordance with law," "without observance of procedure required

9

by law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

10

5 U.S.C. § 706(2). The statute further requires that "[i]n making [those] determinations, the court

11

*shall* review the whole record or parts of it cited by a party, and due account shall be taken of the

12

rule of prejudicial error." *Id.* (emphasis added).

13

      Nothing in the statute authorizes a court to set aside federal agency action without making

14

the predicate finding that the action was unlawful, and that decision must be based on a review of

15

the agency's record. That omission indicates that Congress did not intend for Courts to set aside

16

agency action absent that finding. *See Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th

17

Cir. 2005) (en banc) ("The doctrine of *expressio unius est exclusio alterius* as applied to statutory

18

interpretation creates a presumption that when a statute designates certain persons, things, or

19

manners of operation, all omissions should be understood as exclusions."). Indeed, because the

20

APA is a waiver of sovereign immunity, the *expressio unius* canon applies with particular force.

21

The waiver of sovereign immunity in the APA "must be strictly construed, in terms of its scope, in

22

favor of the sovereign." *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999) (quoting

23

*Lane v. Pena*, 518 U.S. 187, 192 (1996)). And where "Congress attaches conditions to legislation

24

waiving the sovereign immunity of the United States"—here, conditioning the setting aside of a

25

final agency action to the existence of specific findings, after a review of the record, and with due

26

consideration to prejudicial error—"the conditions must be strictly observed, and exceptions

27

thereto are not to be lightly implied." *Block v. North Dakota*, 461 U.S. 273, 287 (1983)). The

28

Court's decision to vacate the Rule without finding that the Rule was unlawful violates the plain text of the statute.

The Court, in its Order, nonetheless found a basis to bypass the statutory text in its residual authority to exercise equitable jurisdiction. The Court relied chiefly on the reasoning in *Center for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1241-42 (D. Colo. 2011), where the court held that "because vacatur is an equitable remedy, and because the APA does not expressly preclude the exercise of equitable jurisdiction, the APA does not preclude the granting of vacatur without a decision on the merits.'" Order at 8.

But *Native Ecosystems* differed in material respect from the situation presented here, and its reasoning is flawed in any event. The Court should not have relied on it. To begin, the federal agency in *Native Ecosystems* confessed error. EPA here has not. That factual difference is meaningful—the confession of error might be considered an admission that the action was unlawful, thus providing the legal predicate for a court to exercise the remedy the APA authorizes. But even with confession of error, courts have concluded that the text of the APA precludes vacatur absent a judicial finding that the agency action was unlawful. *See, e.g., Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 135-36 (D.D.C. 2010). Otherwise, the agency could "do what [it] cannot do under the APA, repeal a rule without public notice and comment, without judicial consideration of the merits." *Id.* at 136 (quoting *Nat'l Parks Conservation Ass'n v. Salazar*, 660 F. Supp. 2d 3, 5 (D.D.C. 2009)). This Court acknowledged none of these points, but instead noted without elaboration its agreement with *Native Ecosystems*.

*Native Ecosystems* is wrong in any event. The court there cites only a law review article for the proposition that "the language of § 706(2) is mandatory, but not exclusive," and "[i]t does not expressly limit a reviewing court's authority to set-aside an agency's action." 795 F. Supp. 2d at 1241. The *Native Ecosystems* court then held that "[b]ecause there is no express jurisdictional limitation in the APA," a district court retains its equitable discretion, and "vacation of an agency action without an express determination on the merits is well within the bounds of traditional equity jurisdiction." *Id.* This reasoning is flawed for at least three reasons.

First, the law review article cited in *Native Ecosystems* addressed whether vacatur was the

exclusive remedy *after* a judicial finding of legal error.[5]  That difference is significant.  Unlike pre-merits-adjudication vacatur, which circumvents plain limits Congress imposed in the statutory text, post-adjudication discretion to fashion a remedy finds support in the statute's direction to give "due account of prejudicial error." 5 U.S.C. § 706.

Second, *Native Ecosystems* does not address the question of whether authority to vacate agency actions in final orders without finding them unlawful was *ever* a recognized equitable remedy. It is true that Federal courts "retain traditional equitable discretion," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982), but that discretion is limited to "the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)," which "did not include the power to create remedies previously unknown to equity jurisprudence." *Grupo Mexicano de Desarrollo, SA v. Alliance Bond Fund*, 527 U.S. 308, 318, 332 (1999).  The *Native Ecosystems* court did not even address the critical question of whether pre-adjudication vacatur has any analog in the precedent of the English High Court of Chancery.

