1

2

3

4

5

6                  UNITED STATES DISTRICT COURT

7

8                  NORTHERN DISTRICT OF CALIFORNIA

9

10   In re                                    No.  C 20-04636 WHA
                                              No.  C 20-04869 WHA
11        CLEAN WATER ACT                      No.  C 20-06137 WHA
          RULEMAKING.
12   _____

13   This Document Relates to:               (Consolidated)

14        ALL ACTIONS.                        **ORDER DENYING MOTION FOR
                                              STAY PENDING APPEAL**
15   _____

16

17                          **INTRODUCTION**

18        Intervenor defendants move for a stay of the order vacating and remanding EPA's Clean

19   Water Act Section 401 certification rule pending appeal.  Intervenors' arguments on the merits

20   and irreparable harm provide lukewarm support for a stay.  On the other side, a stay would

21   substantially injure plaintiffs and does not align with the public interest.  The motion is

22   **DENIED**.

23                           **STATEMENT**

24        The previous order at issue here describes our facts (Dkt. No. 173).  In brief, Congress

25   enacted the Federal Water Pollution Control Act Amendments of 1972, commonly referred to

26   as the Clean Water Act, with the express goal "to restore and maintain the chemical, physical,

27   and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Relevant here, under

28   Section 401 of the act, a federal agency may not issue a permit or license to an applicant that

seeks to conduct any activity that may result in any discharge into the navigable waters of the United States unless the state where the discharge would originate issues a water quality certification or waives the requirement.  Authorized tribes and EPA can also act as certifying entities.  Notably:  "No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator [of the EPA], as the case may be."  33 U.S.C. § 1341(a)(1).  Section 401 certifications are required for certain permits issued by, for example, the Army Corps of Engineers and the Federal Energy Regulatory Commission (FERC).

EPA employed 40 C.F.R. Part 121 to administer Section 401 certifications, which the agency had promulgated a year prior to the Clean Water Act to regulate water quality certifications pursuant to Section 21(b) of the FWPCA.  *See* 36 Fed. Reg. 22,487 (Nov. 25, 1971), redesignated at 37 Fed. Reg. 21,441 (Oct. 11, 1972), redesignated at 44 Fed. Reg. 32,899 (June 7, 1979).  EPA utilized this regulation unchanged for half a century. This order will refer to this certification rule as the 1971 rule.

On September 11, 2020, EPA revised 40 C.F.R. Part 121 in accordance with President Trump's Executive Order 13868, which asserted that the "Federal Government must promote efficient permitting processes and reduce regulatory uncertainties that currently make energy infrastructure projects expensive and that discourage new investment."  84 Fed. Reg. 15,495 (Apr. 15, 2019); *see also* 85 Fed. Reg. 42,210 (July 13, 2020).  The revised Section 401 certification rule — which this order will refer to as the 2020 rule — parted ways with the 1971 rule in dramatic fashion.  This led to challenges to the rule by our plaintiff states, tribes, and non-profit conservation groups.  Those actions eventually consolidated before the undersigned.

In October 2020, eight states and three industry groups intervened as defendants.  But the election of President Biden in November shifted the course of this litigation.  On January 20, 2021, Executive Order 13990 revoked Executive Order 13868.  The Biden administration also specifically listed the 2020 rule as one agency action it planned to review.  Five months later, on June 2, 2021, EPA noticed its intent to revise the 2020 rule.  EPA expects to finalize the new certification rule by Spring 2023.  86 Fed. Reg. 7,037 (Jan. 25, 2021); 86 Fed. Reg. 29,541

1   (June 2, 2021); Fact Sheet: List of Agency Actions for Review,

2   https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-

3   agency-actions-for-review/ (Jan. 20, 2021).

4       Less than a month after EPA announced it would revise the 2020 rule, the agency, in this

5   action, moved for remand of the rule without vacatur (Dkt. No. 143).  Plaintiffs, opposing the

6   motion, argued that the 2020 rule should be vacated upon remand to the agency.  Intervenors,

7   who had chosen not to file any briefing on EPA's motion up to that point, filed a reply brief

8   arguing for remand without vacatur and separately moved to strike plaintiffs' vacatur

9   arguments (Dkt. Nos. 148, 155).  After a hearing on the motions, intervenors were offered the

10  opportunity to file supplemental briefing on the vacatur issue, which they did (Dkt. No. 172).

