**TROUTMAN PEPPER HAMILTON SANDERS LLP**

Elizabeth Holt Andrews (SBN 263206)
elizabeth.andrews@troutman.com
Three Embarcadero Center, Suite 800
San Francisco, CA 94111-4057
Telephone:   415.477.5700
Facsimile:   415.477.5710

Charles Sensiba (admitted *pro hac vice*)
charles.sensiba@troutman.com
401 9th Street N.W., Suite 1000
Washington, D.C. 20004
Telephone:   202.274.2850
Facsimile:   202.274.2994

Misha Tseytlin (admitted *pro hac vice*)
misha.tseytlin@troutman.com
Sean T.H. Dutton (admitted *pro hac vice*)
sean.dutton@troutman.com
227 W. Monroe Street, Suite 3900
Chicago, IL 60606-5085
Telephone:   312.759.1920
Facsimile:   312.759.1939

Andrea W. Wortzel (admitted *pro hac vice*)
andrea.wortzel@troutman.com
1001 Haxall Point, 15th Floor
Richmond, VA 23219
Telephone:   804.697.1406
Facsimile:   804.697.1339

*Attorneys for Intervenor Defendant*
*National Hydropower Association*

**Additional Counsel listed in signature blocks**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>CLEAN WATER ACT RULEMAKING. | Lead Case No. 3:20-CV-04636-WHA<br><br>Consolidated With Case Nos.<br>3:20-CV-04869-WHA<br>3:20-CV-06137-WHA<br><br>**INTERVENOR DEFENDANTS'<br>RESPONSE TO COURT'S QUESTIONS<br>FOR REQUESTED BRIEFING (ECF 220,<br>221)** |

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

**ANSWERS TO COURT'S QUESTIONS FOR BRIEFING**

**I.      Intervenor-Defendant National Hydropower Association's Answers**

Hydropower provides clean, renewable energy even when other, more intermittent renewable energy sources cannot, and as well as grid-wide flexibility that further strengthens our Nation's ability to reduce its use of fossil fuels.  A decision from this Court that would return the Section 401 regime to the one that existed before the Section 401 Rule at issue in this case, "Clean Water Act Section 401 Certification Rule," 85 Fed. Reg. 42,210 (July 13, 2020) ("2020 Rule"), in some or all respects for an extremely abbreviated time before the new rule, *see* "Clean Water Act Section 401 Water Quality Certification Improvement Rule," 87 Fed. Reg. 35,318 (June 9, 2022) ("Replacement Rule"), which is presently before the Office of Management and Budget, *id.* at 35,374, goes into effect later would subject hydropower to a confusing combination of three different Section 401 regimes within a period of weeks.  Creating this type of chaos is entirely unnecessary, given that hydropower is a clean source of energy, and any environmental concerns produced by this critical resource—such as, for example, issues dealing with fish passage through hydropower dams—are already regulated by federal agencies.

> **A.      Answer To Question Posed In June 21 Order, Dkt. 220: "If the Court were to establish an expedited summary judgment schedule next week, with briefing due in July, a hearing set for early August, and an order to issue shortly thereafter, what is the narrowest issue to be briefed and decided that could avert the harms that plaintiffs allege?"**

As an initial matter, the schedule that this Court suggested is, with all respect, impractical and would deeply prejudice National Hydropower Association's ("NHA") rights.   The Environmental Protection Agency ("EPA") has not yet submitted the complete administrative record related to the 2020 Rule to the Court or parties.  EPA submitted the certified index to the administrative record on October 16, 2020, *see* Dkt. 85-1, and Plaintiffs and EPA filed a joint stipulation setting a schedule for negotiating and collection of the record, *see* Dkts. 115, 116.  Under the agreed-to process, (1) EPA must "complete a search for and add to the administrative record all documents from 22 custodians identified by EPA" discussing the entire 2020 Rule and preceding