Third, the *Native Ecosystems* court did not confront the settled principle that equity cannot be invoked to evade limits imposed by law.  The court acknowledged that express statutory foreclosure of an equitable remedy could limit the courts traditional equitable discretion.  *Native Ecosystems*, 795 F. Supp. 2d at 1241.  But what it ignores is that "[u]nless a statute in so many words, *or by a necessary and inescapable inference*, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98 (1946) (emphasis added).  So it is not as difficult for Congress to alter the court's equitable remedies as the *Native Ecosystems* court makes it seem.  As the Supreme Court said, "[o]f course, Congress may intervene and guide or control the exercise of the courts' discretion." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).  The Ninth Circuit has applied that principle to a statute materially similar to the APA.  *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, 632 F.3d 1111, 1121 (9th Cir. 2011).  The court found a statute that "list[ed]

---

[5] Ronald M. Levin, "*Vacation*" *at Sea: Judicial Remedies and Equitable Discretion in Administrative Law,* 53 Duke L.J. 291, 291–92 (2003).

only injunctive relief to the exclusion of other equitable remedies" foreclosed restitution and disgorgement by providing "a different scheme of enforcement." *Id.* As the court explained, "it 'is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'" *Id.* The same principle applies here. The APA expressly provides for vacatur of rules found to be unlawful and so necessarily forecloses vacatur without such a finding.

The Order by its terms does not find the Rule unlawful. *See* Order at 15 (finding the first Allied-Signal factor satisfied because "significant doubt exists that EPA correctly promulgated the rule"). For that determination, the Order relies largely on EPA's decision to reconsider the Rule. Order at 13–15. But EPA did not concede that the Rule is unlawful. In fact, EPA unequivocally denied that it was making any such concession. Sept. 30, 2021 Hr'g. Nor did EPA concede that it would rescind the entire Rule. EPA merely stated that it "will undertake a new rulemaking effort to propose revisions due to substantial concerns with the existing Rule." ECF No. 143 at 2; *see id.* at 7, 8; *see* ECF No. 155 at 2–3. Indeed, EPA could not in fact concede the legality of the Rule or commit to rescinding the entire rule without violating the APA because it is in the middle of a rulemaking process, ECF No. 153 at 3; *see* ECF No. 155 at 3, during which it must keep an open mind on all issues including whether to retain the entire Rule, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009); ECF No. 155 at 2–3. In any event, a concession would be legally insufficient to justify vacatur of the Rule because Intervenor Defendants are parties to the litigation and defend fully every aspect of the Rule.

### 2.     The Court's application of the *Allied-Signal* factors was erroneous.

The same result follows if the question is analyzed under the *Allied-Signal* factors. The first *Allied-Signal* factor asks how "serious[ ]" the agency's errors are. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). This assessment of error can only logically occur after a court has concluded that a legal error has occurred. *See id.* (applying

the two-factor test after determining that the agency acted without "reasoned decision-making");

*Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (same).  There is good

reason for that well-established approach.  Vacating a rule before adjudicating the merits affords

plaintiffs complete relief without ever proving the merits of their case, while also circumventing

the APA's notice-and-comment requirements for repeal of a rule.  *See Nat'l Parks Conservation*

*Ass'n*, 660 F. Supp. at 5 ("[G]ranting vacatur here would allow the Federal defendants to do what

they cannot do under the APA, repeal a rule without public notice and comment, without judicial

consideration of the merits."); *accord Maine v. Wheeler,* No. 1:14-cv-00264-JDL, 2018 WL

6304402, at *3 (D. Me. Dec. 3, 2018); *California v. Regan*, No. 20-cv-03005-RS, 2021 WL

4221583, at *1 (N.D. Cal. Sept. 16, 2021) ("[T]here has been no evaluation of the merits—or

concession by defendants—that would support a finding that the rule should be vacated").[6]