11      An October 2021 order vacated and remanded the 2020 rule (Vacatur Order, Dkt. No.

12  173).  EPA has stated it will not appeal the vacatur order.  Intervenors, however, now move for

13  a stay of the vacatur order pending their own appeal.  To expedite the hearing on this motion,

14  defendants waived their reply briefing.  This order follows oral argument held telephonically

15  due to the COVID-19 pandemic.

16                                      **ANALYSIS**

17      Under the traditional test for a stay pending appeal, a district court considers four factors:

18          (1) whether the stay applicant has made a strong showing that he is
            likely to succeed on the merits; (2) whether the applicant will be
19          irreparably injured absent a stay; (3) whether issuance of the stay
            will substantially injure the other parties interested in the
20          proceeding; and (4) where the public interest lies.

21  *Nken v. Holder*, 556 U.S. 418, 433–34 (2009); *see also Al Otro Lado v. Wolf*, 952 F.3d 999,

22  1006–07 (9th Cir. 2020).

23      Our court of appeals has instructed that we weigh these factors using a flexible, sliding-

24  scale approach, under which "a stronger showing of one element may offset a weaker showing

25  of another."  *Leiva-Perez v. Holder*, 640 F.3d 962, 964, 966 (9th Cir. 2011).  The first two

26  factors are the most critical.  The mere possibility of success or irreparable injury are

27  insufficient.  A movant must show "at a minimum, that she has a substantial case for relief on

28  the merits."  *Id.* at 964, 967–68.  Irreparable harm carries a higher standard:  a movant must

United States District Court
Northern District of California

3

1
2
3
4
5
6

demonstrate irreparable harm is probable, not merely possible.  We consider the final two factors — which tend to merge when the government is an opposing party — once a movant satisfies the first two.  *Nken*, 556 U.S. at 435; *United States v. Mitchell*, 971 F.3d 993, 996 (9th Cir. 2020).  If a petition raises at least a serious question going to the merits, the other factors can be satisfied by a showing that the balance of hardships tips sharply in the movant's favor.  *Leiva-Perez*, 640 F.3d at 970.

7
8
9
10
11
12
13
14
15
16
17
18
19

This order will proceed through the stay factors in a moment, but offers this overview. On the one hand, allowing the 1971 rule to remain in effect will give certifying entities greater latitude to prescribe more conditions.  This would harm those who wish to be free of further requirements, such as our intervenor defendants.  On the other hand, should we allow the 2020 rule to remain in effect, those certifying entities that wish to impose more conditions on Section 401 certifications will lose the opportunity to do so.  This would result in harm to them.  We face a crossroads where one side or the other will suffer some harm, no matter what. But harm is one thing, irreparable harm another.  Certifying entities that dislike more conditions can simply choose not to impose additional conditions.  And, a party saddled with unwanted conditions can sue in district court if presented with a flawed certification process. These considerations mitigate some potential harms.  Ultimately, when it comes to mitigating harm, prudence favors maintaining the course EPA has charted the past fifty years under the 1971 rule, the devil we know, rather than the devil we don't.

20

With these overarching points in mind, this order considers each factor in turn.

21

### 1.    SUCCESS ON THE MERITS.

22
23
24
25
26
27
28

We start with whether intervenors can make a "strong showing" of success on the merits. In light of the irreparable harm considerations previewed above, this order notes intervenors need to make a commensurably stronger showing for the first factor.  Intervenors assert they are likely to succeed on the merits of their appeal of the vacatur order based on two issues:  (1) whether the Administrative Procedure Act (APA) requires a complete administrative record and full briefing on the merits before a reviewing court may set aside an agency action; and (2) whether the vacatur order correctly applied the *Allied-Signal* test (Br. 9–18).  This order

*United States District Court*
*Northern District of California*

4

United States District Court
Northern District of California

1    questions whether intervenors have made a sufficient showing to justify a stay based on either

2    issue.