actions and President Biden's Executive Order 13,868 by January 28, 2021; (2) EPA must "complete a search for all non-privileged documents directly or indirectly considered by EPA, and produce a categorical privilege log for all documents for which a privilege may be asserted" by February 25, 2021; (3) Plaintiffs were required to "request a privilege log that includes descriptions of the privilege(s) asserted, to include substantiation of deliberate process privilege and/or any other privilege" by March 11, 2021; (4) EPA was required to provide that additional privilege log by April 1, 2021; (5) EPA was required to complete a search of the electronic databases and hard copy documents of nine named current or former EPA officials and "add to the record all non-privileged documents directly or indirectly considered by EPA" by March 11, 2021; (6) the parties were ordered to "meet and confer by April 15, 2021 to determine the need for and scope of any further searches to produce documents to complete the administrative record and the requirement to provide a privilege log"; and (7) the parties needed to file with the Court a joint status report on their administrative-record efforts by April 29, 2021. Dkt. 115 at 2–4. The parties never completed these steps.

Any summary judgment proceedings could not possibly occur until the parties all have the opportunity to review the administrative record submitted by EPA and a full and fair opportunity to litigate fully any attendant issues that might arise. Judicial review of agency action shall occur on "the whole record or those parts of it cited by a party," 5 U.S.C. § 706(2), which includes "all documents and materials that the agency directly or indirectly considered," *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (citation omitted). A party that believes that the agency relied on documents not included in the administrative record can move to supplement the record if they "identify reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the record." *California v. U.S. Dep't of Homeland Sec.*, 612 F. Supp. 3d 875, 884 (N.D. Cal. 2020). Therefore, the expedited summary judgment proceedings contemplated by this Court's recent orders is simply not practical.

Nor are expedited summary judgment proceedings necessary in this case, given Plaintiffs' litigation choices. The Federal Rules of Civil Procedure provide a mechanism to block unlawful

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1  rules while the typical Administrative Procedure Act litigation—including as to the proper record

2  on review—takes place: a plaintiff can move for a preliminary injunction of the rule pending full

3  merits review.  Fed. R. Civ. P. 65(a); *see also* 5 U.S.C. § 705; *California v. Wheeler*, 467 F. Supp.

4  3d 864, 871–72 (N.D. Cal. 2020) (noting the standards for a "traditional injunction" under Rule 65

5  and relief under 5 U.S.C. § 705 are "substantively identical").  To receive preliminary injunctive

6  relief against an agency rule, a plaintiff must "establish that he is likely to succeed on the merits,

7  that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

8  equities tips in his favor, and that an injunction is in the public interest," *Winter v. Nat. Res. Def.*

9  *Counsel, Inc.*, 555 U.S. 7, 21–22 (2008).  But, of course, a party's "long delay before seeking a

10 preliminary injunction implies a lack of urgency and irreparable harm," thus supporting denial of

11 any such request, *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir.

12 1985).  Here, Plaintiffs have never, in the almost three years this case has been pending, sought any

13 preliminary injunction.  So giving Plaintiffs an expedited partial summary judgment would

14 essentially provide them a three-years-too-late preliminary injunction escape hatch.

15 **B.     Answer To Questions Posed In June 22 Order, Dkt. 221**

16 **1.     "[S]pecify the projects of concern (involving both new applications and**

17 **renewal applications) that are likely to be approved between the time a**

18 **ruling could be made on the merits and the time the proposed new rule**

19 **is expected to go into effect."**

20 According to the Federal Energy Regulatory Commission ("FERC"), there are 151 pending

21 licensing, relicensing, and exemption federal hydropower applications as of May 25, 2023, some

22 of which have been pending for more than 20 years, while others have been filed within the last

23 couple of months, FERC, *Pending License, Relicense, and Exemption Applications* (May 25,

24 2023),[1] all of which are in various stages of the Section 401 Rule's certification process.  Discerning

25 how many or which of these pending applications could possibly resolve in the interim period

26 between this Court's resolution of summary judgment briefing—including the additional time to

---

[1] Available at https://ferc.gov/sites/default/files/2023-05/PLRE_5.25.2023.xlsx (all websites last visited June 27, 2023).