Here, a merits analysis is not even possible on the record Plaintiffs created.  Plaintiffs failed

to present to the district court anything resembling a developed argument as to why any aspect of

the Rule fails on the first *Allied-Signal* factor.  The State Plaintiffs did not develop any argument

that any aspect of the Rule is unlawful, instead claiming that EPA, as a general matter, admitted

the Rule's illegality in various statements.  *See* ECF No. 146 at 20–21.  The Tribes Plaintiffs, in

turn, also failed to develop any argument that the Rule is unlawful, merely listing three general

considerations—"(1) the agency failed to provide sufficient justification for departing from a half

century of practice and policy related to the interpretation and implementation of Section 401; (2)

it based its decision to do so on an [Executive Order] aimed at promoting fossil fuel infrastructure,

not clean water; and (3) EPA did not present any explanation for how the [ ] Rule would be more

protective of water quality," ECF No. 145 at 12—and then parroted the Plaintiff States' claim that

EPA somehow admitted these errors, ECF No. 145, at 12–13.  The American Rivers Plaintiffs did

make a few brief arguments on a couple of aspects of the Rule, ECF No. 147 at 4–10, while pointing

to the same claimed concession by EPA, *see* ECF No. 147 at 9, 10, but such perfunctory analysis

---

[6] This case is thus distinguishable from cases in which there is no longer a live controversy regarding the legality of the Rule; Intervenor Defendants are vigorously defending every aspect of the Rule from legal challenge.

was nowhere near developed enough for the district to make any judgment as to the Rule's legality.

Moreover, the few merits arguments that Plaintiffs briefly mention are mismatched entirely with the full vacatur remedy that they sought. The Rule is complex and multifaceted, with many operative provisions that cover numerous topics. Plaintiffs asserted that the errors in the Rule are significant, but their arguments only touch on a few discrete sections, which Plaintiffs discussed out of context, ECF No. 146 at 20–21, or only offered passing speculative harms, rather than citing to actual alleged legal errors in the Rule, ECF No. 146 at 4–14. At most, Plaintiffs addressed a fraction of the Rule's provisions, cherry-picking from EPA's statements in its briefing rather than the Rule itself, *see* ECF No. 146 at 20–21, and vaguely alluding to "other detrimental provisions" without any elaboration, *see, e.g.*, ECF No. 146 at 7. Plaintiffs also failed to provide any severability analysis, which would be mandatory if Plaintiffs want this Court to vacate the entire Rule. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351–52 (D.C. Cir. 2019). For example, Plaintiffs did not even attempt to argue that EPA "would [not] have adopted" the various aspects of the Section 401 Rule if some other aspects were declared invalid. *Id.* Courts, after all, must ordinarily "limit the solution to the problem" that the plaintiff has demonstrated. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 82 (D.C. Cir. 2020) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006)).

The Court attempted to side-step those problems. It primarily focused on the scope of certification provision, held that the new rule is "antithetical" to *PUD No. 1 of Jefferson County v. Washington Department of Ecology*, 511 U.S. 700, 710 (1994), then held EPA did not "reasonably explain[] the change." Order at 13. The Court began by chastising EPA for "depart[ing] from what the Supreme Court dubbed the most reasonable interpretation of the statute." *Id.* The Supreme Court's holding that EPA's then-applicable construction of Section 401 was "a reasonable interpretation" or even that the statute was "most reasonably read" that way does not mean it was the *only* reasonable interpretation. EPA was entitled to change its position, a point that this Court did not grapple with. *See Nat'l Cable & Telecomm'cns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). This change does not "compel[] the conclusion that the current rule is unreasonable." Order at 13.

In explaining its change in position, EPA pointed to changes in the text of the statute in 1972, including Congress's changing the word "activity" to discharge;" and further explained that it "is entirely appropriate, and necessary, for the EPA to conform to the 1972 CWA amendments when updating its" pre-amendment certification regulations.  85 Fed. Reg. at 42,227.  EPA elaborated, *inter alia*, that the Clean Water Act does not provide "a single, clear, and unambiguous definition of the appropriate scope of section 401" and Section 401 does not define the terms "discharge" or "water quality requirements," eliminating any possible direct inconsistencies.  *Id.* at 42,250.  Moreover, the Rule's scope of certification and related definitions were drafted to "reasonably resolve any ambiguity" in the statute, after taking into consideration "the text and structure of the Act, as well as the history of modifications between the 1970 version and the 1972 amendments."  *Id.*  The Rule was developed after consideration of all public comments, including "varying interpretations" described in the preamble.  *Id.* at 42,256.  EPA fully and correctly engaged with the text and history of the Act with regard to the Section 401 certification process. *See id.* at 42,229–30 (describing the scope of certification under the Rule in the context of the CWA's text and history), *id.* at 42,230–36 (engaging in a plain text analysis of the statute and showing how the definitional clarifications in the Rule are supported by the ordinary meaning of the text); *see also* 40 C.F.R. §§ 121.2–121.11 (laying out the uniform set of certification procedures).