3                *A.*      *VACATUR PRIOR TO FULL ADJUDICATION ON THE MERITS.*

4           Intervenors argue nothing in the APA "authorizes a court to set aside federal agency

5    action without making the predicate finding that the action was unlawful, and that decision

6    must be based on a review of the agency's record" (Br. 10).  Further, intervenors argue that the

7    vacatur order "relied chiefly on the reasoning in *Center for Native Ecosystems v. Salazar*, 795

8    F. Supp. 2d 1236, 1241–42 (D. Colo. 2011)," which they assert is flawed in several ways (Br.

9    11–13).

10           To start, intervenors' statutory argument picks and chooses parts of the vacatur order to

11    criticize, garbling the order's reasoning in the process.  The vacatur order began with the

12    APA's mandate that a district court "shall . . . set aside" unlawful agency actions (Vacatur

13    Order 7, citing 5 U.S.C. § 706(2)).  Despite this directive, our court of appeals has repeatedly

14    held that, when equity demands, a flawed rule need not be vacated.  *See Pollinator*

15    *Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015); *Cal. Cmtys. Against Toxics v. EPA*

16    (*CCAT*), 688 F.3d 989 (9th Cir. 2012).  Relying on these opinions, the order explained that our

17    court of appeals' "holding that even a flawed rule need not be vacated supports the corollary

18    proposition that a flaw need not be conclusively established to vacate a rule" (Vacatur Order

19    7).  In other words, because federal courts have the equitable power to refrain from vacating an

20    unlawful rule despite the express requirement a court set it aside in the APA, federal courts a

21    priori retain the equitable power to vacate rules prior to a conclusive finding on the merits in

22    procedural postures such as motions for voluntary remand.  Nowhere in their briefing do

23    intervenors grapple with these cases or this analysis.  Moreover, as plaintiffs note:  "Singular

24    equitable relief is commonplace in APA cases." *East Bay Sanctuary Covenant v. Biden*, 993

25    F.3d 640, 681 (9th Cir. 2021) (quotation omitted).

26           Intervenors proceed to state general principles of law that could support their position.

27    They assert that the APA's waiver of sovereign immunity "must be strictly construed," and

28    recite the semantic canon *expressio unius est exclusio alterius* (Br. 10, citing *Dep't of the Army*

*v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999)).  But how do these broad legal concepts apply to the analysis in the vacatur order, or undermine *CCAT* and *Pollinator*?  Intervenors do not say. *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (stating the broad tenet that "a major departure from the long tradition of equity practice should not be lightly implied").

Intervenors go on to assert the vacatur order did not acknowledge cases like *Carpenters Industry Council v. Salazar*, 734 F. Supp. 2d 126 (D.D.C. 2010) — which held the APA precludes vacatur absent a conclusive judicial finding — or the policy concern that pre-merits vacatur would permit an agency to repeal a rule without public notice and comment (Br. 11). But the vacatur order expressly cited *Carpenters Industry Council* and the relevant section of the Wright & Miller treatise regarding the conflicting policy implications of vacatur (Vacatur Order 7).  The order did not build its consideration of vacatur out of whole cloth.  It cited precedent from our court of appeals recognizing analogous equitable powers as well as decisions by district court judges in our circuit supporting the vacatur order's position (Vacatur Order 7–8).  Nor did the order ignore the policy concern that intervenors discuss.  Rather, it found more pertinent the competing concern that, "[l]eaving an agency action in place while the agency reconsiders may deny the petitioners the opportunity to vindicate their claims in federal court and would leave them subject to a rule they have asserted is invalid" (*ibid*).

Intervenors then attempt to distinguish *Native Ecosystems*, which held district courts may vacate agency actions prior to a merits determination.

*First*, intervenors distinguish *Native Ecosystems* on the ground that, unlike here, the agency had confessed error (Br. 11).  This factual difference makes the reasoning in *Native Ecosystems* regarding per-merits vacatur no less applicable.  Moreover, this argument simply puts a different spin on intervenors' contention there must be some sort of conclusive statement regarding unlawfulness in order to set aside an agency action.  The vacatur order examined and rejected that theory.  Moreover, as explained below, step one of the *Allied-Signal* test does not require any definitive statement on the merits.  *See Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

6

United States District Court
Northern District of California

1   *Second*, intervenors contend the law review article relied upon by *Native Ecosystems*