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

receive and review the administrative record mentioned above, *supra* Part I.A.—and the date upon which the Replacement Rule takes effect is simply not feasible.  Determining which applications are even close to a determination would require an individual analysis of the FERC docket and corresponding filings to make an individual assessment of the status of each of application, which is simply not feasible in the short time provided for this response.  And any such review and estimate would be purely speculative because while Section 401 imposes a strict, one-year deadline for a State's decision on a certification request, *see* 33 U.S.C. § 1341(a)(1); *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1103–05 (D.C. Cir.2019), some States have found various ways to circumvent that no-more-than-one-year limit, including denying certification requests without prejudice and requesting that the applicant reapply, *see Turlock Irrigation Dist. v. FERC*, 36 F.4th 1179, 1181–84 (D.C. Cir. 2022).  Although NHA believes that such practices are unlawful, their continued usage by some States—with the explicit blessing of both FERC and the D.C. Circuit, *id.*—further renders it impossible to guess when an approval might come.

> **2.**     **"How exactly would a merits ruling make a practical difference in terms of the objecting states' ability to stop the approval of these applications?  How exactly would a merits ruling improve objecting states' chances of stopping the approval of these applications that would not result under the proposed new rule?"**

Consistent with NHA's prior answer, and given the sheer number of pending applications and uncertainty surrounding timelines, any attempt to estimate the "practical difference in terms of the objecting states' ability to stop the approval of these applications," Dkt. 221 at 1, is not feasible.

> **3.**     **"Please list all of the agencies that are responsible for approving these applications."**

The relevant agencies with an interest in any given application for a federal hydropower project will vary based upon the unique underlying facts and circumstances of each application. That said, the following federal agencies generally have a role in the application process: (1) FERC; (2) EPA; (3) the U.S. Army Corps of Engineers; (4) the U.S. Fish & Wildlife Service; (5) the National Oceanic and Atmospheric Administration's National Marine Fisheries Service ("National

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

Marine Fisheries Service"); (6) the U.S. Forest Service; (7) the Bureau of Land Management; (8) and the Bureau of Reclamation.  *See* Congressional Res. Serv., *Hydropower: Federal and Nonfederal Investment* 2, 25 (July 7, 2015);[2] Aaron Levine, et al., *An Examination of the Hydropower Licensing and Federal Authorization Process*, at 14–21, Nat'l Renewable Energy Lab. (Oct. 2021).[3]  Beyond federal agencies, various state agencies, depending upon the location of the hydropower project, can also have approval authority or the ability to impose conditions as part of their Section 401 certification authority and Section 402 of the Clean Water Act ("CWA").  *Id.*

Most notably, FERC has broad authority to review and alleviate every environmental concern that could arise in the licensing and development of a federal hydropower project under the Federal Power Act ("FPA"), without regard to the specific powers of the States under the various interpretations different Administrations have offered of Section 401.  Under that statutory regime, which applies to nearly every hydropower facility in the United States not owned by the federal government, FERC is the primary authority for "issu[ing] licenses . . . for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works . . . along, from, or in any of the streams or other bodies of water." 16 U.S.C. § 797(e).  Regarding fish and wildlife, the FPA requires that all hydropower licenses must "be best adapted . . . for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes referred to in [16 U.S.C. § 797(e)]," while also giving FERC the "authority to require the modification of any project and of the plans and specifications of the project works before approval."  16 U.S.C. § 803(a)(1).  On this point, the FPA provides for "the National Marine Fisheries Service, the United States Fish and Wildlife Service, and State fish and wildlife agencies" to provide recommended conditions to FERC that are intended to "adequately and equitably protect, mitigate damages to, and enhance, fish and wildlife (including related spawning grounds and habitat)" in relation to any dam project," 16 U.S.C. § 803(j)(1).  Moreover, FERC is required to order "the construction,

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

[2] Available at https://crsreports.congress.gov/product/pdf/R/R42579.
[3] Available at https://www.nrel.gov/docs/fy22osti/79242.pdf.