The Court sought to bolster its analysis that EPA's analysis was insufficient by pointing to a post-rule declaration that EPA has changed its mind yet again in response to pressure from the new administration.  Such a post-action statement is irrelevant to the Rule's compliance with the APA, and it was error for the district court to consider it.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").  Likewise the Court's consideration of EPA's brief as "signal[ing] it will not or could not adopt the same rule upon remand," Order at 14, was erroneous.

Even if the scope of certification provision was defective, it would provide no basis for vacating the entire Rule.  Portions of the Rule were not even challenged in the vacatur briefing.

1   *See, e.g.*, 40 C.F.R. 121.11 – 121.16.  Several of the procedural portions of the rule merely codify

2   what federal courts have held the Clean Water Act requires.   *See N.Y. State Dep't of Envtl.*

3   *Conservation v. FERC*, 884 F.3d 450, 455 (2d Cir. 2018); *Alcoa Power Generating Inc. v. FERC*,

4   643 F.3d 963, 972 (D.C. Cir. 2011).  And even where not required by case law, those requirements

5   address real and substantive problems and act independent of the scope of certification.  There is

6   no basis for believing the agency would not have adopted those provisions without the scope of

7   certification rule.  That the scope of certification provision may have been a "foundation" for other

8   parts of the rule does not mean those parts are not severable.  *See Regan v. Time, Inc.*, 468 U.S.

9   641, 652 (1984) ("[A] court should refrain from invalidating more of the statute than is

10  necessary."); *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 351-52 (D.C. Cir. 2019) (applying

11  severability analysis to administrative regulation); *Community for Creative Non-Violence v.*

12  *Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (citing *Regan* and applying severability analysis to

13  administrative regulation).  The Court's failure to conduct a severability analysis was error, was

14  inconsistent with Supreme Court precedent, and will generate a circuit split if affirmed.[7]

15         This Court also erred in its consideration of the second *Allied-Signal* factor by giving short

16  shrift to the substantial and predictable disruptions the immediate vacatur of a (not-unlawful) Rule

17  has caused.  As Intervenor Defendants explained, vacating the Rule will cause significant disruption

18  to pending Section 401 reviews.  It returns to the regime that was in place before the Rule under

19  which some States used the outdated rules to exert control over activities in other States and to

20  protect their own industries. *See, e.g.*, ECF No. 27-7 at 1-4.  Before the Rule, States imposed

21  uncertainty, never-ending demands for information, interminable delays, and conditions unrelated

22  to the discharges actually regulated by the CWA.  The result was to increase the cost of some

23  interstate projects and fully defeat others, with attendant harms to other states' economies and

24  ability to develop their natural resources.  *See* ECF No. Dkt. 56-1, 56-2.  These abuses will return

25  if this Court's decision to vacate the Rule is not stayed.  Further, vacatur would upend the

26  ───────────────

27         [7] The upshot to the Court's vacatur is that—in reliance on the Court's divinations based on
    EPA's post-action statements—the Court apparently reinstated a rule EPA long-ago suggested was
28  inconsistent with the 1972 amendments to the Clean Water Act. *See* NPDES; Revision of
    Regulations, 44 Fed. Reg. 32,854, 32,856 (June 7, 1979).

INTERVENOR DEFENDANTS' MOTION FOR STAY PENDING APPEAL

substantial progress States and federal agencies have made to improve the section 401 process and make it more transparent.  Such uncertainty and risk of delay deters large capital projects.  ECF No. 172-2 ¶¶ 7-9.  Vacatur of the Rule harms the businesses that need section 401 certifications for critical infrastructure projects. *See* ECF No. 56-2 ¶¶ 21, 23.  Vacatur of the Rule—especially without any actual finding that the Rule or any portion of it is unlawful—casts substantial uncertainty over all of those pending authorizations.