2   addressed remand without vacatur, not pre-merits vacatur (Br. 11–12, citing Ronald M. Levin,

3   *"Vacation" at Sea:  Judicial Remedies and Equitable Discretion in Administrative Law*, 53

4   Duke L.J. 291 (2003)).  Professor Levin's article did indeed focus on remand without vacatur,

5   but the equitable principles it considered are readily applicable to the issues here, as *Native*

6   *Ecosystems* notes.  *See Native Ecosystems*, 795 F. Supp. 2d at 1241 n. 8.  Professor Levin's

7   article, in fact, began with a discussion of our court of appeals' decision *Idaho Farm Bureau*

8   *Federation v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995), which both *CCAT* and *Pollinator*

9   expressly rely upon.  Levin, *supra*, at 294.

10   *Third*, intervenors fault *Native Ecosystems* for not addressing "whether pre-adjudication

11   vacatur has any analog in the precedent of the English High Court of Chancery" (Br. 12, citing

12   *Grupo Mexicano de Desarrollo, SA v. Alliance Bond Fund*, 527 U.S. 308, 318, 332 (1999)).

13   The argument goes no further than stating *Grupo Mexicano*'s holding.  Intervenors provide no

14   analysis.  Nor do they connect the dots back to the vacatur order.  Intervenors do not

15   sufficiently raise this argument for this order to evaluate its merit.

16   *Fourth*, intervenors argue that *Native Ecosystems* "did not confront the settled principle

17   that equity cannot be invoked to evade limits imposed by law" (Br. 12, citing *Porter v. Warner*

18   *Holding Co.*, 328 U.S. 395, 397–98 (1946)).  Once again, intervenors' point is lost given it

19   fails to consider the vacatur order's analysis of *CCAT* or the order's citation to other

20   corroborating caselaw.

21   As explained, intervenors assert many arguments regarding pre-merits vacatur.  The

22   vacatur order itself recognized that the law on this issue is unsettled and that difficult questions

23   arise when vacatur comes into play in an agency's motion for voluntary remand (Vacatur

24   Order 7).  But intervenors neither substantively address the reasoning in the vacatur order, nor

25   proffer new arguments beyond those considered and rejected in the order.  Even EPA, which

26   does not fully endorse the vacatur order's analysis, concludes that intervenors do not "fully

27   grapple" with the complexities here (EPA Opp. 4 n. 3).  This order doubts whether intervenors

28   have made a sufficiently strong showing of their likelihood of success on appeal of this issue.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.     THE ALLIED-SIGNAL ANALYSIS.**

The vacatur order applied the familiar *Allied-Signal* test when considering EPA's remand motion (Vacatur Order 8).  Under *Allied-Signal*, the "decision whether to vacate depends on [1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed."  *Allied-Signal*, 988 F.2d at 150–51 (quotation omitted).  Intervenors argue the vacatur order erroneously applied *Allied-Signal*.  We start with *Allied-Signal* step one.

*First*, intervenors recapitulate their primary equitable-powers argument, saying that review of the first *Allied-Signal* factor "can only logically occur after a court has concluded that a legal error has occurred" (Br. 13).  But, as the vacatur order noted, in full context, the first factor considers "the extent of doubt whether the agency chose correctly."  This analysis can be performed without a conclusive decision on the merits.  Remember, *Allied-Signal* arose from a traditional preliminary injunction analysis (Vacatur Order 8–9).  Intervenors do not address this reasoning.

*Second*, intervenors contend the vacatur order's failure to conduct a severability analysis constituted error.  The vacatur order deemed severance unnecessary because it found "serious deficiencies in an aspect of the certification rule that, in EPA's words, 'is the foundation of the final rule and [] informs all other provisions of the final rule'" (Vacatur Order 10–11, citing 85 Fed. Reg. at 42,256).  Intervenors assert here that severance should have occurred because "[s]everal of the procedural portions of the rule merely codif[ied] what federal courts have held the Clean Water Act requires," and that just because the "scope of certification provision may have been a 'foundation' for other parts of the rule does not mean those parts are not severable" (Br. 17).  Intervenors demand a provision-by-provision review to salvage procedural portions of the rule that remained in force anyway.  As our court of appeals reminds, "we ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule." *East Bay Sanctuary*, 993 F.3d at 681 (quotation omitted).