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

maintenance, and operation by a licensee at its own expense of . . . such fishways as may be prescribed by the Secretary of the Interior or the Secretary of Commerce, as appropriate," 16 U.S.C. § 811, to ensure that fish maintain the ability to migrate upstream and downstream of FERC-licensed hydropower dams to facilitate the completion of their lifecycle requirements.

The EPA also has a role in licensing federal hydropower projects under the CWA.  Under Section 402 of the CWA, if a hydropower project involves "the discharge of any pollutant, or combination of pollutants," EPA can condition the issuance of any permit upon a guarantee that the "discharge will meet either (A) all applicable requirements under [the CWA], or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter," explicitly authorizing EPA's Administrator to "prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate." 33 U.S.C. § 1342(a)(1)–(2).  Furthermore, the CWA authorizes the EPA's Administrator "to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site [for fill materials] . . . whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas," 33 U.S.C. § 1344(c), thus authorizing the EPA to scuttle an entire hydropower project under these specifications, if relevant.

The FPA also authorizes the U.S. Army Corps of Engineers to participate in licensing decisions.  Under the FPA, the U.S. Army Corps of Engineers may provide license recommendations to be included as conditions to a FERC license as necessary to ensure that a hydropower project is best adapted to a comprehensive plan for improving or developing a waterway for the use or benefit of interstate or foreign commerce; the use and improvement of hydropower development; and the adequate protection, mitigation, and enhancement of fish and wildlife and for other public uses.  16 U.S.C. § 803(a)(1), (2)(B).

The U.S. Fish & Wildlife Service similarly has authority to consult with and offer

recommendations to FERC on hydropower licensing decisions, under both the FPA and the Endangered Species Act. Just as with the U.S. Army Corps of Engineers, the FPA authorizes the U.S. Fish & Wildlife Service to provide FERC recommendations "for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat)" as part of a comprehensive plan for water quality. 16 U.S.C. § 803(a)(1), (2)(B). The U.S. Fish & Wildlife Service also can provide to FERC license recommendations that ensure a hydropower project will adequately and equitably protect, mitigate damages to, and enhance fish and wildlife (including related spawning grounds and habitat) affected by the development, operation, or management of the project. 16 U.S.C. § 803(j)(1). Also under the FPA, the U.S. Fish & Wildlife Service can prescribe mandatory "fishway" prescriptions in hydropower projects to ensure that fish can travel through the waterways connected to such projects. 16 U.S.C. § 811. Finally, the Endangered Species Act ("ESA") provides that FERC must consult with the U.S. Fish & Wildlife Service to "insure" that any approval of a dam license "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species," further requiring "consultation as appropriate with affected States." 16 U.S.C. § 1536(a)(2).

The National Marine Fisheries Service maintains authority under the FPA to consult with FERC on hydropower licenses. Under 16 U.S.C. § 803(a)(1) and (2)(B), the National Marine Fisheries Service can provide license recommendations to include conditions ensuring that a hydropower project is best adapted to a comprehensive plan for the adequate protection, mitigation, and enhancement of fish and wildlife and for other public uses. Similarly, the National Marine Fisheries Service can include conditions to adequately and equitably protect, mitigate damages to, and enhance fish and wildlife affected by the development, operation, or management of the project, 16 U.S.C. § 803(j)(1), and establish mandatory fishway prescriptions to ensure the safe passage of fish, 16 U.S.C. § 811. Finally, FERC must consult with the National Marine Fisheries Service under the ESA and Magnuson-Stevens Fishery Conservation and Management Act to ensure that any approval of a dam license "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1   habitat of such species," 16 U.S.C. § 1536(a)(2), and to identify and conserve "Essential Fish

2   Habitat" that may be adversely affected by the hydropower project.  16 U.S.C. § 1855(b)(2).

3       Lastly, the U.S. Forest Service, Bureau of Land Management, and Bureau of Reclamation

4   all maintain similar consulting and recommendation authority under the FPA, as described above.