The Order nevertheless found there would not be significant disruptive consequences from vacatur because the Rule had only been in effect for thirteen months and thus there was not enough time for sufficient reliance to build up around the Rule. Order at 15.  That was error. Since 2020, EPA has issued a number of implementation documents, including recommended best practices and template certifications that can be used by States and Tribes in different circumstances.  EPA, 2020 Rule Implementation Materials. [8]  FERC also completed its own notice-and-comment rulemaking in March 2021 to set a uniform one-year deadline for States to complete certification actions on FERC authorizations based on the Rule.  *See* 86 Fed. Reg. 16,298 (Mar. 29, 2021).

The Order also ascribes the whipsawing effect of vacatur to EPA's decision to promulgate "a revised certification rule that dramatically broke with fifty years of precedent" and its most recent decision to reverse course.  Order at 15.  As an initial matter, EPA sought to correct an outdated rule that had caused numerous problems.  Further, EPA's decision to revise the Rule cannot cause the whipsawing that vacatur does because implementation of that decision requires a thorough notice-and-comment rulemaking process that allows States and regulated entities to examine EPA's proposed rule, provide comments, and prepare for a new rule.  In contrast, the immediate vacatur of the Rule—especially without a merits determination—creates substantial uncertainty regarding pending section 401 certifications.  It raises numerous unanswered questions about what regulations apply, what effect would the Rule have on the Section 401 rulemakings of other agencies, would pending certification requests need to be resubmitted, and would States be free to engage in the same scope and timing abuses that plagued the old regime.

---

[8] Available at https://www.epa.gov/cwa-401/2020-rule-implementation-materials.

-18-

**B.     Intervenor Defendants will be irreparably harmed absent a stay.**

**1.     Industry Intervenors' members are experiencing economic harm.**

Intervenor Defendants will be irreparably harmed if the Order vacating the Rule is not stayed.  Reinstating the prior rule will result in substantial disruption from general whipsawing of both regulators and regulated entities.  ECF No. 172-2 ¶ 8.  Vacatur of the Rule, especially without a finding that the Rule is unlawful, casts substantial uncertainty and raises questions with no clear answers, such as what rules apply and whether pending certification requests need to be resubmitted. These questions will cause substantial delay in completing pending Section 401 reviews.  ECF No. 172-3 at ¶ 11; ECF No. 56-2 ¶¶ 21, 23, 24.  Such uncertainty and the attendant risk of delay deters large capital projects that benefit the Intervenor Defendant States economically and, indeed, which are necessary for the development of their natural resources.  *Id.* ¶¶ 7-9.  The Rule has been applied to potentially thousands of pending requests for Section 401 certification. *See* Moyer Decl. ¶ 14, *N. Plains Resource Council v. U.S. Army Corps of Eng'rs*, No. 4:19-cv-44 (D. Mont. Apr. 27, 2020), ECF No. 131-1 (explaining that "[o]n average, the Corps receives 3,000 standard individual permit applications annually.").  INGAA members alone had numerous certification requests pending for projects that involve billions of dollars in capital investment at this time of its intervention in these actions.  *See, e.g.*, ECF No. 56-2 ¶¶ 14, 22, 24.  NHA members file license applications for renewable hydroelectricity that require section 401 certifications and expect another 54 projects will be required to submit licensing applications before October 1, 2022. ECF No. 172-3 ¶ 10.  And that is just a thin sliver of the potential harm to the regulated community. Section 401 certificates are required for all manner of infrastructure projects requiring federal licenses, the vast majority of which are not connected to natural gas, petroleum projects, or hydropower.

Even those certifications that have already been completed under the Rule are being affected by this Court's decision.  The Corps already has notified permit applicants that, because the Order, it will issue no Section 404 permit authorizations—including nationwide permit (NWP) verifications—that rely on section 401 certifications issued under the Rule until further notice. Ex. 1, Declaration of Joan Dreskin at ¶¶ 14-18.  This suspension already is having real, tangible harm