1    *Third*, intervenors assert the vacatur order's analysis of *PUD No. 1* was erroneous (Br.

2    15–16, citing *PUD No. 1of Jefferson Cty. v. Wash. Dep't of* Ecology, 511 U.S. 700 (1994)).

3    The arguments intervenors proffer here are substantially similar to those considered by the

4    order.  As explained in the order, EPA can change its interpretation of Section 401 and revise

5    the certification rule accordingly.  But, for the 2020 rule, the agency embraced an

6    interpretation of the scope of Section 401 *antithetical* to the 1971 rule — which was consistent

7    with what *PUD No. 1* deemed the most reasonable interpretation of the statute.  It matters that

8    EPA did not merely assert a different interpretation but a contrary interpretation.  As noted,

9    unexplained inconsistencies in an agency's revisions to a rule indicate the new interpretation is

10   unreasonable and not entitled to *Chevron* deference (Vacatur Order 12–13).  EPA failed to

11   sufficiently justify the inconsistent revisions in the 2020 rule.  Without more, intervenors'

12   argument here remains unconvincing.

13       *Fourth*, intervenors argue the vacatur order erred by considering EPA's declaration in

14   support of its remand motion (*see* Br. 16, citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196

15   (1947)).  EPA's declaration asserted that the agency harbored substantial doubts regarding

16   nearly every aspect of the 2020 rule and that it would "restore" principles of cooperative

17   federalism in its new rulemaking (Dkt. No. 143-1).  The vacatur order does not run afoul of

18   *Chenery* by noting EPA's opinion of the grounds upon which it based the 2020 rule.  The order

19   properly focused on the final rule and its preamble (Vacatur Order 13–14).  Upon a motion for

20   voluntary remand, moreover, evaluations of remand and vacatur do not occur in isolation from

21   one another.  *See, e.g.*, *Safer Chemicals, Healthy Families v. EPA*, 791 Fed. App'x 653, 656

22   (9th Cir. 2019); *Pollinator*, 806 F.3d at 532–33; *CCAT*, 688 F.3d at 993–94.

23       Turning to step two of *Allied-Signal*, intervenors contend the vacatur order failed to

24   consider the level of disruption returning to the 1971 rule would cause.  As explained in our

25   framing discussion above and in the proceeding irreparable harm analysis, this speculative

26   argument does not convince.  Intervenors also insist the vacatur order erred when it concluded

27   that insufficient time had elapsed since promulgation of the 2020 rule to justify any

28   institutional reliance on it (Br. 18).  Intervenors' reference to implementation documents for

United States District Court
Northern District of California

9

the 2020 rule do not demonstrate reliance.  Intervenors also cite FERC's rulemaking that aligned its one-year deadline for certifications with the 2020 rule (Br. 18).  But, as plaintiffs point out, FERC explicitly disavowed the notion that it premised its rulemaking on the 2020 rule.  *See* 86 Fed. Reg. 16,298, 16,299 n. 9 (Mar. 29, 2021).  The 2020 rule was in effect for thirteen months — and under attack since before day one — too brief and unsettled a time for justifiable reliance to build up.

This order doubts whether intervenors have made a sufficiently strong showing on their likelihood of success on the merits of their appeal of the vacatur order's *Allied-Signal* analysis.

In sum, intervenors have not made particularly strong showings of their likelihood of success on the merits.  It bears emphasizing here that intervenors do not meaningfully critique the vacatur order.  Rather, intervenors cherry-pick strands of analysis to contest in isolation.  Nor did intervenors proffer any substantive arguments beyond those previously considered by the order.  Nevertheless, this order declines to halt the analysis at this stage.  As explained at the outset, atypical harm considerations warrants proceeding through the rest of the factors so that we can better balance the equities.

## 2.   IRREPARABLE HARM.

This order next considers whether intervenors will suffer irreparable harm absent a stay.  Intervenors argue that vacatur deprived them of statutory rights under the APA, that vacatur "reimposes harms of constitutional magnitude," and that vacatur has imposed irreparable economic harms (Br. 19–22).  This order finds intervenors have made, at best, a marginal showing of irreparable harm.