5   In addition, for all of the many hydropower projects that are located on federal "reservations" (e.g.,

6   National Forests), such licenses "shall be subject to and contain such conditions as the Secretary of

7   the department under whose supervision such reservation falls shall deem necessary for the

8   adequate protection and utilization of such reservation."  16 U.S.C. § 797(e).  Depending on the

9   facts and circumstances surrounding each facility, each of these agencies is authorized to prescribe

10  mandatory conditions for a FERC license to ensure the adequate protection and utilization of the

11  federal reservation managed occupied by the project.  And each of these agencies also may provide

12  recommendations to ensure that a hydropower project will be best adapted to a comprehensive plan

13  for improving or developing a waterway for the use or benefit of interstate or foreign commerce;

14  the improvement and use of hydropower development; and the adequate protection, mitigation of

15  damages to, and enhancement of fish and wildlife and for other public uses.  16 U.S.C. § 803(a)(1),

16  (2)(B).

17          **4.      "For each project identified in response to the first question, what**

18                  **exactly are the point sources of pollution and environmental harm?"**

19      As relevant to hydropower projects, dams, including hydropower dams, are generally not

20  considered "point sources" for purposes of Section 402 because any such releases from hydropower

21  dams are not "addition[s]" of pollutants to the water, consistent with the CWA.  *Nat'l Wildlife Fed.*

22  *v. Gorsuch*, 693 F.2d 156, 171 (D.C. Cir. 1982); *see also Nat'l Wildlife Fed. v. Consumers Power*

23  *Co.*, 862 F.2d 580, 583–86 (6th Cir. 1988).  One exception is that the turbines incorporated in a

24  hydropower dam, which spin as flowing or falling water rushes over them, generating clean energy,

25  U.S. Geological Survey, *Hydroelectric Power: How It Works* (June 6, 2018) ("*Hydroelectric*

26  *Power: How It Works*"),[4] can discharge small amounts of cooling water, oil, and grease.  Such

27  _____

28  [4] Available at https://www.usgs.gov/special-topics/water-science-school/science/hydroelectric-power-how-it-works.

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

discharges are regulated under Section 402 of the CWA, not Section 401, *see* 33 U.S.C. § 1342, and so have no bearing on the Section 401 issues before the Court.

> **5.** **"How exactly does damming a river cause environmental harm? Please be specific and cite to peer-reviewed studies based on data from our established dam system in the United States."**

Damming a river can create challenges for migrating fish and other wildlife, but nearly all federal hydropower projects are regulated through an expansive, interlocking regime of federal statutes, so the development and operation of those projects ensures the protection, enhancement, and mitigation of damage to environmental resources. As previously discussed, *supra* Part I.B.3, numerous federal agencies oversee all such licensure applications for compliance with sweeping and comprehensive statutory protections for the environment, wholly beside Section 401 (which remains in effect), mitigating any possibility that a hydropower dam could cause environmental harm to a river, even if these various statutory protections may not be as broad as Plaintiffs and other reviewing States might wish.

> **6.** **"Would more hydropower reduce our dependence on fossil fuels? Could it help in periods of drought?"**

Hydropower is a truly crucial resource, providing clean, renewable energy and flexibility for our Nation's energy grid, and a critical resource for reducing reliance on fossil fuels. These benefits of hydropower not only remain in times of drought, but hydropower dams can also alleviate the harms caused by drought on fish and wildlife resources.

Hydropower is critical to reducing our Nation's reliance on fossil fuels, while offering numerous environmental and public-health benefits. Hydropower is a clean, renewable source of energy, produced domestically. U.S. Dep't of Energy, *Benefits of Hydropower,*[5] so every watt of clean-produced hydropower energy can replace energy derived from other sources, including fossil fuels. And "[h]ydropower is the backbone of low-carbon electricity generation," accounting for "almost half" of such power generation "worldwide today," Int'l Energy Agency, *Hydropower*

---

[5] Available at https://www.energy.gov/eere/water/benefits-hydropower.

*Special Market Report: Analysis and Forecast to 2030*, at 7 (July 2021),[6] which amounts to approximately 101 gigawatts of installed hydropower capacity as of the end of 2015, U.S. Dep't of Energy, *Hydropower Vision: A New Chapter for America's 1st Renewable Electricity Source*, at 2 (July 2016) ("*Hydropower Vision*"),[7] powering approximately 85 million homes annually.