-19-                                    Case No. 3:20-CV-04636-WHA

on INGAA members.  For example, one INGAA member expected the Crops' Nashville District to authorize the use of a NWP to conduct necessary maintenance and repairs by November 8, 2021. *Id.* at ¶ 20.  The relevant state had already issued the certification under Section 401, but as a result of the Court's vacatur of the 401 Rule, the Nashville District advised that it would not be able to authorize use of the NWP until Corps Headquarters provided further guidance. *Id.*  This delay will require operation of the line at reduced pressure, interruption of service to customers, and higher costs to perform the work. *Id.*  Another member has been told by its Corps district that due to the Court's Order, the Corps cannot issue the NWP verification for the member's proposed approximately $500,000 armoring and streambank stabilization project to ensure integrity for an interstate natural gas pipeline, threatening the member's plan to complete its critical integrity project before winter rains and flooding occur. *Id.* at ¶ 21.  A third INGAA member is experiencing delays related to development of a new natural gas-fired generation plant that because it will replace a retiring coal generation plant, will substantially reduce greenhouse gas emissions. *Id.* ¶ 22.  As a result of this Court's order, the Corps has called into question the validity of the Section 401 certification permit and indefinitely delayed issuance of the Section 404 permit, resulting in delay of the in-service date of the pipeline and new power plant and higher electricity costs and reliability issues for the non-profit electric cooperative building the plant. *Id.*

Such economic harm is irreparable.  *See Phillip Morris USA Inc. v Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers) (granting stay: "If expenditures cannot be recouped, the resulting loss may be irreparable."); *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (finding purely economic harms constituted irreparable harm because plaintiff would be barred from recovering monetary damages from the defendant due to tribal sovereign immunity); *Croew & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (explaining that while economic loss is usually insufficient to constitute irreparable harm, "imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

INTERVENOR DEFENDANTS' MOTION FOR STAY PENDING APPEAL

1

2

**2.      Intervenor Defendants are being irreparably harmed by deprivation of statutory rights under the APA.**

3       The Order also has deprived Intervenor Defendants of their statutory and due process rights

4   to participate in the statutorily prescribed process by which administrative law can be changed.  The

5   substantial and costly limbo industry Intervenors now confront was not the product of APA-

6   prescribed judicial review or notice-and-comment rulemaking.  It instead is due to the Court's

7   decision to bypass those key features of the APA.  Even if the Court's Order produced no immediate

8   economic harm (and it most certainly has), the deprivation of Defendant Intervenors' statutory

9   rights under the APA, which will persist unless the Order is stayed, is sufficient irreparable harm.

10  *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1353 (Ct. Int'l Trade 2020) ("A

11  procedural violation [of the APA] can give rise to irreparable harm justifying injunctive relief

12  because lack of process cannot be remedied with monetary damages or post-hoc relief by a court");

13  *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (finding irreparable harm

14  based on violation of APA's notice-and-comment provisions because "the damage done by [the]

15  violation of the APA cannot be fully cured by later remedial action.").

16      Intervenor Defendants enjoy the statutory right under the APA to participate in the

17  administrative process.  The APA requires EPA to provide public notice and opportunity to

18  comment before enacting, amending, or repealing a rule. 5 U.S.C. §§ 553(b), (c), 551(5); *Consumer*

19  *Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982) ("[T]he APA expressly

20  contemplates that notice and an opportunity to comment will be provided prior to agency decisions

21  to repeal a rule.").  Indeed, among "the most fundamental of the APA's procedural requirements"

22  is the requirement that "the agency shall give interested persons an opportunity to participate in the

23  rule making through submission of written data, views, or arguments for the agency's

24  consideration." *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed.*

25  *R.R. Admin.*, 988 F.3d 1170, 1180 (9th Cir. 2021).  That most fundamental procedural protection

26  was denied here.  In short, the judicial and regulatory machinery were short-circuited, with the

27  practical upshot of compelling States and regulated entities to comply with regulations imposed by

28

a single federal district judge, without notice and comment.  That, too, is an irreparable harm. *Cf. Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (a state suffers irreparable injury whenever it is prevented from effectuating a statute enacted by representatives of its people).  At minimum, when combined with the irreparable economic harm, it bolsters Intervenor Defendants' case. *See Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (procedural harm combined with other irreparable harm bolsters the case for an injunction).

### 3.    Vacatur reimposes harms of constitutional magnitude.

Intervenors advocated and supported the Rule based on harms to their interests, including constitutional rights, sovereign interests, and economic interests.  The Court's vacatur discounted all of those interests as mere "negative economic effects" that it believed are outweighed by "environmental effects" if the Rule were left in place.  But what the Court discounted as mere "negative economic effects" are of constitutional magnitude.  As explained in Intervenors' brief, ECF No. 172 at 15 n.3, "[o]ne of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976).  A particular "source of dissatisfaction was the peculiar situation of some of the States, which having no convenient ports for foreign commerce, were subject to be taxed by their neighbors, [through] whose ports, their commerce was carried on." *Id.* (quoting Records of the Federal Convention of 1787 (M. Fan-and ed. 1966)).  Accordingly, a State "may not use the threat of economic isolation" to control its sister states. *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 379 (1976).  Certain States doing just that was one of the reasons Intervenors petitioned for the Rule. *See, e.g.* ECF No. 172-2 ¶¶ 4-7; *see also* ECF No. 27-7; ECF No. 56-1; ECF No. 56-2.  For example, the State of Maryland attempted to extort billions of dollars from a permit applicant in lieu of impossible certification conditions. *Cf. Nollan v. California Coastal Commission*, 483 U.S. 825 (1987).  There is every reason to believe those constitutional harms will return without the Rule.