*First*, intervenors argue the vacatur order irreparably harmed their "statutory right under the APA to participate in the administrative process" (Br. 21).  How?  EPA announced in June 2021, months before the vacatur order, that the agency would revise the 2020 rule.  Neither the vacatur order, nor this litigation generally, has proscribed intervenors' full participation in that rulemaking process.  Nor did the vacatur order dictate the final outcome of EPA's ongoing rulemaking.  "The key word in this consideration is irreparable."  *Al Otro Lado*, 952 F.3d at 1008 (quotation omitted).  Moreover, the vacatur order did not substitute the 2020 rule with a

United States District Court
Northern District of California

1    judicially manufactured replacement.  It temporarily reinstated the 1971 rule that EPA

2    employed for half a century.

3          *Second*, intervenors contend that "what the [vacatur order] discounted as mere 'negative

4    economic effects' are of constitutional magnitude" (Br. 22).  Constitutional violations are

5    generally deemed irreparable harm.  *See Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th

6    Cir. 1997).  Analogizing to the Articles of Confederation, intervenors explain that certain states

7    unfairly exploited the 1971 rule, concluding:  "There is every reason to believe those

8    constitutional harms will return without the [2020] Rule" (Br. 21).  To support this speculative

9    assertion, intervenors highlight a certification issued by the State of Maryland that would have

10   required the Conowingo dam and hydroelectric project to remove phosphorus and nitrogen

11   from the Susquehanna River despite the project not actually discharging those two elements, or

12   pay $172 million per year for fifty years (Br. 22; Dkt. No. 172-1).  The problem with

13   intervenors argument is that the project manager was able to challenge this alleged overreach

14   in federal court.  It did so.  In fact, the parties recently reached a settlement.  *See Exelon*

15   *Generation Co., LLC v. Grumbles*, No. C 18-01224 APM, Dkt. No. 49 (D.D.C. Apr. 9, 2021)

16   (Judge Amit P. Mehta).  And remember, *PUD No. 1*, our primary guidance from the Supreme

17   Court on Section 401, blessed a broad construction of the types of conditions certifying entities

18   may impose pursuant to Section 401.  *See PUD No. 1*, 511 U.S. at 711–12; *see also id.* at 723

19   (Stevens, J., concurring).

20         *Third*, intervenors say that their members face irreparable economic harm absent a stay.

21   Monetary harm is not typically considered irreparable, although exceptions do exist for certain

22   economic injures that are not recoverable as damages.  *See Al Otro Lado*, 952 F.3d at 1008;

23   *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).  Intervenors focus on how, due to the

24   vacatur order, the Army Corps of Engineers paused permitting under its purview, providing

25   three examples of resultant harm (Dreskin Decl. ¶¶ 14–22).  This order questions whether any

26   of the economic harms intervenors describe rank as irreparable.  Many of the economic harms

27   intervenors assert, such as unspecified delays to projects, remain too speculative to rank as

28   irreparable.  Others do not directly harm intervenors themselves.  *See Azar*, 911 F.3d at 581;

11

United States District Court
Northern District of California

*Doe #1 v. Trump*, 957 F.3d 1050, 1060 (9th Cir. 2020).  And some harms intervenors describe are more properly considered the economic costs of complying with the vacatur order, which do not qualify as irreparable, rather than economic injuries perpetrated by certifying entities, or by permitters like the Corps, which could conceivably be irreparable.

Intervening events, moreover, have significantly undercut the strength of intervenors' showing of irreparable economic harm.  At the hearing, intervenors acknowledged the Corps had already restarted its permitting process during the pendency of the stay motion (*see also* Anastasio Decl. ¶¶ 4–5).  This indicates that the scope of harm intervenors describe amounts to a predictable pause by permitters like the Corps to reassess the certification process in light of the vacatur order.  As EPA states, until it "concludes its rulemaking process, there will be uncertainty regarding future permitting requirements" (EPA Opp. 8).  This comes into play when we balance the hardships.

This order finds that intervenors have not clearly demonstrated serious irreparable harm absent a stay.  At best, intervenors' showing of irreparable harm ranks as marginal.  And, even giving intervenors the benefit of the doubt, "certainty of irreparable harm has never *entitled* one to a stay."  *Leiva-Perez*, 640 F.3d at 965.