There remains room for additional growth in hydropower, furthering efforts to reduce our Nation's reliance on fossil fuels.  Even without technological advancements, certain estimates provide that American hydropower can produce 13 additional gigawatts of new hydropower generation and 36 gigawatts of new pumped storage capacity, for a total hydropower capacity of 150 gigawatts by 2030.  *Hydropower Vision*, *supra*, at xvii.  This expansion can come from various sources, aside from the building of new dams, such as upgrades and operational adjustments at existing hydropower projects, conversion of existing non-powered dams to hydropower assets through installation of hydropower facilities, and more.  *Id.* at 11, 247–55.  The beneficial results of this growth in hydropower would be legion.  The Department of Energy has estimated that the existing hydropower fleet and certain modeled new deployments of hydropower would provide "$209 billion savings from avoided global damages from [greenhouse gas] emissions; 6,700–16,200 premature deaths avoided with $58 billion savings in avoided mortality, morbidity, and economic damages from cumulative reduction in emissions of [sulfur dioxide, nitrogen oxides, and fine particles]; and 30 trillion gallons of avoided water withdrawals between 2017 and 2050," U.S. Dep't of Energy, *Hydropower Vision: A New Chapter for America's 1st Renewable Electricity Source*, at 23 (July 2016),[8] so additional replacements of fossil fuels with hydropower will only increase these benefits.

Hydropower also serves to reduce fossil-fuel reliance due to its inherent flexibility, thereby fortifying the energy grid and allowing for additional investment in other, more intermittent forms

---

[6] Available at https://iea.blob.core.windows.net/assets/4d2d4365-08c6-4171-9ea2-8549fabd1c8d/HydropowerSpecialMarketReport_corr.pdf.

[7] Available at https://www.energy.gov/sites/default/files/2018/02/f49/Hydropower-Vision-021518.pdf.

[8] Available at https://www.energy.gov/sites/default/files/2018/02/f49/Hydropower-Vision-021518.pdf.

Intervenor Defendants' Response To Court's Questions For Requested Briefing

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1   of clean energy, like wind and solar.  Electricity systems require "rapid and flexible generation

2   sources to meet peak demands, maintain the system voltage levels, and quickly re-establish supply

3   after a blackout."  U.S. Geological Survey, *Hydroelectric Power: Advantages of Production and*

4   *Usage* (June 6, 2018).[9]  Most conventional fossil fuel energy resources, including coal plants,

5   "operate close to their rated power capacities, which leaves little room to provide reactive power."

6   U.S. Dep't of Energy, *Hydropower's Contributions to Grid Resilience*, at viii (Oct. 2021).[10]  Wind

7   and solar power, both of which offer clean, non-fossil-fuel energy, are inherently intermittent

8   "[b]ecause the occurrence and velocity of wind is erratic and sunshine is diurnal and affected by

9   cloud cover."  Jerry L. Holechek, et al., *A Global Assessment: Can Renewable Energy Replace*

10  *Fossil Fuels by 2050?*, at 9, Sustainability (Apr. 16, 2022) ("*A Global Assessment*");[11] *see also* L.

11  Bird, et al., *Integrating Variable Renewable Energy: Challenges and Solutions*, at 1–2, Nat'l

12  Renewable Energy Lab. (Sept. 2013) ("*Integrating Variable Renewable Energy*").[12]  Solar and

13  wind power, therefore, cannot alone replace fossil fuels and reliably service peak energy demands,

14  given their inherent intermittency problems, including because of a current lack of adequate,

15  affordable storage technology, and the "major consequences on electric grids" that can come from

16  disruptions in the availability of power.  *A Global Assessment*, *supra*, at 9.  Hydropower is unique

17  in that it is not only clean and renewable but also extremely flexible and fast starting, with some

18  hydropower facilities able to increase and decrease output as needed by the power grid—to "quickly

19  go from zero power to maximum output" in order to "generate power to the grid immediately,"

20  *Benefits of Hydropower*, *supra*—making "hydropower plants . . . among the most flexible

21  generators" of energy, *Integrating Variable Renewable Energy*, *supra*, at 8.  Hydropower is thus

22  an incredibly important clean energy resource "for providing grid reliability and peak load support

23  and for complementing intermittent resources" like wind and solar power.  Val Stori, *The Role of*

24

---

25  [9] Available at https://www.usgs.gov/special-topics/water-science-school/science/hydroelectric-
26  power-advantages-production-and-usage.
    [10] Available at https://www.pnnl.gov/main/publications/external/technical_reports/PNNL-
27  30554.pdf.
    [11] Available at https://www.mdpi.com/2071-1050/14/8/4792.
28  [12] Available at https://www.nrel.gov/docs/fy13osti/60451.pdf.

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

Intervenor Defendants' Response To Court's Questions For Requested Briefing

*Hydropower in State Clean Energy Policy*, Clean Energy Sates Alliance, at 7 (Aug. 2020).[13] Hydropower is "key to increasing the share of electricity generation from variable renewable energy sources, such as wind and solar," Jennifer Daw, et al., *U.S. Hydropower Workforce: Challenge and Opportunities*, Nat'l Renewable Energy Lab., at 3 (Oct. 26, 2022),[14] by supplementing the grid with its own "more constant and even controllable power," in times when other "renewable sources such as wind or solar power are intermittent due to the diurnal and seasonal behavior of wind and solar radiation," Martin K. Chang, et al., *Buffering Intermittent Renewable Power with Hydroelectric Generation: A Case Study in California*, 112 Applied Energy 1, 1 (2013).[15]

These energy-production benefits of hydropower remain even in times of drought. Although there is a general "misconception that hydroelectric power is an unreliable technology" because increasing climate change conditions will produce more severe droughts, depriving hydropower-producing facilities of the water needed to power their turbines, scientific studies have proven that false. *See* Sean W.D. Turner, et al., *Drought Impacts on Hydroelectric Power Generation in the Western United States*, Pac. Nw. Nat'l Lab., at i (Sept. 2022).[16] "Even during the most severe droughts experienced since the turn of the century, the western hydropower fleet sustained four-fifths or more of its typical annual generation." *Id.*

Hydropower also provides drought benefits, beyond its resiliency as a power source, helping to alleviate various harms caused by droughts on downstream ecosystems. In California, for example, hydropower dams were extremely useful during the 2015 drought in alleviating downstream drought conditions because of innate aspects of their energy-generating process. Hydropower dams operate by releasing flowing or falling water to rush over turbines, generating clean energy as the water forces those turbines to spin. *See Hydroelectric Power: How It Works*, *supra*. Thus, it is necessary to release water from reservoirs to run over the turbines and create the

[13] Available at https://www.cesa.org/wp-content/uploads/Role-of-Hydropower.pdf.
[14] Available at https://www.nrel.gov/docs/fy23osti/83817.pdf.
[15] Available at https://doi.org/10.1016/j.apenergy.2013.04.092.
[16] Available at https://www.pnnl.gov/main/publications/external/technical_reports/PNNL-33212.pdf.

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057

1   resulting power, and that released water travels downstream.  *See* Jay Lund, et al., *Lessons from*

2   *California's 2012-2016 Drought*, 144 J. Water Res. Planning & Mgmt. 0418067-1, at 3 (Oct.

3   2018).[17]  Because demand for energy is typically higher in the summer months, hydropower dams

4   release more water from their reservoirs into downstream waterways to power the turbines in the

5   summer, also supplying influxes of water downstream during these hottest, driest months,

6   providing much needed relief in times of drought.  *Id.*

7               **7.      "Does any state seek to stop any project on any river that flows only**

8                        **through states other than itself?"**

9   NHA is unaware of any instance in which a State has taken an interest in, or attempted to

10  scuttle, a Section 401 Rule-covered project on a river that is wholly outside that State's boundaries,

11  nor does NHA believe that is likely to occur.

12  **II.      Intervenor States', API's, And INGAA's Additional Answers**

13  INGAA, API, and Intervenor States cannot speculate as to what issues Plaintiffs might

14  present in a summary judgment motion or whether any would be amenable to full adjudication on

15  the truncated timeline the Court seems to envision.  We note that merits briefing on challenges to

16  federal agency action typically takes place over the span of several months after a complete record

17  has been certified.  Accelerating that process to evaluate a rule that will be replaced in a few months

18  is a monumental waste of judicial and party resources, and may not be possible for the reasons cited

19  by NHA.

20  INGAA and API have polled members, who have identified scores of projects that are

21  currently awaiting State water-quality certifications.  Given the short deadline imposed by the

22  Court, INGAA and API have been unable to ascertain whether any of these certifications are likely

23  to be issued between August 15 and November 15 or whether any pending certification requests

24  would be affected by an order vacating the 2020 Rule.  INGAA and API cannot exhaustively list

25  all agencies involved, but can state that federal licensing authorities for these projects typically

26  include the FERC, the Corps, and EPA, as well as at least one State agency.  In general, the

27

28  _____

[17] Available at https://ascelibrary.org/doi/pdf/10.1061/(ASCE)WR.1943-5452.0000984.

-14-                          Case No. 3:20-CV-04636-WHA

discharges that trigger the need for water quality certifications for these projects are temporary construction-related discharges, such as temporary effects on streams and wetlands associated with constructing linear infrastructure projects.  In all cases, no discharges are authorized by any agency unless that agency concludes that the activity in question satisfies the agency's own environmental regulations.  And Corps and EPA regulations, in particular, overlap substantially with reviews States conduct under section 401.  *See, e.g.*, 40 C.F.R. § 230.11(b)(1).

Intervenor States note that the Court appears to be attempting to balance environmental harms.  In various forms, dams provide a safe supply of drinking water, provide reliable and cheap base-load electricity without air pollution, and serve to control flooding.  Other projects affected by CWA 401 certification also provide environmental benefits: transportation of hydrocarbons by pipeline, for example, is safer and less carbon-intensive that rail or truck transport of those hydrocarbons.  Balancing those harms is not possible in a 15-page brief prepared on a few days' //

Respectfully submitted,

Dated: June 27, 2023                TROUTMAN PEPPER HAMILTON SANDERS LLP

By:  */s/ Elizabeth Holt Andrews*
Elizabeth Holt Andrews*
Misha Tseytlin (admitted *pro hac vice*)
Charles Sensiba (admitted *pro hac vice*)
Andrea W. Wortzel (admitted *pro hac vice*)
Sean T.H. Dutton (admitted *pro hac vice*)

*Attorneys for Intervenor Defendant*
National Hydropower Association

* Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of the document has been obtained from each of the other Signatories.  */s/ Elizabeth Holt Andrews*

Intervenor Defendants' Response To Court's Questions For Requested Briefing

JEFF LANDRY
ATTORNEY GENERAL OF LOUISIANA

By:  */s/ Joseph S. St. John*
     Elizabeth B. Murrill, Solicitor General
     (admitted *pro hac vice*)
     Joseph S. St. John, Deputy Solicitor
     General (admitted *pro hac vice*)
     Ryan M. Seidemann, Assistant Attorney
     General (admitted *pro hac vice*)

     *Attorneys for State Intervenor Defendants*
     States of Arkansas, Louisiana, Mississippi,
     Missouri, Montana, Texas, West Virginia,
     and Wyoming


HUNTON ANDREWS KURTH LLP

By:  */s/ George P. Sibley, III*
     Clare Ellis
     George P. Sibley, III
     (admitted *pro hac vice*)
     Deidre G. Duncan (admitted *pro hac vice*)

     *Attorneys for Intervenor Defendants*
     American Petroleum Institute and
     Interstate Natural Gas Association of
     America

TROUTMAN PEPPER HAMILTON SANDERS LLP
THREE EMBARCADERO CENTER, SUITE 800
SAN FRANCISCO, CALIFORNIA 94111-4057