INTERVENOR DEFENDANTS' MOTION FOR STAY PENDING APPEAL

1

2

### C.   Plaintiffs will not be substantially injured by a stay, which would serve the public interest.

3
Plaintiffs, on the other hand, can seek redress for any prejudice they claim they would suffer

4
if the Rule were left in place.  EPA and the U.S. Army Corps of Engineers both have indicated their

5
willingness to address concerns with the Rule raised by the Plaintiffs on remand.[9]  Further,

6
Plaintiffs can challenge any particular application of the Rule that causes the harm that they claim

7
they will suffer.  *See* Pls.' Opp'n EPA's Motion to Remand Without Vacatur at 9-11 (ECF No.

8
145).

9
The public interest also supports a stay.  The Rule fills a gaping regulatory void.  It sets

10
basic rules for the Section 401 process, including a common rule for defining when the clock starts

11
on a state's reasonable period of time to act on a certification request and procedures for

12
establishing how much time is reasonable.  And critically, it more clearly defines the scope of

13
authority granted by Congress in Section 401, so that Section 401 cannot be used by states to make

14
policy decisions squarely reserved to the federal government and thereby impair the interests of

15
other states. Vacating the Rule eliminates these salutary improvements and returns to the

16
dysfunction fostered by EPA's decades-long failure to set basic rules for the Section 401 process.

17
## IV.   <u>CONCLUSION</u>

18
For the foregoing reasons, Intervenor Defendants request that the Court stay the Order

19
pending their appeal to the Ninth Circuit.

20

21
\*         \*         \*

22

23

24

25

26

27

28

---

[9] Joint EPA Army Memorandum on 401 Implementation (Aug. 19, 2021), available at https://www.epa.gov/cwa-401/2020-rule-implementation-materials.

1

2                                            Respectfully submitted,

3    Dated: November 17, 2021

4
                                             HUNTON ANDREWS KURTH LLP
5
                                             By:  /s/ George P. Sibley, III
6                                                 Clare Ellis
                                                  George P. Sibley, III
7                                                 (admitted *pro hac vice*)
                                                  Deidre G. Duncan (admitted *pro hac vice*)
8
                                                  *Attorneys for Intervenor Defendants*
9                                                 American Petroleum Institute and
                                                  Interstate Natural Gas Association of
10                                                America

11                                           JEFF LANDRY
                                             ATTORNEY GENERAL OF LOUISIANA
12

13                                           By: /s/ Joseph S. St. John
                                                 Elizabeth B. Murrill, Solicitor General
14                                               (admitted *pro hac vice*)
                                                 Joseph S. St. John, Deputy Solicitor
15                                               General (admitted *pro hac vice*)
                                                 Ryan M. Seidemann, Assistant Attorney
16                                               General (admitted *pro hac vice*)

17                                               *Attorneys for State Intervenor Defendants*
                                                 States of Arkansas, Louisiana, Mississippi,
18                                               Missouri, Montana, Texas, West Virginia,
                                                 and Wyoming
19

20                                           TROUTMAN PEPPER HAMILTON SANDERS LLP

21                                           By: /s/ Elizabeth Holt Andrews
                                                 Elizabeth Holt Andrews*
22                                               Misha Tseytlin (admitted *pro hac vice*)
                                                 Charles Sensiba (admitted *pro hac vice*)
23                                               Andrea W. Wortzel (admitted *pro hac vice*)
                                                 Sean T.H. Dutton (admitted *pro hac vice*)
24
                                                 *Attorneys for Intervenor Defendant*
25                                               National Hydropower Association

26

27   * Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of the document
     has been obtained from each of the other Signatories.  /s/ George P. Sibley, III
28
                                             -24-                        Case No. 3:20-CV-04636-WHA