### 3.    INJURY TO OTHER PARTIES, THE PUBLIC INTEREST, AND WEIGHING THE STAY FACTORS.

As discussed in this order's overture, injury to other parties and where the public interest lies merit consideration here.  We thus consider the third and fourth stay factors despite tepid showings by intervenors on their likelihood of success on the merits and irreparable harm.

Intervenors contend that a stay supports the public interest because the 2020 rule "fills a gaping regulatory void" and prevents states from "impair[ing] the interests of other states" (Br. 23).  This order, however, agrees with EPA's statement that the public interest "weighs in favor of returning to the familiar 1971 regulations while EPA completes" its rulemaking (EPA Opp. 9).  Staying the course with a familiar rule avoids further regulatory uncertainty. Intervenors' assertion that plaintiffs "can challenge any particular application of the Rule that

1    causes the harm they claim they will suffer" (Br. 23), would also seem to apply equally well to

2    intervenors themselves.  *See, e.g.*, *Exelon*, No. C 18-01224 APM (D.D.C.).

3          More substantively, the public interest as to the Clean Water Act, at base, lies in

4    preserving nature and avoiding irreparable harm to the environment.  The Act has the express

5    goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's

6    waters." 33 U.S.C. § 1251(a).  And our court of appeals has recognized the public interest in

7    preventing environmental harm.  *See, e.g.*, *The Lands Council v. McNair*, 537 F.3d 981, 1004–

8    05 (9th Cir. 2008), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council,*

9    *Inc.*, 555 U.S. 7 (2008); *Southeast Alaska Conservation Council v. U.S. Army Corps of*

10   *Engineers*, 472 F.3d 1097, 1101 (9th Cir. 2006).

11         Plaintiffs convincingly asserted for the vacatur order that irreparable environmental harm

12   would result should the 2020 rule remain in effect.  The order highlighted permitting issues

13   related to three dams on the State of Washington's Skagit River (Vacatur Order 16).  Other

14   examples carry similar force.  Plaintiffs also pointed to a sediment removal project upstream

15   from the Marble Bluff Dam in Nevada.  The project seeks to remove a sediment island on the

16   Truckee River, and its certification is up for renewal prior to EPA's estimated promulgation of

17   a revised rule.  The sediment currently blocks threatened fish from swimming upstream to

18   spawning areas and contains high levels of mercury.  Removal could cause environmentally

19   dangerous sediment to run off into nearby Pyramid Lake.  The Pyramid Lake Paiute Tribe

20   manages certifications for this project, but the 2020 rule would prevent it from placing

21   restrictions on the mercury run-off (Dkt. No. 145-1 at ¶¶ 26–27).  A stay would permit

22   irreparable environmental harms like this to occur.  The public interest lies in preventing these

23   sorts of environmental injuries, especially given the marginal and speculative showing of

24   economic harm on the other side of the scale.

25         Upon consideration of the applicable factors, this order finds intervenors have not

26   justified a stay of the vacatur order.  Intervenors fail to substantively probe the vacatur order's

27   reasoning, or misstate it.  Most of the harm intervenors describe remains speculative.  If they

28   did identify irreparable harm, their showing ranks as marginal.  On the other hand, EPA and

United States District Court
Northern District of California

plaintiffs have demonstrated that the equities tip sharply in favor of denying a stay due to the importance of preserving some certainty in the administrative process and plaintiffs' showing of substantial, irreparable environmental harm should a stay go into effect.

**4.  THE APPEALABILITY OF THE VACATUR ORDER.**

One last point.  The parties also brief the antecedent question of whether intervenors can even appeal the vacatur order in the first place.  Both EPA and plaintiffs assert that the vacatur order is non-final and unappealable by intervenors within the meaning of Section 1291 of Title 28 of the United States Code (EPA Opp. 5–7; Plaintiffs Opp. 4).  We need not linger on this issue.  This order has already found that a stay should be denied under the traditional four-factor test.  This question can be left up to our court of appeals.

## CONCLUSION

For the reasons stated, the motion is **DENIED**.  **IT IS SO ORDERED.**

Dated:   December 7, 2021.


_____

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE